IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

―――――――――――――――――――――――x

CARL SHUPE and MATTHEW PEARLMAN,
Individually and on Behalf of All Others
Similarly Situated,

      Plaintiffs,

v.

ROCKET COMPANIES, INC., JAY D.
FARNER, DANIEL GILBERT and ROCK
HOLDINGS INC.,

      Defendants.

―――――――――――――――――――――――x

No. 21-cv-11528

Honorable Thomas L. Ludington
District Judge

Honorable Anthony P. Patti
Magistrate Judge

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Nick Gorga (P72297)
Jeremy D. Lockhart (P76500)
Carsten Parmenter (P86425)
HONIGMAN LLP
660 Woodward Ave.
2290 First National Building
Detroit, Michigan 48226
Tel: (313) 465-7000
ngorga@honigman.com
jlockhart@honigman.com
cparmenter@honigman.com

Deborah S. Birnbach
Adam Slutsky
Kate MacLeman
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, Massachusetts 02210
Tel: (617) 570-1000
dbirnbach@goodwinlaw.com
aslutsky@goodwinlaw.com
kmacleman@goodwinlaw.com

*Counsel for Defendant Rocket Companies, Inc.*

December 8, 2023

Jeffrey B. Morganroth (P41670)
MORGANROTH & MORGANROTH, PLLC
344 North Old Woodward Ave., Suite 200
Birmingham, Michigan 48009
Tel: (248) 864-4000
jmorganroth@morganrothlaw.com

Sharon L. Nelles (N.Y. 2613073)
Jeffrey T. Scott (N.Y. 2890374)
Julia A. Malkina (N.Y. 5054572)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel: (212) 558-4000
nelless@sullcrom.com
scottj@sullcrom.com
malkinaj@sullcrom.com

*Counsel for Defendants Jay D. Farner, Daniel Gilbert, and Rock Holdings Inc.*

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ............................................................. 1

**BACKGROUND** ............................................................................. 7

**ARGUMENT** ................................................................................ 12

**I.    The Court Should Deny Certification of the Misstatement Class
        Because Plaintiffs Fail To Prove That Common Issues Will
        Predominate Over Individual Issues** ...................................... 12

    A.    The *Basic* Presumption of Reliance Is Unavailable Because
              Plaintiffs Fail To Prove that Rocket's Securities Traded in an
              Efficient Market ........................................................ 12

        1.    Plaintiffs cannot prove market efficiency because
                    Rocket's stock experienced a meme-stock trading frenzy
                    during the short two-month Class Period .............. 14

        2.    Coffman's event study (*Cammer* 5) is fundamentally
                    flawed and does not answer the question of whether the
                    market was efficient during the Class Period ........ 17

        3.    Other *Cammer/Krogman* factors are inconsistent with
                    market efficiency .................................................. 22

    B.    Even if Plaintiffs Could Invoke the *Basic* Presumption (They
              Cannot), that Presumption Is Rebutted Because the Challenged
              Statements Had No Price Impact ................................... 23

        1.    Farner's February 25, 2021 comments had no price
                    impact ................................................................ 25

        2.    Farner's March 3, 2021 comments had no price impact ........ 31

        3.    Farner's March 11, 2021 comments had no price impact ...... 33

        4.    The March 17, 2021 tweet had no price impact .................... 34

      C.     The *Affiliated Ute* Presumption of Reliance Does Not Apply as
              a Matter of Law Because this Case Primarily Involves Alleged
              Affirmative Misstatements .................................................................. 36

**II.**    **The Court Should Deny Certification of the Misstatement Class
Because Plaintiffs Have Not Proffered the Required Methodology
For Measuring Classwide Damages** .......................................................... 38

**III.**   **The Court Should Deny Certification of the Insider Trading
Class** .................................................................................................................... 40

      A.     Plaintiff Pearlman Lacks Article III Standing To Assert an
              Insider Trading Claim ....................................................................... 40

      B.     The Proposed Class Definition Lacks Objective Criteria To
              Determine Membership ...................................................................... 44

**CONCLUSION** ................................................................................................................... 45

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abell* v. *Potomac Ins. Co.*,
    858 F.2d 1104 (5th Cir. 1988) ........................................................................ 37

*Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023) ..................................................................... *passim*

*Asher* v. *Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) ........................................................................ 27

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988) .............................................................................. *passim*

*Bricklayers* v. *Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014) ........................................................................... 39

*Brokop* v. *Farmland Partners Inc.*,
    2021 WL 4913970 (D. Colo. Sept. 30, 2021) .................................................. 21

*Brophy* v. *Cities Serv. Co.*,
    31 Del. Ch. 241 (1949) .................................................................................. 42

*Buban* v. *O'Brien*,
    1994 WL 324093 (N.D. Cal. June 22, 1994) .................................................. 43

*Burges* v. *Bancorpsouth, Inc.*,
    2017 WL 2772122 (M.D. Tenn. June 26, 2017) ............................................. 37

*Byrd* v. *ViSalus, Inc.*,
    2018 WL 1637948 (E.D. Mich. Apr. 5, 2018) ................................................ 36

*Cammer* v. *Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ............................................................. *passim*

*Carroll* v. *Hill*,
    37 F.4th 1119 (6th Cir. 2022) ........................................................................ 44

*Cavalier Carpets, Inc.* v. *Caylor*,
    746 F.2d 749 (11th Cir. 1984) ....................................................................... 37

*Comcast Corp.* v. *Behrend*,
 569 U.S. 27 (2013) ..................................................................... *passim*

*Davis* v. *Cintas Corp.*,
 717 F.3d 476 (6th Cir. 2013) .......................................................... 12

*Dirks* v. *SEC*,
 463 U.S. 646 (1983) ........................................................................ 42

*Dougherty* v. *Esperion Therapeutics, Inc.*,
 2020 WL 3481322 (E.D. Mich. June 19, 2020) ............................... 18

*Dougherty* v. *Esperion Therapeutics, Inc.*,
 2020 WL 6793326 (E.D. Mich. Nov. 19, 2020) ............................... 39

*Fort Worth Emp's Ret. Fund* v. *J.P. Morgan Chase & Co.*,
 301 F.R.D. 116 (S.D.N.Y. 2014) .................................................... 39

*Fox* v. *Saginaw Cnty.*,
 67 F.4th 284 (6th Cir. 2023) ........................................................... 41

*Frank* v. *Gaos*,
 139 S. Ct. 1041 (2019) .................................................................... 40

*Fridrich* v. *Bradford*,
 542 F.2d 307 (6th Cir. 1976) ........................................... 41, 43, 45

*Gen. Elec. Co.* v. *Joiner*,
 522 U.S. 136 (1997) ........................................................................ 23

*Gjinaj* v. *Ashcroft*,
 119 F. App'x 764 (6th Cir. 2005) ..................................................... 4

*Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*,
 141 S. Ct. 1951 (2021) ............................................................ *passim*

*Grae* v. *Corr. Corp. of Am.*,
 57 F.4th 567 (6th Cir. 2023) ........................................................... 42

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014) ................................................................. *passim*

-iv-

*In re Fed. Home Loan Mortg. Corp.*,
  281 F.R.D. 174 (S.D.N.Y. 2012) ..................................................................... 18

*In re Fed. Nat'l Mortg. Ass'n*,
  503 F. Supp. 2d 25 (D.D.C. 2007) .................................................................. 45

*In re FirstEnergy Corp.*,
  No. 23-0303, Order (6th Cir. Nov. 16, 2023) ............................................ 37, 39

*In re Ford Motor Co.*,
  381 F.3d 563 (6th Cir. 2004) .......................................................................... 25

*In re Home Point Cap. Inc. Sec. Litig.*,
  2022 WL 18932069 (E.D. Mich. Oct. 5, 2022) .......................................... 27, 34

*In re Interbank Funding Corp.*,
  629 F.3d 213 (D.C. Cir. 2010) ....................................................................... 37

*In re Jan. 2021 Short Squeeze Trading Litig.*,
  No. 21-md-2989, slip op. 51 (S.D. Fla. Nov. 13, 2023) .................................. 16

*In re Lipitor*,
  892 F.3d 624 (4th Cir. 2018) .......................................................................... 20

*In re Qualcomm*,
  2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ........................................... 25, 28

*In re Volkswagen "Clean Diesel" Litig.*,
  2 F.4th 1199 (9th Cir. 2021) ................................................................. 6, 36, 37

*IBEW* v. *Deutsche Bank AG*,
  2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ........................................ 13, 15, 17

*J & R Mktg.* v. *Gen. Motors Corp.*,
  549 F.3d 384 (6th Cir. 2008) .......................................................................... 26

*Johnston* v. *HBO Film Mgmt.*,
  265 F.3d 178 (3d Cir. 2001) ........................................................................... 37

*Joseph* v. *Wiles*,
  223 F.3d 1155 (10th Cir. 2000) ...................................................................... 37

*Krogman* v. *Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ............................................................... *passim*

*Macomb Cnty.* v. *Align Tech., Inc.*,
   39 F.4th 1092 (9th Cir. 2022) ............................................................ 26

*Mandala* v. *NTT Data, Inc.*,
   975 F.3d 202 (2d Cir. 2020) ........................................................ 19, 21

*Monroe Cnty.* v. *S. Co.*,
   332 F.R.D. 370 (N.D. Ga. 2019) ...................................................... 24

*Nilavar* v. *Mercy Health Sys.*,
   2005 WL 8162667 (S.D. Ohio June 2, 2005) ...................................... 20

*O'Neil* v. *Appel*,
   165 F.R.D. 479 (W.D. Mich. 1996) .................................................. 23

*Ockerman* v. *May Zima & Co.*,
   27 F.3d 1151 (6th Cir. 1994) ........................................................... 27

*OPERS* v. *Fed. Home Loan Mortg. Corp.*,
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) .......................................... 18, 39

*Oron 2015 LLC* v. *City of Southfield*,
   2019 WL 2502739 (E.D. Mich. June 17, 2019) .............................................. 41

*Ramirez* v. *Exxon Mobil Corp.*,
   2023 WL 5415315 (N.D. Tex. Aug. 21, 2023) .................................... 25, 33, 36

*Shapiro* v. *Merrill Lynch*,
   495 F.2d 228 (2d Cir. 1974) ............................................................. 44

*Shupe* v. *Rocket Cos.*,
   2023 WL 2411002 (E.D. Mich. Mar. 8, 2023) ........................................ *passim*

*Soehnlen* v. *Fleet Owners Ins. Fund*,
   844 F.3d 576 (6th Cir. 2016) ............................................................ 40

*Stromfeld* v. *Great Atl. & Pac. Tea Co.*,
   496 F. Supp. 1084 (S.D.N.Y. 1980) ............................................... 44

*TransUnion LLC* v. *Ramirez*,
  141 S. Ct. 2190 (2021) .............................................................. *passim*

*Treviso* v. *NFL*,
  2020 WL 7021357 (N.D. Ohio Nov. 30, 2020) ................................ 40

*United States* v. *O'Hagan*,
  521 U.S. 642 (1997) ...................................................................... 42

*Vanleeuwen* v. *Keyuan Petrochemicals, Inc.*,
  2013 WL 2247394 (C.D. Cal. May 9, 2013) ................................... 40

*Vervaecke* v. *Chiles, Heider & Co.*,
  578 F.2d 713 (8th Cir. 1978) ......................................................... 37

*Waggoner* v. *Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ................................................. 18, 36, 37

*Ward* v. *Apple Inc.*,
  784 F. App'x 539 (9th Cir. 2019) .................................................. 38

*Young* v. *Nationwide Mut. Ins. Co.*,
  693 F.3d 532 (6th Cir. 2012) ......................................................... 44

**Statutes and Rules**

15 U.S.C. § 78u-4(a)(3) .......................................................................... 40

Fed. R. Civ. P. 23 ......................................................................... *passim*

**Other Authorities**

Dan B. Dobbs, Law of Remedies § 10.5(2) ......................................... 43

Henry G. Manne, *Insider Trading*, 31 J. Corp. L. 167 (2005) .............. 43

John P. Anderson, *Greed, Envy, and the Criminalization of Insider Trading*,
  2014 Utah L. Rev. 1 (2014) ........................................................... 43

Stephen M. Bainbridge, *Incorporating State Law Fiduciary Duties into the
  Federal Insider Trading Prohibition*, 52 Wash. & Lee L. Rev. 1189
  (1995) ........................................................................................... 42

## STATEMENT OF ISSUES PRESENTED

1.      Without a presumption of investor reliance, individualized issues of each class member's reliance on the alleged misstatements would prevent common issues from predominating over individual issues, precluding class certification. Should the Court deny certification of a class for Plaintiffs' misstatement claim because Plaintiffs failed to prove by a preponderance of the evidence that Rocket Companies, Inc.'s ("Rocket") stock traded in an efficient market during the 48-day Class Period[1] as required to invoke the fraud-on-the-market presumption of reliance recognized in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988)?

2.      Should the Court deny certification of a misstatement class because even if Plaintiffs met their evidentiary burden for invoking the fraud-on-the-market presumption of reliance (they have not), Defendants have rebutted the presumption by showing by a preponderance of the evidence that the alleged misstatements did not impact the price of Rocket's stock?

3.      Should the Court deny certification of a misstatement class because Plaintiffs do not "primarily allege omissions," as required to invoke the narrow presumption for reliance on pure omissions recognized in *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972)?

---

[1] The "Class Period" is February 25, 2021 through May 5, 2021, and consists of 48 trading days.

4.      Should the Court deny certification of a misstatement class because Plaintiffs failed to adduce any evidence that damages can be determined on a class-wide basis as required by *Comcast Corp.* v. *Behrend*, 569 U.S. 27 (2013)?

5.      Should the Court deny certification of a class for Plaintiff's insider trading claim because the named Plaintiff (Matthew Pearlman) incurred no concrete injury and therefore lacks Article III standing, and, in any event, Plaintiff fails to define the class in a way that class members are readily ascertainable?

## STATEMENT OF CONTROLLING OR
## MOST APPROPRIATE AUTHORITIES

The controlling or most appropriate authorities for the relief that Defendants seek include:

1.   Fed. R. Civ. P. 23(b)

**Plaintiffs fail to prove that Rocket's securities traded in an efficient market, as required to invoke the *Basic* presumption of reliance:**

2.   *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988)

3.   *O'Neil* v. *Appel*, 165 F.R.D. 479 (W.D. Mich. 1996)

4.   *OPERS* v. *Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)

**Even if Plaintiffs could invoke the *Basic* presumption of reliance, that presumption is rebutted because the challenged statements had no price impact:**

5.   *Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023)

6.   *Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951 (2021)

7.   *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258 (2014)

**The *Affiliated Ute* presumption of reliance does not apply:**

8.   *In re Volkswagen "Clean Diesel" Litig.*, 2 F.4th 1199 (9th Cir. 2021)

9.   *Waggoner* v. *Barclays PLC*, 875 F.3d 79 (2d Cir. 2017)

**Plaintiffs have not proffered a methodology for measuring classwide damages:**

10.   *Comcast Corp.* v. *Behrend*, 569 U.S. 27 (2013)

11.   *OPERS* v. *Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)

**Plaintiff Pearlman lacks Article III standing to assert an insider trading claim and his proposed definition of the insider trading class lacks objective criteria to determine membership:**

12.     *In re Fed. Nat'l Mortg. Ass'n*, 503 F. Supp. 2d 25 (D.D.C. 2007)

13.     *Fridrich* v. *Bradford*, 542 F.2d 307 (6th Cir. 1976)

14.     *Grae* v. *Corr. Corp. of Am.*, 57 F.4th 567 (6th Cir. 2023)

15.     *TransUnion LLC* v. *Ramirez*, 141 S. Ct. 2190 (2021)

## PRELIMINARY STATEMENT

Plaintiffs hope this Court rubber-stamps their proposed classes of purchasers of Rocket stock by overlooking their burden to "*prove*—not simply plead—that their [two] proposed class[es] satisfy each requirement of Rule 23." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*").[2]  Plaintiffs brought this action asserting claims on behalf investors in Rocket common stock between February 25, 2021 and May 5, 2021.  Following prior rulings of this Court that narrowed Plaintiffs' theories by dismissing two of the alleged misstatements, this action is now limited to allegations concerning (i) four supposed misstatements; and (ii) purported insider trading in connection with a March 29, 2021 stock sale by Rock Holdings Inc. ("RHI") and Daniel Gilbert.  Plaintiffs fail to meet their burden of demonstrating through rigorous analysis and evidence that they have satisfied the requirements for certifying their two proposed classes for their surviving misstatement and insider trading claims.

**_The misstatement claim._**   The requirement to prove individual investor reliance "ordinarily would defeat predominance and preclude certification of a securities-fraud class action." *Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1959 (2021).  To show that common issues predominate for their misstatement class as required by Rule 23(b)(3), Plaintiffs must submit reliable

---

[2] All internal citations and quotation marks are omitted, unless otherwise specified.

evidence to invoke the rebuttable "fraud-on-the-market" presumption of class-wide reliance, established in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988).  The *Basic* presumption rests on the theory that "the price of stock traded in an efficient market reflects all public, material information—including material misstatements." *Halliburton II*, 573 U.S. at 263.  Thus, investors who buy "stock at the market price may be considered to have relied on those misstatements." *Id.*  But "defendants may rebut the *Basic* presumption at class certification by showing that an alleged misrepresentation did not actually affect the market price of the stock." *Goldman*, 141 S. Ct. at 1959.  "If a misrepresentation had no price impact, then *Basic*'s fundamental premise completely collapses, rendering class certification inappropriate." *Id.*  Plaintiffs' misstatement claim cannot be certified because Plaintiffs fail to show that common questions of fact and law predominate under Rule 23(b)(3) for at least four reasons.

*First*, Plaintiffs cannot invoke the *Basic* presumption because they have not met their burden to prove by a preponderance of reliable evidence that Rocket's stock traded in an efficient market throughout the Class Period.  The class Plaintiffs seek to certify is not your run-of-the-mill securities class where proving market efficiency faces limited hurdles.  This is not a case with a long class period, a stock with years of established public trading history on a major stock exchange, or a company with a large volume of publicly traded shares.  Instead, the Class Period is

a mere two-months (48 trading days); the Class Period begins just six months after Rocket became a public company; only 7% of Rocket's stock is publicly held, with nearly all of the remaining 93% held directly or indirectly by Rocket's founder and Chairman Daniel Gilbert; and, perhaps most significantly, during the short two-month Class Period Rocket's stock was targeted on the Reddit forum as a so-called "meme stock," resulting in an irrational trading frenzy by non-professional retail investors that is highly indicative of an inefficient market.  Tellingly, Plaintiffs do not cite a single case that certified a class on facts remotely analogous to those here.

Yet Plaintiffs and their expert, Chad Coffman (who has no expertise in financial economics beyond being a professional plaintiff-side expert), follow the same cookie-cutter playbook they use in other cases (including Coffman admitting that he copied sections of his report here from reports submitted in other cases) by mechanically and incorrectly ticking through the so-called *Cammer* and *Krugman* factors that courts sometimes apply to aid the holistic assessment of market efficiency.  As shown by Dr. René Stulz, a world-renowned economist, and as discussed further in the accompanying motion to exclude, Coffman's methodology does not comport with industry standards for financial economists, and he ignores significant evidence of market inefficiency unique to this case.  Coffman relies heavily on the *Cammer/Krugman* factors, but he has admitted that only a properly conducted event study is sufficient to show efficiency from a financial economics

view—indeed, the *Cammer*/*Krugman* factors are at best indicators that a market *may* be efficient, not that it *is* efficient.  In any event, several of those factors are not present here, which is a red flag that Rocket's stock was not efficient during the Class Period.  Despite knowing that he cannot show market efficiency during the very short two-month Class Period, Coffman improperly skews his results by (i) removing from his study the days where Rocket experienced meme stock trading frenzies (as if they never happened), and (ii) analyzing efficiency over an inexplicably long 2.5-year period, which all but ensured that his model would produce the result Plaintiffs' counsel wanted.  Coffman's results-oriented approach contravenes economic standards and cannot support a finding of market efficiency.

*Second*, even if Plaintiffs met their evidentiary burden for invoking the *Basic* presumption (they have not), Defendants have rebutted the presumption by showing that it is "more likely than not that the alleged misrepresentations had [no] price impact." *Goldman*, 141 S. Ct. at 1963.  The Supreme Court's *Goldman* decision effected a sea change in the law regarding price impact:  it recalibrated the scales after virtually no court had found that a defendant proved lack of price impact in the seven years after the Supreme Court recognized the price impact defense in *Halliburton II*.  The Supreme Court clarified that a defendant's rebuttal burden is a mere "preponderance of the evidence," *id.*—meaning Defendants need only "make the scales tip slightly in [their] favor," *Gjinaj* v. *Ashcroft*, 119 F. App'x 764, 773

(6th Cir. 2005).  The Supreme Court also rejected the notion that plaintiffs can neuter a defendant's price impact evidence simply by pointing to a stock price decline at the end of the class period, which occurs in every case, and then alleging that the "price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Goldman*, 141 S. Ct. at 1961.  Instead, there must be a "[]match between the contents of the misrepresentation and the corrective disclosure." *Id.*

Here, Rocket's stock price did not increase as a result of the challenged statements.  In addition, there is a glaring "mismatch between the contents of the misrepresentation[s] and the corrective disclosure," thereby "break[ing] down" any speculative inference that the generic statements "maintained" inflation in the stock price.  *Id.*  Indeed, the Second Circuit decertified a class in the first and only appellate decision applying the Supreme Court's new guidance in *Goldman* for reasons that apply equally here:  "none" of "the analysts" covering Rocket "reference[d] the [challenged] disclosure[s]" either when those statements were made or after the alleged corrective disclosure.  *Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74, 104 (2d Cir. 2023) ("*GS III*").  That evidence "demonstrate[s], by a preponderance of the evidence, that the misrepresentations did not impact [Rocket's] stock price." *Id.* at 105.

*Third*, the narrow *Affiliated Ute* presumption for reliance on pure omissions does not apply here because the Complaint does not "primarily allege omissions."

*In re Volkswagen "Clean Diesel" Litig.*, 2 F.4th 1199, 1205 (9th Cir. 2021).  Even if the *Affiliated Ute* presumption could apply to the one statement Plaintiffs characterize as an omission, all eight courts of appeals that have addressed this issue have rejected Plaintiffs' argument that an allegedly false statement transforms into an omission subject to the *Affiliate Ute* presumption merely because defendant "fail[ed] to disclose which facts in the representation are not true."  *Id.* at 1208-09.

*Fourth*, under the Supreme Court's decision in *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33-35 (2013), before the Court certifies a class, it "must conduct a rigorous analysis to determine" whether Plaintiffs have established, through "evidentiary proof," that their "damages are capable of measurement on a classwide basis" using a methodology "consistent with [their] liability case."  Plaintiffs and their expert make no effort to do so.  Instead of presenting a damages methodology specific to Plaintiffs' theory of liability in this case, Coffman merely speculates that he can figure out how to do the work later.  Although Coffman admits that he took this approach at the direction of Plaintiffs' counsel, his counsel-directed approach is not remotely enough to satisfy the Supreme Court's mandate in *Comcast*.

**The insider trading claim.**  No insider trading class can be certified because Plaintiff Matthew Pearlman (the only class representative for the insider trading claim), incurred no "concrete harm," and therefore lacks "Article III standing." *TransUnion LLC* v. *Ramirez*, 141 S. Ct. 2190, 2200 (2021).  Because RHI and

Gilbert sold their stock in a privately negotiated block trade with Morgan Stanley, Pearlman was not harmed by that sale in any way. Pearlman has offered no evidence, as he is required to do, that he suffered either an informational or monetary injury. Thus, Pearlman has no standing to represent the putative insider trading class. And even if Pearlman had standing (which he does not), Plaintiff's class definition of anyone who traded "contemporaneously" with RHI and Gilbert is too vague to determine who is in and who is out of the class.

## BACKGROUND

Rocket became a public company in August 2020 during the midst of the COVID-19 pandemic. Rocket offered only a small percentage of its stock to the public. After the IPO, RHI and Gilbert continued to own directly or indirectly the majority of Rocket's stock. (*See* Ex. 1 ¶ 107.)

At the time of Rocket's IPO, interest rates were at an all-time low, and Rocket's "closed loan volume" (the number of loans originated) and "gain-on-sale margin" (a measure of the profitability of each loan) reached historic highs. But Rocket warned investors in its IPO prospectus that its "favorable margins" were the "result[]" of "interest rates [being at] historic lows" during the then-ongoing COVID-19 pandemic, and warned that the inevitable rise in interest rates would "significantly impact[]" Rocket's business. (Ex. 6 at 14, 45-46.) On September 2, 2020, Rocket's CFO reiterated to investors that "we'll probably see those margins

come back to more normalized levels."  (Ex. 7 at 8.)

Unlike most other cases, which involve public companies with established public trading histories, Rocket stock had only been trading publicly for six months when the alleged misstatements were made.  Plaintiffs offer no evidence that any investor cared about those statements or that they had price impact.

**February 25, 2021 earnings call (Statement 1).**  On February 25, 2021, Rocket reported its results for Q4 2020, disclosing that 2020 was a "record" year for Rocket and that its closed loan volume was the highest in Rocket's history.  (Ex. 8 at 1-3.)  Rocket also issued closed loan guidance for Q1 2021, projecting that closed loan volume would decline in Q1 2021 from where it had been in Q4 2020—yet still be one of the strongest quarters in Rocket's history.  (*Id.*)  During the earnings call that day, Julie Booth (Rocket's CFO) and Jay Farner (Rocket's CEO) made their now-dismissed statements about "strong" demand, which this Court held were true because "consumer demand was the strongest that it had been in the last decade and that Rocket grew volume twice as fast as the industry in 2020."  *Shupe* v. *Rocket Cos.*, 2023 WL 2411002, *12 (E.D. Mich. Mar. 8, 2023).  Based on the news of this strong performance, Rocket's stock price increased.

Plaintiffs misconstrue another statement Farner made during the February 25 earnings call (Statement 1).  In particular, Farner expressed confidence that Rocket would weather market declines and rising interest rates better than its competitors,

-8-

because when interest rates "tick up a bit," Farner predicted that "others tend to step away or back away" from the market, and if that happens, "we're going to see [that] is an opportunity for us to lean in to spend more," resulting in Rocket "grab[bing] market share" from competitors and positioning itself favorably as "we get to the other side" of the up-and-down interest rate cycle.   (Ex. 5.)[3]   Based on that prediction, Farner opined "[we] don't see interest rates going up or down, really having an impact on our business one way or the other," which is the snippet Plaintiffs strain to construe as a misstatement.   Although Farner's remarks were about Rocket's comparative performance to its competitors across the entire span of the up-and-down cycle, Plaintiffs characterize that snippet as promising that "rising interest rates would not have any effect on [Rocket's] mortgage business" in the near term despite Rocket's contrary warning.  (Mot. 3, ECF 74, PageID.2449.)  Plaintiffs offer no evidence that the market construed the statement in this unnatural way.

**March 3, 2021 Morgan Stanley conference (Statement 2).**  At a March 3, 2021 Morgan Stanley conference, Farner was asked a multi-part question about the "overall volume and business today" of Rocket's various channels, and "what you think that looks like in the very long run."  (Ex. 5.)  After a long discussion of Rocket's various channels, Farner concluded by stating the following:

> [W]e don't break down the percentages, and I'm probably not

---

[3] The full text of the challenged statements is set forth in Exhibit 5.

going to go any further than what we've already laid out in our earnings call,[4] but as you can probably sense from my passion, *they're all growing*.  And with – what about, less than 10% market share wherever we are, it's hard to say today if you think about all those different channels that can grow and give us reach, that's why we get excited about what this company looks like in the years to come.

(*Id.*)  Plaintiffs allege that they construe the three italicized words as a representation that "closed loan volume was currently 'growing'" even though Rocket expressly disclosed the opposite six days earlier.  (Mot. 3 ECF 74, PageID.2449.)  Plaintiffs offer no evidence that the market construed the statement that way, and Coffman disavowed any "suggesti[on] there was company-relevant news that explains th[e] spike in demand on th[at] day"—a spike that resulted from the meme stock trading frenzy that Coffman ignores.  (Ex. 4 at 293:7-10.)

**March 11, 2021 Fox Business Interview (Statement 3).**  During a March 11, 2021 interview on Fox Business, Farner reiterated his prior statements about Rocket's ability to weather market declines, stating that "we're going to see interest rates tick up a little bit here, we're all aware of that, but over the 35 years that we've been in business we take that as an opportunity to grow" because "as other people pull back and capacity shrinks in the mortgage industry, it gives us a great

---

[4] The earnings call refers to Rocket's guidance for Q1 2021 that it had provided to the market six days earlier on February 25, 2021, where Rocket disclosed that it projected that its closed loan volume *would decline* in Q1 2021, falling 4% to 9% from $107.2 billion in Q4 2020.  (Ex. 8 at 2, 4.)

-10-

opportunity to grow market share," especially in products less sensitive to interest rates, such as "title, real estate, auto, [and] personal loans." (Ex. 5.) Farner expanded on why Rocket's historical ability to grow market share in a declining market meant that "interest rates moving around are a great benefit to us," which are the 10 words Plaintiffs allege were false while ignoring Farner's explanation:  "when [interest rates] drop back down, we've got a 90% retention rate on our servicing book; we'll help those clients refinance their mortgage and save money.  So, you know, cycles are good, at least for our business in the mortgage industry, and I think that's what we're going to see here this year."  (*Id.*)  Plaintiffs contend that they construed Farner's statement as a representation that "rising interest rates would not have any effect on [Rocket's] mortgage business" without any evidence that the market construed the statement that way.  (Mot. 3, ECF 74, PageID.2449.)

**March 17, 2021 Twitter post (Statement 4).**  On March 17, 2021, Farner tweeted (and Gilbert re-tweeted) about Rocket's market share following a March 4, 2021 announcement by Rocket's competitor United Wholesale Mortgage ("UWM") that it would not do business with mortgage brokers who work with Rocket.  (Ex. 5.)

**May 5, 2021 Alleged Corrective Disclosure.**  On May 5, 2021, Rocket disclosed for the first time its guidance for Q2 2021, projecting that the decline in gain-on-sale margin that it previously disclosed to the market would continue in Q2 2021, but at a faster rate because the "primary secondary spread," a publicly

available metric, began to "compress[]" faster than Rocket and the market had expected at the time Rocket made the alleged misstatements.  (AC ¶¶ 284-86, ECF 42, PageID.1152-53.)  Plaintiffs offer no evidence that Rocket's stock price declined because the market learned that Rocket's prior statements were untrue, as opposed to learning that macroeconomic conditions were worsening faster than anticipated, which only became apparent after the alleged misstatements were made.

## ARGUMENT

"[P]laintiffs wishing to proceed through a class action must actually *prove*— not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton II*, 573 U.S. at 275.  "The district court must conduct a rigorous analysis" of each Rule 23 requirement, notwithstanding any "overlap with the merits."  *Davis* v. *Cintas Corp.*, 717 F.3d 476, 484 (6th Cir. 2013).  Despite Plaintiffs' effort to portray certification of securities actions as routine (Mot. 6, ECF 74, PageID.2452), the Supreme Court has made clear that certification "is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of [Rule 23]" are met. *Comcast*, 569 U.S. at 33.

**I.     The Court Should Deny Certification of the Misstatement Class Because Plaintiffs Fail To Prove That Common Issues Will Predominate Over Individual Issues.**

**A.     The *Basic* Presumption of Reliance Is Unavailable Because Plaintiffs Fail To Prove that Rocket's Securities Traded in an Efficient Market.**

"To invoke the *Basic* presumption, [] [P]laintiff[s] must prove" that Rocket's

"stock traded in an efficient market." *Goldman*, 141 S. Ct. at 1958.  Because Plaintiffs bear the burden of proof on each of Rule 23's requirements, "[t]o defeat the presumption of reliance, defendants do not . . . have to show an inefficient market.  Instead, they must demonstrate that plaintiffs' proffered proof of market efficiency falls short of the mark." *IBEW* v. *Deutsche Bank AG*, 2013 WL 5815472, at *20 (S.D.N.Y. Oct. 29, 2013).  Plaintiffs' proof unquestionably falls short.

Plaintiffs plod through the factors identified in *Cammer* v. *Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and *Krogman* v. *Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), as supposedly indicative of market efficiency.  (Mot. 16-23, ECF 74, PageID.2462-69.)[5]  But Plaintiffs admit that the *Cammer/Krogman* factors are not a "checklist" (*id.* at 16, PageID.2462), and their expert admits that, aside from an event study (*Cammer* 5), none of the other *Cammer/Krogman* factors "directly" test for market efficiency and are merely "precursor facts" that must exist for a "market mechanism to work" (Ex. 4 at 235:21-236:11).  The only *Cammer/Krogman* factors that support Plaintiffs are the ones providing the weakest indirect evidence of market efficiency, such as analyst coverage and the number of market makers.  But, as Dr.

---

[5] The *Cammer* factors are:  (i) average weekly trading volume, (ii) analyst reporting, (iii) number of market makers and arbitrageurs, (iv) eligibility to file SEC Form S-3, and (v) "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."  *Cammer*, 711 F. Supp. at 1286-87.  The *Krogman* factors are: (i) "market capitalization," (ii) "bid-ask spread," and (iii) "percentage of stock not held by insiders (the 'float')."  *Krogman*, 202 F.R.D. at 474, 478.

Stulz opines, Plaintiffs and their expert ignore glaring indicators of inefficiency during the Class Period—including that Rocket's stock experienced a meme-stock trading frenzy on March 2 and 3, 2021 that caused Rocket's stock price to spike not because of new Rocket-specific positive news, but because of irrational trading. Moreover, Coffman's event study, the only direct evidence of efficiency Plaintiffs proffer, is fatally flawed and does not even attempt to answer the question of whether Rocket's stock was efficient *during the two-month Class Period*.

### 1.   Plaintiffs cannot prove market efficiency because Rocket's stock experienced a meme-stock trading frenzy during the short two-month Class Period.

The short two-month Class Period in this case included a period of profound dislocation in Rocket's stock as a result of the meme stock trading frenzy on March 2 and 3, 2021, which Coffman described as "a unique and unusual event." (Ex. 4 at 275:21-276:14.)  Unlike in an efficient market where prices are "rarely too high or too low" and "new, value-relevant public information" about the company drives changes in the stock price, during March 2 and 3, 2021, Rocket's stock price was driven by enthusiasm on Reddit and Twitter, and not by new, value-relevant information about Rocket. (Ex. 1 ¶¶ 28, 61-77.)  Social media users decided to make Rocket's stock price shoot up apparently just because they liked the rocket emoji (🚀), which they used as their rallying cry for driving up the price of stocks "to the moon" through coordinated irrational trading.  (*Id*. ¶¶ 62-63.)

As Dr. Stulz explains, "meme stock" behavior is "inconsistent with market efficiency because investor coordination" causes "abrupt changes in prices without any new, value-relevant public information." (*Id.* ¶ 52.) The academic literature also shows that irrational trading behavior has long lasting effects by "hinder[ing] the functioning of the mechanisms that make markets efficient." (*Id.*) When "a stock becomes subject to irrational forces, . . . efforts to trade on new, value-relevant public information can lead to large losses," which discourages trading by short sellers "who aid in making markets efficient." (*Id.* ¶ 78.) The resulting short selling constraints compound and exacerbate the market inefficiency brought about by a meme stock trading frenzy. Although meme stocks are a new phenomenon, the study of short selling constraints is not. Indeed, the role of short selling is so important to a functioning efficient market that at least one court has held that a plaintiff failed to prove efficiency where their expert "failed to consider the[] impact" of "short sale bans" during part of the class period. *IBEW*, 2013 WL 5815472, at *21. Coffman likewise failed to account at all for the short sale constraints following the meme stock event.

Here, there is no dispute that Rocket was a meme stock during the Class Period. Analysts called Rocket the next "meme stock" (Ex. 1 ¶ 73), and Coffman acknowledges, but then proceeds to ignore, that Rocket's stock price "spike[d]" on March 2 and 3, 2021 due to irrational trading "fueled by investors on the Reddit

forum . . . encouraging each other to buy Rocket Common Stock." (Coffman ¶ 29
n.36, ECF 74-2, PageID.2492.)   At his deposition, Coffman disavowed any
"suggesti[on] there was company-relevant news that explains that spike in demand
on those day[s]." (Ex. 4 at 293:7-10.) In other words, the market was not efficient.[6]

    Dr. Stulz also shows that it would be incorrect to assume that the market was
inefficient for just those two days of meme stock trading.  Meme stock events can
discourage short sellers from entering the market, which can result in lingering
market inefficiency after the trading frenzy ends.  Short sellers "bet on stocks falling
in value" and "play[] an important role in making markets efficient." (Ex. 1 ¶¶ 21,
78.)   Indeed, "[a]cademic research has found that stocks tend to underreact to
negative news and overreact to positive news when there are short sale constraints."
(*Id.* ¶ 88.)  When the market becomes volatile, and irrational trading causes a stock
to be overvalued, it becomes riskier for short sellers to place bets, and market
efficiency suffers.  (*Id.*)  During a meme stock phenomenon, academic researchers
have found that extreme volatility leads to persistent short-sale constraints, harming

---

[6] Coffman's testimony that Rocket's stock was nonetheless efficient on March 2 and
3 makes no sense.  He testified that the price spike due to the irrational "meme stock"
trading frenzy "doesn't necessarily mean it's inefficient.  It means there is another
factor on top of the fundamental value relevant information that is affecting" the
stock price.  (Ex. 4 at 291:16-21.)  But that is the very definition of an inefficient
market because this additional factor means that "the stock price does not function
as a reliable proxy for publicly available information."  *In re Jan. 2021 Short
Squeeze Trading Litig.*, No. 21-md-2989, slip op. 51 (S.D. Fla. Nov. 13, 2023).

efficiency.  (*Id*. ¶¶ 59-60, 66-94.)  Coffman agrees that "short-selling frictions can lead to periods of market inefficiency."  (Ex. 4 at 270:2-7.)

Dr. Stulz found evidence of this effect during the Class Period.  Short sellers retreated from the market after "coordinated" investing by irrational retail investors in early March 2021 drove up Rocket's stock price, which encouraged a "short squeeze."  (Ex. 1 ¶¶ 52, 62.)[7]  Dr. Stulz found that "after the attempted short squeeze in early March 2021, the level of short interest for Rocket stock remained low through April 2021"—spanning nearly the entire February 25 to May 5, 2021 Class Period.  (Ex. 1 ¶ 82.)  These are "characteristics that the academic literature has found are inconsistent with market efficiency" (*id*. ¶ 53), but Coffman never addresses this issue.  That glaring omission alone precludes a finding of market efficiency.  *See IBEW*, 2013 WL 5815472, at *21.

> **2.     Coffman's event study (*Cammer* 5) is fundamentally flawed and does not answer the question of whether the market was efficient during the Class Period.**

A properly conducted event study producing "evidence of a cause-and-effect relationship between unexpected news and market price" (*i.e.*, *Cammer* 5) is "the

---

[7] A short seller profits when stock prices go down.  Short sellers borrow the stock from one investor and then later buy the stock in the open market (hopefully at a cheaper price) and return the shares to the lending investor.  A short squeeze can occur where coordinated trading drives up the stock price, which pressures short sellers to buy the stock at inflated prices to close out their positions to minimize losses.  That further increases demand for the stock, which drives up the price even higher, putting even more pressure on any remaining short sellers.  (Ex. 1 ¶ 22 n.34.)

*sine qua non* of efficiency." *In re Fed. Home Loan Mortg. Corp.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012). Plaintiffs are incorrect that establishing *Cammer* 5 is "not necessary." (Mot. 20, ECF 74, PageID.2466.) Their own expert agreed that no "respectable financial economist" could "submit an article to a peer-reviewed journal, and say, I've shown efficiency with respect to a company's stock by relying on the first four *Cammer* factors and the *Krogman* factors." (Ex. 4 at 236:12-24.) That is why "*Cammer* 5 has been considered the most important *Cammer* factor in certain cases because it assesses 'the essence of an efficient market and the foundation for the fraud on the market theory.'" *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017). Indeed, "[d]irect evidence of an efficient market may be more critical" where, as here, "the other four *Cammer* factors (and/or the *Krogman* factors) are less compelling in showing an efficient market," and there are significant indicia of inefficiency. *Id.* at 98; *see OPERS* v. *Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *16 (N.D. Ohio Aug. 14, 2018) ("The fifth factor maintains its prominence following *Halliburton II*" as "the 'most important' factor.").[8]

Event studies are financial economists' standard tool for testing whether a

---

[8] Plaintiffs cite a few cases holding that plaintiffs proved efficiency "without regard to the fifth *Cammer* factor." *Dougherty* v. *Esperion Therapeutics, Inc.*, 2020 WL 3481322, at *7 (E.D. Mich. June 19, 2020); Mot. 20, ECF 74, PageID.2466. But none of them involved the unusual facts of this case that raise significant red flags for efficiency (*e.g.*, a newly public company, limited liquidity, and a very short class period that coincides with a meme-stock trading frenzy).

market is efficient.  Event studies use a form of statistical analysis called regression analysis to "isolate[] the stock price movement attributable to a company (as opposed to market-wide or industry-wide movements) and then examine[] whether the price movement on a given date is outside the range of typical random stock price fluctuations observed for that stock."  *GS III*, 77 F.4th at 86 n.5.  But not all event studies are created equal.  "[S]tatistics are pliable," and "must be consulted cautiously."  *Mandala* v. *NTT Data, Inc.*, 975 F.3d 202, 205 (2d Cir. 2020).  Coffman purports to conduct an event study, but his analysis is fatally flawed for numerous reasons set out more fully in the accompanying motion to exclude.

*First*, Coffman acknowledges that Rocket's stock price "spike[d]" on March 2 and 3, 2021 due to irrational trading "fueled by investors on the Reddit forum." (Coffman ¶ 29 n.36, ECF 74-2, PageID.2492.)  But rather than confront how that seismic jolt impacts the efficiency of Rocket's stock, Coffman simply removes those days from his event study (as if they never happened) precisely because this data undermines the opinion he wants to give.  Coffman admitted that he did not establish any *ex ante* rule for identifying those purported "outliers."  (Ex. 4 at 298:19-24.)  As Coffman states, including days indicative of market inefficiency in his event study would "distort the results" of his results-driven approach, so he removed them. (Coffman ¶ 52 n.63, ECF 74-2, PageID.2502; Ex. 4 at 274:10-15.)

As Dr. Stulz explains, Coffman's removal of those days was "arbitrary" and

-19-

"not appropriate given [] the purpose of his analysis." (Ex. 1 ¶ 98.)  In fact, the academic literature establishes that the "arbitrary deletion of extreme stock return observations can lead to incorrect inferences." (*Id.* ¶ 104.)  The reason is obvious: if one is attempting to determine if a market is efficient during a 48-day period, removing days when the market is known to be inefficient obviously biases the results in favor of finding that the market is efficient.  Coffman's "results-oriented mode of economic analysis is not acceptable." *Nilavar* v. *Mercy Health Sys.*, 2005 WL 8162667, at *8 (S.D. Ohio June 2, 2005).  "[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data." *In re Lipitor*, 892 F.3d 624, 634 (4th Cir. 2018).  Indeed, as Dr. Stulz shows, if Coffman did not exclude his purported "outlier days" from his autocorrelation test, "he would have found a significant autocorrelation for Rocket stock . . . , which, in Mr. Coffman's own words, 'would suggest market inefficiency.'" (Ex. 1 ¶ 103.)

*Second*, instead of analyzing Rocket's stock during the two-month Class Period of February 25 to May 5, 2021, Coffman improperly uses a 2.5-year period of September 4, 2020 to May 5, 2023 in his event study to skew his results.  Markets, however, are not static.  Instead, "[a]cademic literature demonstrates that even if markets are generally efficient, stocks can experience episodes of inefficiency," such as "market frictions"—as occurred here during the two-month Class Period—thus requiring "careful empirical investigation of efficiency for each security and

timeframe." (Ex. 1 ¶¶ 25, 29-32.)  It is thus well established that markets can be efficient in one period but not in other periods.  *See Brokop* v. *Farmland Partners Inc.*, 2021 WL 4913970, at *4 (D. Colo. Sept. 30, 2021) (declining to certify class during period where efficiency not shown).

Coffman admitted that he never tested whether his 2.5-year period is representative of the two-month Class Period (Ex. 4 at 337:15-20), even though that is standard practice in any statistical analysis (Ex. 1 ¶¶ 127, 135).  But Dr. Stulz did those tests, and he shows that the behavior of Rocket's stock price during the two-month Class Period is "statistically different" than the rest of Coffman's 2.5-year period.  (*Id.* ¶¶ 127-37.)  As a result, "it is error" to draw any "statistical inferences" about the short two-month Class Period based on Coffman's analysis of his "[non]representative" 2.5-year period.  *Mandala*, 975 F.3d at 211-12.  To give a simple example, a study of traffic patterns on Woodward Avenue over a full year would be unhelpful in determining how long it would take to drive down Woodward Avenue during Dream Cruise weekend.  It is the same here.  Coffman's analysis of Rocket's stock over a 2.5-year period is plainly intended to mask his failure to establish that the market was efficient during the two-month Class Period, which comprises just 7% of the period in Coffman's event study.  Because "what is true of the whole is not necessarily true of its parts," the Court should reject the "statistical fallacy" that Coffman posits.  *Id.* at 205, 212.

### 3.    Other *Cammer/Krogman* factors are inconsistent with market efficiency.

**Rocket's low public float (*Krogman* 3) reinforces the lack of market efficiency.**   Coffman states that "insiders held, on average, just 0.44% of all outstanding shares of Rocket Common Stock," and therefore concludes that Rocket had a large public float.  (Coffman ¶ 72, ECF 74-2, PageID.2512.)  But Coffman is wrong.  As this Court acknowledged in a prior decision, "Gilbert and RHI own '99.9% of Rocket's outstanding Class D Common Stock and 93.1% of Rocket's Class A Common Stock on a fully exchanged and converted basis.'"  *Shupe*, 2023 WL 2411002, at *4.[9]  Because only a tiny amount of Rocket's stock is publicly traded, the lack of liquidity makes it significantly more likely that movements in Rocket's stock price were driven by supply-and-demand dynamics and short-sale constraints rather than new company-related information, which is the premise of the *Basic* presumption.  (Ex. 1 ¶¶ 119-25.)  The lack of liquidity "impair[s] market efficiency," but also has a ratchet effect that "exacerbates" the market inefficiency from the meme stock trading frenzy.  (*Id.* ¶ 42.)  Coffman agrees, testifying that "a small public float can exacerbate short-selling frictions."  (Ex. 4 at 270:12-20.)

---

[9] To arrive at his incorrect conclusion that the public owns 99% of Rocket's stock, Coffman pretends that the Class D stock that RHI and Gilbert own do not exist.  But that ignores the economic realities.  As Dr. Stulz shows, RHI and Gilbert's Class D shares could be easily and immediately converted to Class A shares and sold on the market, which is why Rocket treated these two classes of stock as equivalent for earnings purposes, as did analysts covering Rocket.  (Ex. 1 ¶¶ 105-18.)

**Rocket was not eligible to file annual reports on SEC Form S-3 (*Cammer* 4).** In assessing efficiency, courts consider whether the company was eligible to file short-form annual reports on SEC Form S-3—which is only available for large established companies that, among other things, have been publicly traded for more than a year—because "[e]ligibility to file the S-3 form is predicated upon the SEC's belief that the market for the company's stock already operates efficiently and that further disclosure is unnecessary, as the market price has already accounted for relevant information." *O'Neil* v. *Appel*, 165 F.R.D. 479, 502 (W.D. Mich. 1996). Because Rocket had been a public company for only six months at the start of the two-month Class Period, Rocket was not eligible to use Form S-3 at any point during the two-month Class Period. (Ex. 4 at 308:5-16.) "Although ineligibility does not automatically disqualify a company from a finding of an efficient market, this factor weighs heavily against a finding of efficiency." *O'Neil*, 165 F.R.D. at 502.[10]

## B. Even if Plaintiffs Could Invoke the *Basic* Presumption (They Cannot), that Presumption Is Rebutted Because the Challenged Statements Had No Price Impact.

In *Halliburton II*, the Supreme Court held that a defendant can rebut the *Basic*

---

[10] Coffman states that because Rocket met all the requirements for S-3 eligibility except for the most important one (*i.e.*, being a publicly traded company for more than a year), "Rocket meets the spirit of this *Cammer* efficiency factor." (Coffman ¶ 45, ECF 74-2, PageID.2498.) Coffman cites no support for his "*ipse dixit*" assertion, *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997), and neither do Plaintiffs (*see* Mot. 19 n.7, ECF 74, PageID.2465).

presumption at class certification by showing that "the asserted misrepresentation (or its correction) did not affect the market price."  573 U.S. at 279-280.  After *Halliburton II*, however, lower courts almost never found that a defendant successfully rebutted the *Basic* presumption.  Thus, in *Goldman*, the Supreme Court clarified that a defendant's rebuttal right was not an empty promise.  Rather than impose on defendants a nearly impossible burden to "rule out" all possibility of "price impact whatsoever," as some district courts had required, *Monroe Cnty.* v. *S. Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019), the Supreme Court made clear that the "court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact," *Goldman*, 141 S. Ct. at 1963.  The Supreme Court also clarified that courts "must take into account *all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue."  *Id.* at 1961.  Thus, courts "should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense."  *Id.* at 1960.  Under that "common sense" framework, the "[t]he generic nature of a misrepresentation often will be important evidence of a lack of price impact," because "a more-general statement will affect a security's price less than a more-specific statement on the same question."  *Id.* at 1960-61.

Defendants have easily met their burden of proving that "it is more likely than

not" that each of the alleged misstatements (which the Court must assess statement-by-statement) had no price impact.  *Id.* at 1963.[11]

### 1.    Farner's February 25, 2021 comments had no price impact.

Plaintiffs contend that they construed a snippet from Farner's remarks about weathering market declines better than competitors as promising that "rising interest rates would not have any effect on [Rocket's] mortgage business."  (Mot. 3, ECF 74, PageID.2449.)  "[I]t is more likely than not" that the snippet Plaintiffs isolate out of context had no price impact.  *Goldman*, 141 S. Ct. at 1963.

*First*, "[t]he generic nature of a misrepresentation often will be important evidence of a lack of price impact."  *Goldman*, 141 S. Ct. at 1961.  Farner's statement ("[we] don't see interest rates going up or down, really having an impact on our business one way or the other") is precisely the kind of "loosely optimistic statement[]" that is "numbingly familiar to the marketplace" and which would not be expected to have price impact because "no reasonable investor could find [the statement] important."  *In re Ford Motor Co.*, 381 F.3d 563, 571 (6th Cir. 2004).[12]

---

[11] Courts must assess price impact statement-by-statement.  *See GS III*, 77 F.4th at 94 ("clearly erroneous" to lump together "statements [that] were separately disseminated . . . in separate reports at separate times"); *Ramirez* v. *Exxon Mobil Corp.*, 2023 WL 5415315, at *22 (N.D. Tex. Aug. 21, 2023) (conducting statement-by-statement analysis and finding no price impact for some statements); *In re Qualcomm*, 2023 WL 2583306, at *17 (S.D. Cal. Mar. 20, 2023) (same).

[12] In the motion to dismiss decision, the Court acknowledged that "no reasonable investor" would rely on a "vague" statement "lacking in specificity," but stated that

*Second*, no analyst covering Rocket mentioned the snippet Plaintiffs allege as false. (Ex. 2 ¶¶ 55-68.) That "none of [the analysts] reference[d] the disclosure" is powerful evidence that the "misrepresentation[] did not impact [Rocket's] stock price." *GS III*, 77 F.4th at 104-05. That is because a statement has "price impact" only if it "prop[s] up the price," which "requires some indication that investors relied upon the [] disclosure as written." *Id.* at 100. Here, there is none, which is unsurprising because "professional investors, and most amateur investors as well, know how to devalue" the "vague statements of optimism . . . of corporate executives." *Macomb Cnty.* v. *Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022).

What is more, there is no evidence that any analyst relied on Farner's statement as a guarantee that "rising interest rates would not have any effect on [Rocket's] mortgage business" (Mot. 3, ECF 74, PageID.2449), much less that they "drew that conclusion from [Farner's] disclosure" as required to show price impact, *GS III*, 77 F.4th at 104. This further reinforces the opinion of Dr. Starks, an expert

---

a vague statement about a "key internal metric[] for profitability" is "differen[t]" for purposes of materiality at the pleading stage. 2023 WL 2411002, at *12. In the context of price impact, however, the question is not whether the statement concerned an "important" "subject," but whether there is evidence that "the disclosure as written is specific enough to evoke investor reliance." *GS III*, 77 F.4th at 101, 103-04. The Sixth Circuit agrees. Even if a "topic [i]s important," what matters is "what particularly was represented." *J & R Mktg.* v. *Gen. Motors Corp.*, 549 F.3d 384, 396 (6th Cir. 2008). Thus, irrespective of a subject's importance, a "loosely optimistic" statement about *any* metric is "'too squishy, too untethered to anything measurable,'" for any "reasonable investor [to] rely" on. *Id.*

in investor decision-making, that no reasonable market professional would have construed Farner's statement that way.  (*See* Ex. 2 ¶¶ 38-49, 55-68.)[13]  That also is consistent with Judge Kumar's recent holding that "rising interest rates pose an obvious risk to mortgage lenders, which investors could be expected to understand." *In re Home Point Cap. Inc. Sec. Litig.*, 2022 WL 18932069, at *4 (E.D. Mich. Oct. 5, 2022).  Although one analyst (Credit Suisse) touched on Farner's overall remarks, Credit Suisse did not misconstrue Farner's words as a guarantee that Rocket was impervious to rising interest rates.  (*See* Ex. 2 ¶ 61.)  Instead, Credit Suisse "remain[ed] Neutral on [Rocket] given recently . . . rising interest rates," because "the magnitude at which rates move should affect volumes going forward" and the "effect on GOS margins (pushing them lower) should start to be felt more fully in Q2."  (Ex. 11 at 1, 3.)  Other analysts covering Rocket recognized that rising interest rates were a significant risk to Rocket.  (Ex. 2 ¶¶ 45-47.)[14]

---

[13] Plaintiffs' professed idiosyncratic interpretation of Farner's statement is irrelevant to price impact because "[n]one of the plaintiffs asserts that he read" it.  *Asher* v. *Baxter Int'l Inc.*, 377 F.3d 727, 731 (7th Cir. 2004).  Rather, the theory underlying the *Basic* presumption is that "professional traders" and "securities analysts[] did the reading, and that they made trades or recommendations that influenced the price." *Id.*; *see Ockerman* v. *May Zima & Co.*, 27 F.3d 1151, 1158 (6th Cir. 1994) (same).

[14] *See*, *e.g.*, Ex. 12 (2/26/21 GS report) ("[I]nvestors will likely remain concerned about the trajectory of gain on sale margins given the recent back up in interest rates and recent moves higher in mortgage rates, . . . [and] will likely remain concerned in the near term about the potential for GoS [margin] to overshoot to downside."); Ex. 13 (2/26/21 Wolfe report) (Although "RKT is uniquely positioned to take [market] share . . . in 2021," the "normalization in GOS margins should be

This evidence refutes any notion that Farner's words "*as [spoken]*" had price impact. *GS III*, 77 F.4th at 100. If the "statement[] w[as] [not] consciously relied upon, in the moment, by investors evaluating [Rocket]," it cannot "be that the statement impacted [Rocket's] stock price." *Id.*; *see Qualcomm*, 2023 WL 2583306, at *12 ("generic statements" had no price impact, and rejecting plaintiffs' speculation about how the market "interpreted the[] generic statements").

*Third*, Plaintiffs cannot rely on the "inflation-maintenance theory" to support an inference that "the stock's price would have fallen 'without the false statement.'" *Goldman*, 141 S. Ct. at 1961. As the Supreme Court explained, "Plaintiffs typically try to prove" price impact under the inflation-maintenance theory by "point[ing] to a negative disclosure about a company and an associated drop in its stock price; alleg[ing] that the disclosure corrected an earlier misrepresentation; and then claim[ing] that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Id.* "But that final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.*

---

expected."); Ex. 14 (3/1/21 Zelman report) ("As widely expected, gain-on-sale margins are compressing from historically-robust levels in 2020. . . . While our industry capacity analysis is a factor in our expectations for further compression, the recent volatility in the 10-year Treasury also leads us to skew more cautiously for the remainder of 2021 and into 2022."); Ex. 15 (3/3/21 JPM report) ("Our relatively cautious thesis reflects our view that . . . higher interest rates, . . . declining refi apps and tighter primary/secondary spreads represent looming headwinds.").

Thus, where, as here, "a stock price decline follows a back-end, highly detailed corrective disclosure[,] . . . courts must be skeptical whether the more generic, front-end statement propped up the price to the same extent."  *GS III*, 77 F.4th at 102. Because price impact focuses on whether "investors relied upon the [statement] *as written*," the inflation maintenance theory is viable only if the plaintiff proves that "a truthful—but equally generic—substitute for the alleged misrepresentation would have impacted the stock price." *Id.* at 100, 102 (emphasis in original).

As in *GS III*, the rigorous mismatch analysis that *Goldman* requires precludes a finding that Farner's statement had price impact.  The highly specific "corrective disclosure" on May 5, 2021 that Rocket projected gain-on-sale margin for Q2 2021 of 2.65% to 2.95%, cannot "do the work of proving front-end price impact" of the vaguely optimistic snippet Plaintiffs challenge, because that highly specific "substitute looks nothing like the original" statement.  *Id.* at 99-100.[15]  By contrast, Rocket's stock price did not decline in a statistically significant way when Rocket

---

[15] At the motion-to-dismiss stage, the Court held that Plaintiffs adequately alleged that the purported corrective disclosure was sufficiently "relate[d] to" the challenged statements to plead loss causation.  *Shupe*, 2023 WL 2411002, at *18.  But at class certification, the Court must rely on evidence, not Plaintiffs' allegations.  Moreover, "whether there is a basis to infer that the back-end price [drop] equals front-end inflation [] is a different question than loss causation, and, in light of *Goldman*, requires a closer fit (even if not precise) between the front- and back-end statements."  *GS III*, 77 F.4th at 99 n.11.  Thus, even if there were a "front-end—back-end subject matter match," that "does not meaningfully account for the Supreme Court's guidance in *Goldman*."  *Id.* at 100-01.

"spoke[] *truthfully at an equally generic level*" in its March 24, 2021 10-K, *id.* at 99

(emphasis in original); Ex. 26 at 2 (Coffman data re 3/24/21 price movement):

| Challenged Snippet | Truthful Substitute |
|---|---|
| "[We] don't see interest rates going up or down, really having an impact on our business one way or the other." (Ex. 5.) | "Our business is significantly impacted by interest rates.  Changes in prevailing interest rates . . . may have a detrimental effect on our business." (ECF 50-3, PageID.1733.) |

*Lastly*, "none of [the analysts] reference[d]" Farner's statement after the

alleged corrective disclosure or attributed the stock price decline on May 5 to

learning that Farner's statement was untrue, which rebuts *Basic* and "sever[s] the

link between back-end price drop and front-end misrepresentation." *GS III*, 77 F.4th

at 104; *see* Ex. 2 ¶¶ 89-92.  Instead, analysts attributed the stock price decline on

May 5 to the intervening market event that the primary-secondary spread began to

compress faster in late-March/early-April 2021 (after the alleged misstatements),

and, as a result, the expected decline to normalized gain-on-sale margins from the

record highs during 2020 would be less gradual than the market had expected.[16]

---

[16] *See* Ex. 22 at 1 (Citi 5/6/21 report) ("*We knew that gain on sale [] margins were going to come down from record high levels of 2020*, but we *thought it'd be more gradual* and take a bit longer."); Ex. 18 at 2 ("RKT provided 2Q guidance below consensus expectations and noted that margins are normalizing *much faster than previously expected*."); Ex. 19 at 1 (JPM 5/5/21 report) ("We expect shares to trade lower on guidance that suggests GoS margins are *normalizing more rapidly than previously assumed*."); Ex. 21 at 1 (Barclays 5/6/21 report) ("The increase in rates has led to strengthening competition and *pressuring margins faster than anticipated*."); Ex. 20 at 1 (Keefe 5/5/21 report) ("We would expect some weakness on the 2Q guidance reflecting GOS margins *normalizing more quickly than*

Indeed, analysts at Morgan Stanley concluded that Rocket's May 5 disclosure confirmed that Rocket's public statements since the September 2020 IPO were true:

> From our initiation (Aug 20, 2020), . . . we had expected [Rocket's] closely watched gain on sale margin would gradually return to more normalized level of ~2.5-3%, vs the 5.2% at the peak in 2020.  And *anticipating that eventual normalization, [Rocket] management has always clearly communicated* that the plan is to sustain investment with the intention of gaining [market] share, which would be best monetized in future market upswings.  As such, we generally see evolving conditions and the company's reaction as generally consistent with our medium-term views, even as *rising interest rates and the cooling of the mortgage market may have started a bit sooner than we had anticipated earlier in the year*.

(Ex. 24 at 1(MS 5/6/21 report) (emphasis added).

### 2.    Farner's March 3, 2021 comments had no price impact.

As discussed, Plaintiffs take out of context three words from Mr. Farner's remarks at the March 3, 2021 Morgan Stanley conference and construe them as a representation that "closed loan volume was currently 'growing,'" despite Rocket's statement to the contrary.  (Mot. 3 ECF 74, PageID.2449.)  "[I]t is more likely than not" that those three words had no price impact.  *Goldman*, 141 S. Ct. at 1963.

*First*, Coffman concedes that Rocket's stock price on March 3, 2021 did not move based on anything Farner said, but instead was driven by a meme stock trading frenzy.  (Coffman ¶ 29 n.36, ECF 74-2, PageID.2492; Ex. 4 at 293:7-10.)

---

*expected*.") (all emphasis added).

*Second*, no analysts covering Rocket discussed the three allegedly false words. (Ex. 2 ¶ 71.) Morgan Stanley was the only analyst that discussed Farner's March 3 remarks at all, and it construed Farner's overall discussion of "rising interest rates" not as a representation that closed loan volume would rise, but instead that "the company believes that its diverse portfolio of offerings will help it weather challenging interest environments better than its competitors, potentially offering market share gain opportunities." (Ex. 16 at 1 (3/4/21 MS report).) Far from relying on Farner's statement as a representation that volumes would increase, Morgan Stanley projected Rocket's Q2 2021 closed loan volume to be $87.3 billion—*a 12% decline* from its projection for Q1. (Ex. 17 at 5 (3/9/21 MS report).) This refutes the notion that the market relied on Farner's March 3 remarks as a representation that "closed loan volume was currently 'growing.'" (Mot. 3 ECF 74, PageID.2449.)

*Third*, Plaintiffs cannot rely on the "inflation-maintenance theory" based on the stock-price drop on the May 5, 2021 alleged corrective disclosure. Far from correcting the three allegedly false words, Rocket disclosed that the actual closed loan volume of $103.5 billion for Q1 2021 *was higher* than the $98 to $103 billion range Rocket projected on February 25, 2021 (before the March 3 statement). (Ex. 9 at 2.) Nor did any analyst conclude that Rocket's closed-loan-volume guidance for Q2 2021 corrected any misimpression from the three allegedly false words that volume was rising. To the contrary, Rocket's guidance of "$82.5B-$87.5B" was

-32-

only "a touch below consensus at $89B." (Ex. 18 at 2 (5/5/2021 BofA report).) Moreover, that consensus estimate of $89 billion for Q2 2021 represented a 9% to 14% decline from Rocket's guidance for Q1 2021. (*Id.* at 3.) In other words, despite Farner's statement, analysts had expected Rocket's volumes to decline.

*Lastly*, no analyst attributed the stock price decline on May 5 to learning that Farner's statement was untrue. (Ex. 2 ¶¶ 89-92.) Instead, as discussed above, analysts attributed the stock price decline on May 5 to faster than expected changes in macroeconomic conditions. *See Ramirez*, 2023 WL 5415315, at *16-17 (no price impact because disclosure of "earnings miss" not "linked" to challenged statement where "analysts mainly ascribed the earnings shortfall to Canadian wildfires").

### 3.    Farner's March 11, 2021 comments had no price impact.

Plaintiffs allege that they construed 10 words plucked from Farner's comments during a March 11, 2021 interview on Fox Business ("interest rates moving around are a great benefit to us") as a representation that "rising interest rates would not have any effect on [Rocket's] mortgage business." (Mot. 3, ECF 74, PageID.2449.)  "[I]t is more likely than not" that the 10 words Plaintiffs excerpt out of context from Farner's remarks had no price impact. *Goldman*, 141 S. Ct. at 1963.

*First*, Rocket's stock price did not increase after Farner made his statement. (Ex. 26 (Coffman data).) *Second*, Farner's statement is the kind of loosely optimistic statement that, as discussed above, would not be expected to have price impact.

*Third*, no analyst covering Rocket mentioned Farner's statement, let alone relied on it as a guarantee that "rising interest rates would not have any effect on its mortgage business." (Mot. 3, ECF 74, PageID.2449; *see* Ex. 2 ¶¶ 55-68. *Fourth*, Plaintiffs cannot rely on the "inflation-maintenance theory" for the same reasons as discussed above regarding the February 25 statement. In particular, there is a mismatch in genericness between the highly specific corrective disclosure and the generic snippet Plaintiffs allege as a misstatement, and Rocket's stock price did not decline when Rocket "spoke[] *truthfully*" about the effect of rising interest rates "*at an equally generic level*." *GS III*, 77 F.4th at 99 (emphasis in original). *Lastly*, none of the analysts covering Rocket referenced Farner's statement after the alleged corrective disclosure or attributed the stock price decline on May 5 to learning that Farner's statement was untrue—*i.e.*, that analysts learned for the first time that rising interest rates were detrimental to Rocket's business, which, again, was "an obvious risk to mortgage lenders." *Home Point*, 2022 WL 18932069, at *4.

### 4. The March 17, 2021 tweet had no price impact.

The evidence shows that the tweet had no price impact.

*First*, Rocket's stock price did not increase when Farner tweeted (and Gilbert re-tweeted) that (i) "Rocket Pro TPO has increased its market share in the weeks since UWM's ultimatum to brokers"; and (ii) "[v]olume is up significantly" since the ultimatum. (AC ¶ 240, ECF 42, PageID.1134; Ex. 26 (Coffman data).)

*Second*, no analyst covering Rocket mentioned the tweet when it was issued. Although analyst "commentary [discussed] the *subject* of" UWM's ultimatum, that "does not suggest that the market relied on *[Rocket's] statements*," as required to infer that *the tweet* had price impact. *GS III*, 77 F.4th at 103 (emphasis in original).

*Third*, Plaintiffs cannot rely on the "inflation-maintenance theory" because the disclosure on May 5, 2021 did not "actually correct[]" the tweet. *GS III*, 77 F.4th at 91. The allegedly new information the market learned on May 5, 2021 was that Rocket projected that its margin and volumes would be lower than the market expected in Q2 2021 because of faster than expected compression in the primary-secondary spread. (AC ¶¶ 284-86, ECF 42, PageID.1152-54.) Nothing about that disclosed projection for Q2 (*i.e.*, April-June) revealed that volume in the broker channel had declined in the prior quarter between March 4, 2021 (when UWM issued its ultimatum) and March 17, 2021 (the date of the tweet). Indeed, Rocket's May 5 disclosure that the actual closed loan volume of $103.5 billion for Q1 2021 *was higher* than the $98 to $103 billion range Rocket projected on February 25, 2021 (before the UWM ultimatum) *indicates that the tweet was true*—volume did go up. (Ex. 9 at 2.) Thus, as analysts explained, the market learned on May 5 that Q1 2021 "was a strong quarter for volumes," and that Rocket's "relationships with existing partners have been strengthening post the UWM[] announcement, with partners sending more volume" to Rocket. (Ex. 23 at 1 (5/6/21 GS analyst report).) *See*

*Ramirez*, 2023 WL 5415315, at \*16-17 (no price impact where corrective disclosure not "linked" to statement).  Indeed, Rocket set an annual record for closed loan volume in fiscal year 2021 of $351 billion.  (Ex. 10 at 1 (2/24/22 8-K).)

*Lastly*, none of the analysts covering Rocket referenced the tweet after the alleged corrective disclosure or attributed the stock price decline on May 5 to learning that the tweet was untrue.  (Ex. 2 ¶¶ 89-92.)

### C.    The *Affiliated Ute* Presumption of Reliance Does Not Apply as a Matter of Law Because this Case Primarily Involves Alleged Affirmative Misstatements.

Under the presumption recognized in *Affiliated Ute*, courts may presume investor reliance on an omission, but only if the case "primarily involves a failure to disclose," rather than "affirmative misstatements."  *Byrd* v. *ViSalus, Inc.*, 2018 WL 1637948, at \*9 (E.D. Mich. Apr. 5, 2018).  The presumption exists because "when no positive statements [are] made" at all, requiring Plaintiffs "to prove a speculative negative" (*i.e.*, reliance "on what was not said") is "impossible or impractical." *Volkswagen*, 2 F.4th at 1206.

Here, Plaintiffs do not allege *primarily* omissions.  They allege that only one of the four challenged statements "omitted" information (Statement 2).  Putting aside that *Affiliated Ute* "does not apply" to a "complaint alleg[ing] numerous affirmative misstatements," *Waggoner*, 875 F.3d at 96, the presumption would not apply in any

event to the one statement Plaintiffs characterize as an omission.[17]  Plaintiffs allege

that Farner's March 3, 2021 comment that "all [channels are] growing" is ***both***

"false" because "volume was . . . actually in decline," and "misleading" because it

"omitted to disclose" that "volume" was "declin[ing]."  (AC ¶¶ 232-36, ECF 42,

PageID.1129-31.)  Although the Sixth Circuit has not yet addressed this issue,[18] eight

Courts of Appeals have unanimously held that Plaintiffs cannot "transform

affirmative misstatements into implied omissions" simply by contending that

defendant "fail[ed] to disclose which facts in the representation are not true."

*Volkswagen*, 2 F.4th at 1208-09.[19]  "[B]ecause all misrepresentations can be cast as

omissions . . . [that] fail to disclose which facts are not true," adopting Plaintiffs'

position would permit plaintiffs to sidestep the more demanding *Basic* standard and

obtain automatic class certification.  *Volkswagen*, 2 F.4th at 1208-09.

---

[17] Plaintiffs observe that in *Burges* v. *Bancorpsouth, Inc.*, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017), the court stated that *Affiliated Ute* applies to claims involving "a combination of omissions and misstatements."  (Mot. 23, ECF 74, PageID.2469.)  But the court's sole authority for that statement was a New York district court decision that the Second Circuit abrogated in *Waggoner*.

[18] The Sixth Circuit recently agreed to address this issue under Rule 23(f) review in *In re FirstEnergy Corp.*, No. 23-0303, Order (6th Cir. Nov. 16, 2023).

[19] *See Waggoner*, 875 F.3d at 96 (*Affiliated Ute* inapplicable to "half-truths" or "misstatements whose only omission is the truth that the statement misrepresents"); *Joseph* v. *Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000); *Johnston* v. *HBO Film Mgmt.*, 265 F.3d 178, 193 (3d Cir. 2001); *In re Interbank Funding Corp.*, 629 F.3d 213, 219-21 (D.C. Cir. 2010); *Abell* v. *Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988); *Cavalier Carpets, Inc.* v. *Caylor*, 746 F.2d 749, 756-57 (11th Cir. 1984); *Vervaecke* v. *Chiles, Heider & Co.*, 578 F.2d 713, 717 & n.2 (8th Cir. 1978).

## II.   The Court Should Deny Certification of the Misstatement Class Because Plaintiffs Have Not Proffered the Required Methodology For Measuring Classwide Damages.

Although damages "[c]alculations need not be exact" at the certification stage, Rule 23(b) still requires "evidentiary proof"; it does not "set forth a mere pleading standard." *Comcast*, 569 U.S. at 33, 35.  Thus, it "is not enough" for Plaintiffs' expert to "merely assert[] that he would be able to develop a model at some point in the future." *Ward* v. *Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019).

Here, Plaintiffs' expert Coffman merely asserts that, in theory, "[t]here is a standard and well-accepted method for calculating class-wide damages in cases under Section 10(b)."  (Coffman ¶ 79, ECF 74-2, PageID.2514.)  But Coffman developed no such model here.  Instead, he admits that developing a model that "disaggregates corrective and confounding information" and determines "how inflation per share may have evolved over a class period" requires an "intensely factual, case-specific" analysis that he did not undertake in this case.  (*Id.* ¶¶ 82-83, PageID.2516-17.)  And although Coffman expresses confidence in his ability to develop a model based on his "experience in dozens of similar matters," he claims that he does not know if he can actually do so until the "the completion of discovery, and full development of the case record."  (*Id.* ¶ 84, PageID.2517.)

Coffman's conclusory description of a hypothetical damages model that he thinks he might be able to construct in the future does not satisfy Rule 23.  "When a

class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts (as did [Coffman]) that there are unspecified 'tools' available to measure damages, the model amounts to no damages model at all, and the class cannot be certified." *OPERS*, 2018 WL 3861840, at *19.[20]

Some district courts have accepted an expert's *ipse dixit* that damages can be calculated on a class-wide basis in cases with no unusual characteristics, which is in tension with *Comcast*. *E.g.*, *Dougherty* v. *Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *6 (E.D. Mich. Nov. 19, 2020).[21] But as Dr. Mark Garmaise shows, the facts here are far from typical, and Coffman has not proposed any methodology that can measure damages on a class-wide basis that, for example, adjusts for the rapidly changing mix of information during the Class Period about interest rates and other macroeconomic factors, and accounts for the meme stock behavior in Rocket's stock price. (Ex. 3 ¶¶ 34-63.) Thus, unlike in some other cases, Coffman "face[s] a 'herculean task' in sorting through the continuous flow of information about" changing macroeconomic conditions during the Class Period, but he "d[oes] not establish any reliable means of addressing this problem." *Bricklayers* v. *Credit*

---

[20] *See Fort Worth Emp's Ret. Fund* v. *J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) ("say-so" of plaintiffs' expert not sufficient); *In re BP plc Sec. Litig.*, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014) (same).

[21] The Sixth Circuit also will address this issue in *FirstEnergy*.

*Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014).[22]

**III.  The Court Should Deny Certification of the Insider Trading Class.**

    **A.  Plaintiff Pearlman Lacks Article III Standing To Assert an Insider Trading Claim.**

As an initial matter, the Court cannot certify an insider trading class because Pearlman was never appointed as a lead plaintiff to represent this entirely distinct class, as the PSLRA requires.  *See* 15 U.S.C. § 78u-4(a)(3).  Instead, Plaintiffs' counsel added Pearlman as a plaintiff in their Amended Complaint to assert a claim on behalf of an entirely new class without following the PSLRA appointment process.  As a result, Pearlman cannot proceed on behalf of a putative class.  *See Vanleeuwen* v. *Keyuan Petrochems., Inc.*, 2013 WL 2247394, at *4-6 (C.D. Cal. May 9, 2013).

In any event, Pearlman lacks standing.  "[C]lass representatives must demonstrate 'individual standing vis-a-vis the defendant,'" *Soehnlen* v. *Fleet Owners Ins. Fund*, 844 F.3d 576, 582 (6th Cir. 2016), and "if no named plaintiff has standing," the Court "lack[s] jurisdiction," *Frank* v. *Gaos*, 139 S. Ct. 1041, 1046 (2019).  Here, only Pearlman asserts an insider trading claim.  But he suffered no

---

[22] At a minimum, even if a class could be certified as to liability, Plaintiffs' failure to adduce *evidence* that damages can be calculated on a classwide basis under *Comcast* requires that the Court deny certification of a damages class.  *See Treviso* v. *NFL*, 2020 WL 7021357, at *7 (N.D. Ohio Nov. 30, 2020) (certifying "liability-only class issue" where plaintiff failed to prove that damages could be calculated on a common basis).

"concrete harm" from RHI and Gilbert's stock sale, and thus he lacks "Article III standing." *TransUnion*, 141 S. Ct. at 2200.[23]   Pearlman's lack of standing also makes him an inadequate class representative under Rule 23.  *See Oron 2015 LLC* v. *City of Southfield*, 2019 WL 2502739, at *6 (E.D. Mich. June 17, 2019).

In *TransUnion*, the Supreme Court "rejected" that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right."  141 S. Ct. at 2205.  Under Article III, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court."  *Id.* (emphasis in original).  Pearlman alleges that RHI and Gilbert's purported insider trading caused two harms:  (i) an informational injury by not having "access to th[e] material, non-public, adverse information"; and (ii) a monetary injury because "Rocket's stock price declined" after the "material adverse information" was disclosed.  (AC ¶¶ 323-24, ECF 42, PageID.1166-67.)  Neither theory gives rise to a concrete injury because RHI and Gilbert sold Rocket stock in an off-market block trade with Morgan Stanley (Ex. 25 (Trade Confirm)), and thus Pearlman incurred no "'injury in fact,' economic or otherwise."  *Fridrich* v. *Bradford*, 542 F.2d 307, 315 n.21 (6th Cir. 1976).

*No informational injury.*  "[T]he mere denial of information is insufficient to

---

[23] A "standing defect implicates the propriety of a class certification" because a "court has no power to certify a class if it lacks jurisdiction." *Fox* v. *Saginaw Cnty.*, 67 F.4th 284, 292 (6th Cir. 2023).

support standing." *Grae* v. *Corr. Corp. of Am.*, 57 F.4th 567, 569 (6th Cir. 2023). The question is "whether the asserted harm has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2200. Here, "there is no historical or common-law analog where" an insider's failure to publicly disclose information to the market at large "amounts to concrete injury." *Id.* at 2209. At common law, an insider sale based on non-public information breached a duty only to the company itself. *See Brophy* v. *Cities Serv. Co.*, 31 Del. Ch. 241, 244-46 (1949). To the extent courts expanded the duty to disclose to a trading counterparty, an insider owed a duty to disclose only in "face-to-face transactions." Stephen M. Bainbridge, *Incorporating State Law Fiduciary Duties into the Federal Insider Trading Prohibition*, 52 Wash. & Lee L. Rev. 1189, 1221 (1995). But "[t]he uniform state law approach in the [open] market context remained a no duty [to disclose] rule" when an insider sold shares. *Id.* That is why the Supreme Court long ago "repudiat[ed] any notion that all traders must enjoy equal information before trading": "a duty to disclose [inside information] arises from the relationship between parties." *Dirks* v. *SEC*, 463 U.S. 646, 657-58 (1983) (alterations omitted). Thus, "[t]he classical theory [of insider trading] targets a corporate insider's breach of duty to shareholders *with whom the insider transacts*." *United States* v. *O'Hagan*, 521 U.S. 642, 652 (1997) (emphasis added).

Accordingly, any "harm" to market participants writ large from insider trading

has never been one "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2200.  Indeed, the Sixth Circuit held in similar circumstances that a plaintiff incurred no "injury in fact, economic or otherwise," and thus lacked "standing" to assert an insider trading:  because "[i]t [wa]s undisputed that defendants did not purchase any shares of stock from plaintiffs" before a lucrative merger announcement, "defendants' acts of trading in no way affected plaintiffs' decision to sell." *Fridrich*, 542 F.2d at 315 n.21, 318.

***Monetary Injury.***  Economists agree that "insider trading" causes "no direct harm" to anyone.  Henry G. Manne, *Insider Trading*, 31 J. Corp. L. 167, 168 (2005).[24]  And any theoretical harm from insider trading might arise only "where it appears the plaintiff might, in fact, have traded with the defendant." *Buban* v. *O'Brien*, 1994 WL 324093, at *3 (N.D. Cal. June 22, 1994).  But Pearlman did not trade with RHI or Gilbert.  They sold their stock to Morgan Stanley in a private block trade.  That "trading with a third person bears absolutely no causal relationship whatsoever to plaintiffs' injury." *Fridrich*, 542 F.2d at 315 n.23.  "Because [Pearlman] would have suffered the same financial injury regardless" of whether

---

[24] *See, e.g.*, John P. Anderson, *Greed, Envy, and the Criminalization of Insider Trading*, 2014 UTAH L. REV. 1, 9 (2014) ("The harm-to-counterparty argument against insider trading has all but disappeared from legislative debates, court decisions, and scholarly treatment."); Dan B. Dobbs, LAW OF REMEDIES § 10.5(2) ("[A]n inside trade as such does not obviously cause harm to the investor who buys or sells on the stock exchange.  His loss would usually be just as great if there were no inside trading at all.").

RHI and Gilbert sold stock to Morgan Stanley, he "cannot establish that this injury flows from [their] conduct." *Carroll* v. *Hill*, 37 F.4th 1119, 1122 (6th Cir. 2022).

To be clear, Defendants do not argue that no plaintiff ever has standing to assert an insider trading claim. Here, for example, Morgan Stanley could potentially claim it incurred the kind of informational injury cognizable at common law. Similarly, if an insider sells stock directly *into the open market*, some courts permitted claims by plaintiffs who bought stock "during the same period" that the insider sold without proof linking "a particular defendant's sale with a particular plaintiff's purchase," because "it would be impossible to" do so. *Shapiro* v. *Merrill Lynch*, 495 F.2d 228, 236-37 (2d Cir. 1974). This relaxed standard—which courts did not apply to the kind of private sale at issue here, *see Stromfeld* v. *Great Atl. & Pac. Tea Co.*, 496 F. Supp. 1084, 1087-88 (S.D.N.Y. 1980)—may be consistent with *TransUnion*'s recognition that "the law has long permitted recovery by certain tort victims even if their harms may be difficult to prove or measure." 141 S. Ct. at 2211.

## B. The Proposed Class Definition Lacks Objective Criteria To Determine Membership.

Plaintiffs' proposed class definition of persons who purchased Rocket common stock "contemporaneously with" RHI and Gilbert's stock sale is too vague and "[in]sufficiently definite . . . to determine whether a particular individual is a member of the proposed class." *Young* v. *Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012). Pearlman asserts that his purchase of Rocket stock on the

"very same day" as the stock sale qualifies as a "contemporaneous[]" purchase under Section 20A (Mot. 11, ECF 74, PageID.2447), and courts have likewise limited an insider trading class to persons who purchased stock on the "same day" as the insider sale because those are the only persons who could "have realistically traded with a given defendant." *In re Fed. Nat'l Mortg. Ass'n*, 503 F. Supp. 2d 25, 47 (D.D.C. 2007); *see Fridrich*, 542 F.2d at 327 (Celebrezze, J., concurring) (investors who traded "contemporaneously" with defendant "should be limited to those who sold" on the days defendants purchased).

## CONCLUSION

The Court should deny Plaintiffs' motion for class certification.

December 8, 2023                        Respectfully submitted,

*/s/ Nick Gorga*                         */s/ Jeffrey T. Scott*
Nick Gorga (P72297)                   Jeffrey T. Scott (N.Y. 2890374)
HONIGMAN LLP                          SULLIVAN & CROMWELL LLP

(Additional counsel listed on cover)    (Additional counsel listed on cover)

*Counsel for Rocket Companies, Inc.*     *Counsel for Jay D. Farner, Daniel Gilbert, and Rock Holdings Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2023, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all parties of record, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:  None.

Respectfully submitted,

*/s/ Jeffrey T. Scott*
Jeffrey T. Scott (N.Y. 2890374)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000

*Counsel for Defendants Jay D. Farner,*
*Daniel Gilbert, and Rock Holdings Inc.*

December 8, 2023