UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CARL SHUPE, individually and
on behalf of all others similarly situated,

                    Plaintiffs,                    Case No. 1:21-cv-11528

v.                                                 Honorable Thomas L. Ludington
                                                   United States District Judge
ROCKET COMPANIES, INC., JAY FARNER,
DANIEL GILBERT, and ROCK HOLINGS, INC,

                    Defendants.
_____/

**OPINION AND ORDER (1) GRANTING PLAINTIFFS' MOTION TO SUBSTITUTE; (2) GRANTING PLAINTIFFS LEAVE TO AMEND COMPLAINT; (3) GRANTING PLAINTIFFS LEAVE TO WITHDRAW AND RE-FILE CLASS CERTIFICATION MOTION; (4) GRANTING IN PART PLAINTIFFS' MOTION TO MODIFY CASE SCHEDULE; AND (5) ADJOURNING SCHEDULING ORDER**

Plaintiffs have filed a Motion for Class Certification in this securities-fraud class action, proposing a subclass under §20A of the Exchange Act and seeking to appoint named Plaintiff Matthew Pearlman as the subclass representative. But, after this motion was filed, Pearlman indicated he no longer wished to participate in the case and refused to make himself available for depositions. Accordingly, Plaintiffs seek to withdraw Pearlman and substitute Construction Laborers Pension Trust for Southern California (SoCal) as a named Plaintiff and proposed subclass representative. Plaintiffs also seek to adjourn the scheduling order to accommodate the substitution. Because SoCal's substitution is not sought in bad faith, is not futile, and does not cause undue delay or prejudice, Plaintiff will be granted leave to file an amended complaint and renewed motion for class certification reflecting Pearlman's withdrawal and SoCal's substitution, and the scheduling order will be accordingly adjourned.

- 1 -

# I.

## A.

Numerous shareholders of Rocket stock (NYSE:RKT) have sued Daniel Gilbert,[1] Rocket Holdings (RHI),[2] Rocket Companies (RCI), and some of RCI's senior officers and directors—Jay Farner,[3] Julie Booth,[4] and Robert Walters[5]—for alleged insider trading and securities fraud. ECF No. 42.

In June 2021, shareholder Zoya Qaiyum initiated this case under 15 U.S.C. § 78j(b), t(a) and 17 C.F.R. § 240.10b-5 in the Southern Division, and it was randomly assigned to District Judge Paul D. Borman. ECF No. 1. The next month, Judge Borman recused himself from the case, and it was then randomly reassigned to District Judge Judith E. Levy. ECF No. 4 In August 2021, six plaintiffs from later-filed Case No. 5:21-CV-11618 filed five motions to consolidate that case with this case, as well as to be appointed as the lead or colead plaintiff under 15 U.S.C. § 78u–4(a)(3)(B)(i), as amended by the Private Securities Litigation Reform Act of 1995 (PSLRA). *See* ECF Nos. 10; 13; 14; 15; 16.

In April 2022, Judge Levy consolidated the cases under Civil Rule 42(a)(2) but did not determine the lead plaintiff under the Private Securities Litigation Reform Act (PSLRA). *See* ECF

---

[1] Defendant Gilbert founded Rocket Mortgage in 1985 and, at all relevant times, was the Chairman of Rocket's Board of Directors and Rocket's majority shareholder through his holdings in RHI. ECF No. 42 at PageID.1038.

[2] Referred to collectively as the "Insider Trading Defendants," Defendants Gilbert and RHI indirectly owned of 99.9% of Rocket's outstanding Class D Common Stock—with ten votes per share—and 93.1% of Rocket's Class A Common Stock—with one vote per share. ECF No. 44 at PageID.1038–39, 1165; ECF No. 42 at PageID.1209.

[3] At all relevant times, Defendant Farner was Rocket's CEO, RHI's CEO, and Vice Chairman of Rocket's Board of Directors. ECF No. 44 at PageID.1209.

[4] At all relevant times, Julie Booth was Rocket's CFO and Treasurer. ECF No. 44 at PageID.1209.Booth was dismissed as a Defendant on March 8, 2023. ECF No. 55

[5] At all relevant times, Robert Walters was Rocket's President and COO. ECF No. 44 at PageID.1209. Walters was dismissed as a Defendant on March 8, 2023. ECF No. 55.

Nos. 30; 31. Two days later, the case was randomly reassigned to the undersigned so that Judge

Levy could "effectively manage the ongoing Flint water cases." E.D. Mich. Admin. Order 22-AO-

024 (effective Apr. 19, 2022); *see also In re Flint Water Cases*, No. 5:16-CV-10444 (E.D. Mich.

Feb. 23, 2023).

In May 2022, Qaiyum voluntarily dismissed her complaint and this Court appointed Carl

Shupe as Lead Plaintiff. *Shupe v. Rocket Cos.*, 601 F. Supp. 3d 214, 217 n.1, 221 (E.D. Mich.

2022). A month later, Plaintiffs filed a Second Amended Complaint, alleging the following causes

of action:

| Count | Claim | Defendants |
|-------|-------|------------|
| I | Exchange Act Rule 10b-5 | Gilbert, RHI |
| II | Section 20A of the Exchange Act | Gilbert, RHI |
| III | Section 10(b) of the Exchange Act and Rule 10b-5 | RCI, Farner, Booth, Walters, Gilbert |
| IV | Section 20(a) of the Exchange Act | RHI, Farner, Booth, Walters, Gilbert |

ECF No. 42 at PageID.1165–74.

Generally, Plaintiffs allege Rocket executives knew in late 2020 that Rocket's financial

situation would likely decline but nevertheless made a series of false statements to the public

throughout early 2021 expressing their belief in Rocket's financial growth and viability.[6] *See id.*

---

[6] The seven specific alleged false statements are:

(1) On a February 25, 2021 Earnings Call, Defendant Farner told a Morgan Stanley analyst that Rocket was "seeing strong consumer demand, especially in the housing market . . . the strongest that it's been here in the last decade," and that "overall, [Rocket] was able to grow volume twice as fast as the industry in 2020." ECF No. 42 at PageID.1124.

(2) On the same February2021 Earnings Call, Defendant Booth stated that Rocket is "still in a very strong demand environment" and is "still seeing strong closed loan volume . . . in Q4 of § 107 billion and then looking ahead into Q1, between $98 million and $103 billion," which "would be the second biggest quarter in [Rocket's] history." *Id.* at PageID.1124–25. (emphasis omitted)

(3) On the same February 2021 Earnings Call, Defendant Farner responded to a Goldman Sachs analyst's question on changing interest rates by stating that rising interest rates will give Rocket "an opportunity . . . to lean in to spend more money," and that in "the retail or Direct-

at PageID.1032–33, 1098–1099, 1122–37. Plaintiffs further allege that Defendants Gilbert and RHI engaged in insider trading[7] by selling over 20 million shares, profiting nearly $500 million, on March 29, 2021—six days after Gilbert learned of Rocket's forecasted financial decline. *See id.* at PageID.1031, 1033–34, 1110–22. ( emphasis omitted).  Importantly, Plaintiffs allege (1) this was the first time Gilbert *ever* sold his shares,[8] (2) Rocket's rules barred this sale as outside the allotted trading window, but (3) Gilbert—through his position as Chairman—convinced the Board to change their own rules and open the trading window to allow this specific sale. *See id.* at PageID.1110–22. After Defendant Gilbert sold his 20 million shares, Plaintiffs allege the share price of Rocket stock fell from $22.80 to $16.48. *Id.* at PageID.1035.

Importantly, although Carl Shupe was appointed Lead Plaintiff for the putative class of "all persons and entities that purchased or otherwise acquired publicly traded Rocket Class A common stock during the period from February 25, 2021 through May 5, 2021[,]" *id.* at

---

to-Consumer space," Rocket "[does not] see interest rates going up or down, really having an impact on [its] business one way or the other." *Id.* at PageID.1126–27 (emphasis omitted).

(4) During a March 3, 2021 virtual conference hosted by Morgan Stanley, Defendant Farner responded to a question about the growth rate of Rocket's business channels by stating "you can probable sense from [his] passion, they're all growing." *Id.* at PageID.1129–30 (emphasis omitted).

(5) On March 11, 2021, Defendant Farmer responded to a question on COVID-19's market impact from a Fox Business representative by stating ""You know, we're going to see interest rates tick up a little bit here," which Rocket takes "as an opportunity to grow. . . . So, really, interest rates moving around are a great benefit to [Rocket]." *Id.* at PageID.1132 (emphasis omitted). The same is true, he added, "when they drop back down." *Id.*

(6) On March 17, 2021, Defendant Farner posted on Twitter that market share and volume from third-party originators "is up significantly at [Rocket]! Thank you partners. #BrokertsCan[.]" *Id.* at PageID.1134.

(7) On March 19, 2021, Defendant Gilbert re-tweeted the same. *Id.*

[7] For a full list of the "ten details" that illustrate the alleged insider trading, *see* ECF No. 55 at PageID.2037–39; *Shupe v. Rocket Companies, Inc.*, 660 F. Supp. 3d 647, 661–62 (E.D. Mich. 2023).

[8] Rocket launched its initial public offering (IPO) in August 2020, by selling 100 million shares at $18.00 per share. ECF No. 42 at PageID.1045.

PageID.1162, the Second Amended Complaint also named Matthew Pearlman as a plaintiff and alleged he "purchased Rocket Class A common stock on March 29, 2021 . . . and traded *contemporaneously* with Defendant Gilbert[.]" *Id.* at PageID.1037 (emphasis added). This language is important because Section 20A of the Exchange Act, alleged in Count II, provides a right of action only for those who traded "contemporaneously" with an insider trade. 15 U.S.C. § 78t-1.

In March 2023, this Court granted in part Defendants' motion to dismiss, to the extent it sought the dismissal of Julie Booth and Robert Walters as Defendants—because Plaintiffs had not shown any statements made by Walters and the one statement allegedly made by Booth was not actionable—but denied Defendant's motion in all other respects. *See generally* ECF No. 55; *Shupe v. Rocket Companies, Inc*., 660 F. Supp. 3d 647, 691 (E.D. Mich. 2023). Plaintiffs plausibly pleaded actionable false statements, loss causation, scienter, and insider trading. *See id.*

**B.**

On August 30, 2023, Plaintiffs filed their Motion for Class Certification, ECF No. 74, and proposed the following class and subclass definitions:

> **Class:** All persons and entities that purchased or otherwise acquired publicly traded Rocket Companies, Inc. ("Rocket" or the "Company") Class A common stock (NYSE: RKT) between February 25, 2021 and May 5, 2021, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are: (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendant Rocket and Defendant RHI; (d) any person who is an officer, director, or controlling person of Rocket; (e) any entity in which any Defendant has a controlling interest; and (f) the legal representatives, heirs, successors, or assigns of any such excluded party.

> **Subclass:** All persons and entities within the Class that purchased publicly traded Rocket Class A common stock *contemporaneously* with Defendant Gilbert's and Defendant RHI's sale of Rocket Class A common stock on March 29, 2021 (the "Subclass"). Excluded from the Subclass are: (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendant Rocket and Defendant RHI; (d) any person who is an officer, director, or controlling

person of Rocket; (e) any entity in which any Defendant has a controlling interest; and (f) the legal representatives, heirs, successors, or assigns of any such excluded party.

*Id.* at PageID.2447–48 (italics added).

Notably, the proposed Subclass relates specifically to Count II of Plaintiffs' Complaint, alleging violations of § 20A of the Exchange Act which creates a private right of action for those who trade contemporaneously with an alleged insider trade. *See* ECF No. 42 at PageID.1167–69.

Plaintiffs sought to appoint previously-approved lead Plaintiff Carl Shupe as Class Representative and named Plaintiff Matthew Pearlman as Subclass Representative, alleging each had typical claims and would fairly and adequately protect the interests of the proposed Class and Subclass. *Id.* at PageID.2477, 2455–58. Plaintiffs alleged both Shupe and Pearlman were personally harmed by Defendants conduct, had typical claims, and "demonstrated an ability to take an active role in the litigation to protect the interests of Class members" by defending the litigation throughout pleadings, participating in discovery, and retaining experienced attorneys. *Id.* at PageID.2457–58.

But things changed. On November 20, 2023, this Court granted the Parties' stipulation to adjourn a settlement conference, in part because the Parties explained they "agreed to pursue a full-day private mediation" in New York with an agreed-upon mediator and because the Parties stipulated that "*Plaintiffs intend to seek to substitute one of the proposed class representatives, Matthew Pearlman, with another proposed class representative*." ECF No. 78 at PageID.2786–87 (emphasis added).

Accordingly, on December 8, 2023—before Defendants responded to Plaintiffs' Motion for Class Certification—Plaintiffs simultaneously filed (1) a Motion to Modify the Case Schedule, ECF No. 80, and (2) a Motion to Substitute the proposed Subclass representative, ECF No. 81. In

- 6 -

these motions, Plaintiffs explain that, since filing their Motion for Class Certification, Plaintiff Pearlman "indicated he was too busy with work to make himself available for a deposition," and Plaintiffs concluded he "no longer wished to participate in the litigation." ECF No. 81 at PageID.2823. So, Plaintiffs seek to withdraw Pearlman and substitute Construction Laborers Pension Trust for Southern California (SoCal) as a party under Civil Rule 21,[9] and leave to withdraw their pending motion for class certification so they can file a renewed motion proposing SoCal as the Subclass Representative. *See* ECF No. 81. Plaintiffs also seek an accommodating adjournment of the Scheduling Order. ECF No. 80. Defendants oppose both motions. ECF Nos. 87; 88.

---

[9] Plaintiffs' Motion for Substitution does not explicitly seek leave to amend the operative Complaint, ECF No. 42, but, practically, Plaintiffs seek this relief, too. True, a proposed—or approved—class or subclass representative need not also be a named plaintiff. *See In re Telectronics Pacing Sys., Inc*., 172 F.R.D. 271, 283 (S.D. Ohio 1997) ("While it seems unusual that a class representative has not sued individually, the Court finds no requirement in Rule 23 that they do so. . . . [t]hus, Rule 23 seems to contemplate the possible substitution of non-parties as class representatives."); *United States Parole Commission v. Geraghty*, 445 U.S. 388, 415–16 n. 8 (Powell, J., dissenting) (noting the court's authority under Civil Rule 23 to seek substitute class representatives if a named plaintiff can no longer serve); ANN. MANUAL COMPLEX LIT. § 21.26 (4th ed. 2023) (noting that, when substitution of a class representative is necessary "[t]he court may permit intervention . . . or may simply designate that person as a representative in the order granting class certification."); *see also* 3 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 7.30 (6th ed. 2023) (discussing subclasses and their representatives). However, Plaintiffs do not seek merely to amend their prior Motion for Class Certification by swapping Pearlman's name with SoCal's. Instead, Plaintiffs explicitly seek to *add* SoCal *as a party*. ECF No. 81 at PageID.2814, (seeking SoCal's substitution "into this action for the purpose of moving to serve as a class representative"), at PageID.2823 (explaining SoCal is "well-equipped to litigate this case on behalf of the Subclass"), at PageID.2824 (arguing this Court can *add* SoCal under Civil Rule 21), at PageID.2828 (discussing SoCal's service as an additional plaintiff), at PageID.2830. Indeed, relevant Sixth Circuit precedent suggests amending a complaint when plaintiffs seek—before the class is certified—to withdraw a named plaintiff and substitute a new proposed class representative. *See, e.g.*, *LaDrigue v. City of Bay City*, No. 1:19-CV-11196, 2022 WL 1205000 (E.D. Mich. Apr. 22, 2022), *reconsideration denied*, No. 1:19-CV-11196, 2022 WL 1567312 (E.D. Mich. May 18, 2022); *Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2020 WL 3529659, at *3 (E.D. Tenn. June 29, 2020); *Thorn v. Bob Evans Farms*, LLC, No. 2:12-CV-768, 2013 WL 2456336, at *2 (S.D. Ohio June 6, 2013).

## II.

The issues are (1) whether Pearlman should be withdrawn as a named Plaintiff; (2) whether Plaintiffs should be granted leave to amend their operative Complaint to add SoCal as a party; and (3) if so, whether Plaintiffs should be granted leave to withdraw their motion for class certification so they can file a renewed motion with their new proposed Subclass Representative. These three issues lie at the intersection of three different rules of civil procedure.

Civil Rule 23 governs class actions in federal courts. Rule 23 provides that, when appropriate, a class may be divided into subclasses which, for all intents and purposes, are "treated as a class." FED. R. CIV. P. 23(c)(5). Thus, at the certification stage, among other requirements, plaintiffs must establish that proposed subclass representatives have claims typical of the subclass and will fairly and adequately protect the subclass's interest. *See* FED. R. CIV. P. 23(a)(3) and (4). Rule 23 also vests district courts with the authority to "determine the course of proceedings" by "prescribe[ing] measures to prevent undue repetition or complication in presenting evidence or argument" or "require[ing] that pleadings be amended to eliminate allegations about representation of absent persons[.]" *See* FED. R. CIV. P. 23(d)(1).

Civil Rule 15 governs amendments to pleadings and allows a party to amend its pleading "with the opposing party's written consent or with the court's leave." FED. R. CIV. P. 15(a)(2). While Rule 15 contemplates a change in pleading, Civil Rule 21 contemplates a change in parties. Rule 21 provides that "[o]n a motion or on its own, the court may, at any time, on just terms, add or drop a party." FED. R. CIV. P. 21. Regardless of whether a motion is construed to amend a complaint under Rule 15 or to add a party under Rule 21, the same standard applies. *Thorn v. Bob Evans Farms, LLC*, No. 2:12-CV-768, 2013 WL 2456336, at *2 (S.D. Ohio June 6, 2013); *see also*

*Abington Emerson Cap., LLC v. Adkins*, No. 2:17-CV-143, 2019 WL 13161926, at *1 (S.D. Ohio

May 3, 2019). This "liberal" standard provides:

> In the absence of any apparent or declared reason—such as undue delay, bad faith
> or dilatory motive on the part of the movant, repeated failure to cure deficiencies
> by amendments previously allowed, undue prejudice to the opposing party by virtue
> of allowance of the amendment, futility of amendment, etc.—the leave sought
> should, as the rules require, be "freely given."

*Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 640–41 (6th Cir. 2018) (quoting *Foman v.

Davis*, 371 U.S. 178, 182 (1962)). And, regardless of which Civil Rule is cited by the Parties,

"decision[s] as to whether leave to amend and/or to substitute should be granted [are] committed

to the trial court's discretion." *Id.*; *see also Letherer v. Alger Grp., L.L.C.*, 328 F.3d 262, 266 (6th

Cir. 2003), *overruled on other grounds by Blackburn v. Oaktree Cap. Mgmt.*, LLC, 511 F.3d 633

(6th Cir. 2008); *Williams v. Hoyt*, 556 F.2d 1336, 1341 (5th Cir.1977), *cert. denied*, 435 U.S. 946

(1978).

### III.

Plaintiff does not seek to withdraw Pearlman—and add SoCal—in bad faith. Additionally,

the withdrawal and addition will not prejudice Defendants, will not cause undue delay, and are not

futile. Thus, under Rules 15 and 21, in the interest of justice, Plaintiffs will be "freely given" leave

to amend their Complaint, ECF No. 42, and withdraw and refile their Motion for Class

Certification, ECF No. 74. This Court will also set an accommodating briefing schedule.

#### A. Bad Faith

First, Defendants do not argue that Plaintiffs' Motion to Substitute was motivated by bad

faith or dilatory tactics. And neither is apparent to this Court. Plaintiffs aver that Matthew Pearlman

did not express his disinterest in the litigation until *after* Plaintiffs filed their Motion for Class

Certification which—consistent with their belief at the time—proposed Pearlman as an adequate

Subclass Representative. *See generally* ECF No. 74. And the record reflects Plaintiffs diligently sought a substitute proposed Subclass Representative after Pearlman refused to make himself available for deposition. *See* ECF No. 81 at PageID.2823. Defendants stipulated that Plaintiffs would seek to substitute Pearlman with another "proposed class representative" on November 17, 2023, nearly one month before Plaintiffs' Motion. ECF No. 78. And Plaintiffs maintain they told Defendants about their plans to seek substitution even earlier. ECF No. 81 at PageID.2831–32.

### B. Undue Prejudice and Delay

Second, Defendants do not argue that Plaintiffs' Motion to Substitute would cause undue delay or prejudice. Nor could they. The proposed withdraw of Pearlman and addition of SoCal will not add any new claims and will not cause Defendants to assert any new defenses. Likewise, Plaintiffs explain their "renewed class certification motion would be substantively the same as the prior motion but for" SoCal's proposed service as Subclass Representative. ECF No. 80 at PageID.2809. Thus, Defendants' arguments in response to class certification would largely be the same as those already asserted, but for some new potential arguments concerning SoCal's proposed adequacy or typicality. True, the proposed substitution would cause some delay as the Parties brief a renewed motion for class certification. But this modest delay is not "undue" nor a sufficient reason to deny Plaintiffs' substitution. *See Moore v. City of Paducah*, 790 F.2d 557, 561 (6th Cir. 1986) ("Delay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself to disallow an amendment of a pleading."); *see also Dura Operating Corp. v. Magna Int'l*, 2011 WL 126990, at *4 (E.D. Mich. 2011) (noting the Sixth Circuit requires "both undue delay by the party seeking the amendment and a substantial prejudice to the non-movant" to deny amending or adding a party).

- 10 -

**C. Futility**

Turning to the crux of this controversy,[10] Plaintiffs' proposed substitution is not futile. A proposed amendment, including those adding parties, is "futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss."[11] *Dobronski v. Selectquote Ins. Servs.*, 462 F. Supp. 3d 784, 788 (E.D. Mich. 2020) (quoting *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)). And this Court already held that Plaintiffs stated a valid insider trading claim under § 20A of the Exchange Act, to survive Defendants' 2022 Motion to Dismiss. *See Shupe v. Rocket Companies*, Inc., 660 F. Supp. 3d 647, 684–90 (E.D. Mich. 2023).

§ 20A of the Exchange Act creates provides:

---

[10] Defendants also argue SoCal's substitution runs afoul of the PSLRA because Plaintiffs have not republished notice and sought lead plaintiff applications on the §20A claim and proposed Subclass. ECF No. 88 at PageID.4357–59. In Defendants' view, Plaintiff is attempting to skirt notice and lead plaintiff approval requirements under the PSLRA because SoCal would essentially serve as another *lead* plaintiff for the §20A proposed subclass. *Id.* at PageID.4457. Not so. Although the PSLRA does require plaintiffs to notify class members and courts to approve lead plaintiffs, 15 U.S.C. § 78u-4(a)(3), the purpose of the lead plaintiff requirements "was never to do away with the notion of [additional] *class representatives* or *named plaintiffs* in securities class actions." *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002) (emphasis added). "Nowhere is it suggested that the concept of 'lead plaintiff'"—and the corresponding PSLRA requirements—"w[ere] intended to be coterminous with 'named plaintiffs' or 'class representatives.'" *Id.* Indeed, "[r]eading the PSLRA in accordance with its plain meaning, the Court concludes that being a Lead Plaintiff under the PSLRA is not the same as being a Class [or Subclass] Representative under" Civil Rule 23. *Id.* (*quoting In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 378 (S.D.N.Y.2000)). Thus, Plaintiffs' proposed substitution does not implicate procedural PSLRA requirements.

[11] Under Civil Rule 12(b)(6), a pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a Rule 12(b)(6) dismissal, the court accepts all factual allegations of the complaint as true and will construe the pleading in favor of the nonmovant. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The plaintiff need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," but the court need not accept as true the complaint's legal conclusions. *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, *contemporaneously* with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t-1(a) (emphasis added). Thus, § 20A  provides a private right of action to "any person" who traded "securities of the same class" "contemporaneously" with an insider trader. *See id.* If successful, plaintiffs may be able to recover up to the insider's profit gained or loss avoided, offset by any disgorgements to the SEC. *See id.* § 78t–1(b)(1)–(2). But the statutory language does not define "contemporaneously" nor does it clarify whether the §20A plaintiff must directly buy from or sell to the insider-defendant to establish a sufficient economic injury. Seizing on these gaps in the statutory language, Defendants argue Plaintiffs' proposed substitution is futile because, in their view (1) SoCal does not have *constitutional* Article III standing to pursue a §20A claim because it did not buy shares directly from Defendants Gilbert or RHI;[12] and (2) SoCal did not trade "contemporaneously" to provide it with *statutory* standing to state a claim under § 20A because it purchased Rocket shares the day after Defendant Gilbert's alleged insider trade. ECF No. 88 at PageID.4345–46,4352–57. Defendants' views are misguided.

### 1.  Constitutional Standing

Beginning with constitutional standing, Plaintiffs have shown SoCal has a fairly traceable and redressable concrete injury. Defendants' argument that SoCal lacks such injury because SoCal did not buy Rocket shares *directly from Defendants* is misguided.

---

[12] Curiously, Defendants did not argue Pearlman lacked Article III standing to pursue a §20A claim in their 2022 Motion to Dismiss, *see* ECF No. 44, and instead raise the issue for the first time over one year later.

It is axiomatic that, if a plaintiff lacks Article III standing, federal courts lack subject matter jurisdiction. *Stalley v. Methodist Healthcare*, 517 F.3d 911, 916 (6th Cir.2008). Thus, if a proposed additional plaintiff lacked Article III standing, their addition would be futile under Rules 15 and 21. To satisfy Article III's standing requirement, Plaintiffs must show:

> (1) SoCal suffered an injury-in-fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
> (2) SoCal's injury is fairly traceable to the Defendant's alleged conduct; and
> (3) it is likely, as opposed to merely speculative, that SoCal's injury will be redressed by a favorable decision.

*See Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 581 (6th Cir. 2016); *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 606–07 (6th Cir. 2007); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000). And, at this pleading stage,[13] all Plaintiffs must do is "clearly *allege* facts that demonstrate each element of standing." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (emphasis added)).

In order to satisfy the first element, a plaintiff must show that a concrete injury "actually exist[s]." *Spokeo*, 578 U.S. at 340. "The most obvious [concrete injuries] are traditional tangible harms, such as physical and monetary harms." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). But what of statutory causes of action? The Supreme Court recently explained "[i]n determining whether a harm is sufficiently concrete to qualify as an injury in fact, . . . Congress's views may be 'instructive.'" *Id.* (quoting *Spokeo*, 578 U.S. at 340–41). On one hand, "[c]ourts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that

---

[13] Recall that the standard for amendment futility is whether the proposed amendment would withstand a motion to dismiss under Civil Rule 12(b)(6). *Dobronski v. Selectquote Ins. Servs.*, 462 F. Supp. 3d 784, 788 (E.D. Mich. 2020) (quoting *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)).

statutory prohibition or obligation." *Id.* In this way, Congress may elevate de facto injuries that were previously inadequate to the level of legally cognizable "concrete" injuries. *Id.* On the other hand, Congress cannot "simply enact an injury into existence" and "Congress's creation of a statutory . . . cause of action does *not* relieve courts of their responsibility to independently decide whether a plaintiff has suffered concrete harm under Article III" by analyzing whether the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts. *Id.* at 426–27.

The second Article III standing requirement—causation—requires a plaintiff to show that their concrete harm was likely caused by the defendant rather than the "independent action of some third party not before the court." *Simpson-Vlach v. Michigan Dep't of Educ.*, 616 F.Supp.3d 711, 726 (E.D. Mich. 2022), *aff'd*, No. 22-1724, 2023 WL 3347497 (6th Cir. May 10, 2023); *Gamboa*, 381 F.Supp.3d at 886; *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 796 (6th Cir. 2009).

To satisfy the third standing requirement of redressability, a plaintiff "must show that each requested remedy will redress some portion of the plaintiff's injury." *Simpson-Vlach*, 616 F.Supp.3d at 726. Further, the remedy must be "limited to the inadequacy that produced [a plaintiff's] injury in fact." *Id.* (quoting *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 540); *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (*quoting Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

At this pre-certification stage, Plaintiffs have sufficiently shown SoCal's Article III standing to pursue a §20A claim. Importantly, §20A does not proscribe unlawful conduct—it merely provides a private right of action for those harmed by conduct violating other sections of the Exchange Act, such as, here, insider trading in violation of 15 U.S.C. § 78j(b). *See* 15 U.S.C. § 78t–1(a). And insider trading victims undoubtedly suffer concrete monetary harm, traditionally recognized as providing a basis for lawsuits. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 427

(2021) (noting monetary injury as a traditional concrete harm); *see also In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006) (insider trading plaintiffs have standing to the extent they purchased the relevant shares); *In re Columbia Entities Litig.*, No. 04–11704, 2005 WL 6776751 (D.Mass. Nov. 30, 2005) (same).

Here, Plaintiffs alleged that Defendant Gilbert and RHI traded 20 million shares of Rocket Class A common stock while possessing material nonpublic information concerning Rocket's financial forecast in violation of §10(b) of the Exchange Act. ECF No. 91 at PageID.4454. As a result of the Defendants' nondisclosure, Plaintiffs allege, SoCal contemporaneously purchased $502,186.31 of the same stock at an artificially inflated price. ECF No. 81-2 at PageID.2847. Thus, Plaintiffs allege a particularized concrete harm to satisfy their Article III standing.

Defendants' argument to the contrary is unpersuasive and outdated. Defendant argues that "harm to market participants writ large from insider trading has never been one traditionally recognized as providing a basis for a lawsuit in American courts." ECF No. 88 at PageID.4348. (internal quotations omitted). But Defendants then argue SoCal's harm was not sufficiently concrete because SoCal did not *directly* trade with either Defendant Gilbert or RHI. *See* ECF No. 88 at PageID.4349, 4353. This argument concerns the second element of standing—whether a plaintiff's injury is fairly traceable to a defendant's conduct—rather than whether harm exists in the first instance. Defendants cite only two cases in support of their proposition. One is a 30-year-old Northern District of California Case, and the other *Fridrich v. Bradford*—a 1976 Sixth Circuit opinion decided twelve years *before* Congress enacted § 20A in 1988. *Id.* at 4347, 4349; *see also Fridrich v. Bradford*, 542 F.2d 307, 314 (6th Cir. 1976) (noting private plaintiff insider trading claim was only a "judicially implied" claim at the time).

In *Fridrich*, private plaintiffs sued J.C. Bradford Jr. for his purchase of 1,225 shares of Old Line Life Insurance Company based on inside information Bradford received from his father. *Fridrich*, 542 F.2d at 308. After Bradford's purchase, Old Line stock increased and Bradford reaped $13,000 in profits. *Id.* After Bradford entered a consent decree with the Securities and Exchange Commission, the district court awarded a group of private plaintiffs over $300,000 for their Rule 10b-5 claim, even though plaintiffs did not sell directly to Bradford. *Id.* The Sixth Circuit reversed, holding in part that plaintiffs did not "establish a causal connection between [Bradford's] misconduct and [their] loss" because Bradford "did not purchase any shares of stock from plaintiffs, and [Bradford's] trading in no way affected plaintiffs' decision to sell. *Id.* at 318. But *Fridrich* is outdated, and has been since at least 1992.

After *Fririch* was decided, Congress passed the Insider Trading and Securities Fraud Enforcement Act of 1988 (ITSFEA) and codified §20A of the Securities Exchange Act. As recognized in 1992 by the Southern District of Ohio, the legislative history of the ITSFEA illustrates the Congressional intent to "adopt[] a *more expansive* notion of the necessary . . . causation in insider trading cases[.]" *In re Nord Res. Corp. Sec. Litig.,* 1992 WL 1258516, at *4 (S.D. Ohio Dec. 16, 1992). Indeed, House Reports suggest that §20A's explicit purpose was to "augment enforcement of the securities laws, particularly in the area of insider trading, through a variety of measures designed to provide greater deterrence, detection, and punishment of violations of insider trading." H.R.Rep. No. 910, 100th Cong. 2nd Sess. 7 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 6044 [hereinafter House Report]. The legislative history further suggests "Congressional dissatisfaction with the pre-statute remedies"—such as those analyzed in *Fridrich*—"that traditional common law principles of privity and causation are the basis of securities fraud litigation." *In re Nord*, 1992 WL 1258516, at *4. Indeed, the House Reports reveal

Congressional approval of numerous decisions that directly contradicted *Fridrich*, and even one which expressly rejected *Fridrich*'s rationale. *Id.*; *see also* House Report at 6064 n. 22 (citing *O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*, 559 F. Supp. 800, 804 (S.D.N.Y. 1983) (allowing pre-§20A insider trading claims when plaintiffs did not trade directly with defendants and noting widespread approval within other Circuits at the time))).

This Court joins the Southern District of Ohio in concluding that *Fridrich*, nearly 50 years later, is non-binding and unpersuasive. *See id.* at *4; *see also Backman v. Polaroid Corp.*, 540 F. Supp. 667, 669 (D. Mass. 1982) ("The privity requirement announced by the Sixth Circuit in *Fridrich* places a burden upon plaintiffs in insider trading cases which is nearly impossible to meet."); *O'Connor & Assocs. v. Dean Witter Reynolds, Inc.,* 559 F. Supp. 800, 805 (S.D.N.Y. 1983). Plaintiffs need not allege SoCal traded directly with either Defendants Gilbert or RHI for constitutional standing to pursue a §20A claim on behalf of the proposed Subclass. Plaintiffs have sufficiently pleaded SoCal's redressable, concrete, particularized, and fairly traceable injury; Article III requires nothing more.[14]

## 2.   Statutory Standing

Defendants next argue that SoCal lacks *statutory* standing to bring a §20A claim because, in their view,  the "contemporaneous" element of §20A limits the statutory right of action to only those who purchase the relevant shares *the same day* as the alleged insider trade, and SoCal

---

[14] Notably, Defendants also argue SoCal should not be substituted because *Pearlman* lacked Article III standing. ECF No. 88 at PageID.4344–52. But, for the same reasons SoCal has Article III standing to pursue §20A claims, Pearlman did, too. *See* ECF No. 42-2 at PageID.896 (alleging Pearlman purchased Rocket Class A common stock contemporaneously to Defendants' alleged insider trade).

purchased Rocket Class A common stock the day after Defendants' alleged insider trade.[15] But Defendant's definition of "contemporaneous" is too narrow and this Court is satisfied that SoCal has statutory standing to pursue a §20A claim.

In addition to the *Fridrich* holding discussed above, the Sixth Circuit in *Fridrich* also rejected plaintiffs' insider trading claims against defendant Bradford because plaintiffs "did not sell [their shares] the same day or even in the same month" as Bradford's alleged insider trade. *Fridrich v. Bradford*, 542 F.2d 307, 308 (6th Cir. 1976). But this conclusion is also nonbinding and unpersuasive. *In re Nord Res. Corp. Sec. Litig.*, 1992 WL 1258516, at *5 (S.D. Ohio Dec. 16, 1992) (noting *Fridrich* is non-binding and concluding that a trade is "contemporaneous" if made "within a few days" of the alleged inside trade). Today, although courts vary in defining the term, most agree that a trade is made "contemporaneously" for the purposes of §20A if it is made "within a few days" or the "day after" the alleged insider trade. *See e.g.*, *id.*; *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1205 (C.D. Cal. 2008) (§20A plaintiff trades contemporaneously if trades on same day "or one trading day after" the insider trade); *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 508 (S.D.N.Y. 2011) ("[F]ive trading days appears to be a reasonable period of time within which sales and purchases will be considered contemporaneous."); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 311 n. 51

---

[15] The threshold question of whether a §20A plaintiff traded "contemporaneously" with the alleged insider trade is a question of statutory standing, separate and apart from the constitutional Article III analysis. *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 299, n.3 (D. Md. 2022) *Turocy v. El Pollo Loco Holdings, Inc.*, 2018 WL 3343493, at *9; *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *13 (N.D. Cal. Aug. 14, 2008). A statutory standing limitation "does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case." *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014) (internal quotations omitted). !
!

(S.D.N.Y. 2008) (noting the Second Circuit defines the term to encapsulate a "reasonable period of time, usually limited to a few days" after the alleged insider trade); *In re Valeant Pharms. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075, at *12 (D.N.J. June 30, 2019) (finding a same-day requirement inappropriate); *Beach v. Healthways, Inc.*, No. CIV.A. 3:08-0569, 2009 WL 650408, at *6 (M.D. Tenn. Mar. 9, 2009) (holding that plaintiff who merely *alleges* a "contemporaneous" trade and supports it by showing trades within a few days of one another survives motion to dismiss); *see also* 3 BROMBERG & LOWENFELS ON SECURITIES FRAUD § 6:390 (2023) ("In sum, it seems that trades must be after, and somewhere between a day and a 'few days' after[] an insider trade to be contemporaneous.").

This Court need not define specific contours of "contemporaneous" trades because this Court is satisfied that SoCal's alleged trade of Rocket Class A common stock on March 30, 2021 was sufficiently contemporaneous to Defendants' alleged insider trade on March 29, 2021. *See* ECF Nos. 81 at PageID.2826; 81-2 at PageID.2847. SoCal has statutory standing to pursue a §20A claim and, thus, its substitution would not be futile.

In sum, Defendants have not shown that SoCal's substitution for named Plaintiff Pearlman is sought in bad faith, nor that the substitution would be unduly prejudicial, cause undue delay, or would be futile. On the contrary, without SoCal's substitution, this Court would be tasked with resolving an outstanding motion for class certification involving a named Plaintiff and proposed Subclass representative who has already demonstrated his disinterest in participating in this litigation. As a matter of judicial efficiency, it makes far more sense for Plaintiffs to get their ducks in a row, file an amended complaint swapping SoCal for Pearlman, allow Plaintiffs to withdraw their Motion for Class Certification, ECF No. 74, file a renewed motion reflecting the substitution, and allow both Parties to brief the renewed motion with the proper proposed Subclass

representative. To that end, Plaintiffs' Motion to Substitute, ECF No. 81, will be granted, they will be directed to file an amended complaint and amended motion for class certification, and the Scheduling Order will be adjourned. Notably, beyond holding that SoCal has constitutional and statutory standing to pursue claims on behalf of the proposed Subclass, this Court is *not* holding that SoCal will be the Subclass's representative, nor that the proposed Subclass will be certified. These issues will be delt with later, after both Parties fully brief Plaintiffs' forthcoming renewed motion for class certification..

## IV.

Accordingly, it is **ORDERED** that Plaintiffs' Motion to Substitute, ECF No. 81, is **GRANTED**.

Further, it is **ORDERED** that Plaintiffs are **GRANTED LEAVE** to withdraw the operative Complaint, ECF No. 42.

Further, it is **ORDERED** that Plaintiffs are **DIRECTED** to file an amended complaint, in accordance with the briefing schedule that follows, which mirrors their operative Complaint, ECF No. 42, but for the substitution of Construction Laborers Pension Trust for Southern California in place of Matthew Pearlman as named Plaintiff. The amended complaint shall comply with all requirements of 15 U.S.C. § 78u-4(a)(2).

Further, it is **ORDERED** that Plaintiffs are **GRANTED LEAVE** to withdraw their Motion for Class Certification, ECF No. 74.

Further, it is **ORDERED** that Plaintiffs are **DIRECTED** to file a renewed motion, in accordance with the briefing schedule that follows, for class certification which mirrors their current Motion, ECF No. 74, but for the substitution of, Laborers Pension Trust for Southern

California in place of Matthew Pearlman as proposed Subclass Representative and any arguments in support.

Further, it is **ORDERED** that Plaintiffs' Motion to Modify Case Schedule, ECF No. 80, is **GRANTED IN PART**, to the extent it seeks to adjourn the Scheduling Order to allow both Parties to fully brief Plaintiffs' renewed motion for class certification.

Further, it is **ORDERED** that the Scheduling Order, ECF No. 56, as amended by ECF Nos. 69; 75; 78, is **ADJOURNED** as follows:

| | |
|---|---|
| Plaintiffs' Amended Complaint Due: | February 12, 2024 |
| Plaintiffs' Renewed Motion for Class Certification Due: | February 12, 2024 |
| Defendants' Response to Renewed Motion for Class Certification Due: | February 26, 2024 |
| Plaintiffs' Reply in Support of Renewed Class Certification Motion Due: | March 8, 2024 |
| Factual Discovery Due: | March 27, 2024 |
| Expert Disclosure and Reports Due: | March 27, 2024 |
| Rebuttal Expert Reports Due: | April 29, 2024 |
| Expert Depositions Due: | June 21, 2024 |
| Expert Motion and Summary Judgment Motion Cutoff: | July 16, 2024 |
| Response to Expert and Summary Judgment Motions Due: | August 16, 2024 |
| Replies in Support of Expert and Summary Judgment Motions Due: | September 10, 2024 |
| Motions *in Limine* Due: | November 22, 2024 |
| Pretrial Submissions Due: | January 7, 2025 |
| Final Pretrial Conference: | January 15, 2025 at 2:00 PM EST |
| Jury Trial: | February 4, 2025 at 8:30 AM EST |

**This is not a final order and does not close the above-captioned case.**

Dated: February 5, 2024                    s/Thomas L. Ludington
                                           THOMAS L. LUDINGTON
                                           United States District Judge