**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas
Christine M. Fox
David Saldamando
140 Broadway
New York, New York 10005
Phone: (212) 907-0700
cvillegas@labaton.com
cfox@labaton.com
dsaldamando@labaton.com

*Lead Counsel for Lead Plaintiff Carl Shupe,*
*Plaintiff Construction Laborers Pension Trust*
*for Southern California, and the Proposed Class*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

| | |
|---|---|
| CARL SHUPE and CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) Civ. No. 1:21-cv-11528 |
| | ) Honorable Thomas L. Ludington ) United States District Judge |
| Plaintiffs, | ) |
| vs. | ) DEMAND FOR JURY TRIAL ) |
| ROCKET COMPANIES, INC., JAY D. FARNER, DANIEL GILBERT, and ROCK HOLDINGS INC., | ) LEAVE TO FILE GRANTED ) BY THE COURT ON ) FEBRUARY 5, 2024 ) |
| Defendants. | ) |

## SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................3

II.    JURISDICTION AND VENUE ...........................................................8

III.   THE PARTIES AND WITNESSES ....................................................8

    A.  Plaintiffs.....................................................................................8

    B.  Defendants..................................................................................9

    C.  Witnesses .................................................................................14

IV.   SUBSTANTIVE ALLEGATIONS ....................................................16

    A.  Rocket Company Background...................................................16

    B.  Rocket's Business Is Organized Into Two Business Segments .............22

        1.  The Direct-to-Consumer Segment....................................22

        2.  The Partner Network Segment ........................................25

    C.  Rocket's Key Performance Indicators......................................26

        1.  Gain on Sale Margin........................................................28

        2.  Closed Loan Origination Volume ....................................31

        3.  Market Share ...................................................................33

    D.  Defendants Constantly Tracked Rocket's KPIs and Every Step in the Loan Pipeline.................................................................34

        1.  Defendants Admit to Closely Monitoring Rocket's Loan Production KPIs................................................................34

        2.  Confidential Witnesses Support That the Loan Production KPIs, Including Gain on Sale Margin and Closed Loan Volume, Were Constantly Tracked ...................................36

i

3.  Using Rocket's Data Lake, Defendants Also Tracked Every Step in the Loan Pipeline, From Initial Customer Interest to Closed Loan Status .................................................................40

    a.  Confidential Witnesses Support That Rocket Closely Tracked These Data Points with Predictive Analytics to Estimate Loan Volume .............................................47

    b.  Based on These Analytics, Defendants Knew (or Were Reckless in Not Knowing) the Amount of Loans that Would Likely Reach Closed Loan Status at the Time of Loan Application, Which was 45 to 60 Days Prior to Closing.........................................................................52

E.  During the Class Period, Defendants Falsely Assured Investors That There Was "Strong Consumer Demand" and that Loan Volume Was Increasing ...............................................55

    1.  Volume In Each of Rocket's Channels Was Decreasing, Not Growing ............................................................56

    2.  The Amount of Loan Applications in the Pipeline Were Decreasing ...........................................................60

        a.  Client Inquiries Began a Steady Decline Starting in 2Q 2020 That Continued Throughout the Class Period.................60

        b.  Net Rate Locks Were Flat and Growth was Declining Starting in Mid-2020 and Continuing Throughout the Class Period ................................................................62

        c.  Confidential Witnesses Support that Loan Applications Were Decreasing Going Into 2021 ............................................63

        d.  The United Wholesale Ultimatum Placed Additional Downward Pressure on New Loan Applications ....................66

F.  During the Class Period, Defendants Also Falsely Assured Investors That Interest Rates Would Not Affect the Company .............70

G.  Defendant Gilbert Commits Insider Trading in Violation of the Securities Exchange Act 10(b) and 20A When He Sells $500 Million Worth of Rocket Stock While in Possession of MNPI .............82

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................94

        A.  Defendants' False and Misleading Statements in Earnings Calls ..........95

            1.  Materially False and Misleading Statements in the February
                25, 2021 Earnings Call ......................................................................95

        B.  Materially False and Misleading Statements During the March
            3, 2021 Morgan Stanley Virtual TMT Conference ...............................101

        C.  Materially False and Misleading Statements in Media ........................103

VI.     THE TRUTH IS REVEALED ....................................................................109

VII.    ADDITIONAL SCIENTER ALLEGATIONS ...........................................114

        A.  The Individual Defendants Knew or Recklessly Disregarded
            That Their Statements Were Materially False When Made .................114

            1.  Defendants *Admit* They Closely Monitored Critical KPIs
                That Showed Rocket's Loan Volume and Gain on Sale
                Margin Were Expected to Significantly Decline in 2021 ..............115

            2.  Defendants Had Access to and Reviewed Internal Reports
                and Data that Directly Contradicted Their Public Statements ........116

            3.  Declining Loan Volume and Gain on Sale Margin Were
                Discussed at Internal Company and Board Meetings ....................117

            4.  Defendants Were Aware of Rocket's Declining Gain on
                Sale Margin and Closed Loan Volume Because They
                Measured Rocket's Core Business ..................................................119

        B.  Defendants Gilbert and RHI Were Motivated to Engage in the
            Alleged Fraud to Profit From RHI's Gigantic, Unusually
            Timed, Insider Sale Executed in Violation of the Company's
            Insider Trading Policy ..........................................................................121

VIII.   LOSS CAUSATION ..................................................................................124

IX.     PRESUMPTION OF RELIANCE .............................................................130

X.      NO SAFE HARBOR ..................................................................................133

XI.     CLASS ACTION ALLEGATIONS .............................................................134

        COUNT I For Violations of Section 10(b) of the Exchange Act And
        Rule 10b-5     Against Defendants Daniel Gilbert and RHI......................137

        COUNT II For Violations of Section 20A of the Exchange Act
        Against the Insider Trading Defendants......................................................139

        COUNT III For Violations of Section 10(b) of the Exchange Act
        and Rule 10b-5 Against Rocket and the Individual Defendants
        (Farner, Booth, Walters, and Gilbert)..........................................................141

        COUNT IV For Violations of Section 20(a) of the Exchange Act
        Against RHI and the Individual Defendants (Farner, Booth,
        Walters, and Gilbert) ...................................................................................143

PRAYER FOR RELIEF .........................................................................................146

JURY DEMAND .....................................................................................................146

Court-appointed Lead Plaintiff Carl Shupe and additional named Plaintiff Construction Laborers Pension Trust for Southern California ("SoCal," and together with Carl Shupe, the "Plaintiffs")[1] bring this action pursuant to §§ 10(b), 20A, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), on behalf of themselves and all persons other than Defendants (defined *infra*, at ¶¶19-25) who purchased or otherwise acquired Rocket Companies, Inc. ("Rocket" or the "Company") Class A common stock (NYSE: RKT) between February 25, 2021 and May 5, 2021, inclusive (the "Class Period").

---

[1] Leave to withdraw the Amended Complaint (ECF No. 42) and file this Second Amended Complaint was granted by the Court in its February 5, 2024 Opinion and Order Granting Lead Plaintiff's Motion for Substitution. ECF No. 107. Consistent with the Court's instruction therein, Plaintiffs ***have not*** added or removed any claims, statements, defendants, or allegations in this Complaint, and no other material changes were made to this Complaint. The only change that is made in this Complaint is the substitution of Mr. Matthew Pearlman with SoCal. *See* ECF No. 107 at 10 and ECF No. 107 at 20 ("[I]t is ORDERED that Plaintiffs are DIRECTED to file an amended complaint, in accordance with the briefing schedule that follows, which mirrors their operative Complaint, ECF No. 42, but for the substitution of Construction Laborers Pension Trust for Southern California in place of Matthew Pearlman as named Plaintiff."). Plaintiffs acknowledge that the "demand" statements (¶¶222; 224) and the defendants Julie Booth and Robert Walters (¶¶21-22) were dismissed from this action, as per the Court's Order on Defendants' motion to dismiss (ECF No. 55). By filing this Second Amended Complaint, Plaintiffs do ***not*** intend to attempt to revive those allegations.

Further, consistent with the Court's instruction that "[t]he amended complaint shall comply with all requirements of 15 U.S.C. § 78u-4(a)(2)," ECF No. 107 at 20, Plaintiff SoCal files their sworn certification as Exhibit B to this Complaint.

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their undersigned Lead Counsel, which included, among other things, review and analysis of (i) Rocket's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Rocket's other public statements, including press releases; (iii) discussions with experts in the mortgage loan origination industry; (iv) interviews with former employees of Rocket; (v) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Rocket and the industry in which it operates; (vi) the complaints and internal Rocket documents attached thereto filed in connection with a consolidated action pending in the Delaware Court of Chancery; and (vii) review of pertinent court filings.

Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This case is brought to recover losses to investors based on Defendants' false and misleading statements to the market about Rocket's mortgage business during the Class Period, and Defendants Gilbert and Rock Holdings Inc. insider trading of over 20 million shares *for proceeds of nearly $500 million* on the same material non-public information that was kept from investors during this time.

2.    Rocket is an online mortgage origination company.  It operates in two business segments by selling mortgage loans to consumers through its Direct to Consumer ("DTC") channel and Partner Network channel.  The DTC segment generates significantly more profits (i.e. "Gain on Sale") than the Partner Network segment because DTC loans arise out of direct contacts with consumers, as opposed to the Partner Network segment where new loans arise out of referrals from third party brokers with whom Rocket must share profits.

3.    Rocket sells two types of loans: (1) refinancing loans, and (2) new purchase loans.  Refinancing loans are heavily dependent on current market interest rates, as when interest rates are low, homeowners seek to refinance on their home and take advantage of the lowered interest rates.  Historically, the majority of loans Rocket generated were refinance loans.  In 2020, approximately 80% of Rocket's new loan applications were refinance loans and 20% were new purchase loans.

4.     Rocket makes money primarily by selling mortgage loans to consumers, and then repackaging and selling off nearly all of those loans. Most of those loans are purchased by government sponsored enterprises, or "GSEs," such as Fannie Mae and Freddie Mac.  The GSEs then pool the loans sold by Rocket together and package them to issue and sell to the secondary market as mortgage-backed securities, i.e. "MBS."  Investors in the secondary market then buy, sell, and trade on these securities.

5.     Rocket is then able to make money by capitalizing on what the industry calls the "primary-secondary spread."   The primary-secondary spread is the difference between the mortgage interest rate for borrowers (i.e., the primary rate) and yields on newly issued MBS (i.e., the secondary rate).  In essence, taking the spread and subtracting other components such as the guarantee fee and servicing fee, provides an indication of the profit margins of mortgage originators like Rocket.

6.     During the Class Period – between February 25, 2021 and May 5, 2021 – Rocket told the market that it was seeing "strong consumer demand" and that rising interest rates would not have any effect on its mortgage business. However, Defendants knew, based on their own admitted tracking of key performance indicators and access to a wealth of internal Company data, that starting in November 2020, there was a marked downward trend in demand for loans and a corresponding negative impact on the volume of loans that closed and could be sold

4

into the secondary market. In addition, there was a material shift in the loan volume towards the less profitable Partner Network segment. Moreover, beginning in February 2021, when interest rates began trending up, refinancing – which accounted for the vast majority of Rocket's originated loans – began to decrease. The interest rate increase also impacted Rocket's ability to sell mortgages into the secondary market at a favorable amount (the primary-secondary spread), which ultimately led to a steep decline in its Gain on Sale margin – the primary indicator of the Company's profitability and success.

7.     This steep decline in Gain on Sale margin and refinancing volume was not news to Defendant Gilbert – founder, former CEO, and current Chairman of the Board of Directors of Rocket.  During a Board Meeting on March 23, 2021, Defendant Gilbert was presented with a Board report showing (1) an internal forecasted decline in Gain on Sale margin from 3.5% to 3.19% for the full year 2021; (2) a corresponding expected decrease in ***almost a billion dollars*** of revenue for the year; (3) an astonishing 80% forecasted decrease in refinancing volume for the year; and (4) an expected compression of the primary-secondary spread.  Just six days later, on March 29, 2021, and while in possession of this material, non-public information which demonsrated decrease profitability and revenue for the Company, Defendant Gilbert (through a holding company that he controls) sold 20.2 million

shares of his personal holdings of Rocket stock at $24.75 per share – resulting in proceeds of approximately ***$500 million.***

8.      Suspiciously, Gilbert had never publicly sold a single share of Rocket stock prior to this huge insider sale.  Moreover, while Company rules barred this sale because it was outside of the allowed trading window, Gilbert convinced the Board to change their own rules and open the trading window so he could make this sale.

9.      On May 5, 2021, Defendants shocked the market when they revealed Rocket was now guiding "Second Quarter 2021 Outlook" for closed loan volume of between $82.5 billion and $87.5 billion and Gain on Sale margin between 2.65% to 2.95%. At the mid-point, the closed loan volume guidance of $82.5 billion and $87.5 billion reflected a material decrease of $18.5 billion from 1Q 2021 actual closed loan volume.  At the mid-point, the 2Q 2021 Gain on Sale Margin guidance equated to a 239 basis point decline year-over-year and a 94 basis point decline sequentially, which represented the Company's lowest quarterly Gain on Sale margin in two years.

10.      During the 1Q 2021 Earnings Call, Defendant Booth attributed the decline in Rocket's Gain on Sale margin to three previously undisclosed factors: (i) change in product mix where Rocket was generating more loans in the less-profitable Partner Network segment; (ii) declines in loan pricing from sales into the secondary market; and (iii) primary-secondary spread compression.

11.     Upon this news, the price of Rocket Class A common stock dropped from a closing price of $22.80 per share on May 5, 2021 to $19.01 per share on May 6, 2021, a nearly 17% decline, on very heavy trading volume of over 37 million shares and reaching a low of just $16.48 per share by May 11, 2021.

12.     Analysts were shocked by the drastic decline in loan volume and Gain on Sale margin and downgraded their price targets. For example, Jeffries decreased its price target to $26.00 per share, down from $30.00 per share, "to reflect a conservative GOS[2] outlook thru '22" and "given the reduced earnings power" of a 100 bps GOS margin in the Partner Network segment. Likewise, UBS reported that "RKT provided GOS and volume guidance for 2Q which are substantially below our forecasts." And *Barron*'s reported that: "[t]he company expects margins to continue to decline. On a call with investors, the company told investors to expect a second-quarter gain-on-sale margin of between 2.65% and 2.95%, while Wall Street had expected 3.1%."

13.     As a result of the misconduct alleged herein, Plaintiffs and the Class have suffered significant damages.

---

[2] Gain on Sale.

## II.    JURISDICTION AND VENUE

14.    The claims asserted herein arise pursuant to Section 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a) and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the 1934 Act. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and § 27 of the 1934 Act, 15 U.S.C. § 78aa, because Rocket is headquartered in this District and many of the acts and practices complained of herein occurred in substantial part in this District, including the preparation and/or dissemination of materially false or misleading information.

## III.    THE PARTIES AND WITNESSES

### A.    Plaintiffs

17.    Lead Plaintiff Carl Shupe purchased Rocket Class A common stock during the Class Period, as set forth in the certification filed with his lead plaintiff application (ECF No. 15-2).  Lead Plaintiff subsequently submitted a revised certification to the Court on June 21, 2022, at ECF No. 42-1, and a further corrected

revised certification to the Court, on August 9, 2023. ECF No. 73. Thus, ECF No. 73-1 is the operative certification for Mr. Shupe, and is attached hereto for the Court's convenience, as Exhibit A.

18.     Additionally named Plaintiff SoCal purchased Rocket Class A common stock on March 30, 2021, as set forth in its certification filed herein as Exhibit B to this Complaint. Plaintiff SoCal traded contemporaneously with Defendant Gilbert, who traded on March 29, 2021 while in possession of material non-public information, when Defendant Gilbert, through Defendant Rock Holdings Inc., sold 20.2 million shares of Rocket stock in a private sale to Morgan Stanley at $24.75 per share.

## B.     Defendants

19.     Defendant Rocket Companies, Inc. ("Rocket" or the "Company") is a mortgage loan provider based in Detroit, Michigan. Rocket's Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RKT."

20.     Defendant Jay D. Farner ("Farner") was at all relevant times the Chief Executive Officer ("CEO") and Vice Chairman of Rocket and sat on Rocket's Board of Directors ("Board"). Farner was also, at all relevant times, CEO of Defendant Rock Holdings Inc. ("RHI") - Rocket's controlling shareholder, which owned approximately 99.94% of Rocket's Class D stock equivalent to 79% of Rocket's voting rights, during the Class Period.

21.     Defendant Julie R. Booth ("Booth") was, at all relevant times, Rocket's Chief Financial Officer ("CFO") and Treasurer.  Booth is responsible for the Company's accounting, finance, treasury, tax, procurement, and internal audit functions. Prior to joining Rocket, she was a senior manager with Ernst & Young LLP in Detroit, where she had 13 years of experience serving banking and mortgage banking clients.

22.     Defendant Robert Dean Walters ("Walters") was, at all relevant times, Rocket's President and Chief Operating Officer ("COO"), and has served in that capacity since March 2020. Walters oversaw the day-to-day operations of the business and focused on strategic planning and leveraging synergies amongst the various operational teams at the Company.

23.     Defendant Daniel Gilbert ("Gilbert") is the founder and former CEO of Rocket, and was the Chairman of the Board of Directors at Rocket for all relevant times.  At all times during the Class Period, Gilbert was the majority shareholder of Rocket through his holdings in RHI, which was an entity controlled by Gilbert.

24.     The Defendants referred to above in ¶¶20-23 are collectively referred to herein as the "Individual Defendants."

25.     Defendant Rock Holdings Inc. ("RHI") is a privately held entity based in Detroit, Michigan.  RHI's majority shareholder is Rocket founder and Chairman, Daniel Gilbert, and RHI is therefore controlled by Daniel Gilbert. As of March 31,

2021, RHI held 1,847,777,661 shares of Rocket's Class D stock, or 99% of the outstanding Class D shares. Each Class D share is entitled to 10 votes per share. Each Class A share of stock is entitled to 1 vote per share. Pursuant to Rocket's certificate of incorporation, whenever RHI's voting power exceeded 79.0%, that voting power would be reduced to 79.0%.[3] At all relevant times, therefore, RHI had voting control over 79% of outstanding Rocket shares.

26.    Defendants admitted in Rocket's 2020 Form 10-K filed with the SEC on March 24, 2021 (the "2020 Form 10-K"), that Defendant Gilbert through his stock ownership and executive management, controlled Rocket's business and operations at all relevant times:

> **We are controlled by RHI, an entity controlled by Dan Gilbert, whose interests may conflict with our interests and the interests of other stockholders.**
>
> RHI, an entity controlled by Dan Gilbert, our founder and Chairman, holds 99.94% of our issued and outstanding Class D common stock and controls 79% of the combined voting power of our common stock. As a result, RHI is able to control any action requiring the general approval of our stockholders, so long as it owns at least 10% of our issued and outstanding common stock, including the election of our board of directors, the adoption of amendments to our certificate of incorporation and bylaws and the approval of any merger or sale of substantially all of our assets. So long as RHI continues to directly or

---

[3] "Our certificate of incorporation provides that, at any time when the aggregate voting power of the outstanding common stock or preferred stock beneficially owned by RHI or any entity disregarded as separate from RHI for U.S. federal income tax purposes (the "RHI Securities") would be equal to or greater than 79% of the total voting power of our outstanding stock, the number of votes per share of each RHI Security shall be reduced such that the aggregate voting power of all of the RHI Securities is equal to 79%." Rocket Companies Form 424B4, Aug. 10, 2020.

indirectly own a significant amount of our equity, even if such amount is less than a majority of the combined voting power of our common stock, RHI will continue to be able to substantially influence the outcome of votes on all matters requiring approval by the stockholders, including our ability to enter into certain corporate transactions. The interests of RHI could conflict with or differ from our interests or the interests of our other stockholders.

27.    Rocket and RHI also have significant overlapping management. Defendant Gilbert serves as Chairman of both companies' boards of directors; Defendant Farner serves as CEO of both Rocket and RHI and also serves as Rocket's vice chairman and a director of the Rocket board; Jennifer Gilbert, Defendant Gilbert's wife, and Matthew Rizik, serve as directors of both boards; and Rizik also serves as RHI's Chief Financial Officer.

28.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

29.    As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Exchange Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, and present and future business prospects. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.  Defendants Gilbert and RHI also had a duty under Sections 10(b) and 20A of the Exchange Act to either not trade on material non-public information or to disclose that information before trading.

30.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public

statements detailed herein and are, therefore, primarily liable for the representations contained therein.

### C.   Witnesses

31.    This Complaint references numerous former employees of Rocket that support Plaintiffs' allegations herein.

32.    CW-1 worked at Rocket Mortgage / Quicken Loans[4] as an Associate Business Analyst beginning in November 2019, and from June 2021 until November 2021 served as a Business Metrics Analyst.  CW-1 was responsible for analyzing the time it takes for loans to "convert," i.e., move through the pipeline from application to closed loan.

33.    CW-2 worked as a Rocket Strategy & Analytics Data Analyst intern from May 2021 to August 2021 and was assigned to the "tech side" of Rocket's Strategy & Analytics Group.

34.    CW-3 worked at Rocket from May 2020 to May 2021 as Senior Digital Product Manager.   He[5] was hired to work on Rocket's "customer experience," specifically, how customers interfaced with the Company's website.

---

[4] According to Rocket's 2020 Form 10-K for the year ended December 31, 2020, Rocket Mortgage is interchangeable with "Quicken Loans."  Further, according to Rocket Companies, Inc.'s press release on May 12, 2021, Quicken Loans officially changed its name to Rocket Mortgage.  Thus, "Quicken Loans" herein refers to "Rocket Mortgage," and vice-versa.
[5] In order to protect confidentiality, masculine pronouns will be used to describe the CWs throughout this Complaint, regardless of identity.

35.    CW-4 was a former Account Executive for Rocket Pro TPO from June 2020 to July 2021 and was a Collateral Underwriter for Rocket Mortgage from July 2021 to October 2021.  He was on the "Wholesale" side of the business and explained that his responsibilities included building a relationship, training, and interfacing with broker partners to get them to use Rocket's platform.

36.    CW-5 was employed as a Resolution Analyst at Rocket Mortgage from November 2019 to August 2021.  CW-5 reviewed closed loans to ensure they met the standards necessary for sale to the secondary market.

37.    CW-6 worked at Rocket Companies/Rocket Pro TPO as a National Account Executive from August 2020 to May 2021 and as a Senior Credit Underwriter from May 2021 to July 2021.

38.    CW-7 worked at Rocket—specifically for Rocket Pro TPO, which CW-7 confirmed was Rocket's wholesale mortgage business that dealt with brokers—from January 2020 to January 2021 as a National Account Executive in Charlotte, NC.  As a National Account Executive, CW-7 was responsible for "nurturing existing relationships" that Rocket had with mortgage brokers, credit unions, and correspondent partners in order to bring in more lending business from those customers.  CW-7 reported to a Divisional VP, who in turn reported to a Regional VP, who in turn reported to the EVP for Rocket Pro TPO, who in turn reported to the CEO.

15

39.    CW-8 worked as an Account Executive at Rocket from August 2013 to August 2021.

40.    CW-9 worked as a Mortgage Loan Originator for Rocket from November 2020 until May 2021. CW-9 was responsible for selling loans to customers and reported to a former Rocket Mortgage Banking Director.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Rocket Company Background

41.    Rocket, founded in 1985 by Defendant Daniel Gilbert, describes itself as "a Detroit-based holding company consisting of tech-driven real estate, mortgage and eCommerce businesses." Rocket began as a traditional mortgage lender, but in 1999 the Company launched a branch-based lender website that sought to bring mortgage loan applications online. Defendant Gilbert believed that putting the entire mortgage process online would simplify the process and add transparency to the lending experience. This, in turn, would transform Rocket into a market leader known for excellence and innovation. In 2015, Rocket launched Rocket Mortgage, a digital, online mortgage platform, which allows clients to apply for mortgage loans through the internet using Rocket's website or its proprietary mobile application.

42.    Indeed, Rocket described Rocket Mortgage as its "flagship business" and as "[t]he nation's largest mortgage lender, providing what we believe is the simplest and most convenient way to get a mortgage. Our digital solution utilizes

automated data retrieval and advanced underwriting technology to deliver fast, tailored solutions to the palm of a client's hand.  Our clients leverage the Rocket Mortgage app to apply for mortgages, interact with our team members, upload documents, e-sign documents, receive statements, and complete monthly payments."

43.     Rocket's online mortgage platform has been highly successful, which has provided more than $1 trillion in home loans since its inception. By 1Q 2020, Rocket's market share grew to 9.2% of an over $2.0 trillion annual market, making Rocket the largest home mortgage loan originator in the United States.

44.     In August 2020, Rocket launched its initial public offering (the "IPO") in which the Company sold 100 million shares for $18.00 per share and with total proceeds of $1.8 billion.

45.     Rocket's primary business is to originate mortgage loans and then sell those loans in the secondary market at a premium.  For the year ended December 31, 2020, Rocket earned over $15.7 billion in total revenue.

46.     As reflected in the graph below, the net revenue generated by the sale of loans to the secondary market, known as the "*gain on sale of loans*, *net*," accounted for more than 85% of Rocket's total revenues over the last 5 years (as demonstrated in blue below):



47.    This "*gain on sale of loans, net*" metric was thus highly material to the Company.   Indeed, Rocket stated in its annual reports that "[o]ur mortgage origination business ***primarily generates revenue and cash flow from the gain on sale of loans, net***.  The *gain on sale of loans, net* includes all components related to the origination and sale of mortgage loans[.]"

48.    Rocket also utilizes the metric "Gain on Sale margin," which—as stated in Rocket's Registration Statement filed to the SEC in connection with its IPO and in its annual reports—"is a measure of ***profitability*** for our on-going mortgage business."[6]  More specifically, the Gain on Sale margin "measures the ***gain on sale revenue generation*** of our combined mortgage business."[7]

---

[6] Rocket, Form S-1 Registration Statement, filed July 28, 2020 (emphasis added).
[7] *Id.*

49.     As a result, the "Gain on Sale revenue," "Gain on Sale margin," and "*gain on sale loans, net*," metrics were extremely material to investors as it delineated how much revenue Rocket was producing and how profitable Rocket was within the mortgage loan origination industry.  For example, in touting its Company to the market in connection with its IPO, Rocket stated in the Registration Statement a year-to-year increase on "Gain on Sale Revenue" (for the three months ended March 31, 2019, to the three months ended March, 31, 2020) of $665 million to over $1.6 billion.  Rocket also touted that the "increases in total revenue, net and net income for the three-months ended June 30, 2020, as compared to the three-months ended March 31, 2020, ***were driven by an increase in gain on sale margin.*** Gain on sale margin increased from 3.25% for the three-months ended March 31, 2020 to a preliminary range of 5.10% to 5.25% for the three-months ended June 30, 2020."[8]

50.     The Company's loan originations are comprised primarily of (i) home purchase loans (i.e., loans extended to clients to purchase a new home) and (ii) home refinance loans (i.e., loans extended to clients for the purpose of paying off an existing loan and refinancing the underlying property). The largest volume of Rocket's loan originations are refinance loans, as demonstrated in the chart below[9]:

---

[8] *Id.* (emphasis added).

[9] This information was derived in conjunction with an expert in the mortgage industry.  This information comes from expert data and expert analysis, sourced from a mortgage-industry database that requires a particularized subscription.  Throughout this Complaint, certain information will be referenced from such expert data and expert analysis.  This information is not generally available to the public because in order to view it, one must subscribe to a service and



51.     Nearly all loans that Rocket originates are sold into the secondary market, and most of those loans are sold to government sponsored enterprises, or "GSEs," such as Fannie Mae and Freddie Mac.  GSEs securitize the loans they purchase from mortgage originators like Rocket and then sell them to investors as bonds that offer returns based on the expected cash flows of the underlying mortgage loan obligations.  Prior to 2020, the Company sold approximately 90% of its closed loans to government-sponsored enterprises. In 2020, that percentage rose to about 97%, before falling to 93% in 2021.[10]

---

pay a monthly fee.  Moreover, there is a one month delay from the period to which the data relates to when it becomes available for purchase (e.g., data concerning the month of February 2020 will only be available on March 2020).  The information for this particular chart reflects Rocket's Fixed Rate Mortgages in Fannie Mae, Freddie Mac, and Ginnie Mae Single Family Programs.
[10] A small portion of loans originated by Rocket are non-conforming loans that are sold to private investors and mortgage conduits (including Rocket's own loan securitization company) for securitization in non-GSE loan products.

52.     The GSEs then pool the loans sold by Rocket together and package them to issue and sell to the secondary market as mortgage-backed securities, i.e. MBS.[11] The MBS "Yield" refers to the relationship between the MBS price and interest paid,[12] and according to Plaintiffs' expert, generally follows and is closely correlated to the historical 10-year Treasury yield.

53.     Further, 10-year Treasury yield rate affects mortgage interest rates; indeed, "historically, the 10-year U.S. Treasury yield has been considered a key benchmark for mortgage rates."[13] As seen in the graph below, interest rates have historically moved in exactly the same direction as the 10-year Treasury yield:

[graph on next page]

---

[11] AllianceBernstein, *Guide to Mortgage Investing* (2018), available at https://www.alliancebernstein.com/sites/library/Instrumentation/MORT-MAG-GR-EN-0118-FINAL.PDF.
[12] Gina Freeman, *MBS: What REALLY Determines Your Mortgage Rates*, Themortgagereports.com (Oct. 14, 2016), available at https://themortgagereports.com/22560/mbs-what-really-determines-your-mortgage-rates.
[13] *How The 10-Year U.S. Treasury Note Impacts Mortgage Rates*, MCT-Trading.com, available at https://mct-trading.com/10-year-treasury-impacts-mortgage-rates/ (Last updated on May 17, 2022).



**B.     Rocket's Business Is Organized Into Two Business Segments**

54.     Rocket has two primary business segments: (1) Direct-to-Consumer ("DTC"), which is comprised of mortgage loans generated by consumers who contact Rocket directly through its website or mobile app, and (2) the Partner Network, which is comprised of loans generated through referrals from mortgage brokers or third parties. The Direct-to-Consumer segment is oftentimes called "Retail" and the Partner Network segment is oftentimes called the "Wholesale" or "Broker" business.

**1.     The Direct-to-Consumer Segment**

55.     In the DTC segment (i.e., Retail), Rocket originates loans for clients who interact directly with the Company through various marketing channels, including the Rocket Mortgage App, or its website, or the Company's sales team members, known as the Rocket Cloud Force. Rocket seeks to provide these clients

with an "end-to-end" mortgage origination experience, offering mortgage-related products and services such as appraisals, title insurance, settlement services, and loan servicing after closing.

56.   Historically, the DTC segment has enjoyed significantly higher Gain on Sale margins than the Partner Network segment because the profits received for loans originating in the DTC segment are fully retained by Rocket, whereas in the Partner Network segment, the Company must share profits with the third party "partners" who refer loans to Rocket. From 2018 to 2021, the DTC segment reported annual Gain on Sale margins of 4.13%, 4.45%, 5.48%, and 4.75%, respectively, which were, on average, approximately 330 basis points higher than the Gain on Sale margin of the Partner Network segment (i.e., on average, 3.3% higher)[14]:



---

[14] Source: Rocket's SEC filings.

57.    In addition to higher Gain on Sale margins, the DTC segment also originated higher volumes of closed loans. Closed loan volume refers to the unpaid principal dollar amount of the loans originated by Rocket. As seen below, for example, for the quarter ended March 31, 2019 (i.e., 1Q 2019), the DTC segment originated ***$15.4 billion*** worth of closed loan volume as compared to Partner Network origination of $6.9 billion – more than double the amount:



58.    Because the DTC segment has historically originated greater volumes of loans at higher Gain on Sale margins, the DTC segment has accounted for most of Rocket's revenues. As demonstrated in the graph below, the DTC segment accounted for approximately 88%, 87%, 81%, 75%, and 82% of annual revenues from 2017 to 2021, respectively:



### 2.    The Partner Network Segment

59.    In the Partner Network segment (i.e., Wholesale or Broker), Rocket acquires clients through its partnerships with third parties, such as mortgage brokers, consumer-focused companies like E-Trade, Intuit, and Morgan Stanley, and community banks and credit unions. These partners provide the face-to-face service that certain clients desire, while using Rocket's electronic platform to originate and process mortgage loans.

60.    As discussed above, the Partner Network segment historically has a significantly lower Gain on Sale margin than Rocket's DTC segment because Rocket must share profits with its partners. However, Rocket is still willing to generate loans through the Partner Network segment because it can later cross-sell

to existing clients by way of mortgage refinances, personal loans and auto loans, among other products. The Partner Network segment also has much lower client acquisition costs and minimal incremental overhead costs.

61.    From 2018 to 2021, the Partner Network segment reported annual Gain on Sale margins of 1.21%, 0.77%, 2.19%, and 1.20%, respectively. *See supra* ¶56. The Partner Network segment revenues accounted for approximately 6%, 6%, 12%, 21%, and 14% of annual revenues from 2017 to 2021, respectively. *See supra* ¶58.

### C.    Rocket's Key Performance Indicators

62.    In Rocket's Form S-1 Registration Statement, dated July 28, 2020, (the "Registration Statement") Defendants touted to investors that they closely "monitor[ed]" and tracked Key Performance Indicators ("KPIs"), which included "Loan Production" KPIs.  This assertion was repeated in every subsequent quarterly and yearly filing made by Rocket, including for the period encompassing the Class Period (i.e., in the 1Q 2021 and 2Q 2021 Form 10-Qs).

63.    The "Loan Production" KPIs consisted of the following three key metrics:

(1)  ***Gain on Sale margins***

(2)  ***Closed Loan Origination Volume***.  The closed loan volume metric was also broken down and monitored by the respective DTC and Partner Network segments:

- Direct to Consumer origination volume;

- Partner Network origination volume; and

(3) *Total Market Share*

64.    Rockets' public SEC filings demonstrate that Rocket consistently reported on these three important Loan Production KPIs.  As reported on a yearly basis:

| Reported Year | Gain on Sale Margins | Closed Loan Volume for the Year | Closed Loan Volume: DTC | Closed Loan Volume: Partner | Total Market Share |
|---|---|---|---|---|---|
| Year ended Dec. 31, 2017 | 3.97% | $85.5 billion | $70.9 billion | $14.6 billion | 5.0% |
| Year ended Dec. 31, 2018 | 3.55% | $83.1 billion | $64.1 billion | $19 billion | 5.0% |
| Year ended Dec. 31, 2019 | 3.19% | $145.1 billion | $92.4 billion | $52.7 billion | 6.7% |
| Year ended Dec. 31, 2020 | 4.46% | $320.2 billion | $200.5 billion | $119.7 billion | 8.4% |

65.    As reported on a quarterly basis:

| Reported Quarter | Gain on Sale Margins | Closed Loan Volume for the Quarter | Closed Loan Volume: DTC | Closed Loan Volume: Partner |
|---|---|---|---|---|
| 1Q 2019 | 2.64% | $22.3 billion | $15.4 billion | $6.9 billion |
| 2Q 2019 | 3.23% | $31.9 billion | $19.9 billion | $12.1 billion |

| Reported Quarter | Gain on Sale Margins | Closed Loan Volume for the Quarter | Closed Loan Volume: DTC | Closed Loan Volume: Partner |
|---|---|---|---|---|
| 3Q 2019 | 3.29% | $40.1 billion | $25.7 billion | $14.3 billion |
| 4Q 2019 | 3.41% | $50.8 billion | $31.4 billion | $19.4 billion |
| 1Q 2020 | 3.25% | $51.7 billion | $31.7 billion | $20 billion |
| 2Q 2020 | 5.19% | $72.3 billion | $45.8 billion | $26.5 billion |
| 3Q 2020 | 4.52% | $89 billion | $54.6 billion | $34.4 billion |
| 4Q 2020 | 4.41% | $107.2 billion | $68.4 billion[15] | $38.8 billion |
| 1Q 2021 | 3.74% | $103.5 billion | $61.4 billion | $42.1 billion |
| 2Q 2021 | 2.78% | $83.7 billion | $45.2 billion | $38.5 billion |

### 1.      Gain on Sale Margin

66.      As Rocket described it, Gain on Sale margin "is a measure of *profitability* for [Rocket's] on-going mortgage business."[16]

---

[15] Rocket reported 4Q 2020 and 4Q 2019 numbers through its Form 8-K, filed with the SEC on February 25, 2021.  On that Form 8-K, Rocket reported total closed loan volume and Gain on Sale margins for each quarter, but did not report the breakout of closed loan volume between the DTC channel and Partner Network channel.  Plaintiffs arrived at those numbers by subtracting the total of 1Q, 2Q, and 3Q closed loan volume numbers (broken out by channel) from the year end reported closed loan volume (broken out by channel) filed in Rocket's 10-Ks.

[16] Registration Statement.

67.     Indeed, Gain on Sale margin is the most important measure of profitability in the mortgage loan origination industry. Defendants report Gain on Sale margin in every quarterly earnings release. It was also a frequent topic of discussion during the Q&A section of Rocket's quarterly earnings calls with analysts.

68.     Rocket reports Gain on Sale margin on both a Company level and by individual business segment – i.e., the DTC segment and Partner Network segment.

69.     At the segment level, Rocket calculates Gain on Sale margin as the revenues on loans that have been closed and sold to investors in the secondary market divided by the volume (unpaid principal balance) of those loans.

70.     At the Company-wide level, Gain on Sale margin is calculated as "[the] ratio of gain on sale of loans, net to the net rate lock volume for the period."[17] Through the Company's Registration Statement and its subsequent public filings, the Company disclosed that the formula to calculate Gain on Sale margins was:

> Gain of Sale margin =  The "*gain on sale of loans, net*" **divided** by the "*net rate lock volume for the period*"[18]

---

[17] *Id.*

[18] Excluding all reverse mortgage activity.  As disclosed in their filings, Rocket "origination volume and gain on sale margins exclude all reverse mortgage activity."  A reverse mortgage is a loan that allows homeowners to borrow money using their home as security for the loan, but is usually reserved only for homeowners who are 62 and older.

71.     For example, the "*gain on sale of loans, net*" for the three months ended

March 31, 2020 was $1,822,109,000.[19]   The "*net rate lock volume*" for the three

months ended March 31, 2020 was $56,049,944,000.[20]   The Gain on Sale margin

would therefore be the first number divided by the latter number, or 3.25%, for the

period.

72.     The "*gain on sale of loans, net*" "includes all components related to the

origination and sale of mortgage loans, including (1) net gain on sale of loans, which

represents the premium [Rocket] receive[s] in excess of the loan principal amount

and certain fees charged by investors upon sale of loans into the secondary market,

(2) loan origination fees, credits, points and certain costs, (3) provision for or benefit

from investor reserves, (4) the change in fair value of interest rate locks ("IRLCs"

or "rate lock")[21] and loans held for sale, (5) the gain or loss on forward commitments

hedging loans held for sale and IRLCs, and (6) the fair value of originated MSRs

[i.e. mortgaging servicing rights]."[22]

73.     As disclosed in the Registration Statement, IRLCs are "agreements to

lend to a client as long as there is no violation of any condition established in the

contract.   Commitments generally have fixed expiration dates or other termination

---

[19] Registration Statement.
[20] *Id.*
[21] An IRLC is synonymous with a "rate lock," and stands for "Interest Rate Lock Comittment."
*See* Registration Statement.
[22] *Id.*

clauses and may require payment of a fee. The Company evaluates each client's creditworthiness on a case-by-case basis."

74.   "*Net rate lock volume*" refers to the unpaid principal balance of all loans subject to IRLCs net of Rocket's estimated "pull-through factor."[23]  Rocket's "pull-through factor" was "a key assumption and estimates the loan funding probability, as not all loans that reach IRLC status will result in a closed loan."[24]

## 2.   Closed Loan Origination Volume

75.   Closed loan origination volume, or closed loan volume, represents the number of loans that have been fully originated, processed, and funded (i.e., "closed"), thus making this another materially important metric.  Prior to and throughout the Class Period, Defendants carefully tracked and monitored closed loan volume for the entire Company, as well as for each of its two business segments. Closed loan volume was highly indicative of the volume of loans that would be sold in the secondary market during the same period.

76.   Further, Rocket stated in its public filings that an increase in closed loan volume was the ***driving force*** behind an increase in *gain on sale of loans, net*.[25]  For example, in its 3Q 2020 Form 10-Q, Rocket stated that the increase in "*gain on sale*

---

[23] *Id.*
[24] *Id.*
[25] *See, e.g.*, 3Q 2020 Form 10-Q.

*of loans, net* was **primarily driven** by an increase in mortgage loan origination volume of $48.9 billion [year over year], or 121.9%."[26]

77.    And as illustrated above, the formula in *supra* ¶70 indicates that the higher the "*gain on sale of loans, net*" figure was for the time period, the higher the Gain on Sale margins would be.

78.    Thus, as explained by Rocket's own filings, there is an inherent relationship between closed loan volume and Gain on Sale margins—the higher the closed loan volume, the higher the *gain on sale of loans, net*.  And the higher the *gain on sale of loans, net*, the higher the potential Gain on Sale margins.  Indeed, Rocket admitted that "[l]ower loan origination volumes generally place downward pressure on margins."[27]  Given the importance of Gain on Sale margins—and the inherent importance of the closed loan volume metric itself—Defendants would have tracked closed loan volume constantly.

79.    Further, as seen in the chart below, DTC volume fell from 64% of total closed loan volume in 4Q 2020 to 59% in 1Q 2021 and 54% in 2Q 2021:

---

[26] *Id.* (emphasis added).  "Mortgage loan origination volume" is thus synonymous with closed loan volume.  According to the Company's filings with the SEC, for the three months ended 3Q 2019, closed loan volume was $40.1 billion.  For the three months ended 3Q 2020, closed loan volume was $89 billion. The difference was $48.9 billion.
[27] Rocket 2021 Form 10-K.

| Reported Quarter | Gain on Sale Margins | Closed Loan Volume for the quarter | Closed Loan Volume: DTC | Closed Loan Volume: Partner |
|---|---|---|---|---|
| 3Q2020 | 4.52% | $89 billion | $54.6 billion | $34.4 billion |
| 4Q 2020 | 4.41% | $107.2 billion | $68.4 billion | $38.8 billion |
| 1Q 2021 | 3.74% | $103.5 billion | $61.4 billion | $42.1 billion |
| 2Q 2021 | 2.78% | $83.7 billion | $45.2 billion | $38.5 billion |

### 3.   Market Share

80.   At the time of Rocket's IPO in August of 2020, the Company touted that it was "the largest retail mortgage originator in the U.S. according to Inside Mortgage Finance, with $145 billion in origination in 2019. . . . We are the scaled leader in the U.S. mortgage industry with market share of 9.2%."[28]

81.   Rocket further touted that it had grown its market share at a compounded annual growth rate of 19%, from 1.3% in 2009 to 6.7% in 2019[29]:

---

[28] Registration Statement.
[29] *Id.*



.

## D.   Defendants Constantly Tracked Rocket's KPIs and Every Step in the Loan Pipeline

### 1.   Defendants Admit to Closely Monitoring Rocket's Loan Production KPIs

82.   In Rocket's Registration Statement, and every subsequent filing since—including  during the Class Period—Defendants touted to investors that it closely "monitor[ed]" the three KPIs (Gain on Sale margin, closed loan volume, market share) mentioned above.  Importantly, these KPIs were measured in order to evaluate Rocket's performance and to monitor Rocket's "ability" to generate *gain on sale revenue*:

> ***We monitor a number of key performance indicators to evaluate the performance of our business operations. <u>Our loan production key performance indicators enable us to monitor our ability to generate gain on sale revenue as well as understand how our performance compares to the total mortgage origination market.</u>*** Our servicing portfolio key performance indicators enable us to monitor the overall size of our servicing book of business, the related value of our mortgage

servicing rights, and the health of the business as measured by the total
serviced delinquency rate. . . . We also include Rockethomes.com
average unique monthly visits, as we believe traffic on the site is an
indicator of consumer interest.[30]

83.     As Rocket asserted, analysis of its "Loan Production" KPIs enables
Rocket to (1) "evaluate the performance" of Rocket's mortgage origination business
and "understand how [Rocket's] performance compares to the total mortgage
origination market," and (2) "monitor" Rocket's "ability to generate *gain on sale
revenue*."  Rocket thus admitted that the monitoring and analysis of Loan Production
KPIs—i.e., Gain on Sale margin, closed loan volume, and market share—allowed
Rocket to understand and forecast *gain on sale revenue*.

84.     Given the importance of *gain on sale revenue* to the Company, and the
importance of "evaluat[ing] the performance" of Rocket's business, Defendants
tracked the three metrics (Gain on Sale margin, closed loan volume, and market
share) on a constant basis, beyond just the quarterly basis when they reported those
metrics.  In other words, Defendants would have tracked the three Loan Production
KPIs during the quarter on a constant basis.

85.     Thus, it was clear to Defendants that by 3Q 2020 and 4Q 2020, the Gain
of Sale margin that Defendants were constantly tracking had peaked in 2Q 2020, and

---

[30] Registration Statement.  As stated above, Defendants also repeated this assertion throughout
the Class Period, including in Rocket's Form 10-Q for the period ending March 31, 2021, and
their 2020 and 2021 Form 10-Ks.

was on a precipitous decline.  This decline continued for three straight fiscal quarters, and during the time of Defendants' false and misleading statements and omissions:

| Reported Quarter | Gain on Sale Margins | Closed Loan Volume for the Quarter | Closed Loan Volume: DTC | Closed Loan Volume: Partner |
|---|---|---|---|---|
| 4Q 2019 | 3.41% | $50.8 billion | $31.4 billion | $19.4 billion |
| 1Q 2020 | 3.25% | $51.7 billion | $31.7 billion | $20 billion |
| 2Q 2020 | 5.19% | $72.3 billion | $45.8 billion | $26.5 billion |
| 3Q 2020 | 4.52% | $89 billion | $54.6 billion | $34.4 billion |
| 4Q 2020 | 4.41% | $107.2 billion | $68.4 billion | $38.8 billion |
| 1Q 2021 | 3.74% | $103.5 billion | $61.4 billion | $42.1 billion |
| 2Q 2021 | 2.78% | $83.7 billion | $45.2 billion | $38.5 billion |

## 2. Confidential Witnesses Support That the Loan Production KPIs, Including Gain on Sale Margin and Closed Loan Volume, Were Constantly Tracked

86.    CW-1 was an Associate Business Analyst of Rocket Loans/Quicken Loans from November 2019 to June 2021 and a Business Metrics Analyst from June 2021 to November 2021.  CW-1 was responsible for analyzing the time it takes for loans to "convert," i.e., move through the pipeline from application to closed loan.

87.     According to CW-1, Rocket management tracked the Company's Gain on Sale margin "***daily***," if not "***at least four times a week.***"

88.     Further, CW-1 stated that Rocket set "***monthly***" Gain on Sale margin forecasts that would have been approved by the executives of the Company.

89.     CW-1 participated in meetings that took place at least four times a week, which he believed that Regional VPs attended.  Each Regional VP was responsible for 100 bankers and the meetings were a way for the Regional VPs to see the performance of their respective bankers.

90.     CW-1 explained that the Senior VPs had access to a "dashboard" or software by which to track metrics.  CW-1 believed that the dashboard was available to every manager Director-level and above, including the Regional VPs, all the way to the senior executives.  The Gain on Sale margin was tracked and viewable on the dashboard by all director-level and above, including the senior executives, (e.g., the Defendants).

91.     According to CW-1, the dashboard metrics were pulled from Rocket's "data warehouse."   As CW-1 explained it, the dashboard was populated automatically on the backend with data from the warehouse.  The program known as "Sequel" was used to pull data from the warehouse.  As CW-1 explained, he pulled data and entered it into a PowerPoint presentation for use in the meetings and which he sent out to the attendees. The materials provided at the meetings were

PowerPoint presentations accessible in a shared Company folder. According to CW-1, there were many metrics presented, including the "talk time" of the bankers with prospective borrowers, the allocation of clients to the bankers, and the extent to which the bankers were being monitored.

92.     CW-1 confirmed that he also used Sequel to obtain data from Rocket's data warehouse that CW-1 then used to examine the overall time it took for loans to close.

93.     According to CW-1, closed loan volume and approved credit volume and other metrics were tracked on the dashboards accessible by all director-level and above, including the senior executive (e.g., the Defendants). These "dashboards" broke these statistics (gain on sale, closed loan volume) out by business segment (retail and wholesale).

94.     CW-2 was a Rocket Strategy & Analytics Data Analyst intern from May 2021 to August 2021, and was tasked with designing a new dashboard intended to provide a range of metrics regarding "the purchase side of home buying" and refinancing, which he clarified meant tracking the "life cycle" of a loan across the multiple steps from when a customer visited the website, downloaded an application, submitted it, went through underwriting, all the way to so-called "closed folder" status. The dashboard CW-2 developed tracked the volume of activity and time it was taking for the various steps to be completed. CW-2 said the dashboard was "a

38

visual platform" by which senior leadership at the Company could make decisions, such as "banker placement in particular areas" (i.e., assigning bankers). The metrics also enabled evaluating the effects of various promotions or deals the Company may have been offering. In addition, the metrics allowed leadership to determine where there might be bottlenecks in the loan process that delayed the completion of the loan folders.

95.    According to CW-2, the dashboard itself was just one of many dashboards that Rocket used. The dashboard that CW-2 developed didn't actually go live until a week or two until his internship ended, but CW-2 confirmed that the Company *already had dashboards for the same metrics* that his new dashboard was intended for. CW-2 said that it was more appropriate to consider the work he did as a "redesign" of the existing dashboards, so it was not as if that data was not previously available.

96.    According to CW-2, all of Rocket's various dashboards were available through what was called "the BIG platform." The data was derived from Rocket's database and extracted using Sequel and other tools. Adobe Analytics was used to measure the various steps in the loan cycle. CW-2 was tasked with creating the dashboard because it would have been time-consuming for an employee to have been assigned to develop it.

**3.     Using Rocket's Data Lake, Defendants Also Tracked Every Step in the Loan Pipeline, From Initial Customer Interest to Closed Loan Status**

97.     Loan originations at Rocket begin with marketing efforts that drive potential clients to Rocket's website or mobile application. Once on the website or mobile app, potential clients are prompted to provide Rocket with information such as:

(1) Type of Loan: Home Refinance, Home Purchase, or Cash-Out Refinance;

(2) Home Description: Single-Family, Multifamily, Condominium, or Townhouse;

(3) Property Use: Primary Residence, Secondary Home, or Investment Property;

(4) Expected Timeline: Signed a Purchase Agreement, Offer Pending, Found a House, Buying in 30 Days, Buying in 2 to 3 Months, Buying in 4 to 5 Months, Buying in 6+ Months, or Researching Options;

(5) First-time home buyer: Yes or No;

(6) Credit Profile: 720+, 660-719, 620-659, 580-619, or Below 580;

(7) Name: First and Last;

(8) Email Address; and

(9) Password to establish an account with Rocket.

40

98.     After providing the above information, the potential client has created a Rocket Mortgage account and can proceed to "Start A New Application" online. Thus, even before a potential client has started a new application, Rocket has collected a large amount of data about the potential client and the characteristics about a potential loan.

99.     Rocket's online mortgage application process requires potential clients to provide much of the same information that they provide when setting up the Rocket Mortgage account, in addition to current address, length of stay at current address, whether the potential client is currently renting or owns the residence, marital status, military status, details of the future home purchase, identification details, contact information, and credit information.

100.    Prior to and throughout the Class Period, Rocket also tracked and analyzed internet traffic to Rocket's website(s). As Defendants explained in their SEC filings:

> We monitor a number of key performance indicators to evaluate the performance of our business operations. Our loan production key performance indicators enable us to monitor our ability to generate gain on sale revenue as well as understand how our performance compares to the total mortgage origination market. . . . *We also include Rockethomes.com average unique monthly visits, as we believe traffic on the site is an indicator of consumer interest*.

101.    Additionally, Rocket tracked and analyzed "client inquiries generated" through its subsidiary "Core Digital Media," which it described as an "online

marketing and client lead acquisition platform," to measure consumer interest and predict the likely volume of new loans that would enter Rocket's funnel of potential clients.  In Rocket's Registration Statement, Rocket explained:

> Core Digital Media is an online marketing and lead generation service provider in the mortgage, insurance and education sectors. ***Core Digital Media is a generator, buyer and seller of leads for third parties and for Rocket Mortgage***. Core Digital Media owns and operates several marketing platforms, including "LowerMyBills.com," that connect clients with providers of home loans, auto loans, personal loans, and auto, life and home insurance. Acquired in 2017, ***Core Digital Media has become an important component of our performance marketing strategy***. Core Digital Media enables growth for our broader ecosystem by ***offering unique insight into the lead generation market*** and allows us to introduce innovative marketing programs designed to increase the conversion rates for online leads.

> Core Digital Media generated over six million client leads for mortgage and other industries in 2019. ***Core Digital Media's unique ability to consistently generate high quality leads***, coupled with Rocket Mortgage's superior client experience*, **has driven higher conversion rates and has aided our market share growth in Rocket Mortgage***. We also leverage Core Digital Media's capabilities in cross-marketing our products and services to clients across our ecosystem.

102.  To that end, Rocket in the IPO Registration Statement touted to potential investors its ability to monitor Rocket website visits and the corresponding increase in site visits:





103.   Thus, using the client data gathered even before an application is submitted, and the number of website visits and Core Digital Media generated leads, Rocket has a wealth of information about potential new loan applications and can therefore analyze its potential loan application volume and predict closed loan volume.

104.   Indeed, during the Class Period, Rocket touted its ability to use proprietary machine learning technology and its vast "data lake" of information—which encompasses an outstanding **85% of the United States population**—to anticipate future transactions—in "***real time***"—including mortgage loans and loan volume analysis. For example, during the 4Q 2020 Earnings Call on February 25, 2021, Defendant Farner stated that:

> Along with our powerful Rocket Cloud Force, our company also continues to rapidly grow its use of ethical, artificial intelligence and

machine learning to streamline the business. This acceleration is made possible, thanks to ***our vast data lake, which includes proprietary first-party data on more than 58 million consumers and extends to 220 million consumers in total or <u>85% of the adults in the United States</u>***. We have the benefit of millions of clients working with us each year to buy a car, get a personal loan, buy a home or refinance a mortgage, and ***we've been able to leverage this information to build sophisticated models*** to ensure our brand is in front of our clients and top of mind when they're ready to transact. In fact, since the beginning of 2019, ***<u>data science has driven more than $75 billion in application volume</u>***. ***<u>The importance of data cannot be overstated</u>. It is this information that allows us to quickly innovate, <u>anticipate the market</u> and, in some cases, develop new companies all together. These <u>real-time insights are a significant market advantage and consistently guide us to the right decisions</u>*** with incredible efficiency. Together, these pillars of our business: our scalable platform, our national brand, our Rocket Cloud Force and our strategic use of data, combine to create a technology powerhouse that continues to accelerate at scale.

105.   And as stated on Rocket's Press Release for 4Q 2020:

The Rocket Companies platform generated 153 million unique visitors in 2020, a 61% increase from 2019. Our vast data lake includes proprietary first-party data on more than 58 million consumers and extends to 220 million consumers in total or 85% of the population of adults in the United States. [] ***<u>Using our data science capabilities and leveraging our data lake, we recently crossed an important milestone, generating more than $75 billion in application volume</u>*** over the past two years.

106.   Further, Rocket's Registration Statement explained how the Company uses all this information it gathers to manage its "funnel of potential clients" and to track "every step" of the loan pipeline, in a subsection entitled "Data Analytics":

***Data Analytics***

We have access to client financial information and needs which allows us to more effectively understand and market to our clients. ***Both***

*through lead acquisition and servicing, we aggregate this information on* current and *potential clients*. For example, knowing the details of a client's existing mortgage *allows us to execute a real-time marketing campaign to targeted clients when mortgage rates drop*. <u>We also have the ability to predict</u> . . . *when a family may be looking to buy a new home and will potentially need a purchase mortgage*.

The scale and design of *our model allows us to gather insights into and improve the client experience <u>through measuring and recording each step in the process</u>. We track, test and refine every step of the <u>client journey</u>* and our users' experience. *This allows us to intelligently manage our funnel of potential clients, drive conversion* and continuously identify areas of potential improvement. Our scale has enabled us to experiment with various approaches to these tasks and constantly tune our strategies for user satisfaction.

107.   Rocket further explained that the Company uses "proprietary technology" to analyze the data it gathers to "*prioritize[] each step of the loan process based on a client's propensity to close* [the loan]."

108.   And in the Company's May 2021 Earnings Call for 1Q 2021, Defendant Farner stated:

As we develop industry-leading technologies that create better outcomes for our clients, we are also continuing to improve and evolve how we leverage the tremendous insights we can glean from our centralized integrated data lake. *This data lake and its 220 million consumer records is a strategic moat for the Rocket platform*. Leveraging this resource in the first quarter, we significantly expanded our data marketplace, an internal API platform that allows our teams to develop new applications, run marketing campaigns and even build new business lines, *all using common, trusted and secured data assets. Machine learning and AI continue to play an increasingly important role in our organization as well. Every single day*, our systems make nearly 8.5 million automated decisions, helping to ensure we are running the business

45

109.   Further, in the same call, Defendant Farner stated Rocket even creates models to analyze future patterns:

> *I think we're very well positioned and this goes back to our data science team.  We have 220 million records. We talk to millions of people a month*, understanding their debt load. *We can model out where they were a year ago and then also model out where they will be in the future*, creating all kinds of opportunity to balance out the equity in their home, with the debt that they're building and we can consolidate that.  *That's a huge piece of our business*.  *We've been executing on that for years.*

110.   Thus, that Defendant Farner admitted that Rocket can "model out where consumers will be in the future" indicates that Defendants would have been able to forecast key metrics about the business based off the data derived from its massive data warehouse.   This is further supported by Rocket's own admissions in the Registration Statement that "[o]ur crediting decisioning and scoring models are based on algorithms that evaluate a number of factors, including behavioral data, transactional data, and employment information," which allow Rocket to predict likelihood of closed loan status.

111.   Indeed, Rocket touted to investors that it had "advanced analytics tools" and that its technological infrastructure allowed it to "stay ahead of regulatory changes." Further, Rocket touted to investors that it knows how many loan applications were started, website visits, and Rocket mortgage mobile app sign-ins occur – down to the second:

46

We have thoughtfully developed our technology infrastructure in modules to enable agile enhancements and ensure flexibility to deploy this technology to a variety of partners. ***Our infrastructure allows us to act swiftly and stay ahead of regulatory changes*** and more quickly introduce new products and services, without the need for expensive overhauls or disruptive interventions. ***With advanced analytics tools, we are often able to foresee potential issues before they arise***, further supporting uninterrupted client experience, business growth and operational efficiency.

Our software is designed with scalability in mind to manage a large quantity of loans. On average, we currently process more than ***6,200 client applications each day, and over 8,100 applications are started each day via our website, mobile app and mobile web. A sign-in to Rocket Mortgage occurs every half second from clients who are applying for a mortgage, have a mortgage in process, or accessing their loan servicing. Every 26 seconds a mortgage application is completed and ready for underwriting.*** The versatility and scalability of our technology provide a solid foundation for our continued growth.

> a.   **Confidential Witnesses Support That Rocket Closely Tracked These Data Points with Predictive Analytics to Estimate Loan Volume**

112.   CW-3—a Senior Director Product Manager at Rocket from May 2020 to May 2021, who was hired to work on aspects of Rocket's "customer experience," specifically how customers interfaced with the Company's website—confirmed that there is a "clear connection" between web traffic and lead generation.  CW-3 stated that user traffic was a "source for leads."

113.   CW-3 explained that Rocket ***could predict how many loans they can close based on web traffic***.  CW-3 explained that the accuracy of that prediction depends on the information that is captured and then cross-referenced with publicly

available information on the applicant.  CW-3 referred to this as "predictive data,"

adding that the "predictive analysis" occurs "early on" and happens "very quickly."

114.   CW-3 explained that this predictive analysis is based on available

information and that Rocket can get an accurate estimate of which loans are likely

to close and which ones will not, and that this estimate gets more accurate over time

as more information becomes available throughout the process. According to CW-

3, the inputs to this information include: if someone clicks on the Rocket site,

downloads the Rocket Mortgage App, completes a mortgage application, converses

with agents through chats, direct responses to emails, or phone conversations.  CW-

3 explained that *all of this information gets inputted into analytics*, and that Rocket

had a team, such as a market research type team, that conducted "standard statistical

testing."

115.   According to CW-3, Gain on Sales margin and closed loan volume

could be projected based on the types of leads, inputs, and data mentioned above

that the Company received.  He added that Rocket has "that capability" because of

predictive analysis.  CW-3 further added that the Company also knows "historically"

from their historical data they have accumulated how many loans they are likely to

close on.

116.   CW-3 further stated that there is a "correlation" of such activities in the

entire "sales funnel," adding that lead generation, which is "at the top of the funnel"

is "a core thing" in that regard.  To that point, he said that Rocket engaged in "a boatload" of outbound calls based on leads that were generated from visits to the Company's website, the genesis of which might be a Google search.

117.   Regarding the "funnel," CW-3 stated that Rocket knew what their numbers should be at "every stage" in the funnel.  CW-3 further described the "funnel" as beginning with Intake, which he described as possible leads, and that in the next stage those leads are filtered out to include only the better qualified prospects, then to an actual deposit, and then to eventual "closed loan status."  He added that Rocket employed predictive analytics throughout the "***entire process***," and further added that the "product is data."

118.   This loan pipeline "funnel"—and Rocket's corresponding predictive analytics at every step of the way—can thus be pictured as such:

[figure on next page]



119.   Rocket admitted that its system allows it to "continuously monitor[] in-progress loans and leverage our proprietary, data-driven, decision engine to recommend the most efficient task[.]"[31] Other CWs corroborated that Rocket constantly tracked each stage of the loan pipeline funnel.

120.   CW-1 stated that he met three to four times per week with Rocket's Senior Vice Presidents to discuss the status of the loan origination pipeline.  CW-1 stated that the meetings covered the various milestones that occurred up to when a loan closed, which was also referred to as "a closed folder."  According to CW-1, these milestones included initial telephone contacts with prospective borrowers that

---

[31] Registration Statement.

*began even prior* to when a loan application was submitted or the borrower's credit history was pulled.  According to CW-1, the percentages of how many prospective borrowers met the various milestones towards a closed loan folder were tracked and discussed.

121.    Further, CW-1 explained that the Chief Revenue Officer for Rocket had attended these meetings three to four times per week during 2020.  Because of a restructuring within the Company, the Chief Revenue Officer participated in these meetings once every two months in 2021.

122.    CW-1 also confirmed that he used the "Sequel" program to obtain data from Rocket's data warehouse that CW-1 then used to examine the overall time it took for loans to close.

123.    CW-4 was employed as an Account Executive at Rocket Pro TPO[32] from June 2020 to July 2021 and as a Collateral Underwriter for Rocket Mortgage from July 2021 to October 2021.  He was on the "Wholesale" side of the business and explained that his responsibilities included building a relationship, training, and interfacing with broker partners to get them to use Rocket's platform.

124.    According to CW-4, brokers would submit loans through the portals, and explained that each group, such as Wholesale and Retail, had their own portals

---

[32] CW-7 explained that Rocket Pro TPO was Rocket's Wholesale mortgage business side that dealt with brokers.

with Wholesale using the "Partner Portal."  CW-4 further explained that employees on the Wholesale side could then track their own loan pipelines through Salesforce, and that one could view information on their loans going back three years in Salesforce.  CW-4 advised that the Retail side used a system other than Salesforce to track their loans and pipeline.

125.   CW-4 further explained that "every stage of the loan approval process" could be tracked including the initial application, the registration, and the updated status dates as it moved through the approval process from stage to stage.  CW-4 stated that the "top people" could access the entire pipeline in Salesforce.

> **b.      Based on These Analytics, Defendants Knew (or Were Reckless in Not Knowing) the Amount of Loans that Would Likely Reach Closed Loan Status at the Time of Loan Application, Which was 45 to 60 Days Prior to Closing**

126.   In terms of timing, Rocket states on its website that the timeline from when a new loan application is submitted to when it is closes is between 45 to 60 days:

### How Long Does It Take To Process a Mortgage?

Since the whole mortgage process has many parts, it can take a while for everything to be done. This includes everything from preapproval (or prequalification), to getting a home appraisal, to the underwriting. ***Typically it can take around 30 days from when you officially apply for your mortgage to when you get your home loan. However, during busier times of the year, it can take an average of 45-60 days.***[33]

---

[33] Sarah Li Cain, *Mortgage Process Basics And Key Terms*, Rockethq.com (Feb. 3, 2022),

127.   Further, Rocket's website indicates that "standard mortgage loans take an average of 49 days, while FHA loans, with the longest average time, take 54 days, according to Ellie Mae."[34] Thus, the likely timeframe from loan application to closed loan status during the relevant time period here is ***45 to 60 days*** (i.e., the "lag time").

128.   The vast proprietary data and information maintained by Defendants' "data lake" allowed Defendants to foreshadow the Company's upcoming closed loan volume and Gain on Sale margins in a given quarter approximately 45-60 days prior to those trends manifesting in Rocket's financial results.  In other words, because of the lag time from when a new loan application is submitted to when the loan closes and is recorded as a "closed loan," the Defendants knew approximately 45-60 days from the time of the initial application, how many loans would likely close in the future and the Company's corresponding financial performance.

129.   Indeed, as stated in Rocket's February 25, 2021 Earnings Call for 4Q 2020, Defendant Farner represented that Rocket's "capital market folks" carefully monitored the loan origination pipeline "***every day***," analyzing the rate at which loan applications pull through or fall out, to make informed decisions about hedging.

---

available athttps://www.rockethq.com/learn/home-buying/mortgage-process-basics-and-key-terms.
[34] Victoria Araj, *How Long Does It Take To Close On A House?*, Rocketmortgage.com (May 19, 2022), https://www.rocketmortgage.com/learn/time-to-close-on-a-house. *See also* Mortgage Ice Technology, *Origination Insight* Report (June 2021), https://static.elliemae.com/pdf/origination-insight-reports/ICE_OIR_JUNE2021.pdf.

Defendant Farner remarked that this information was included in or "priced in to" the guidance that Defendant Booth was presenting to investors:

> **Q** (JPMorgan & Chase Analyst): ***When we look at the guidance on gain on sale for the first quarter***, how should we think about that in context of -- primary, secondary spreads have come in pretty significantly. But also, and this is the, I think, the more interesting nuance point, how are you thinking about your pipeline hedge and potentially an [inverse] a decrease in fallout with the [splicing rates]?
>
> **A** (Defendant Jay Farner): Yes. Great question. I can tell you that those type of things are what our capital markets folks are looking at every day and the data that we have, ***and I'm going to go back to the importance of the data from the top of the funnel, even pre-application*** to understand pull-through rates. And so those type of ***data points are priced in to the guidance*** that Julie's provided.

130.    During the Earnings Call, Defendant Booth gave 1Q 2021 guidance of closed loan volume of $98 billion to $103 billion; *net rate lock volume* of $88 billion to $95 billion; and Gain on Sale margins of 3.6% to 3.9%.

131.    Defendant Farner's statements are thus a self-admission that Rocket and the Individual Defendants understood that its data points at the top of the "funnel," even pre-application data points like number of website visits, and downloads of the Rocket Mortgage app, etc., foreshadow actual amount of closed loan volume, *net rate lock volume*, and Gain on Sale margin, and thus are to be "***priced***" into the guidance that Rocket gives on those metrics. Defendants thus knew internally that volume and Gain on Sale margins would be affected by pre-application data points at the top of the "funnel" in a material way.

132.   To that end, Rocket constantly tracked the status of the loans throughout the loan pipeline funnel—from initial interest to loan application to closed loan status—which Defendants use to estimate the volume of new loans that will ultimately progress to closed loan status (and thus revenue).  Defendants used the characteristics of those new applications to forecast Gain on Sale margin, closed loan origination volume, *net rate lock volume*, and other key important metrics.

### E.   During the Class Period, Defendants Falsely Assured Investors That There Was "Strong Consumer Demand" and that Loan Volume Was Increasing

133.   Beginning in February 25, 2021, during Rocket's Earnings Call, Defendant Booth repeatedly stated that there was "strong consumer demand," and that the "demand environment's very strong."  Defendant Booth also touted that "we're still seeing strong closed loan volume."  These assertions were made in response to analyst questions concerning the "current environment . . . for selling of loans" and the "very specific guidance for first quarter" of 2021 that Rocket gave.

134.   Roughly a week later, Defendant Farner was then asked about the growth rate for Rocket's business channels during a Morgan Stanley Conference (March 3, 2021):

> Q: You talked about kind of your partner channel as direct. There's different types of direct, whether they're engaging with Rocket or they're doing everything electronically just with a phone and kind of what you're imagining and envisioning ultimately getting to. Can you talk a little bit about what portion each of those types of channels or processes are of the overall volume and business today? What their

relative growth rates are? And how -- what you think that looks like in the very long run?

135.    In  response,  Defendant  Farner  claimed  that  ***all  channels  were growing***:

> A: So I know we don't break down the percentages, and I'm probably not going to go any further than what we've already laid out in our earnings call, but as you can probably sense from my passion, ***they're all growing***.

136.    Yet, unbeknownst to investors – but known to Defendants – all relevant metrics were actually on the decline, indicating that volume, as a whole and broken out by channel segments, was in fact ***not growing***, and that demand was much lower due to less loan applications being completed.

### 1.    Volume In Each of Rocket's Channels Was Decreasing, Not Growing

137.    Contrary to Defendant Farner's statements above, and as demonstrated in the graph and chart below, starting in November 2020, closed loan volume for each channel segment of Rocket (i.e. Retail and Broker) was ***not growing***, but was, in fact, trending downwards[35]:

---

[35] Source: Expert Data.  "Broker and Correspondent Channel" is synonymous with the Partner Network segment. "Retail Channel" is synonymous with the DTC segment.  This graph and chart reflects Rocket's Fixed Rate Mortgages in Fannie Mae, Freddie Mac, and Ginnie Mae Single Family Programs.



| Date | Retail Channel ($ Thousands) | Broker Channel ($ Thousands) |
|------|------------------------------|------------------------------|
| Sep-19 | 8,857,456 | 3,972,872 |
| Oct-19 | 10,825,250 | 5,015,676 |
| Nov-19 | 11,047,426 | 5,035,485 |
| Dec-19 | 11,439,756 | 4,541,259 |
| Jan-20 | 9,441,627 | 4,161,202 |
| Feb-20 | 9,022,179 | 3,973,944 |
| Mar-20 | 10,847,597 | 6,053,123 |
| Apr-20 | 13,829,313 | 6,548,025 |
| May-20 | 13,846,219 | 5,030,748 |
| Jun-20 | 18,691,138 | 7,349,675 |
| Jul-20 | 17,671,387 | 8,273,177 |
| Aug-20 | 20,247,244 | 9,187,134 |
| Sep-20 | 18,485,851 | 8,980,657 |
| Oct-20 | 22,439,103 | 11,051,740 |
| Nov-20 | 27,681,273 | 12,566,502 |
| Dec-20 | 22,413,988 | 10,007,541 |
| Jan-21 | 22,216,385 | 9,849,362 |
| Feb-21 | 21,716,850 | 11,556,967 |
| Mar-21 | 21,747,955 | 11,407,178 |
| Apr-21 | 20,903,202 | 10,468,444 |
| May-21 | 14,464,014 | 7,895,238 |
| Jun-21 | 15,335,190 | 8,974,004 |
| Jul-21 | 13,768,499 | 8,164,059 |

138.   Indeed, the combination of the two channels (i.e., Partner Network and Retail) demonstrate that total closed loan volume was decreasing and stalling for Rocket, starting in November 2020[36]:



139.   As shown in the graph above, although total closed loan volume peaked in November 2020, it was steadily in decline thereafter.  Closed loan volume fell significantly, declining from $40.25 billion in November 2020 to just $32.44 billion in December 2020 and then continued to decline to approximately $22.38 billion by May 2021.[37]

---

[36] Source: Expert Data. This graph reflects Rocket's Fixed Rate Mortgages in Fannie Mae, Freddie Mac, and Ginnie Mae Single Family Programs.
[37] Source: Expert Data.

140.   While Rocket reported *quarterly* closed loan volume and *quarterly* closed loan volume broken out by segment, i.e., DTC and Partner Network (usually six weeks after the end of the quarter) it did not report closed loan volume on a monthly basis.[38]

141.   Defendants, including Defendant Farner, had access to this information given that they admitted to closely tracking closed loan volume as a Loan Production KPI, even by segment channel.  Defendants, including Defendant Farner, would have seen in the data they reviewed that there was a material decline from just November 2020 to January 2021—for both total closed loan volume and broken out by segment—and that his statements that volume was actually "growing" were misleading and incorrect.

142.   In addition, Rocket's use of proprietary first-party data and machine learning technology gave Defendants a clear understanding of, *inter alia*, (1) the type of products moving through the pipeline (refinance or purchase loans), (2) the channel or segment in which the loans originated (Direct-to-Consumer or Partner Network), (3) what stage the loan was at (whether at the top of the funnel as mere customer interest, to middle of the funnel as a loan application, to the bottom of the

---

[38] Thus, the information in the two graphs (and chart) above was not public information easily accessible to investors.  Further, as discussed, even through subscription, the information concerning monthly data would have not been available on a contemporaneous basis, given that the information concerning one month would only be available the following month.

funnel at closed loan status), and (4) the likely amount of closed loan volume in the future based upon present amount of loan application volume.

143.   As a result, at the time of Defendants' statements in February and March of 2021, Defendants knew (or were reckless in not knowing – given their review and access to data) that closed loan volume was going to fall off a cliff in the months of April and May 2021 (given the 45 to 60 day lag period), as demonstrated in the graphs above.

> **2.     The Amount of Loan Applications in the Pipeline Were Decreasing**
>
> **a.     Client Inquiries Began a Steady Decline  Starting in 2Q 2020 That Continued Throughout the Class Period**

144.   The number of client inquiries generated by Rocket's subsidiary, Core Digital Media, began declining in 2Q 2020. As made available for analysis in Rocket's SEC filings, and as demonstrated in the chart below, client inquiries generated in 3Q 2020 declined by more than 20% as compared to those generated in 1Q 2020:



145.   This informed Defendants that fewer leads were entering the "top" of Rocket's sales funnel in 3Q 2020, which would result in less loan applications being filled out in 4Q 2020, and thus, less closed loan volume in 4Q 2020 and 1Q 2021:



146.   Notably, this comports with the material decrease in closed loan volume from its peak of November 2020, onwards.

> **b.    Net Rate Locks Were Flat and Growth was Declining Starting in Mid-2020 and Continuing Throughout the Class Period**

147.    Similarly, and as expected given the decline in new client inquiries, *net rate lock volume* was flat in the second half of 2020, and was actually declining in 1Q and 2Q 2021.

148.    As stated previously, "*net rate lock volume*" refers to the unpaid principal balance of all loans subject to Interest Rate Lock Commitments (IRLC), discounted with Rocket's estimated "pull-through factor."  Rocket's "pull-through factor" was "a key assumption and estimates the loan funding probability, as not all loans that reach IRLC status will result in a closed loan."

149.    *Net rate lock volume* became stagnant in 3Q and 4Q of 2020 and then declined throughout the first half of 2021[39]:



---

[39] Source: Rocket's SEC filings.

150.   *Net rate lock **growth***, however, had been declining since 2Q 2020. As demonstrated in the graph below, quarter-over-quarter growth for *net rate locks* declined from 64% in 2Q 2020 to 3% in 3Q 2020, and to just 1% in 4Q 2020, after which *net rate lock* volumes began to decline:



151.   Because *net rate locks* are a critical step in Rocket's core operations of originating and selling mortgage loans, Defendants would have monitored this metric very closely. Thus, Defendants knew that *net rate lock volume* and growth was declining and, as a result, so too would closed loan volume.

### c.   Confidential Witnesses Support that Loan Applications Were Decreasing Going Into 2021

152.   According to CW-4, business was down in 2021 as compared to 2020. Indeed, CW-4 recalled that by December 2020, Rocket was "behind goal" and Rocket management was "freaking out." He further recalled that Retail was behind

by 3%.  CW-4 explained that Wholesale was forced to work longer hours in December to make up for Retail's lagging performance.[40]

153.   CW-9 worked as Mortgage Loan Originator for Rocket from November 2020 until May 2021.  CW-9 was responsible for selling loans to customers and reported to a former Mortgage Banking Director.  CW-9 recalled that during his six-month tenure at Rocket, it was very difficult to sell loans. CW-9 explained that no one was refinancing or purchasing new properties, and while Rocket executives claimed that the business was good, it was clear to all Rocket's employees that business was suffering.

154.   CW-9 explained that new loan originators were expected to sell 13 loans during their first month on staff, 17 loans during their second month, and over 20 loans during their third month, with quotas increasing as time went on.  CW-9 recounted that he only sold a total of 14 loans during his entire tenure at Rocket, and that his boss, the Mortgage Banking Director, would often join his calls and try to make the sales himself, but was equally unsuccessful.  CW-9 related that he would often prepare a loan, but that the customer would be frightened off by Rocket's high origination fees.

---

[40] CW-4 provided the following as the steps in the loan approval process: (1) Registration, in which the Account Executive enters the loan; (2) disclosures are produced; (3) documents are uploaded; (4) folder reviewed and goes to Underwriting; (5) Closing department then handles the fees, conducts fund transfers, and closes out the loan.

155.   CW-5 was a Resolution Analyst employed at Rocket from November 2019 to August 2021.  CW-5 reviewed closed loans to ensure they met the standards necessary for sale to the secondary market.  CW-5 explained that in 2020, he was required to work 60-70 hours per week, with no limits on overtime, which reflected the high volume of loans that needed to be reviewed. CW-5 estimated that during 2020, he reviewed anywhere from 100 to 200 loans each day, but that this amount fell to approximately 75 to 100 per day in 2021.

156.   CW-6 was a National Account Executive at Rocket Companies/Rocket Pro TPO (*i.e.*, Wholesale) from August 2020 to May 2021, and a Senior Credit Underwriter from May 2021 to July 2021.  According to CW-6, Rocket's broker-facing software and technology was not so simple that a broker could just "pick up and run" with it, but would require training from the Account Executives to the brokers to use.  CW-6 stated that Rocket's Wholesale business was slower to underwrite and close loans not only because they didn't have enough underwriters, but also because of its lower rates and discounting increased loan volume (although not margins).  And Rocket's wholesale business had also been handling a lot of "self-employed" loans which took longer to underwrite because they required more documentation.

157.   CW-7 worked at Rocket—specifically for "Rocket Pro TPO," which CW-7 confirmed was Rocket's wholesale mortgage business that dealt with

brokers—from January 2020 to January 2021 as a National Account Executive in Charlotte, NC.  As a National Account Executive, CW-7 was responsible for "nurturing existing relationships" that Rocket had with mortgage brokers, credit unions, and correspondent partners in order to bring in more lending business from those customers.  CW-7 reported to a Divisional VP, who in turn reported to a Regional VP, who in turn reported to the EVP of Rocket Pro TPO, who in turn reported to the CEO.

158.  CW-7 stated that during 2020, Rocket's wholesale business had been "really surviving" on refinancing, as opposed to purchases.  However, as 2020 was coming to an end and there was anticipation that rates were going to increase, the refinance business was going to be "harder to come by."  CW-7 reiterated that Rocket's Wholesale business had not been doing a lot of purchase financing, but mainly refinances.

> **d.  The United Wholesale Ultimatum Placed Additional Downward Pressure on New Loan Applications**

159.  As explained below, in early March of 2021, Rocket was forced to implement an undisclosed discounting program in order to compete with other lenders in the business.  As interest rates began to rise in 1Q 2021, Rocket's competitors began cutting their rates in order to increase loan volume and market share. In order to compete, Rocket was forced to do the same.

160.   More specifically, on March 4, 2021, United Wholesale Mortgage ("UWM") – Rocket's primary competitor in the mortgage loan origination industry – issued an ultimatum to mortgage brokers that threatened huge penalties against brokers who continued to work with Rocket, forcing brokers to choose between UWM or Rocket.[41]

161.   To that end, and in response to this ultimatum, CWs explained that Rocket lowered prices and engaged in a "discounting" program of Wholesale loans.

162.   According to CW-7, UWM was definitely recognized as Rocket's primary competitor in the wholesale business, and because Rocket was based in Detroit and UWM was in Pontiac, MI, there was even a "local rivalry."  UWM was a topic in virtually every one of the weekly meetings in which CW-7 participated. These meetings, which were run by the EVP of Rocket Pro TPO (and who reported to the CEO), went over "production numbers," pricing promotions that might be underway, regulatory changes that might be occurring, and what the performance had been for the prior week.

163.   CW-6 explained that Rocket's lower pricing and discounting of wholesale loans *preceded* the UWM ultimatum, which according to CW-6, "no one

---

[41]JC Reindl, *UWM CEO issues ultimatum, escalates war against Rocket Companies* (Mar. 4, 2021)
https://www.freep.com/story/money/business/2021/03/04/united-wholesale-mortgage-ultimatum-rocket-companies/4578357001/.

was expecting."  CW-6 indicated that Rocket had released a new JUMBO loan product that had already been scheduled for release.  This new JUMBO loan product had been necessary because UWM already had such a loan product.  CW-6 explained that the discounting that was already being offered prior to the ultimatum and the new JUMBO loan product reflected that Rocket had been in a "rebuilding phase" of its relationships with brokers.  In that regard, many brokers were already distrustful of Rocket which was known for trying to coopt wholesale borrowers to become Rocket's retail clients.  Accordingly, Rocket had been trying to "save face" and rebuild its broker relationships by way of "aggressive pricing."

164.   Immediately after the UWM ultimatum, CW-6 was involved in calling his clients to try to save business from going with UWM.  According to CW-6, a lot of mortgage brokers, especially smaller ones, were very loyal to UWM.  Rocket's efforts to retain mortgage brokers following the UWM ultimatum included aggressive and special pricing and faster turnarounds for closing.

165.   According to CW-6, after UWM issued its ultimatum, what used to be a special discounting became available for just about everybody who asked for it.  Despite these efforts, CW-6 recalled that he lost around 10 of his 25 mortgage broker clients, one of which was "pretty big."

166.   CW-4 confirmed that due to the UWM ultimatum that forced brokers to choose between Rocket and UWM, Rocket lost a lot of partners starting in March and April 2021.

167.   Further, according to CW-4, Rocket was negatively impacted by the UWM ultimatum, and that it started soon after the ultimatum was given.   CW-4 explained that soon after the ultimatum he went from generating 30 to 35 new loans per month to 5 per month, and that this started within a month after the ultimatum.

168.   CW-8, an Account Executive at Rocket from August 2013 to August 2021, recalled that Rocket "lost a good chunk of business" with brokers because of the ultimatum.   CW-8 stated that while he had been dealing with around 20 broker accounts prior to the UWM ultimatum, by the time he left he was down to 13.

169.   Despite all of Rocket's attempts to retain the business of brokers after the UWM ultimatum, Rocket's market share of loan volume originating with brokers declined after the ultimatum, falling from 23.39% in February 2021 to just 18.69% in May 2021[42]:

[graph on next page]

_____

[42] Source: Expert Data. This graph reflects Rocket's Fixed Rate Mortgages in Fannie Mae, Freddie Mac, and Ginnie Mae Single Family Programs.



**F.      During the Class Period, Defendants Also Falsely Assured Investors That Interest Rates Would Not Affect the Company**

170.    Interest rates play a special role in the mortgage origination industry that Rocket operates in.

171.    GSEs such as Fannie Mae and Freddie Mac set the price they are willing to pay for conforming loans. While such pricing is developed through sophisticated models, the most important factor is prepayment speeds.  Prepayment speeds are the estimated rate at which mortgagors pay off their loans ahead of schedule.

172.    Prepayment speeds for conforming loans, such as the ones purchased by Fannie Mae and Freddie Mac, are most commonly linked to variations in interest rates and refinancing volume.  When interest rates decrease, loan servicers report high numbers of prepayments on existing loans, as homeowners seek to take advantage of the lower interest rates to refinance. Historically, as interest rates decline, therefore, refinancing volume significantly increases.  When interest rates increase, refinancing volume significantly decreases[43]:



---

[43] Source: Expert Data.  This graph reflects Refinance Origination Volume in the mortgage industry compared to the Mortgage Interest Rate, concerning Fixed Rate Mortgages in Fannie Mae, Freddie Mac, and Ginnie Mae Single Family Programs.

173.   The paper *The Impact of Higher Interest Rates on the Mortgage Market*, published by the Housing Finance Policy Center, also discusses what happens when interest rates increase, and "identifies and examines six impacts on the mortgage market" from increased rates.[44]

174.   As discussed, chief among the identified impacts is that "mortgage origination volumes will ***decrease***."[45]   Correspondingly, "[t]he drop in mortgage refinancing ***will also affect profitability***. Originators are most profitable during refinance waves, when they are capacity constrained.  As interest rates decline and borrowers refinance, it is unnecessary to reduce rates in line with the market, so originators can increase their spreads and still secure sufficient business volume. In contrast, when rates increase, competitive pressure force originators to raise mortgage rates as little as possible to maintain market share."[46]   In doing so, originator profitability decreases.

175.   The paper also discusses that as a result of increased interest rates, "prepayment speeds will slow" because of the decrease in refinanceability.[47]   In other words, in an increasing interest rate environment, the homeowner has a low

---

[44] Laurie Goodman, Housing Finance Policy Center, The Impact of Higher Interest Rates on the Mortgage Market (August 2017).
[45] *Id.*
[46] *Id.*
[47] *Id.*

incentive to refinance, and thus the homeowner has less incentive to prepay off their existing mortgage in order to refinance with a new loan, as there is no advantage to financing with a higher interest rate.[48]

176.   Further, increased interest rates affect profitability because they can impact what is known as the "primary-secondary spread."

177.   The primary-secondary spread is the "difference between mortgage rates for borrowers (the primary rate) and yields on newly-issued, agency, mortgage-backed securities or MBS (the secondary rate)."[49]  According to Plaintiffs' expert, this spread is a major determinate of the premium price that the GSEs will pay for the loans, after adjusting for other components such as the guarantee fee and servicing fee.   Thus, according to Plaintiffs' expert, and industry market commentary, the primary-secondary spread gives some indication, although imperfect, *of the profit margins of mortgage originators*.[50]

178.   In other words, the primary-secondary spread can serve as a proxy for the profitability of a mortgage originator, like Rocket, and, according to Plaintiffs' expert, can provide an indication of increasing or decreasing profit margins.

---

[48] *See* Joseph C. Hu, *Appendix A: Analysis of Prepayment and Prepayment Rate*, Asset Securitization: Theory and Practice (2011), available at https://onlinelibrary.wiley.com/doi/pdf/10.1002/9781118390481.app1.

[49] Michael Clark, Ph.D., Market Commentary: *The Impact of Low Rates on Lender Profitability* https://engage.optimalblue.com/blueline/market-commentary-the-impact-of-low-rates-on-lender-profitability.

[50] *See also id.*

179.   More specifically, the chart below, as prepared by Plaintiffs' mortgage industry expert, illustrates the relationship between (i) increased mortgage interest rates, (ii) the MBS yield, and (iii) the primary-secondary spread.  The primary-secondary spread is calculated by subtracting the MBS yield from the mortgage interest rate:

| Hypothetical Time Period | Month 1 | | Month 2 |
|---|---|---|---|
| | | | |
| Mortgage Interest Rate | 3.30 | increase | 3.70 |
|  - Servicing Fee | 0.25 | | 0.25 |
|  - Guarantee Fee | 0.55 | | 0.55 |
| Net Mortgage Rate | 2.50 | increase | 2.90 |
| | | | |
| MBS Coupon | 2.50 | | 3.00 |
| MBS Price w/ 2.50 Coupon | 105.00 | decrease | 104.40 |
| MBS Yield | 1.75 | increase | 2.30 |
| | | | |
| Primary Secondary Spread | 1.55 | decrease | 1.40 |

180.   Assume, for example, that the mortgage interest rate was 3.30% in Month 1.  Rocket generates profit by selling the loan that it originates to GSEs such as Freddie Mac or Fannie Mae.  The GSEs then pool the loans sold by Rocket together and package them to issue and sell to the secondary market as mortgage-backed securities, i.e. MBS.[51]  The GSEs will place the loans into a given MBS based on the monthly amount of interest being generated by the loans, net of certain monthly fees, such as for servicing and for the GSE's guarantee.  According to

---

[51] AllianceBernstein, *Guide to Mortgage Investing* (2018), available at https://www.alliancebernstein.com/sites/library/Instrumentation/MORT-MAG-GR-EN-0118-FINAL.PDF..

Plaintiffs' expert, the net amount of interest available needs to cover the coupon paid on the MBS; and the MBS coupon that is most actively sold at any point in time generally exceeds the required MBS "Yield" of the investors.  This results in the investors paying a premium for the MBS bonds, so that the interest at the MBS coupon rate divided by the premium price paid will result in the required yield.

181.   The MBS "Yield" refers to the relationship between the MBS price and interest paid,[52] and according to Plaintiffs' expert, generally follows and is closely correlated to the historical 10-year Treasury Yield.  The 10-Year rate, in turn, is also



closely correlated to the mortgage interest rate:[53]

---

[52] Gina Freeman, *MBS: What REALLY Determines Your Mortgage Rates*, Themortgagereports.com (Oct. 14, 2016), available at https://themortgagereports.com/22560/mbs-what-really-determines-your-mortgage-rates.
[53] Source: Expert Data.

182.   In other words, the 10-year Treasury Yield serves as a good measure of where the MBS yield is at any given time – as the 10-year Treasury Yield rises, generally speaking, the MBS yield likely rises as well.

183.   As seen in the example in the chart above (*supra* ¶179), when the interest rates rose from 3.30% in Month 1 to 3.70% in Month 2, the primary-secondary spread correspondingly decreased to 1.40% (from 1.55%).  This is known as primary-secondary spread "compression."

184.   And as discussed, given that the primary-secondary spread serves as proxy for profitability, compression of the primary-secondary spread leads to a decrease in profitability. Indeed, when Rocket gave downward guidance on Gain on Sale margins in its 1Q 2021 Earnings Call in May 2021, it stated that one of the reasons for the downward guidance was:

> If we look at that quarter-over-quarter change in the gain on sale margin guidance, it's really being driven kind of roughly by three *equal* factors: first of all, is changes in loan pricing and particularly our investment to drive the growth in the partner network channel; the ***second thing is that we did see the primary-secondary spread compress at the end of Q1 and into Q2***; and then the third factor that I'll mention is the channel and the product mix.

185.   As seen above, rising mortgage interest rates can therefore have a negative compressing effect on the primary-secondary spread, which cuts into a mortgage originator's profits.

186.   Rocket also stated previously in their 2020 Form 10-K how significant interest rates are to their business and that "[o]ur business is ***significantly impacted*** by interest rates."[54]   Rocket stated, in relevant part:

> Our financial performance is ***<u>directly affected</u>*** by changes in prevailing interest rates. . . . ***<u>We generally note that the refinance market experiences more significant fluctuations than the purchase market as a result of interest rate changes.</u>*** Long-term residential mortgage interest rates have been at or near record lows for an extended period, but they may increase in the future. As ***interest rates rise, refinancing generally becomes a smaller portion of the market as fewer consumers are interest in refinancing their mortgages. . . .  Higher interest rates may also reduce demand . . . increase or maintain our volume of mortgages. Decreases in interest rates can also adversely affect our financial condition, the value of our MSR portfolio and the results of operations***.  With sustained low interest rates, as we have been experiencing, refinancing transactions decline over time, as many clients and potential clients have already taken advantage of the low interest rates. . . . Borrowings under our financing facilities are at variable rates of interest, which also expose us to interest rate risk. If interest rates increase, our debt service obligations on certain of our variable-rate indebtedness will also increase.

187.   This disclosure is significant given that Rocket's main source of originations was in the refinancing sector and not new purchases. Indeed, as seen in the graph and corresponding chart below, from December 2020 through March of 2021, refinancing accounted for around 90% of all of Rocket's originated loans - before beginning to fall off and decline to 79% in May (corresponding with the

---

[54] Rocket 2020 Form 10-K.

increasing interest rate environment)[55]:



| Month | Loan Balance | Number of Loans | Mortgage Rate | Purchase % | Refinance % |
|--------|--------------|-----------------|---------------|------------|-------------|
| Nov-20 | 40,255,422,087 | 145,791 | 2.780 | 7.21 | 92.79 |
| Dec-20 | 32,440,218,353 | 121,414 | 2.741 | 9.40 | 90.60 |
| Jan-21 | 32,094,514,890 | 119,420 | 2.699 | 9.31 | 90.69 |
| Feb-21 | 33,295,197,829 | 122,292 | 2.660 | 7.44 | 92.56 |
| Mar-21 | 33,180,591,675 | 124,581 | 2.705 | 8.58 | 91.42 |
| Apr-21 | 31,392,011,255 | 120,761 | 2.868 | 12.46 | 87.54 |
| May-21 | 22,385,705,276 | 86,220 | 2.925 | 20.09 | 79.91 |
| Jun-21 | 24,339,548,817 | 92,481 | 2.887 | 22.30 | 77.70 |
| Jul-21 | 21,965,881,044 | 82,966 | 2.871 | 24.00 | 76.00 |
| Aug-21 | 26,630,506,648 | 96,882 | 2.851 | 21.64 | 78.36 |

[55] Source: Expert Data. This graph and chart reflects Rocket's Fixed Rate Mortgages in Fannie Mae, Freddie Mac, and Ginnie Mae Single Family Programs.

188.   Rocket also confirmed in the same 2020 Form 10-K that:

> ***Our profitability is directly affected by changes in interest rates***. ***The market value of closed loans held for sale*** and interest rate lock generally change along interest rates. ***The value of such assets move opposite of interest rate changes.  For example, as interest rates rise, the value of existing mortgage assets falls***.

189.   Indeed, to that end, Rocket disclosed that "net loss from these fair value changes was $801.8 million for the year ended December 31, 2020, compared to a net loss of $121.7 million for the year ended December 31, 2019, ***driven by changes in interest rates*** and loan volume.  The net less from the fair value changes was $121.7 million for the year ended December 31, 2019, compared to a net gain of $201.5 million for the year ended December 31, 2018 ***driven by changes in interest rates*** and loan volume."

190.   As shown below, starting in early February 2021, interest rates were rising for both the 30-year and 15-year fixed rate mortgage[56]:

[graph on next page]

---

[56] Source: *Mortgage Rates*, FreddieMac.com, https://www.freddiemac.com/pmms (Last visited June 3, 2022).



191.   And the U.S. 10-Year Treasury interest rate was also increasing[57]:



---

[57] Source: Expert Data.

192.   Yet, despite this rising rate environment and Defendants own admission in previous filings, Defendants downplayed the effects of the rising rate environment on February 25, 2021 and fraudulently misled the market.  Specifically, Defendant Farner stated to investors the outrageous notion that "[we] ***don't see interest rates going up or down, really having an impact on our business one way or the other.***" This was in direct response to analyst concerns and questions of how the increase in rates would affect profitability and Gain on Sale margins.  Indeed, Defendant Farner doubled down just a few weeks later on March 11, 2021, when stating to Fox Business in a televised interview that, "***really, interest rates moving around are a great benefit to us.***"

193.   These statements were in direct contradiction to what Defendants had told the market before: that "our profitability is directly affected by changes in interest rates," and that the value of the closed loans held for sale to GSEs and the secondary market are directly tied and "change along" interest rates.

194.  Further, the increased interest rates had a negative effect—in particular—on Rocket, because Rocket's main source of closed loan volume was through refinancing.  Indeed, refinancing accounted for approximate 80-90% of Rocket's business, and interest rate increases generally produce a significant reduction in refinancing loan volume.

**G.  Defendant Gilbert Commits Insider Trading in Violation of the Securities Exchange Act 10(b) and 20A When He Sells $500 Million Worth of Rocket Stock While in Possession of MNPI**

195.  Two Rocket shareholders, Doris Shenwick Trust and Christopher Vargoshe, obtained internal documents pursuant to books and records demands made under Section 220 of the Delaware General Corporations Law, which demonstrate that Defendants were aware of Rocket's declining Gain on Sale margin and the negative effects that interest rates were having on profitability early in the Class Period through Board and Audit Committee meetings. The two shareholders filed separate actions,[58] against Defendants Gilbert and RHI, which have now been consolidated into one action bearing the following caption: *In Re Rocket Companies, Inc. Stockholder Derivative Litigation,* Consolidated C.A. No. 2021-1021-KSJM (Del. Ch. 2021).  The public consolidated complaint was filed on that docket on March 28, 2022 (the "*Consolidated Stockholder* Complaint").  Pursuant to Rocket's Section 220 books and records production and the resultant complaints filed therein, the following information – which was not known to the market publicly during the Class Period – was revealed:

196.  On March 10, 2021, Rocket's Audit Committee met.  At this meeting,

---

[58] *Doris Shenwick Trust v. Daniel Gilbert and Rock Holdings, Inc., and Rocket Companies, Inc.*, C.A. No. 2021-1021-KSJM (Del. Ch. filed Nov. 23, 2021) (public complaint filed Dec. 21, 2021) ("*Shenwick Trust*"); *Christopher Vargoshe v. Daniel Gilbert and Rock Holdings, Inc., and Rocket Companies, Inc.*, C.A. No. 2022-0116-KSJM (Del. Ch. filed Feb. 2, 2022) (public complaint filed Feb. 7, 2022) ("*Vargoshe*").

senior members of Rocket's management, including Defendant Booth, and Chief Accounting Officer ("CAO") Brian Brown were in attendance, and the Audit Committee meeting minutes state "[i]t was reported that Management discussed certain business matters with the Committee." *See Vargoshe* Complaint at ¶60; *Shenwick Trust* Complaint at ¶60.

197.   Rocket's Audit Committee Charter (effective August 5, 2020) requires the Audit Committee to "[r]eview and discuss the Company's annual audited and quarterly unaudited financial statements with management," to "review and discuss with management . . . issues regarding, or significant changes in, the Company's . . . financial statement presentations," and to "[r]eview and discuss with management the Company's earnings press releases . . . as well as financial information and earnings guidance provided to analysts and rating agencies."[59]

198.   Given the critical importance of the Gain on Sale margin, the Audit Committee's required review of earnings releases and guidance, and Defendants' own admissions that management closely monitored Gain on Sale margin, the Audit Committee would have discussed the declining Gain on Sale margin at the March 10 meeting as part of its discussion of "business matters."  Moreover, Defendants Farner and Booth would have prepared and analyzed the materials presented to the

---

[59] Rocket Companies, Inc., Audit Committee Charter (August 5, 2020), available at https://s25.q4cdn.com/509921419/files/doc_downloads/gov_doc/2020/RKT-Audit-Committee-Charter.pdf.

Audit Committee in the days prior to the meeting, which occurred only nine business days after Rocket provided 2Q 2021 guidance to the market on February 25, 2021.

199.   On March 23, 2021, just nine business days after the March 10, 2021 meeting, Defendant Booth and Defendant Farner attended a Board meeting where they and CAO Brown presented a "Finance Overview" presentation to Defendant Gilbert and the Board.[60]   As displayed below and as presented to Defendant Gilbert and the Board, the Finance Overview presentation discussed that Rocket's "March 2021 Revised Forecast" for Rocket's Gain on Sale margin would now be 3.19% for 2021, _**down 9%**_ from the 3.50% internal December 2020 Board forecast for 2021[61]:

## 2021 Forecast Highlights: **Revenue**

| $ in millions | December 2020 Board Forecast | March 2021 Revised Forecast | DIFF $ | DIFF % |
|---|---|---|---|---|
| | A | B | C | D | E |
| **RKT Revenue** | | | | |
| 1   Total Closed Volume | $300 B | $300 B | $0 B | 0% |
| 2   Average Gain on Sale Margin | 3.50% | 3.19% | -0.31% | -9% |
| 3   **Total Net Gain on Sale Revenue** | **$10,460** | **$9,510** | **-$950** | **-9%** |

Redacted – Non-Responsive

3/23/2021          Prepared by: Julie Booth [Redacted – Non-Responsive] & Brian Brown [Redacted – Non-Responsive]          12 of 25

---

[60] *Consolidated Stockholder* Complaint at ¶57; *Vargoshe* Complaint at ¶40; *Shenwick Trust* Complaint at ¶62.
[61] *Consolidated Stockholder* Complaint at ¶57.

200.   Although management had previously told the Board and Defendant Gilbert that it was projecting a Gain on Sale margin of 3.50% for 2021, management now told the Board and Defendant Gilbert that it was projecting a Gain on Sale margin of 3.19%.[62]  This, in turn, translated into a 9% reduction in net gain on sale revenue for 2021 from a previously believed $10.46 billion to a now $9.51 billion – or almost **one billion dollars**.

201.   Further, Rocket management told the Board that the rising interest rate environment and recent rise in the yield on the 10-year Treasury note would have a severe impact on Rocket's business.[63]  Management warned the Board that Rocket expected refinances to decrease by an astonishing **_80%_** over the course of 2021, as demonstrated below.[64]


[presentation on next page]

---

[62] *Id.*
[63] *Id.* at ¶58.
[64] *Id.*



202.   In that same meeting, management also explained that the rising 10-year yield had "compressed the primary-secondary spread," which was expected to result in a decrease in the Gain on Sale margin.[65]

203.   The events that occurred after the March 10, 2021 Audit Committee meeting confirm that: (1) the expected decline in Gain on Sale margin from 3.5% to 3.19%; (2) the expected decrease in $950 million of revenue for the year; (3) the expected 80% decrease in refinancing volume for the year; and (4) the expected compression of the primary-secondary spread (and thus decreased profits), were discussed at the March 10, 2021 meeting.   On March 19, 2021, RHI (wholly controlled by Defendant Gilbert) delivered a notice of exchange ("Exchange

---

[65] *Id.*

Notice") to Rocket expressing its interest in exchanging up to 47 million Holding Units and shares of Class D stock for shares of Class B stock.[66] The Class B shares would then be automatically converted into Class A shares that could be sold on the open market by RHI.[67]

204. RHI's Exchange Notice stated that the final "execution of [a sale] will depend on the stock price and market interest," thereby allowing RHI and Defendant Gilbert—who had knowledge of material nonpublic information concerning Rocket—to time the sale around Rocket's public disclosures and anticipated stock price reaction.[68] RHI's Exchange Notice, in other words, did not commit RHI to a sale of any Rocket stock, but instead, gave RHI the *option* to sell a discretionary amount of stock if it deemed that market conditions and Rocket's stock price were sufficiently favorable.[69]

205. When RHI delivered the Exchange Notice, the trading window under Rocket's Insider Trading Policy was closed. Rocket's Insider Trading Policy by its terms applies to the Company, its officers and directors, and "investment funds or other similar vehicles with which Rocket officers and directors are affiliated."[70]

206. Rocket's Insider Trading Policy states:

---

[66] *Id.* at ¶61.
[67] *Id.*
[68] *Id.* at ¶62.
[69] *Id.*
[70] *Vargoshe* Complaint at ¶66.

The Company requires Rocket Personnel to comply with applicable securities laws.

Rocket Personnel and their Related Parties ***must never***:

(1) Buy, sell or engage in transactions in Company securities at any time while aware of material non-public information about the Company.

(2) Buy or sell securities of other companies at any time while aware of material non-public information about those companies that Rocket Personnel become aware of as a result of business dealings between the Company and such other companies.

(3) Disclose material non-public information to any unauthorized persons outside the Company (including family members), commonly known as "tipping." Rocket Personnel are prohibited from "tipping" other persons about material non-public information or otherwise making unauthorized disclosures or use of such information, regardless of whether the person profits or intends to profit by such tipping, disclosure, or use. You must take steps to prevent the inadvertent disclosure of material non-public information to unauthorized persons outside the Company. If you believe that the disclosure of material non-public information is necessary or appropriate for business reasons, you must consult with the General Counsel of Rocket Companies or a designee of the General Counsel to ensure that they concur that such disclosure is necessary, and to ensure that any such disclosure will comply with all applicable laws.[71]

207.   The Insider Trading Policy provides for a trading window as follows:

Trading Window:

The Company imposes certain restrictions on specified senior officers, management, directors and team members, and their Related Parties when trading in Company securities. These

---

[71] *Id.* at ¶67.

restrictions govern even though the transactions may be permissible under law and apply to the following persons hereafter defined as the "Window Group":

- All members of the board of directors of the Company;

- All senior executives of the Company, meaning the Chief Executive Officer, the Chairman, the Chief Financial Officer, the President, their specific direct reports, and any other officer subject to Section J 6 of the Securities Exchange Act of 1934;

- Certain team members that are a part of accounting, finance and legal teams; and

- Any other team members designated by the General Counsel of Rocket Companies or a designee of the General Counsel as a member of the Window Group as such list may be updated from time to time.

The Company will conduct an evaluation each quarter to determine whether the scheduled trading window should be cancelled. The Company may close an open trading window or open a closed trading window early at any time, as deemed appropriate by the General Counsel or other members of senior management. The General Counsel of Rocket Companies or any designee of the General Counsel, in his or her own discretion, may from time to time remove one or more team members from the Window Group.

Notwithstanding transactions made subject to an approved 10b5-1 trading plan, members of the Window Group and their household and immediate family members may only enter into transactions in Company securities (including option exercises and gifts) during an open trading window that commences one business day after the public release of the Company's quarterly or annual financial results and ends on the date two weeks before

the end of each fiscal quarter. After the close of the trading window, the Window Group and their household and immediate family members may not purchase, sell or otherwise dispose of any of the Company's securities. The prohibition against trading while aware of, or tipping of, material non-public information applies even during an open trading window. For example, if during an open trading window you are aware that a material acquisition is pending, you may not trade in the Company's securities. You should consult the General Counsel of Rocket Companies or a designee of the General Counsel whenever you are in doubt.

The restrictions shall not apply with respect to a public offering of Company securities specifically authorized by board of directors or Rocket Companies or duly authorized board committee.

<u>Pre-clearance of Trades</u>: During a trading window, all directors and Section 16 Officers (as defined below) and their Related Parties must pre-clear all transactions in Company securities with the General Counsel of Rocket Companies or a designee of the General Counsel. ***Pre cleared transactions may only be performed during the trading window in which approval was granted and within two business days from the date of approval. If the transaction does not occur during the two-day period, pre-clearance of the transaction must be re-requested.***

<u>Hardship Exemptions</u>: In the event of exceptional personal hardship, a member of the Window Group may request a hardship exemption from the General Counsel of Rocket Companies or a designee of the General Counsel for permission to trade outside the trading window, if the person does not possess any material non-public information and not otherwise prohibited from trading pursuant to this policy.[72]

---

[72] *Vargoshe* Complaint at ¶68.

208.    According to the Policy, insiders could only trade in Rocket stock "one business day after the public release of the Company's quarterly or annual financial results" until "the date two weeks before the end of each fiscal quarter." Thus, as relevant here, the trading window had already closed ***two days*** prior to RHI's Exchange Notice delivery, (i.e., on March 17 the window closed and on March 19 the Exchange Notice was delivered), and was not expected to reopen until May 2021.[73] This timing thus supports the inference that if Defendants Gilbert and RHI had a long-term plan in place to sell their stock, as opposed to responding to adverse material non-public information, they would have traded during the open window as to avoid having to request clearance from the Company.

209.    As shown above, Rocket's Insider Trading Policy allowed the trading window to be opened at any time, but only as "deemed appropriate by the General Counsel or other members of senior management." However, because Rocket's senior management overlapped with RHI's senior management (including Defendant Farner, who was CEO of both entities), and because RHI controlled Rocket as majority shareholder, Rocket's Insider Trading Policy was thus effectively meaningless.

210.    On March 22, 2022, Defendants Booth and Farner attended another

---

[73] *Consolidated Stockholder* Complaint at ¶66.  The end of the first fiscal quarter for 2021 was March 31, 2021.  Two weeks before this date is March 17, 2021.

Rocket Audit Committee meeting to discuss RHI's Exchange Notice.[74] Certain members of Rocket's management, Rocket's general counsel, and Rocket's outside counsel attended this meeting.[75]

211.    The Audit Committee noted that "[t]he Company's trading window closed on March 17th and is not expected to open in the ordinary course until May 12th," after the scheduled second quarter May 5 earnings announcement.[76]

212.    Despite the trading window being closed, and the Audit Committee's express acknowledgement of this fact, the Audit Committee, "following discussions with Jay Farner" and other members of management, "voted unanimously to approve opening the trading window for a limited sale by RHI."[77]

213.    In other words, the Audit Committee, upon the insistence and recommendation of Rocket's conflicted and overlapping management, agreed to reopen the trading window for the sole purpose of allowing Defendant Gilbert to dump his stock before the 1Q 2021 earnings announcement.

214.    On March 29, 2021, Defendant Gilbert—armed with the material non-public information revealed just six days earlier—sold ***$500 million*** worth of Rocket stock to unsuspecting buyers, selling his stock prior to the disappointing guidance

---

[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.* at ¶67.

that he knew would be announced in the 1Q 2021 Earnings Call.  The Form 4 filed on March 31, 2021 disclosed that on March 29, 2021, Defendant Gilbert, through RHI, sold 20,200,000 shares of Rocket Class A common stock at $24.75 a unit, in a private sale, for total proceeds of $499.95 million.

215.   Crucially, Rocket's own Insider Trading Policy prohibited trading, ***even during an open trading window***, when the insider possesses or is "aware of" material, nonpublic information. The Policy states, in relevant part:

> *The prohibition against trading while aware of, or tipping of, material non-public information applies even during an open trading window. For example, if during an open trading window you are aware that a material acquisition is pending, you may not trade in the Company's securities. You should consult the General Counsel of Rocket Companies or a designee of the General Counsel whenever you are in doubt.*

216.   This restriction was in place even when requesting "Hardship Exemptions."  Indeed, according to the Policy above, in the event of "exceptional personal hardship," a member of the Window Group may request a hardship exemption from the General Counsel of Rocket Companies, but only "***if the person does not possess any material non-public information***."

217.   It is undisputable that on March 29, 2021, Defendant Gilbert had actual knowledge and was "aware" of adverse material non-public information, including: (1) the expected decline in Gain on Sale margin from 3.5% to 3.19%; (2) the expected decrease of almost a ***billion*** dollars of revenue for the year; (3) the expected

80% decrease in refinancing volume for the year; and (4) the expected compression of the primary-secondary spread (and thus decreased profits).  Indeed, Defendant Gilbert was presented with this inside information by Defendant Farner, Defendant Booth, and the CAO of the Company, just six days earlier before his massive trade.

218.   Thus, Defendant Gilbert's sale (through Defendant RHI) violates the Securities Exchange Act Section 10(b) because he traded on material non-public information and had a duty to speak before trading.

219.   Specifically, Defendant Gilbert had a duty to make known or publicly disclose the material non-public information that he possessed before committing his trade on March 29, 2021, or refrain from trading.  He did not speak nor abstain, and therefore both he and Defendant RHI violated Sections 10(b) and 20A of the Exchange Act.

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS[78]

220.   Despite knowing that: (1) Rocket's Gain on Sale margin was decreasing; (2) closed loan volume, including the volume of closed refinance loans, was dramatically decreasing; (3) the Company's sales funnel was decreasing and customer loan applications were declining; and (4) that interest rates were affecting Rocket's key refinancing business and profitability; Defendants assured analysts and

---

[78] All statements alleged to be false and misleading are bolded and italicized. Other text is provided for context.

investors the following misleading statements and omissions.

## A. Defendants' False and Misleading Statements in Earnings Calls

### 1. Materially False and Misleading Statements in the February 25, 2021 Earnings Call

221. On February 25, 2021, after market close, Defendants Farner, Booth, and Walters held an investor conference call to discuss the Company's fourth quarter 2020 financial results, 1Q 2021 guidance, and business operations ("February 2021 Earnings Call"). During the February 2021 Earnings Call, Defendant Booth reiterated Rocket's financial results for the fourth quarter and full year 2020 reported in Rocket's earnings release issued earlier that day. In particular, for 4Q 2020, Rocket reported *total revenue, net* of $4.7 billion, closed loan origination volume of $107.2 billion, and a Gain on Sale margin of 4.41%. For full year 2020, Rocket reported *total revenue, net* of $15.7 billion, closed loan origination volume of $320.2 billion, and a Gain on Sale margin of 4.46%. Defendant Booth also confirmed that Rocket was guiding a Q1 2021 Gain on Sale margin of 3.6% to 3.9% and closed loan volume for 1Q 2021 of between $98 billion and $103 billion.

222. During the February 2021 Earnings Call, analyst James Eugene Faucette of Morgan Stanley requested that Rocket provide more transparency about the purported "strong" demand Rocket was expecting, to which Defendant Farner responded that Rocket was seeing "strong consumer demand":

Q: <u>Morgan Stanley</u>: "Jay, Julie, I'm wondering if you can help shed some light on what we should expect in terms of new applications and growing – continuing to grow the business, particularly in the rising rate environment…And where should we be particularly sensitive to where rates could go is kind of my first question."

A: <u>Jay Farner</u>: "***We're seeing strong consumer demand,*** especially in the housing market. I mean, it's ***the strongest*** that it's been here in the last decade… I'll draw your attention to the fact that overall, we were able to grow volume twice as fast as the industry in 2020."

223.  In a follow-up question on the February 2021 Earnings Call, Morgan Stanley noted that Defendant Booth gave "very specific guidance for the first quarter" of 2021 and asked Booth: "How should we think about, particularly the evolution of gain on sale through the course of the year, at least directionally? And any color you can you can [sic] give us to help us think about like what the current environment is for selling of loans and how you're anticipating that, roughly, to evolve over the year?"

224.  In response, Defendant Booth falsely assured investors that loan demand was strong:

Yes. Sure. First of all, say, ***we're still in a very strong demand environment*** with the Fed buying 95% or so of all conforming mortgage production today. ***The demand environment's very strong***…as a market leader, we also benefit from the scale of our business when we execute into the secondary market…, so we've seen gain-on-sale margins of 4.52% in Q3 of this year. And then we saw continued strength as we came into Q4, coming in at 4.41%. And then as we look ahead into Q1, our expectations, as I said, for gain-on-sale margins are between 3.6% and 3.9%, and this is up from 3.25% in Q1 of last year. So margins are still well ahead of where they were a year ago…at the same time, ***we're still seeing strong closed loan volume***.

Our closed loan volume in Q4 of $107 billion and then looking ahead into Q1, between $98 million and $103 billion: with those numbers, that would be the second biggest quarter in our company's history.

225.   The above statements in *supra* ¶¶ 222, 224 were materially false and misleading when made because:

    i.    Salesforce and other internal Company dashboards showed that consumer demand was not strong because web traffic and new loan applications began declining in 2020, which continued on to 1Q 2021;

    ii.    *Net Rate Lock volumes* were declining at an increasing rate in 1Q 2021, indicating less growth in volume;

    iii.    Gain on Sale margin was expected to decline in the near term because in Q1 2021, Rocket was experiencing a significant volume shift in channel mix where a higher percentage of overall loans were generated from the less profitable Partner Network segment, with the higher margin DTC volumes falling;

    iv.    Closed loan volume began declining after peaking in November 2020, declining from $40.25 billion in November 2020 to $32.44 billion in December 2020 and then remaining below the peak of November in January and February of 2021; thus,

v.      Contrary to Defendant Farner's and  Defendant Booth's statements, which gave the false and misleading impression that closed loan volume was going to stay the same or increase in 2021, and that consumers are applying for loans at the same rate, all relevant metrics were on the decline.

226.   Later in the Earnings Call, Defendants made the outrageous statement that Rocket's business was ***not impacted*** by the increase interest rate environment.

227.   Goldman Sachs analyst Ryan Matthew Nash asked Rocket to discuss the "competitive dynamics you're seeing given the changing rate backdrop," particularly "in the context of the direct-to-consumer and the partner segments" to which Defendant Farner assured investors that rising interest rates would not negatively impact Rocket's business:

> Q: <u>Morgan Stanley</u>: Got it. And maybe I can ask a follow up to an earlier question. Jay, can you maybe just talk about some of the competitive dynamics you're seeing, given the changing rate backdrop and I was hoping you can maybe talk about it in the context of the Direct-to-Consumer and the Partner segments. I think there was a competitor in the Partner segment talking about exiting parts of the market. So I was hoping you can maybe talk about how that's evolving. And if we do continue to see rates going up, like, where do you inevitably see margins getting to over time? Thanks.
>
> A: <u>Jay Farner</u>: ***And so, usually, as we see these interest rates tick up a bit,*** what we're going to see is an opportunity for us to lean in to spend more money and now to talk about the retail or Direct-to-Consumer space, same situation here. There are so many marketing opportunities out there for us. And as others tend to step away or back away from the space, this is where we can lean in, we can grab market share. And not

only are we thinking about the profitability that we achieved on the first transaction, we're thinking about the lifetime value of that client and we're now thinking about the lifetime value not only over mortgage, but real estate, auto, and these additional businesses that we'll be adding. So, I guess you can tell we're pretty excited about it and ***don't see interest rates going up or down, really having an impact on our business one way or the other.***

228.   The above statements were materially false and misleading when made because:

    i.   During the Class Period, refinancing—as opposed to new purchases—continued to be Rocket's primary source of business and closed loan volume, such that Rocket was particularly dependent on refinancing loan volume;

    ii.   As discussed, Rocket was particularly sensitive to fluctuations in interest rates, because (1) refinancing volume was highly dependent on interest rates (the higher the interest rates, the lower the amount of refinancing volume); (2) the less refinancing volume Rocket has, the lower revenue it generates; (3) increased interest rates can reduce profitability and the Gain on Sale margin for a mortgage originator; (4) increased interest rates can further compress the primary-secondary spread, which cuts into Rocket's profits; and (5) Rocket admitted that its "financial performance is directly affected by changes in prevailing interest rates," among other admissions;

iii. Given the interest rate increase in February of 2021, refinance loan applications and volume materially decreased, which drove lower closed loan volumes overall and lower revenues;

iv. Rocket's primary and secondary spread, Gain on Sale margins, volume, and overall profitability were significantly impacted in a negative manner by increased interest rates;

v. Defendants later admitted on May 5, 2021 that (1) "continuing to drive strong volume in 2021 will require addressing client needs that are less sensitive to interest rates", and (2) that its forecasted decrease in Gain on Sale margin outlook for 2Q 2021 was due in part due to primary-secondary compression in the spread – an admission that Rocket's business was in fact negatively impacted by rising interest rates.

229. Analysts reacted positively to Defendants' false and misleading statements and omissions. A February 28, 2021 news article titled *News Flash: Analysts Just Made A Meaningful Upgrade to Their Rocket Companies, Inc. (NYSE:RKT) Forecasts*, reported "[t]he analysts have sharply increased their revenue numbers, with a view that Rocket Companies will make substantially more sales than they'd previously expected."

230. To that end, Barclays published an analyst report on February 26, 2021

in response to the February Earnings Call, stating that it expected Rocket's Gain on Sale margin to be 3.7% for the full year 2021. RBC Capital also published an analyst report in response to the February Earnings Call, indicating that it expected full year Gain on Sale margin to be 3.92%.

231.   In response to Defendants' materially false and misleading statements and omissions, after close of market on February 25, 2021, Rocket's stock shot up from $19.90 per share (closing price) on that day, opening the next day on February 26 at $23.33 per share, and rising up to $28.01 per share on March 3, 2021 (closing price).

**B.    Materially False and Misleading Statements During the March 3, 2021 Morgan Stanley Virtual TMT Conference**

232.   On March 3, 2021, Defendant Farner was interviewed as part of the virtual Morgan Stanley TMT Conference. At the Conference, a Morgan Stanley analyst asked Farner about the growth rate for Rocket's business channels:

> You talked about kind of your partner channel as direct. There's different types of direct, whether they're engaging with Rocket or they're doing everything electronically just with a phone and kind of what you're imagining and envisioning ultimately getting to. Can you talk a little bit about what portion each of those types of channels or processes are of the overall volume and business today? What their relative growth rates are? And how -- what you think that looks like in the very long run?

233.   In response, Defendant Farner falsely claimed that all segments were growing, even though internal data informed him that DTC (i.e. Retail) volume was

declining:

> So I know we don't break down the percentages, and I'm probably not going to go any further than what we've already laid out in our earnings call, but as you can ***probably sense from my passion***, ***they're all growing.*** And with what about less than 10% market share, wherever we are, it's hard to say today. If you think about all those different channels that can grow and give us reach, that's why we get excited about what this company looks like in the years to come.

234.   The above statements were false and misleading when made because, contrary to Defendant Farner's answer that Rocket's various channels are "all growing," loan volume in each of Rocket's channels was not growing but was actually in decline from its peak in November 2020:



235.   Indeed, total closed loan volume began declining after peaking at $40.25 billion in November 2020 to just $32.44 billion in December 2020, and then continued to decline to about $22.38 billion by May 2021:



236.    Further, Defendant Farner's statement that all segments were in fact, "growing," was misleading because it (1) omitted to disclose that there was a significant decline in volume from November 2020, and (2) gave investors the false impression that growth would continue to occur in the near future, when all relevant metrics pointed to a decline in (i) refinancing loan volume due to the present increased interest rate environment, (ii) closed loan volume due to less loan applications being completed, (iii) and a Gain on Sale margin decrease.

### C.    Materially False and Misleading Statements in Media

237.    On March 11, 2021, Fox Business aired an interview with Defendant Farner that was later uploaded to YouTube.[79]

238.    During that interview, the Fox Business interviewer asked Defendant

---

[79] The Castle Realty Channel, *Jay Farner interview, Fox Business- 03/11/2021*, YouTube (Mar. 11, 2021), avaialble at https://www.youtube.com/watch?v=c8B3X6ILnWc&t=122s.

Farner whether it was "good for Rocket Companies" that the effects of the pandemic were winding down:

> Fox Business Representative: The pandemic is, I think, winding down. I'm not going to say it's over, but the effects of it are certainly winding down. Do you think that's good for Rocket Companies?

> Defendant Farner: "I do. You know, we're going to see interest rates tick up a little bit here, we're all aware of that, but over the 35 years that we've been in business we take that as an opportunity to grow. Our focus on our platform and our tech platform really allows us to be very efficient when we're underwriting, processing, and closing mortgages. And so as other people pull back and capacity shrinks in the mortgage industry, it gives us a great opportunity to grow market share. And now, as we grow market share, not only are we capturing revenue with our mortgage, but title, real estate, auto, personal loans. So as we grow out all of those different services we're able to offer our clients that lifetime value of a client grows and grows for us. So, ***really, interest rates moving around are a great benefit to us.*** And then, of course, when they drop back down, we've got a 90% retention rate on our servicing book; we'll help those clients refinance their mortgage and save money. So, you know, cycles are good, at least for our business in the mortgage industry, and I think that's what we're going to see here this year."

239.   The above statements were materially false and misleading when made because:

> i.   During the Class Period, refinancing—as opposed to new purchases—continued to be Rocket's primary source of business and closed loan volume, such that Rocket was particularly dependent on refinancing loan volume;

ii.     As discussed, Rocket was particularly sensitive to fluctuations in interest rates, because (1) refinancing volume was highly dependent on interest rates (the higher the interest rates, the lower the amount of refinancing volume); (2) the less refinancing volume Rocket has, the lower revenue it generates; (3) increased interest rates can reduce profitability and the Gain on Sale margin for a mortgage originator; (4) increased interest rates can further compress the primary-secondary spread, which cuts into Rocket's profits; and (5) Rocket admitted that its "financial performance is directly affected by changes in prevailing interest rates," among other admissions;

iii.    Given the interest rate increase in February of 2021, refinance loan applications and volume materially decreased, which drove lower closed loan volumes overall and lower revenues;

iv.     Rocket's primary and secondary spread, Gain on Sale margins, volume, and overall profitability were significantly impacted in a negative manner by increased interest rates;

v.      Defendants later admitted on May 5, 2021 that (1) "continuing to drive strong volume in 2021 will require addressing client needs that are less sensitive to interest rates", and (2) that its forecasted

decrease in Gain on Sale margin outlook for 2Q 2021 was due in part due to primary-secondary compression in the spread – an admission that Rocket's business was in fact negatively impacted by rising interest rates.

240.   About one week later, Defendants Gilbert and Farner boasted on Twitter that the Company had increased its market share and that volume from third-party originators had increased, despite knowing that the pipeline was slowing. Specifically, on March 19, 2021, Defendant Gilbert retweeted the following March 17, 2021 post from Defendant Farner:



241.   The above statements were materially false and misleading when made because:

    i.   At this time Rocket had lost a large amount of business due to the UWM ultimatum;

    ii.   In response to the UWM ultimatum, Rocket began offering higher discounts and special pricing in 1Q 2021 than previously offered to increase loan volume and loan applications;

iii.    Rocket's market share of broker business fell in the months immediately following the UWM ultimatum, from 23.39% at the end of February 2021 to just 18.69% in May 2021. Indeed, market share of broker volume was on a decline beginning in February 2021:



iv.    Overall closed loan volume was actually decreasing throughout the Class Period, including volume analyzed by channel:





v.      Thus, Defendant Farner's and Defendant Gilbert's statements
downplaying the impact of the UWM ultimatum were materially
false and misleading because the ultimatum did in fact have a
serious negative impact on Rocket's business, causing many
Rocket Pro TPO brokers to lose clients, and volume was certainly

not "***up significantly*** at Rocket Pro TPO," i.e. the Partner Network / Broker / Wholesale channel, resulting in loss of broker market share.

## VI.    THE TRUTH IS REVEALED[80]

242.    On May 5, 2021, after markets closed, Defendants issued a press release titled "Rocket Companies Announces First Quarter Results." In the 1Q 2021 Earnings Release, Defendants shocked the market when they revealed Rocket was substantially revising ***downward***, its Second Quarter 2021 guidance for Gain on Sale margin and closed loan volume.

243.    Specifically, Defendants were now guiding "Second Quarter 2021 Outlook" for closed loan volume of between $82.5 billion and $87.5 billion and Gain on Sale margin of 2.65% to 2.95%. At the mid-point, the 2Q 2021 closed loan volume guidance reflected a material decrease of $18.5 billion from 1Q 2021 actual closed loan volume.   And at the mid-point, the Gain on Sale margin guidance equated to a ***239 basis point decline year-over-year***, which would represent the Company's ***lowest post-IPO quarterly Gain on Sale Margin ever reported***, falling even below pre-pandemic levels. The stunning collapse in the Company's Gain on Sale margin and closed loan volume reflected the fact that the favorable market conditions Rocket experienced in 2020 had in fact reversed and, contrary to

---

[80] In this section, language is bold and italicized for emphasis only.

Defendants' prior false Class Period statements, Rocket was experiencing declining demand and interest rates were negatively impacted its profitability.

244. Also on May 5, 2021, after market close, Defendants held an Earnings Call wherein they reiterated Rocket's financial results reported in the 1Q 2021 Earnings Release. During the earnings call, Rocket broke down the Gain on Sale margins for each segment, specifying that margins in the DTC segment would fall to around 4.0% and margins in the Partner Network segment would fall to around 1.0%. Rocket characterized these margins as "moving back to more historical averages," and "roughly consistent with historical levels prior to 2020."

245. Defendants further revealed in the 1Q 2021 Earnings Call that the touted increase in purchase application volume had actually decreased, which resulted, in part, from a previously undisclosed shift in product mix to the *lower margin* Partner Network segment.

> Our combined second quarter gain on sale margin guidance of between 2.65% and 2.95% **reflects changes in channel and product mix, including continued strong growth in our partner network**, which drives attractive incremental profits.

246. Defendants further revealed that for Rocket to continue growing, it would have to rely on new home purchases less sensitive to increases in interest rates which, as discussed above, largely come from the less profitable Partner Network segment:

> ***In our mortgage business, continuing to drive strong
> volume in 2021 will require addressing client needs that
> are less sensitive to interest rates.***
>
> Turning to the home buying opportunity specifically, as
> you heard from Jay, home purchase transactions represent
> the single largest growth opportunity for Rocket
> Companies today. In the first half of 2021, we are seeing
> strong acceleration in purchase activity at Rocket
> Mortgage.

247.    In other words, Defendants admitted that Rocket's business was subject
to—and was being negatively impacted by—increased interest rates, and that its
higher margin refinancing loans that elevated Rocket's Gain on Sale margin in 2020
had been declining for months and would continue declining throughout 2021.  Thus,
Gain on Sale margins were much lower and would continue to be lower due to
Rocket's reliance on new home purchase loans (rather than refinance loans from
existing customers) through its less profitable Partner Network segment.

248.    Indeed, during the 1Q 2021 Earnings Call, Defendant Booth attributed
the decline in Rocket's forecasted Gain on Sale Margin to three previously
undisclosed factors: (i) change in product mix where Rocket was generating more
loans in the Partner Network segment; (ii) declines in loan pricing from sales into
the secondary market; and (iii) primary secondary spread compression:

> If we look at that quarter-over-quarter change in the gain
> on sale margin guidance, it's really being driven kind of
> roughly by three equal factors. First of all, is changes in
> loan pricing and particularly our investment to drive the
> growth in the partner network channel.  The second thing

is that we did see the primary secondary spread compress at the end of Q1 and into Q2.  And then the third factor that I'll mention is the channel and the product mix.

249.   When asked if Gain on Sale margins had hit their floor, Defendant Farner confirmed that the increase in volume from broker transactions and shift in product mix to more broker-referred loans was a significant contributor to the lower Gain on Sale Margins.

> **Q:** <u>Goldman Sachs</u>**:** So I wanted to follow-up on a question that Arren asked on gain on sale margins. Do you foresee that we're at the bottom by channel? I know others have talked about industry underpricing loans. So can you maybe just talk about that combined with the competitive dynamics what's going on in the wholesale channel that's causing these competitive pressures? And Jay, how do you think about long term customer lifetime value versus trading off with some of the near term economics?
>
> **A:** <u>Jay Farner</u>**:** Maybe I'll start with the margin piece and Julie you can jump in here, too. But, look, we're kind of back to some of the historical longer term margins that we've experienced, which on our platform are still very profitable, number one, in the first transaction. But again, to some of the other comments that I made, it's also the additional or the lifetime value. ***Now, there's been some changes in particular in the broker market that I think are very interesting***. Our focus here is to solve the problem of our client. If a client needs to buy a house, how can we develop technology and service to assist them? If a broker wants to grow their business, how can we provide technology, marketing, et cetera, to assist them? Others have kind of focused on solving their own problems, I think, versus the brokers' problems. ***It's interesting what's happened because through that our partnership with the brokers that we got in that part of our partnership***

> *channel has strengthened. So the volumes that they're*
> *setting us are increasing.*

250.   Upon the news, the price of Rocket Class A common stock dropped

from $22.80 per share when the market closed on May 5, 2021 to $19.01 per share

when the market closed on May 6, 2021, a nearly 17% decline on very heavy volume

of over 37 million shares traded. As the market continued to digest the news in the

days that followed, the price of Rocket Class A common stock continued to decline,

falling to a low of just $16.48 per share by May 11, 2021.

251.   Analysts were surprised by the news, as demonstrated in the Q&A

portion of the May 5, 2021 earnings call in which analysts' first questions were about

the steep decline in Gain on Sale margins.  During that call, a Citigroup analyst,

Arren Cyganovich, asked the first question:

> The gain on sale margin guidance that you have coming down, I was
> wondering if you could talk a little bit about the trends that you're seeing
> both, from the direct-to-consumer side and on the partner – channel
> partner network as well.

252.   The second analyst to speak on the call, Ryan M. Nash of Goldman

Sachs & Co., also wanted more information on the gain on sale guidance:

> So I wanted to follow-up on a question that Arren asked on gain on sale
> margins. Do you foresee that we're at the bottom by channel? I know
> others have talked about industry underpricing loans. So can you maybe
> just talk about that, combined with the competitive dynamics, what's
> going on in the wholesale channel that's causing these competitive
> pressures? And Jay, how do you think about long-term customer
> lifetime value versus trading off with some of the near-term economics?

253.   The revelation that Rocket's Gain on Sale Margins would fall so far and

so fast caused analysts to downgrade the price target of RKT stock:

- <u>Jeffries</u>—adjusting the price target to $26.00 per share, down from $30.00 per share, "to reflect a conservative GOS outlook thru '22" and "[g]iven the reduced earnings power" of a 100 bps GOS margin in the Partner Network segment.

- <u>RBC Capital Markets</u>—reducing estimates to $26.00 per share per share, down from $30.00 per share explaining: "While Q2/21 guidance for origination and rate lock brackets our prior estimates, gain on sale margin is below."

- <u>UBS</u>—reporting that "RKT provided GOS and volume guidance for 2Q which are substantially below our forecasts . . . ."

- <u>Wedbush</u>—lowering price target to $17.00 per share, down from $20.00 per share.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   The Individual Defendants Knew or Recklessly Disregarded That Their Statements Were Materially False When Made

254.   As alleged herein, Defendants acted with scienter in that Defendants

knew, or recklessly disregarded, that the public documents and statements they

issued and disseminated to the investing public in the name of the Company, or in

their own name, during the Class Period were materially false and misleading when

made. Defendants knowingly and substantially participated or acquiesced in the

issuance or dissemination of such statements and documents as primary violations

of the federal securities laws. Defendants, by virtue of their receipt of information

reflecting the true facts regarding Rocket, and their control over and/or receipt and/or

modification of Rocket's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

> **1. Defendants *Admit* They Closely Monitored Critical KPIs That Showed Rocket's Loan Volume and Gain on Sale Margin Were Expected to Significantly Decline in 2021**

255. Defendants admit in the Registration Statement and 2020 and 2021 Form 10-Ks, and each of Rocket's Form 10-Qs throughout the Class Period, that Rocket's management "***monitor*** a number of key performance indicators to evaluate the performance of our business operations" and identified (1) Gain on Sale margin, (2) closed loan volume, and (3) market share as three of those key metrics. The Form 10-Ks and Form 10-Qs (including 1Q 2021 Form 10-Q and 2Q 2021 Form 10-Q) further states: "Our loan production key performance indicators enable us to monitor our ***ability*** to generate gain on sale revenue as well as understand how our performance compares to the total mortgage origination market."

256. Moreover, Defendant Walters boasted during the February 2021 Earnings Call that, as a 35-year-old company, Rocket has "a very consistent track record of gain on sale." Defendant Farner represented that Rocket's "capital market folks" carefully monitored the loan origination pipeline "every day," analyzing the rate at which loan applications pull through or fall out, to make informed decisions about hedging. Defendant Farner remarked that this information was included in or "priced in to" the guidance that Defendant Booth was presenting to investors.

257.   Rocket's use of data, metrics, and proprietary technology to monitor and prioritize the loans moving though its sales pipeline gave Rocket management great insight into the volume of loans that would close in the next 45-60 days. These metrics alerted Defendants that Rocket's closed loan volume, Gain on Sale margin, and market share all began a steady decline prior to and throughout the Class Period.

258.   Defendants' admission that they carefully monitored these data-based metrics relating to loan origination volume and Gain on Sale margins, combined with Rocket's touting of its ability to manage its funnel of potential clients and predict when a client will need a purchase mortgage, supports a strong inference that Defendants were fully aware of the declining Gain on Sale margins, primary-secondary spread compression, and falling volume that Rocket was seeing internally at the same time Defendants made their false statements to investors that loan volume and demand was increasing, and that Rocket's business was unaffected by rising interest rates or competition.

## 2.   Defendants Had Access to and Reviewed Internal Reports and Data that Directly Contradicted Their Public Statements

259.   Gain on Sale margin was tracked daily and viewable on the dashboard by all director-level employees and above, including the senior executives, (*e.g.*, the Defendants).

260.   During the Class Period, these dashboards tracked internal metrics,

which would have demonstrated that Rocket's product mix was shifting towards generating more loans in the less profitable Partner Network segment, and that new loan applications were declining. Thus, each of these internal metrics foreshadowed an imminent decline in Gain on Sale margins and informed Defendants that Rocket's closed loan volume was drastically in decline from its peak at November 2020.

261.   In addition, as discussed above, the Defendants admit that Rocket has a vast "data lake" of loan characteristics that allowed them to analyze the types of loans generated (purchase, refinance), loan segment and other characteristics using Rocket's proprietary AI technology and financial modeling, and to accurately forecast loan volume and Gain on Sale margin.

262.   Thus, Defendants were aware that their public statements about elevated and/or increased demand, the UWM ultimatum, and the effects of the rising interest rate environment, among others, were false when made.

### 3.    Declining Loan Volume and Gain on Sale Margin Were Discussed at Internal Company and Board Meetings

263.   Defendants discussed Rocket's declining loan volume and Gain on Sale Margin at a March 23, 2021 Board meeting immediately prior to Defendant Gilbert's massive insider sale. At the March 23, 2021 Board meeting, attended by Defendants Farner, Gilbert and Booth, among others, Defendants Farner and Booth provided a PowerPoint presentation entitled Finance Overview for March 2021, which reported a "March 2021 Revised Forecast" of:

- Expected decline in Gain on Sale Margin from 3.5% to 3.19%, a 9% decline from previous forecasts just a couple months ago.

- Expected declining 2021 revenue of $.95 billion, from $10.46 billion to $9.51 billion.

- Expected decline in refinance loan volume of 80% in 2021.

- Compression of primary/secondary spreads.

264.   On March 10, 2021, Defendants Farner and Booth attended an Audit Committee meeting where they discussed "certain business matters." Defendants Farner and Booth attended another Audit Committee meeting on March 22, 2021, where they discussed Defendant Gilbert's March 19, 2021 Exchange Notice and request to re-open the insider trading window for the limited purpose of allowing RHI to sell $500 million of Rocket Class A stock.

265.   The Audit Committee's main function was to review Rocket's quarterly earnings releases and SEC filings. Thus, the "business matters" discussed at the March 10, 2021 meeting would have included the declining loan volume and Gain on Sale margin demonstrating Defendants Booth, Farner and Gilbert were aware of Rocket's declining performance from the above Board and Audit Committee meetings.

266.   In addition, Rocket's declining Gain on Sale margin and closed loan volume were discussed at internal Company meetings. CW-1 reported that as a Business Metrics Analyst, CW-1 attended internal Company business metrics

meetings three to four times a week with Rocket's Senior Vice Presidents. Executive Vice Presidents and the Chief Revenue Officer of Rocket attended these meetings periodically. During these meetings, they covered the various milestones that occurred up to when a loan closed (which was also referred to as "a closed folder"), including initial telephone contacts with prospective buyers that began even prior to when a loan application was submitted or the borrower's credit history was pulled, and the percentages of how many prospective borrowers met the various milestones towards a closed loan folder.

### 4.   Defendants Were Aware of Rocket's Declining Gain on Sale Margin and Closed Loan Volume Because They Measured Rocket's Core Business

267.   Loan origination constituted Rocket's core business; indeed, Rocket touted to investors in its Registration Statement that Rocket Mortgage was Rocket's "flagship business."

268.   Further, in its 2021 Form 10-K, Rocket stated that "[o]ur mortgage origination business primarily generates revenue and cash flow from the gain on sale of loans, net," which "includes all components related to the origination and sale of mortgage loans." Rocket also stated that the Gain on Sale margin "is a measure of ***profitability*** for our on-going mortgage business" and "measures the ***gain on sale revenue generation*** of our combined mortgage business." [81]   To that end, gain on

---

[81] Rocket 2021 Form 10-K.

sale revenue for the year 2021 was $8.84 billion dollars, and accounted for over *83%* of the Company's total revenue, net.  Loan origination volume, and specifically, closed loan origination volume, were a further measure of the Company's business and were a key performance indicator that allowed Rocket to understand its "ability to generate gain on sale revenue." Indeed, Rocket disclosed that lower loan origination volumes also "generally place downward pressure on margins" Gain on Sale margin and closed loan volume were thus Rocket's two single most important metrics because they directly equated to revenue that the Company generated in a reporting period.

269.   Gain on Sale margin was the focal point in Rockets' earnings releases and calls, at Board meetings and was addressed in Board presentations. Moreover, analysts were heavily focused on Rocket's Gain on Sale margin and closed loan volume during *every* analyst call.

270.   Accordingly, Defendants closely monitored these metrics and reported on them every quarter typically as the first two items in the earnings release.

271.   Given the importance of closed loan volume and Gain on Sale margins to Rocket's business, financial performance and earnings, monitoring and analyzing these metrics was critical to managing Rocket's core loan origination business and Defendants would have, and admittedly were aware, of at all relevant times, doing so.

**B. Defendants Gilbert and RHI Were Motivated to Engage in the Alleged Fraud to Profit From RHI's Gigantic, Unusually Timed, Insider Sale Executed in Violation of the Company's Insider Trading Policy**

272. On March 29, 2021, Defendants RHI and Gilbert engaged in a massive sale of 20.2 million shares of RKT stock in a private transaction at a price of $24.75 per share for proceeds of approximately $500 million (the "Stock Sale"). Prior to this, neither RHI nor Gilbert had publicly sold a single share of Rocket stock.

273. This sale of RHI's interest in RKT was significant and highly unusual for a number of reasons. First, the sale price was nearly 33% higher than the closing market price of Rocket stock just one week after the truth was revealed on May 5, 2021.

274. Moreover, the Stock Sale undermined Defendant Farner's comments, made just days earlier on March 3, 2021 (at the Morgan Stanley TMT Conference), that defendants had not sold shares because they believed strongly in Rocket's future performance:

> And as I've mentioned before, between myself and [Defendant Gilbert] and the other leaders in the organization, we own roughly 94%, 95% of the company. We believe in its future. And **we have not sold shares** - - or our key shares since we went public **because we believe strongly in the future of what we're building**.

275. Further raising the specter of impropriety was the unusual timing of the sale. Defendants Gilbert and RHI submitted an Exchange Notice on March 19, 2021 requesting pre-clearance approval for the sale. Since the insider trading window had

already closed on March 12, 2021, Gilbert and RHI also had to seek approval for the trading window to be re-opened for the limited purpose of conducting this sale.

276.   According to Rocket's Insider Trading Policy, the window for insiders to trade typically opened "one business day after the public release of the Company's quarterly or annual financial results and ends on the date two weeks before the end of each fiscal quarter." Thus, the trading window for the first quarter of 2021 had closed on March 17, 2021 (two weeks prior to the end of the quarter) and was not scheduled to reopen until May 2021.

277.   Thus, for RHI and Gilbert to exchange their Holdings Units and sell shares of RKT, they had to avail themselves of an exception in the Company's Insider Trading Policy, that stated a closed trading window could be reopened "at any time, as deemed appropriate by the General Counsel *or other senior members of management*." It appears that the Audit Committee relied on management's approval—and not the General Counsel's—as "following discussions with [RHI's CEO] Jay Farner," the Audit Committee voted to open the trading window for RHI and Gilbert.

278.   Rocket's Insider Trading Policy was essentially meaningless because Defendant Gilbert, through RHI, could reopen the blackout period at will. Indeed, as the controlling shareholder of Rocket, Defendants RHI and Gilbert had effective control over Rocket's board, management, and policies. Rocket even acknowledges

this in their Form 10-K filings with the SEC:

> We are controlled by RHI, an entity controlled by Dan Gilbert, whose interests may conflict with our interests and the interests of other stockholders. [] RHI is able to control any action requiring the general approval of our stockholders [].

279.   The re-opening of the insider trading window, at the request of RHI and following discussions with Defendant Farner, who was both CEO of RHI and RKT, allowed RHI and Gilbert to sell 20.2 million shares while in possession of material, nonpublic information and prior to the truth being disclosed to the market. Because of the overlap in management and control at RHI and Rocket, RHI and Gilbert would have been aware—and were aware—in real-time, of the sharply declining Gain on Sale margin at Rocket throughout the Class Period.

280.   In addition to the unusual timing of the Stock Sale, *i.e.*, being planned and executed entirely outside of the normal trading window, the Stock Sale violated the Insider Trading Policy itself.  The Policy prohibited trading, ***even inside an open trading window***, when the insider possesses material, nonpublic information. The Policy states, in relevant part:

> The prohibition against trading while aware of, or tipping of, material non-public information applies even during an open trading window. For example, if during an open trading window you are aware that a material acquisition is pending, you may not trade in the Company's securities. You should consult the General Counsel of Rocket Companies or a designee of the General Counsel whenever you are in doubt.

281.   Defendant Gilbert's knowledge of Rocket's declining performance had

been reinforced on March 23, 2021, when Rocket management formally communicated to Rocket's Board, including Defendant Gilbert, the plan to cut guidance, detailing (1) the expected decline in Gain on Sale margin from 3.5% to 3.19%; (2) the expected decrease in $950 million of revenue for the year; (3) the expected 80% decrease in refinancing volume for the year; and (4) the expected compression of the primary-secondary spread (and thus decreased profits).

282.   Thus, when Defendants Gilbert and RHI executed the Stock Sale on March 29, 2021, the sale violated the Company's Insider Trading Policy and the Securities Exchange Act because Defendants Gilbert and RHI were in possession of material non-public information.

## VIII.  LOSS CAUSATION

283.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated or maintained the price of Rocket Class A common stock and operated as a fraud or deceit on Class Period purchasers of Rocket stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to the market, the price of Rocket common stock declined significantly as the prior artificial inflation was removed from the stock's price.

284.   Specifically, on May 5, 2021, at 4:05 pm ET, Defendants issued a press

Case 1:21-cv-11528-TLL-APP   ECF No. 109, PageID.8539   Filed 02/12/24   Page 130 of 152

release titled "Rocket Companies Announces First Quarter Results." In the 1Q 2021 Earnings Release, Rocket reported its "Second Quarter 2021 Outlook" of Closed loan volume of between $82.5 billion and $87.5 billion and Gain on Sale margins of 2.65% to 2.95%, a significant decline from 1Q 2021.

285.   Also on May 5, 2021, Defendants held the 1Q 2021 Earnings Call wherein they further revealed that the forecasted decline in closed loan volume and Gain on Sale Margin was due to a previously undisclosed shift in product mix to generate more loans in the lower margin Partner Network segment.

> Our combined second quarter gain on sale margin guidance of between 2.65% and 2.95% *reflects changes in channel and product mix,* including continued strong growth in our partner network, which drives attractive incremental profits.

286.   Defendant Booth elaborated in the Q1 2021 Earnings Call further revealing that Rocket's Gain on Sale margin guidance for 2Q 2021 was declining due to three factors: (i) change in product mix where Rocket was generating more loans in the Partner Network segment; (ii) declines in loan pricing from sales into the secondary market; and (iii) primary secondary spread compression:

> If we look at that quarter-over-quarter change in the gain on sale margin guidance, it's really being driven kind of roughly by three equal factors: first of all, is changes in loan pricing and particularly our investment to drive the growth in the partner network channel; the second thing is that we did see the primary secondary spread compress at the end of Q1 and into Q2; and then the third factor that I'll mention is the channel and the product mix.

287.   In addition, Defendants revealed that for Rocket to continue growing, it would have to rely on new home purchases less sensitive to increases in interest rates which, as discussed above, largely come from the less profitable Partner Network segment:

> In our mortgage business, continuing to drive strong volume in 2021 will require addressing client needs that are less sensitive to interest rates.
>
> Turning to the home buying opportunity specifically, as you heard from Jay, home purchase transactions represent the single largest growth opportunity for Rocket Companies today. In the first half of 2021, we are seeing strong acceleration in purchase activity at Rocket Mortgage. Q1 represented our strongest first quarter purchase volume in company history. Momentum accelerated throughout the quarter, with March setting a record for purchase application volume. And strong performance carried into the second quarter, with April exceeding March, setting a new record as the single largest month for purchase application volume in company's history.

288.   Analysts understood Defendants' statements to be revealing that the reduction in 2Q 2021 forecasts was the result of a decrease in the more profitable refinancing loans in 1Q 2021, as a result of the rising interest rate environment, and that Rocket was shifting its focus to less profitable new purchase loans. For example, Zelman & Associates LLC commented:

> I just wanted to tie back to maybe the data that we're looking at for 2020 would imply that there was *a little bit of **share loss*** in the purchase channel. And I was

wondering if that is a good ***example of last year being a year where the profitability was most attractive in the refi side***. And a good example of where you can *shift product mix* and go after the more profitable part of the business? And then thinking about that moving forward, if purchase is a more attractive area that's where you can lean. So is that the right way to think about the fluctuation that you might see year to year versus smoothing that out over a multiple year period?

289.    Analysts also commented on the channel mix.  For example, Wedbush

Securities stated in an Earnings Report published on May 6, 2021:

> Gain on sale margins dropped more than expected, falling from the 4.41% reported in 4Q20 to 3.74%. Funded volume in the direct retail channel declined modestly from $67.8 billion in 4Q20 to $65.0 billion in 1Q21 and funded loan gain on sale margin (not the same as GAAP GOS) dropped 53 basis points between 4Q20 and the current quarter. Funded volume in the partner network increased from $37.9 billion in 4Q20 to $40.7 billion in the current quarter and funded gain on sale margin fell by 64 bps during the same period. While it's hard to tie the segment data back to GAAP results, the data suggests that the larger-than-expected drop in GOS margins was tied to both a mix issue (less direct to consumer volume in the mix) and the reported drop in funded GOS in each segment.

290.    Similarly, Wells Fargo stated in its Price Target Change report:

> Overall, a tough quarter for RKT vs expectations, with particular weakness on the Q2 gain on sale margin forecast. This quarter highlights the quandary we struggle with on RKT shares. Does the normalization of the mortgage market origination economics trump the technology value at the company? For now, it seems that near-term fundamentals in their origination business are the focus, therefore the stock is likely to be range bound

around the ~$20 range. We expect the 10-year US treasury yield to grind higher as the re-opening gains momentum, so we'll stay on the sidelines for now. We are lowering our target price to $20 from $25, which is ~13x our 2022 EPS estimate.

291.  Barron's further stated in an Earnings Report published on May 6, 2021:

Rocket Cos. went public at a time when its margins on loan originations were sky-high.  Now they are falling back to earth, and investors aren't happy. . . .  The company reported a gain-on-sale margin—the profit it makes when it issues, or originates, a loan—of 3.74%.  The margin was higher than the same quarter in 2020 by 0.49 percentage point, but below last quarter's margin of 4.4%.  Wall Street expected a result of 3.9%, according to FactSet.  The volume of completed loan originations was also slightly lower than expected, missing analysts' estimates by 0.3%. The company expects margins to continue to decline.  On a call with investors, the company told investors to expect a second-quarter gain-on-sale margin of between 2.65% and 2.95%, while Wall Street had expected 3.1%.

292.  Upon the news, the price of Rocket Class A common stock dropped from $22.80 per share when the market closed on May 5, 2021 to $19.01 per share when the market closed on May 6, 2021, a nearly 17% decline, on very heavy volume of over 37 million shares traded. As the market continued to digest the news in the days that followed, the price of Rocket Class A common stock continued to decline, falling to a low of just $16.48 per share by May 11, 2021.

293.  Analysts subsequently reported on Rocket's declining Gain on Sale

margins and loan volume citing those factors as the primary reasons they were cutting their price estimates.

294.   As a result of their purchases of Rocket Class A common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Rocket Class A common stock to trade at artificially inflated or maintained levels throughout the Class Period.

295.   The decline in the price of Rocket Class A common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations and omissions being revealed to investors and the market. The timing and magnitude of the price decline in Rocket Class A common stock negates any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

296.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate or maintain the price of Rocket Class A common stock and the subsequent significant declines in the value of Rocket Class A common stock when Defendants' prior misrepresentations, omissions, and other fraudulent conduct were revealed.

297.   Further, Defendants Gilbert and RHI traded Rocket Class A common

stock while in possession of material non-public information.  Later, on May 5, 2021, as the information previously omitted was publicly revealed, the price of Rocket Class A common stock declined sharply as a result.

## IX.   PRESUMPTION OF RELIANCE

298.   Plaintiffs are entitled to a presumption of reliance under the fraud-on-the-market doctrine.  At all relevant times, the market for the Rocket's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities.  Throughout the Class Period:

    a.   Rocket's Class A common stock was actively traded on the New York Stock Exchange;

    b.   The market price of Rocket's Class A common stock reacted promptly to the dissemination of public information regarding the Company;

    c.   The Company's stock was followed by at least thirteen financial analysts from different institutions, [82] including those cited in this Complaint.

---

[82] Susquehanna Financial Group, RBC Capital Markets, Morgan Stanley, UBS Investment Bank, Wright Reports, Wells Fargo, Wedbush Securities, Wolfe Research, JP Morgan, Jeffries, Credit Suisse, Barclays, and Bank of America Merrill Lynch.

    d.  The average weekly trading volume for Rocket's stock during the Class Period was approximately 116.67 million shares;

    e.  As a regulated issuer, Rocket filed with the SEC periodic public reports during the Class Period;

    f.  Rocket regularly communicated with public investors via established market communication mechanisms; and

    g.  During the Class Period, the Rocket's market capitalization was as high as $4.8 billion and the Company had as many as 135.57 million shares outstanding.

299.   Throughout the Class Period, the Company was consistently followed by the market, including securities analysts.  The market relied upon the Company's financial results and management to accurately present the Company's financial results.  During this period, Defendants continued to pump materially false and misleading information into the marketplace regarding, *inter alia*, the Company, its Gain on Sale margin, its closed loan volume, the demand environment, and the effect of interest rates on its business operations. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of

the Company's securities.

300.   As a result of the misconduct alleged herein (including Defendants' false and misleading statements and omissions), the market for Rocket's Class A common stock was artificially inflated and artificially maintained during the Class Period.  Under such circumstances, the presumption of reliance available under the "fraud-on-the market" theory applies.  Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

301.   Plaintiffs and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Rocket's Class A common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

302.   Plaintiffs and the other Class Members are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah  v. United States*, 406 U.S. 128 (1972), because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

303.   Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or been aware of the truth behind Defendants' material misstatements, Plaintiffs and other members of the Class

would not have purchased Rocket's Class A common stock at artificially inflated prices and/or artificially maintained prices.

## X.  NO SAFE HARBOR

304.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the alleged false and misleading statements plead in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

305.  In addition, to the extent certain of the statements alleged to be false and misleading may be characterized by Defendants as forward looking, those statements were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward-looking statements.

306.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

307.    Plaintiffs bring this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities that purchased or otherwise acquired publicly traded Rocket Class A common stock during the period from February 25, 2021 through May 5, 2021, inclusive, the ("Class Period"), and were damaged thereby, which includes the investors who purchased publicly traded Rocket Class A common stock contemporaneously with the Insider Trading Defendants' (defined below) sale of Rocket Class A common stock on or about March 29, 2021 (the "Class").

308.    Excluded from the Class are: (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendant Rocket and Defendant RHI; (d) any person who is an officer, director or controlling person of Rocket; (e) any entity in which any Defendant has a controlling interest; and (f) the legal representatives, heirs, successors or assigns of any such excluded party.

309.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Indeed, as of May 5, 2021, Rocket had 135.57 million outstanding shares of Class A common

stock.

310.   Members of the Class may be identified from records maintained by Rocket or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

311.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

a)  whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

b)  whether the statements made by Defendants were materially false or misleading, or omitted material facts;

c)  whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

d)  whether Defendants engaged in a scheme to defraud investors;

e)  whether the prices of Rocket's securities during the Class Period were artificially inflated and/or artificially maintained because of Defendants' conduct complained of herein;

f)  whether certain Defendants engaged in insider trading on material non-public information; and

g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

312.  Plaintiffs' claims are typical of the claims of other members of the Class and the other members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as alleged in this Complaint.

313.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

314.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impractical for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

315.  Plaintiffs will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine.  All purchasers of Rocket securities during the Class Period suffered similar injuries, including injury through their purchase of Rocket securities at artificially inflated prices and/or artificially

maintained prices.  A presumption of reliance therefore applies.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act And Rule 10b-5 Against Defendants Daniel Gilbert and RHI

316.   Plaintiffs reallege each allegation as if fully set forth herein.

317.   This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Defendant Daniel Gilbert and Defendant RHI (the "Insider Trading Defendants").

318.   The information provided to the Insider Trading Defendants about (1) an internal forecasted decline in Gain on Sale margin from 3.5% to 3.19% for the full year 2021; (2) a corresponding expected decrease in almost a billion dollars of revenue for the year; (3) a 80% forecasted decrease in refinancing volume for the year; and (4) an expected compression of the primary-secondary spread, was material and non-public.  In addition, the Insider Trading Defendants' conduct violated Rocket's own Insider Trading Policy, which prohibits trading when one is "aware" of material non-public information, even during an open trading window.

319.   The Insider Trading Defendants obtained the material non-public information from Rocket and in the context of their roles as insiders of Rocket, including due to Defendant Gilbert's role as a Chairman of the board of Rocket and as majority shareholder of Rocket, through his holdings in RHI, of which he was

na

also Chairman of RHI's board of directors.   RHI was the controlling majority shareholder of Rocket during the Class Period.  The Insider Trading Defendants had a duty to disclose this information before trading or refrain from trading.

320.   While in possession of material, non-public, adverse information, the Insider Trading Defendants on March 29, 2021, sold 20,200,000 shares of class A common stock at $24.75 a unit, for total proceeds of $499.95 million.

321.   By virtue of the foregoing, the Insider Trading Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) omitted to disclose information that they had a duty to disclose; and/or (c) engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

322.   By virtue of the foregoing, the Insider Trading Defendants, directly or indirectly, violated §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 there under, 17 C.F.R. §240.10b-5.

323.   Plaintiff SoCal and members of the Class purchased Rocket common stock without access to this material, non-public, adverse information.   Plaintiff SoCal and members of the Class purchased Rocket stock contemporaneously with the Insider Trading Defendants' sales of that stock on or around March 29, 2021.

324.   When the material adverse information was eventually revealed, Rocket's stock price declined precipitously and investors suffered economic loss, i.e. damages.

## COUNT II

### For Violations of Section 20A of the Exchange Act
### Against the Insider Trading Defendants

325.   Plaintiffs reallege each allegation as if fully set forth herein.

326.   This claim is brought under §20A of the Exchange Act, 15 U.S.C. §78jt-1 against the Insider Trading Defendants.

327.   The information provided to the Insider Trading Defendants about (1) an internal forecasted decline in Gain on Sale margin from 3.5% to 3.19% for the full year 2021; (2) a corresponding expected decrease in almost a billion dollars of revenue for the year; (3) a 80% forecasted decrease in refinancing volume for the year; and (4) an expected compression of the primary-secondary spread, was material and non-public.  In addition, the Insider Trading Defendants' conduct violated Rocket's own Insider Trading Policy, which prohibits trading when one is "aware" of material non-public information, even during an open trading window.

328.   The Insider Trading Defendants obtained the material non-public information from Rocket and in the context of their roles as insiders of Rocket, including due to Defendant Gilbert's role as board member of Rocket and as majority shareholder of Rocket, through his holdings in RHI, of which he was also Chairman

of RHI's board of directors.  RHI was the controlling majority shareholder of Rocket during the relevant time period.  The Insider Trading Defendants had a duty to disclose this information before trading or refrain from trading.

329.   While in possession of material, non-public, adverse information, the Insider Trading Defendants on March 29, 2021 sold 20,200,000 shares of class A common stock at $24.75 a unit, for total proceeds of $499.95 million.

330.   By virtue of the foregoing, the Insider Trading Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly engaged in conduct that constituted a violation of §10(b) of the Exchang Act, 15 U.S.C. §78j(b), and Rule 10b-5 there under, 17 C.F.R. §240.10b-5.

331.   Plaintiff SoCal and members of the Class purchased Rocket common stock without access to this material, non-public, adverse information.  Plaintiff SoCal and members of the Class purchased Rocket stock contemporaneously with the Insider Trading Defendants' March 29, 2021 sale of that stock.

332.   By virtue of the foregoing, these Defendants are jointly and severally liable to Plaintiff SoCal and the Class for their insider sales pursuant to §20A of the Exchange Act, 15 U.S.C. § 78t-1.

333.   When the material adverse information was eventually revealed,

Rocket's stock price declined and investors suffered economic loss, i.e., damages.

334.   Plaintiff SoCal and members of the Class are therefore entitled to the measure of damages delineated under 15 U.S.C § 78t–1(b)(1).

## COUNT III

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against Rocket and the Individual Defendants**
**(Farner, Booth, Walters, and Gilbert)**

335.   Plaintiffs reallege each allegation as if fully set forth herein.

336.   This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Defendants Rocket, Farner, Booth, Walters, and Gilbert.

337.   Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

338.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or

documents as primary violations of the securities laws.  These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

339.  As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a severely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Rocket Class A common stock during the Class Period.

340.  In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Rocket's securities, Plaintiffs and other members of the Class purchased Rocket Class A common stock at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and other members of the Class would not have purchased Rocket Class A common stock at such artificially inflated prices.

341.  As set forth herein, when Defendants began to reveal adverse, previously undisclosed facts concerning the Company, the price of Rocket Class A

common stock declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchase of shares of Rocket Class A common stock at artificially inflated prices and the subsequent decline in the price of shares of those securities when Defendants began to reveal such facts.

342.   By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT IV

### For Violations of Section 20(a) of the Exchange Act
### Against RHI and the Individual Defendants
### (Farner, Booth, Walters, and Gilbert)

343.   Plaintiffs reallege each allegation as if fully set forth herein.

344.   This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against Defendants RHI and Farner, Booth, Walters, and Gilbert.

345.   Each of the Individual Defendants, by reason of their status as senior executive officers and/or directors of Rocket, directly or indirectly controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of §20(a) of the Exchange Act.

346.   Defendant RHI, by reason of its status as controlling shareholder of Rocket, directly or indirectly controlled the conduct of the Company's business and

its representations to Plaintiffs and the Class, within the meaning of §20(a) of the Exchange Act.

347.   Defendant RHI and the Individual Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiffs' and the Class's investments in Rocket securities within the meaning of §20(a) of the Exchange Act.   Therefore, Defendant RHI and the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

348.   Defendant RHI and the Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, Defendant RHI and the Individual Defendants reviewed or had the opportunity to review those documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

349.   Defendant RHI and the Individual Defendants knew or recklessly disregarded the fact that Rocket's representations were materially false and misleading and/or omitted material facts when made.   In doing so, Defendant RHI and the Individual Defendants did not act in good faith.

350.   By virtue of their high-level positions and their participation in and

awareness of Rocket's operations and public statements, the Individual Defendants were able to and did influence and control Rocket's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

351. By virtue of its status as controlling shareholder of Rocket, and its participation in and awareness of Rocket's operations and public statements, Defendant RHI was able to and did influence and control Rocket's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

352. Defendant RHI and the Individual Defendants had the power to control or influence the statements made, giving rise the securities violation alleged herein, as set forth more fully above.

353. By virtue of Defendant Gilbert's status as controlling shareholder of RHI, and his participation in and awareness of both RHI's and Rocket's operations and public statements, Defendant Gilbert was able to and did influence and control RHI's decision-making, and is liable for the insider trading violations alleged herein.

354. By virtue of their positions as controlling persons, Defendant RHI and the Individuals Defendants are also liable pursuant to §20(a) of the Exchange Act.

145

As a direct and proximate result of the RHI's and the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of Rocket securities.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

146

DATED: February 12, 2024                    Respectfully submitted,

*/s/ Carol C. Villegas*
**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas
Christine M. Fox
David Saldamando
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cvillegas@labaton.com
cfox@labaton.com
dsaldamando@labaton.com

*Lead Counsel for Lead Plaintiff Carl Shupe,*
*Plaintiff Construction Laborers Pension*
*Trust for Southern California, and the*
*Proposed Class*

SHANNON HOPKINS
**LEVI & KORSINSKY LLP**
1111 Summer Street, Suite 403 Stamford,
Connecticut 06905
Telephone: (203) 992-4523
shopkins@zlk.com

*Additional Counsel for Plaintiffs and the*
*Proposed Class*


**SCHENK & BRUETSCH PLC**
James Allen
West Fort Street, Suite 1410
Detroit, MI 48226
Telephone: (313) 774-1000
james.allen@sbdetroit.com

*Liaison Counsel for Plaintiffs and the*
*Proposed Class*