IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

---

CARL SHUPE and CONSTRUCTION LABORERS
PENSION TRUST FOR SOUTHERN CALIFORNIA,
Individually and on Behalf of All Others
Similarly Situated,

  Plaintiffs,

v.

ROCKET COMPANIES, INC., JAY D. FARNER,
DANIEL GILBERT and ROCK HOLDINGS INC.,

  Defendants.

---

x
:
:
:
:
:
:
:
:
:
:
:
:
:
:
x

No. 21-cv-11528

Honorable Thomas L. Ludington
District Judge

Honorable Anthony P. Patti
Magistrate Judge

## DEFENDANTS' MOTION TO EXCLUDE PORTIONS OF DANIEL TAYLOR'S PROFFERED EXPERT TESTIMONY

Nick Gorga (P72297)
Jeremy D. Lockhart (P76500)
Carsten A. Parmenter (P86425)
HONIGMAN LLP
660 Woodward Avenue
2290 First National Building
Detroit, Michigan 48226
Tel:  (313) 465-7000
*ngorga@honigman.com*
*jlockhart@honigman.com*
*cparmenter@honigman.com*

Deborah S. Birnbach
Adam Slutsky
Kate MacLeman
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel:  (617) 570-1000
*dbirnbach@goodwinlaw.com*
*aslutsky@goodwinlaw.com*
*kmacleman@goodwinlaw.com*

*Counsel for Defendant Rocket Companies, Inc.*

July 16, 2024

Jeffrey B. Morganroth (P41670)
MORGANROTH & MORGANROTH, PLLC
344 North Old Woodward Avenue,
Suite 200
Birmingham, Michigan 48009
Tel:  (248) 864-4000
*jmorganroth@morganrothlaw.com*

Sharon L. Nelles (N.Y. 2613073)
Jeffrey T. Scott (N.Y. 2890374)
Julia A. Malkina (N.Y. 5054572)
Jacob E. Cohen (N.Y. 4787271)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel:  (212) 558-4000
*nelless@sullcrom.com*
*scottj@sullcrom.com*
*malkinaj@sullcrom.com*
*cohenja@sullcrom.com*

*Counsel for Defendants Rock Holdings
Inc., Jay Farner, and Daniel Gilbert*

Pursuant to Rules 702 and 703 of the Federal Rules of Evidence, Defendants Rocket Companies, Inc., Rock Holdings Inc., Jay Farner, and Daniel Gilbert, by and through their attorneys, Morganroth & Morganroth, PLLC, Sullivan & Cromwell LLP, Honigman LLP, and Goodwin Procter LLP, move this Court to exclude portions of the proffered expert testimony of Daniel Taylor (Ex. 1) because this testimony is unreliable under Federal Rules of Evidence 702 and 703 and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The grounds for exclusion are explained more fully in the accompanying Memorandum of Law.

Pursuant to Local Rule 7.1(a), Defendants' counsel conferred with Plaintiffs' counsel by phone to seek concurrence in the relief sought by this Motion to Exclude and explained the nature of the motion and its legal bases, but Plaintiffs declined to agree to voluntarily exclude portions of Taylor's proffered expert testimony.

WHEREFORE, Defendants respectfully request that this Court grant their Motion to Exclude and enter an order excluding portions of Taylor's proffered expert testimony.

July 16, 2024                                         Respectfully submitted,

*/s/ Nick Gorga*                                     */s/ Jeffrey T. Scott*
Nick Gorga (P72297)                          Jeffrey T. Scott (N.Y. 2890374)
HONIGMAN LLP                                   SULLIVAN & CROMWELL LLP

(Additional counsel listed on cover)    (Additional counsel listed on cover)

*Counsel for Rocket Companies, Inc.*    *Counsel for Rock Holdings Inc., Jay Farner, and Daniel Gilbert*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

---

|  |  |
|---|---|
| CARL SHUPE and CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA, Individually and on Behalf of All Others Similarly Situated, | x : : : : No. 21-cv-11528 : : : Honorable Thomas L. Ludington : District Judge : : Honorable Anthony P. Patti : Magistrate Judge : : : x |
| Plaintiffs, |  |
| v. |  |
| ROCKET COMPANIES, INC., JAY D. FARNER, DANIEL GILBERT and ROCK HOLDINGS INC., |  |
| Defendants. |  |

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE PORTIONS OF DANIEL TAYLOR'S PROFFERED EXPERT TESTIMONY

Nick Gorga (P72297)
Jeremy D. Lockhart (P76500)
Carsten A. Parmenter (P86425)
HONIGMAN LLP
660 Woodward Avenue
2290 First National Building
Detroit, Michigan 48226
Tel:  (313) 465-7000
*ngorga@honigman.com*
*jlockhart@honigman.com*
*cparmenter@honigman.com*

Deborah S. Birnbach
Adam Slutsky
Kate MacLeman
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel:  (617) 570-1000
*dbirnbach@goodwinlaw.com*
*aslutsky@goodwinlaw.com*
*kmacleman@goodwinlaw.com*

*Counsel for Defendant Rocket Companies, Inc.*

July 16, 2024

Jeffrey B. Morganroth (P41670)
MORGANROTH & MORGANROTH, PLLC
344 North Old Woodward Avenue,
Suite 200
Birmingham, Michigan 48009
Tel:  (248) 864-4000
*jmorganroth@morganrothlaw.com*

Sharon L. Nelles (N.Y. 2613073)
Jeffrey T. Scott (N.Y. 2890374)
Julia A. Malkina (N.Y. 5054572)
Jacob E. Cohen (N.Y. 4787271)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel:  (212) 558-4000
*nelless@sullcrom.com*
*scottj@sullcrom.com*
*malkinaj@sullcrom.com*
*cohenja@sullcrom.com*

*Counsel for Defendants Rock Holdings Inc., Jay Farner, and Daniel Gilbert*

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................1

BACKGROUND .......................................................................................3

ARGUMENT ...........................................................................................6

I.    Taylor's Opinion That the Process Leading to RHI's Sale Was
      "Unusual" Is Based on Insufficient Facts and Data ........................7

II.   Taylor's "Peer Comparisons" Are Unreliable ..............................10

      A.    Taylor Provides No Reliable Methodology or Validation for
            His "Peer" Group Selection..................................................11

      B.    Taylor's Analysis Period Is Arbitrary and Potentially Biased............17

      C.    Taylor's Fixed $400 Million Threshold Is an Unreliable
            Benchmark............................................................................18

CONCLUSION ......................................................................................20

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Allgood* v. *Gen. Motors Corp.*,
  2006 WL 2669337 (S.D. Ind. Sept. 18, 2006) ............................................. 12, 17

*Dow Corning Corp.* v. *Weather Shield Mfg., Inc.*,
  2011 WL 2490962 (E.D. Mich. June 22, 2011) ................................................ 11

*In re Flint Water Cases*,
  2023 WL 6624685 (E.D. Mich. Oct. 11, 2023) ................................................. 13

*Gen. Elec.* v. *Joiner*,
  522 U.S. 136 (1997) ........................................................................................ 17

*Hurt* v. *Com. Energy, Inc.*,
  2015 WL 410703 (N.D. Ohio Jan. 29, 2015) ................................................... 16

*James* v. *Thompson/Ctr. Arms, Inc.*,
  2024 WL 1328738 (N.D. Ohio Mar. 28, 2024) ................................................... 7

*Matilla* v. *S. Ky. Rural Elec. Coop. Corp.*,
  240 F. App'x 35 (6th Cir. 2007) ...................................................................... 14

*Newell Rubbermaid, Inc.* v. *Raymond Corp.*,
  676 F.3d 521 (6th Cir. 2012) ........................................................................... 15

*In re Onglyza*,
  93 F.4th 339 (6th Cir. 2024) .............................................................................. 6

*Reed Constr. Data Inc.* v. *McGraw-Hill Cos.*,
  49 F. Supp. 3d 385 (S.D.N.Y. 2014) .......................................................... 18, 20

*Rolen* v. *Hansen Beverage Co.*,
  193 F. App'x 468 (6th Cir. 2006) ................................................................. 2, 10

*Snowden* v. *Speedway*,
  2021 WL 5625548 (E.D. Ky. Nov. 30, 2021) .................................................... 9

*Tamraz* v. *Lincoln Elec. Co.*,
  620 F.3d 665 (6th Cir. 2010) ..................................................................... 2, 3, 9

*Thomas* v. *Lambert*,
    606 F. Supp. 3d 592 (E.D. Mich. 2022) ...............................................................9

*Thomas* v. *Novartis Pharms. Corp.*,
    443 F. App'x 58 (6th Cir. 2011) ...............................................................3, 6, 10

*United States ex rel. Tenn. Valley Auth.* v. *1.72 Acres of*
    *Land in Tenn.*, 821 F.3d 750 (6th Cir. 2018) ......................................................15

*Williams* v. *Syphan*,
    2023 WL 1305084 (6th Cir. Jan. 31, 2023) ................................................. 10-11

**Statute**

Fed. R. Evid. 702 .............................................................................................*passim*

**STATEMENT OF ISSUES PRESENTED**

1.     Should the Court exclude Taylor's opinion that the approval process for Rock Holdings Inc.'s ("RHI") March 29, 2021 stock sale was "unusual" because that opinion is based on speculation regarding both the General Counsel's supposed conflict of interest as an RHI shareholder and the speed of the bring-down due diligence process?

2.     Should the Court exclude Taylor's "peer comparisons" because they are based on unreliable methodologies and would confuse and mislead the jury?

## STATEMENT OF CONTROLLING OR
## MOST APPROPRIATE AUTHORITIES

The controlling or most appropriate authorities for the relief that Defendants seek include:

1. Fed. R. Evid. 702

2. *In re Flint Water Cases*, 2023 WL 6624685 (E.D. Mich. Oct. 11, 2023)

3. *Gen. Elec.* v. *Joiner*, 522 U.S. 136 (1997)

4. *Newell Rubbermaid, Inc.* v. *Raymond Corp.*, 676 F.3d 521 (6th Cir. 2012)

5. *Reed Constr. Data Inc.* v. *McGraw-Hill Cos.*, 49 F. Supp. 3d 385 (S.D.N.Y. 2014)

6. *Tamraz* v. *Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010)

## PRELIMINARY STATEMENT

Lacking any factual evidence of insider trading with respect to Rock Holdings Inc.'s ("RHI") March 29, 2021 block sale, Plaintiffs proffer the opinions of business school Professor Daniel Taylor that the trade was "unusual."  But Taylor—despite being the "self-proclaimed" "world's leading scientific expert on the trading of corporate insiders" (Ex. 3 at 28:23-29:6)—fails to apply any "scientific" standards to his opinions.  Setting aside that even Taylor himself recognizes that the fact that conduct is "unusual" does not necessarily make it "wrongful" or illegal (*Id.* at 47:16-19, 169:5-12, 259:17-20), Taylor's "unusualness" opinions rest entirely on (i) unsupported conjecture based on his review of a handful of documents; and (ii) a fundamentally unreliable "empirical analysis" of stock sales by a small, non-representative sample of supposed "peers."  (*See* Ex. 1 ¶¶ 27-57.)  Neither of those analyses satisfy Rule 702's requirements for admissibility.

Taylor first opines that the approval process for RHI's March 29 stock sale was "unusual" because Rocket Companies, Inc.'s ("Rocket") then-General Counsel, Angelo Vitale, was an RHI shareholder who received a pro-rata distribution from RHI earlier in March.  Taylor concludes this "obviously" created a conflict of interest, which, combined with the "speed" of Rocket's bring-down due diligence process, he finds "concerning."  (*See id.* ¶¶ 31-41.)  Taylor, however, came to this conclusion after reviewing scant record evidence, and his "conflict" opinion entirely

ignores that the distribution to Vitale was proportionate to a dividend paid to all Rocket shareholders that was publicly announced well before the approval process for the stock sale began.  Moreover, in coming to this opinion, Taylor neglected to review the deposition testimony of *any* individual involved in the due diligence process (or the sale).  Ultimately, Taylor's suggestion that Vitale's receipt of an unrelated distribution from RHI influenced his decision to open the trading window simply because one event preceded the other is no more than "the logical fallacy of *post hoc ergo propter hoc* [which] typically, do[es] not pass muster under *Daubert*." *Rolen* v. *Hansen Beverage Co.*, 193 F. App'x 468, 473 (6th Cir. 2006).  Likewise, Taylor's view that the speed of the bring-down due diligence process was "concerning" is not based on any actual experience, empirical evidence, or understanding of real-world due diligence processes.  Taylor's opinion that the approval process was "unusual" should be excluded because "Rule 702 requires more than subjective belief or unsupported speculation." *Tamraz* v. *Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010).

*Second*, Taylor opines that the March 29 stock sale itself was "unusual." (Ex. 1 ¶¶ 42-43.)  To get there, Taylor offers a pseudo-scientific "comparison" between RHI's stock sale and sales by two artificially selected groups that he deems to be "peers."  (*See id.* ¶ 43.)  By ignoring the actual circumstances of the trade, and instead comparing it to unrepresentative samples, Taylor concludes that the trade

was "unusual." (*See id.* ¶¶ 46, 54.)  But Taylor's pretensions at scientific rigor are window-dressing:  his unreliable methodology does not meet the standards for empirical analysis Taylor himself teaches and applies in his academic research and is precisely the kind of "junk science" that "district courts must . . . [keep] away from juries." *Thomas* v. *Novartis Pharms. Corp.*, 443 F. App'x 58, 60 (6th Cir. 2011); *see* (Ex. 1 at Ex. A).

In short, "[n]o matter how good [Taylor's] credentials may be" (self-proclaimed or otherwise), "the courtroom is not the place for scientific guesswork." *Tamraz*, 620 F.3d at 671.  The Court should exclude Taylor's pseudo-scientific opinions that Rocket's internal approval process and RHI's stock sale were "unusual."

## BACKGROUND

***Taylor's Opinion Regarding the Approval Process for RHI's Trade.***  Taylor first opines that "well-designed" insider trading policies "serve as an important constraint on opportunistic trading by corporate insiders" and identifies three customary elements of robust insider trading policies: (i) "restricted trading windows"—*i.e.*, periods during which corporate insiders are presumptively disallowed from trading—overseen by a company's general counsel; (ii) general counsel approval of all trades by corporate insiders; and (iii) encouraged (or, more rarely, mandated) use of Rule 10b5-1 trading plans.  (Ex. 1 ¶¶ 10-11, 13-26.)

Looking at those three elements, Taylor finds that Rocket's insider trading policy is customary.  (*Id.* ¶¶ 15-16, 26; Ex. 3 at 106:15-19.)  Unable to find fault with Rocket's robust insider trading policy, Taylor opines that Rocket's process for approving RHI's March 29, 2021 stock sale was "unusual" as a factual matter.

According to Taylor, "[t]he single most unusual aspect of the internal process" was that Rocket's General Counsel had received an ownership distribution payment from RHI earlier in the month, which Taylor suggests created an "economic conflict of interest" that Rocket did "little to recognize or address."  (Ex. 1 ¶¶ 32-34.)  Taylor also contends that "[t]he speed" of Rocket's bring-down due diligence on March 29—the purpose of which was to confirm that there had been no material changes since the prior due diligence session on March 19—was "particularly concerning," despite having never participated in a bring-down call himself and having no benchmark for comparison.  (*Id.* ¶¶ 35-41; *see* Ex. 3 at 207:18-20, 208:3-13.)

***Taylor's "Peer Comparisons."***   After offering his general opinions on Rocket's process, Taylor offers two supposedly "empirical" "peer comparisons" to "provide context on the unusual nature" of the trade.  (Ex. 1 ¶¶ 4, 43.)

For his first "peer" group, Taylor used the 19 firms identified by Rocket in its 2021 Proxy Statement "for purposes of establishing [its] executive and director compensation practices"—a sample he made no attempt to validate.  (*Id.* ¶ 44 & n.72; *see* Ex. 4 at 51.)  Taylor refers to this sample as "Proxy Peers."  (Ex. 1 ¶ 43.)

For his second group, Taylor started with individuals ranked in the top 30 of the Forbes 2021 World's Billionaires List, because "30 seemed like a round number" and he "certainly didn't want to do all of the billionaire peers because the Forbes [list]" includes "[l]ots of billionaires." (Ex. 3 at 287:2-15.) Taylor then excluded foreign billionaires, billionaires whose wealth is not associated with a U.S. publicly traded company, and billionaires who are not required to file Form 4s with the SEC. (Ex. 1 ¶ 51.) This left a sample of only 14 billionaires, with holdings in only ten public companies. (*Id.* ¶¶ 51-52.) Taylor refers to this group as "Billionaire Peers." (*Id.* ¶ 51.)

Having selected those two groups, Taylor then searched for trades (i) by corporate insiders at each "Proxy Peer" and by the "Billionaire Peers" to identify trades made (ii) outside of a Rule 10b5-1 trading plan (iii) for over $400 million (iv) on a single day (v) between 2014 and 2023. (*Id.* ¶¶ 45-46, 52-53.) Using those highly specific criteria, Taylor finds that three of the 19 "Proxy Peers" and two of the 14 "Billionaire Peers" had at least one such trade. Based on those counts, Taylor extrapolates that "unplanned stock sales in excess of $400 million are objectively unusual." (*Id.* ¶¶ 46, 54.)[1]

_____

[1] Rather than count how many trades exceeding $400 million appear in his two sample groups, Taylor instead chooses to count the number of companies (of the "Proxy Peers") and billionaires (of the "Billionaire Peers") with at least one $400 million, single-day sale in the last ten years. By so obscuring that some insiders in his samples engaged in trades exceeding $400 million on multiple occasions, Taylor

Taylor then compiles all the sales meeting his criteria (five for the "Proxy Peers" and 17 for the "Billionaire Peers") and looks at how many of those sales were (i) followed by a single-day stock drop of 15% or more and/or (ii) a cumulative stock drop of 25% or more during the 45 calendar days after the sale.  (*Id.* ¶¶ 47, 55.) Without any statistical analysis or other validation of his sampling method, Taylor concludes that his failure to identify a "peer" trade that meets his narrow criteria is "striking[]."  (*Id.* ¶¶ 49, 57; Ex. 3 at 283:22-24.)

## ARGUMENT

Under Federal Rule of Evidence 702, a properly qualified expert may testify only "if the proponent [of the testimony] demonstrates to the court that it is more likely than not that" (i) the expert has "scientific, technical, or other specialized knowledge," (ii) "the testimony is the product of reliable principles and methods" and the "reliable application" of that methodology "to the facts of the case," (iii) "the testimony is based on sufficient facts or data," and (iv) the expert's testimony "will help" the trier of fact "to understand the evidence or to determine a fact in issue." The Sixth Circuit has emphasized that district courts "must . . . screen[] the reliability of expert testimony to keep 'junk science' away from juries," *Novartis*, 443 F. App'x at 60, and ensure "*only* relevant and reliable expert testimony" goes to the jury, *In re Onglyza*, 93 F.4th 339, 348 (6th Cir. 2024) (emphasis in original).

shrinks the results from his "peer comparisons" even further.

The recent amendments to Rule 702 emphasize that the reliability and application of an expert's methodology are "not merely [] question[s] of weight, to be decided by a jury," but must be established to the Court "by a preponderance of the evidence" before the testimony is admitted. *James* v. *Thompson/Ctr. Arms, Inc.*, 2024 WL 1328738, at *2 (N.D. Ohio Mar. 28, 2024).

## I.   Taylor's Opinion That the Process Leading to RHI's Sale Was "Unusual" Is Based on Insufficient Facts and Data.

Taylor's opinion that "the internal processes at Rocket leading up to the March 29 Stock Sale [] were unusual" should be excluded as impermissible speculation. (Ex. 1 ¶ 27.)  Taylor's review of the factual record was sparse at best.  Despite supposedly asking Plaintiffs' counsel for "all board meeting decks, all comm[unication]s between various officers and directors, [and] everything related to any due diligence" (Ex. 3 at 56:22-57:8), Taylor considered only *nine* documents produced by Rocket (out of over 250,000 pages of documents produced in this case) and *one single* deposition transcript in preparing his report (*see* Ex. 1 at Ex. B; Ex 3 at 72:5-11).[2]  And even though all four individuals interviewed as part of the due diligence process—Jay Farner (Rocket's then-CEO), Bob Walters (Rocket's then-

---

[2] Examples of documents relevant to the stock sale that Taylor failed to review include an August 2020 Morgan Stanley presentation laying out potential secondary options (Ex. 5), text messages among the key individuals involved in approving and executing the stock sale (Exs. 6-10), and an email chain setting up a "Transaction Options Discussion" with Paul Weiss (Ex. 11).

COO), Julie Booth (Rocket's then-CFO), and Brian Brown (Rocket's then-CAO)—were deposed in this action, the only deposition transcript that Taylor deemed worth reading was that of Bill Emerson, Rocket's Rule 30(b)(6) witness, who had no involvement in the approval process and was not even employed by Rocket at the time of the stock sale.  (*See* Ex. 3 at 66:22-68:4; Ex. 1 at Ex. B.)

Even more perplexingly, Taylor did not review the transcript of the deposition testimony of Vitale, Rocket's General Counsel at the time of the March 29, 2021 stock sale, who Taylor accuses of having an "obvious[]" economic conflict of interest, which made the approval process for the sale "unusual."[3]  Taylor also ignores that (i) the distribution had nothing whatsoever to do with the stock sale, and instead was made in conjunction with a dividend payment to all Rocket shareholders that had been planned and announced on February 25, 2021, well before the stock sale; (ii) ███████████████████████████████████████████████ ███████████████████████████████████████████████ ; and (iii) each and every one of Rocket's public shareholders also received proportionate distributions, including Plaintiffs.  (*See* Ex. 3 at 173:11-177:17, 185:8-187:23; Ex. 1 ¶ 32.)

---

[3] While Plaintiffs oddly chose not to depose Vitale in this action, he was deposed in the related Delaware action.  That transcript was produced to Plaintiffs in March, yet Taylor evidently did not receive or review it.  (*See* Ex. 3 at 71:10-24.)  At deposition, Vitale said, "[W]e would have been aware of conflicts and would have discussed them in the moment" (Ex. 13 at 36:23-37:1), testimony that flatly contradicts Taylor's contention that no one considered Vitale's potential conflict of interest.

Taylor's opinion that the bring-down due diligence call was too short is equally *ipse dixit*. He admitted at deposition that he has no "sense for [how long] a bring-down due diligence call would normally take" because he has never participated in one. (Ex. 3 at 207:18-20, 208:3-13.) As far as Taylor knows, it could take anywhere from "two hours or three hours or four, five, six[,] eight, three days" to update the prior due diligence. (*Id.* at 220:24-221:2.) Such rank speculation has no business masquerading as expert opinion, particularly when the documents and testimony reflect that the diligence session *was* of sufficient length to confirm that nothing had changed during the short period that had passed since Vitale's prior diligence session and review by the Audit Committee.[4]

Although a court should not "reject admissible expert testimony with a reasonable factual basis," exclusion is appropriate "when an expert's testimony amounts to mere guess or speculation." *Snowden* v. *Speedway*, 2021 WL 5625548, at *3, 5 (E.D. Ky. Nov. 30, 2021), *aff'd*, 2022 WL 18228396 (6th Cir. Nov. 28, 2022); *see Tamraz*, 620 F.3d at 670 ("speculative" expert opinions are inadmissible); *Thomas* v. *Lambert*, 606 F. Supp. 3d 592, 603 (E.D. Mich. 2022) ("Although Rule

---

[4] *See*, *e.g.*, Ex. 12 (minutes from Rocket's March 23 board meeting). Taylor identifies this Board meeting as the potential source of new material non-public information between the Audit Committee meeting on March 22 and the sale on March 29. Yet, the minutes, which Taylor did not review, show that Vitale and Deputy General Counsel Tina John were present at the board meeting, and thus did not need to be brought up to speed on information presented there. (*See* Ex. 3 at 212:4-10.)

702 does not require an expert to consider *all* the facts and data available, it does require the factual basis of his opinion to be *sufficient*." (citation omitted)).  Rather than facts, Taylor's opinion that the approval process was "unusual" is based almost entirely on speculation about (i) RHI's stock sale following the General Counsel's receipt of an unrelated distribution from RHI made to all shareholders and having nothing to do with the stock sale; and (ii) the speed of the bring-down due diligence process.  Such speculation, "based upon nothing more than the logical fallacy of *post hoc ergo propter hoc*"—*i.e.*, after this, therefore because of this—"do[es] not pass muster under *Daubert*."  *Rolen*, 193 F. App'x at 473.

## II.    Taylor's "Peer Comparisons" Are Unreliable.

Taylor's purported "peer comparisons" are not "the product of reliable principles and methods" that he has reliably applied "to the facts of the case."  Fed. R. Evid. 702.  This Court should therefore reject them as exactly the sort of "junk science" that the gatekeeping function is designed to exclude.  *Novartis*, 443 F. App'x at 60.  Neither of Taylor's purported "peer" samples is in any way representative of the larger population of corporate insiders at publicly traded companies.  Instead, Taylor's opinions amount to unscientific extrapolation from arbitrary and limited samples.  Likewise, no reliable methodology underpins either his selection of a 2014-2023 analysis period or use of a fixed $400 million threshold to define "large" stock sales.  Taylor's cobbled-together analysis—divorced from

-10-

any meaningful methodology—does not belong in a courtroom.  *See, e.g.*, *Williams* v. *Syphan*, 2023 WL 1305084, at \*3 (6th Cir. Jan. 31, 2023) (affirming exclusion of expert's opinion where there was "no articulated underlying methodology to pull everything together").

## A.   Taylor Provides No Reliable Methodology or Validation for His "Peer" Group Selection.

As Taylor readily admitted at deposition, he selected both his "Proxy Peer" and "Billionaire Peer" groups arbitrarily, leaving his "empirical" sampling and analysis without statistical or other validation.  (*See* Ex. 3 at 241:20-242:15, 287:7-13.)   Because "[r]eliability has been described as the [f]irst and universal requirement for the admissibility of expert opinion evidence," Taylor's "peer comparisons" should be excluded.  *Dow Corning Corp.* v. *Weather Shield Mfg., Inc.*, 2011 WL 2490962, at \*7 (E.D. Mich. June 22, 2011).

*"Proxy Peers."*  Taylor selected the first of his two "peer" groups by using the companies identified in Rocket's 2021 Proxy Statement as "appropriate for purposes of benchmarking [and] evaluating the competitiveness and reasonableness of [Rocket's] executive compensation program."  (Ex. 4 at 51; *see* Ex. 1 ¶ 44 n.72.) But nowhere in his report does Taylor explain why the companies Rocket used for benchmarking executive compensation—an entirely different context—provide a meaningful sample for the analysis he performed.   Indeed, even Taylor acknowledged that "it's certainly true that you can be a peer in one respect but not a

peer in another respect."  (Ex. 3 at 245:14-16.)[5]  When pressed on this point at

deposition, Taylor essentially tried to wipe his hands of the peer-group selection

process entirely, explaining:

> Well, whenever one does a comparison or a peer group, it's always very
> fraught in litigation.  Someone says, [o]h, you should have set the
> threshold at this or you should have chosen smaller companies or larger
> companies or a different factor or something like that.  And so what I
> wanted to do here is choose something that was beyond my degree of
> discretion but choose an objective list so that I didn't actually choose
> the companies.  And so that's why I went with the peers that Rocket
> chose for itself in its [P]roxy.

(*Id.* at 242:4-15.)

Despite his best efforts, Taylor's "don't blame me, blame Rocket" defense

doesn't pass muster.  Taylor's explanation that the selection of a peer group is

"always very fraught in litigation" does not relieve him of the responsibility to

validate his comparator group, nor does it make his decision to arbitrarily use a group

of companies identified by Rocket for an entirely different purpose "objective."  *See*

*Allgood* v. *Gen. Motors Corp.*, 2006 WL 2669337, at *10-11 (S.D. Ind. Sept. 18,

2006) ("Questions as to [an expert's] data sampling go the heart of his methodology"

and "samples must be chosen using some method that assures the samples are

---

[5] Worse still, Taylor seems not to understand the bases on which Rocket selected
these peers, despite listing them in his report.  He incorrectly stated at his deposition
that "size" was a factor Rocket considered in identifying peers and then backtracked
by peculiarly claiming that revenue—rather than market capitalization—equated to
size.  (Ex. 3 at 243:6-244:16; *see* Ex. 4 at 50.)

appropriately representative of the larger entity or population being measured").

Such "arbitrary choices" in sampling, "which were not validated in any way," "create reliability concerns sufficient to justify exclusion." *In re Flint Water Cases*, 2023 WL 6624685, at *5 (E.D. Mich. Oct. 11, 2023). Furthermore, as of March 2021, Rocket was (i) a newly public company (ii) with a market capitalization of approximately $35 billion and (iii) a controlling shareholder.[6] Taylor considered none of those factors (Ex. 3 at 246:2-12, 267:17-22), but all three were highly relevant:

*First*, the academic literature shows that insiders at newly public companies, like Rocket, often engage in large follow-on sales in the post-IPO period since it is an early opportunity to gain liquidity. (*See* Ex. 2 ¶ 49 & n.86.) Taylor did not, and could not, argue with this research, simply stating that he "ha[s]n't done a study" himself. (Ex. 3 at 271:14-20.) Because 13 of the 19 "Proxy Peers" went public prior to 2014, any such follow-on sales at those companies would not have been captured in Taylor's analysis. (*See* Ex. 2 ¶ 64.) Taylor's failure to construct an appropriate peer sample set—or to even look at the context of RHI's stock sale—makes his "unusualness" analysis meaningless.

*Second*, sales of $400 million or larger are unlikely to occur at companies with smaller market capitalizations. Such a sale at a smaller company would require an

---

[6] *See* Ex. 2 at App'x D. Market capitalization is as of December 31, 2020.

insider to have a much larger equity stake and a willingness to trade a greater percentage of their equity at once.  (*See* Ex. 2 ¶¶ 67-69.)  When asked, even Taylor could not argue with this basic math.  (Ex. 3 at 262:16-263:23.)  Yet, six of Taylor's 19 "Proxy Peers" had market capitalizations below $10 billion at the end of 2020, meaning they were less than one-third the size of Rocket.  (Ex. 2 ¶ 64.)  This, too, demonstrates the unreliability and lack of scientific reasoning behind Taylor's limited sample selection.

*Third*, controlling shareholders "would likely have a much larger shareholding than the average company insider and therefore would be able to engage in a larger sale," a point Taylor acknowledged at deposition.  (Ex. 3 at 272:16-20; *see* Ex. 2 ¶ 71.)  Only five of the 19 "Proxy Peers" were controlled companies at the time they went public, meaning that nearly 75% of the companies did not have a shareholder comparable to RHI that would have been capable of easily engaging in what Taylor deems to be a "large" stock sale.  (*See* Ex. 2 ¶ 64.)

Taylor considered none of these in picking a sample (in fact, he did not consider any factors at all).  What's worse, Taylor improperly extrapolates from his use of the "Proxy Peer" sample that "unplanned stock sales of more than $400 million are objectively unusual."  (Ex. 1 ¶ 46.)[7]  Such "improper extrapolation" is

---

[7] Taylor tried to save face at deposition by "hazard[ing] a guess" that his results would have been even stronger if his analysis had included all U.S. publicly traded companies.  (Ex. 3 at 276:22-247:3.)  But Taylor did not do the work to determine

one of the "[r]ed flags that caution against certifying an expert." *Newell Rubbermaid, Inc.* v. *Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). Taylor should not be permitted to offer any opinions extrapolated from a sample he did not select using any scientific methodology, he did not validate, and which fails to account for multiple obvious factors.

*Billionaire "Peers."* Taylor's "Billionaire Peer" group is even less coherently defined than his "Proxy Peer" group. To construct this sample, Taylor took the Forbes list of 2,755 billionaires from 2021, located Gilbert at #23, and "made a subjective decision to stop looking at billionaires shortly after [he] cleared Mr. Gilbert in terms of wealth rank," because "30 seemed like a round number." (Ex. 3 at 286:23-287:13; *see* Ex. 2 ¶ 65.)

After applying various exclusions—for foreign billionaires, billionaires whose wealth is not associated with a U.S. publicly traded company, and billionaires who are not required to report their trades on Form 4—Taylor ended up with a total sample size of "14 individual-company pairs," three of which are members of the Walton family, associated with Walmart Inc. (Ex. 1 ¶¶ 51-52.) Those exclusions

---

if that "guess" was supported by the evidence, and cannot now offer such an opinion. *See Matilla* v. *S. Ky. Rural Elec. Coop. Corp.*, 240 F. App'x 35, 42-43 (6th Cir. 2007) (affirming exclusion of expert's opinion, first offered at deposition, "on the grounds that it was not timely disclosed"); *United States ex rel. Tenn. Valley Auth.* v. *1.72 Acres of Land in Tenn.*, 821 F.3d 742, 750 (6th Cir. 2018) ("[W]here . . . expert testimony amounts to 'mere guess or speculation,' the trial court should exclude the testimony.").

had nothing to do with producing a representative sample; rather, "[e]verything here [was] driven by the availability of Form 4s." (Ex. 3 at 289:3-9.) Thus, even out of Taylor's arbitrary selection of 30 billionaires, he created an even narrower "convenience sample . . . [of] the people [he] had at hand, rather than people who would be representative of the entire population," *Hurt* v. *Com. Energy, Inc.*, 2015 WL 410703, at *5 (N.D. Ohio Jan. 29, 2015), rendering his sampling methodology fundamentally unreliable.

Moreover, as with the "Proxy Peers," Taylor did not consider that (i) most of the companies with which Taylor's "Billionaire Peers" are affiliated have been public for decades and (ii) only three of those companies were controlled at the time they went public. (*See* Ex. 3 at 299:12-17, 303:2-6; Ex. 2 ¶ 65.) The sale at issue in this case was made by a controlling shareholder, within one year of Rocket's IPO, and—as Taylor acknowledged—was conceived of as a secondary transaction to make up the shortfall from Rocket's IPO. (*See* Ex. 3 at 134:5-22.) As Professor Coates notes, because Taylor is largely looking at trades by billionaire "peers" who took their companies public long ago and who do not own a controlling interest in those companies, he "necessarily omit[s] any trades by large or controlling shareholders within a year of going public that would have been chronologically similar to RHI's trade." (Ex. 2 ¶ 71c.) Taylor's failure to account for these variables renders his results meaningless.

-16-

Nonetheless, as with the "Proxy Peer" group, Taylor purports to extrapolate from his "Billionaire Peer" sample that "large, unplanned stock sales in excess of $400 million are objectively unusual—even among other billionaires who derive their wealth from holdings in publicly-traded companies." (Ex. 1 ¶ 54.) Because Taylor's samples were, by his own admission, arbitrary, his "peer" analyses are not "sufficient, whether individually or in combination, to support their conclusion[]." *Gen. Elec.* v. *Joiner*, 522 U.S. 136, 147 (1997).

In sum, Taylor has "failed to offer any scientific justification for his sample selection choices, which are central to the reliability of his methodology." *Allgood*, 2006 WL 2669337, at *11. For this reason alone, Taylor's "peer comparisons" should be excluded.

### B.  Taylor's Analysis Period Is Arbitrary and Potentially Biased.

In addition to his fatally flawed sampling procedure, nowhere in his report does Taylor explain why he selected 2014 to 2023 as the appropriate analysis period. At deposition, Taylor's only explanation for this period was that ten years "was the longest time frame that [he] thought would be appropriate." (Ex. 3 at 249:15-24.)[8] When an expert's arbitrary time frame "has an outcome-determinative effect," it can become "a fatal problem" for that expert's analysis. *Reed Constr. Data Inc.* v.

---

[8] Nor does Taylor explain why his ten-year analysis period was keyed off of the date he received his assignment (2023) as opposed to the date of the sale (2021).

*McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014).

Here, Taylor's analysis period did have such an effect. As Professor Coates explains, because almost all of the companies in both "peer" groups went public before 2014, any large, post-IPO trades at these companies were excluded, making Taylor's "purported peer analysis [] a classic comparison of apples to oranges." (Ex. 2 ¶ 71c.)

For example, Mark Zuckerberg, one of the billionaires in Taylor's sample, sold $2.3 billion worth of Facebook stock the year after Facebook went public, on December 26, 2013. (*See id.* ¶ 71b; Ex. 3 at 301:16-302:8.) That trade, 4.6 times the size of RHI's, was made just days prior to the start of Professor Taylor's review period. (Ex. 2 ¶ 71b.) Had Taylor, for instance, looked at the ten years prior to RHI's sale rather than the ten years prior to his report, his analysis would have captured this trade. With such a small sample, even that single observation—from a small change in the date parameter—would be meaningful to Taylor's "unusualness" analysis. When "minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions, that model is insufficiently robust to withstand the scrutiny of Rule 702." *Reed*, 49 F. Supp. 3d at 407.

## C. Taylor's Fixed $400 Million Threshold Is an Unreliable Benchmark.

Taylor's decision to assess whether RHI's trade was "unusual" based on a fixed $400 million threshold to define a "large" trade also is not supported by any

reliable methodology.

*First*, Taylor's use of a fixed dollar threshold regardless of company size is methodologically inappropriate.  (*See* Ex. 2 ¶ 69.)  As discussed above, a number of Taylor's "Proxy Peers" were significantly smaller than Rocket in terms of market capitalization.   In December 2020, for example, three of the "Proxy Peers" had market capitalizations of less than $5 billion.  (*See id.* ¶ 67.)  A $400 million trade by an insider at any of those companies would have constituted a sale of at least 8% of that company's equity—an extremely unlikely occurrence given the impact such a large sale would have on the market for that company's stock, as Taylor himself recognized.   (*See, e.g.*, *id.* ¶¶ 67-68 (illustrating this point with "Proxy Peer" PennyMac); *see* Ex. 3 at 264:8-16 (acknowledging that "the market would respond differently when it saw a stock sale that was a higher percentage of market value").)  Moreover, Taylor does not establish in his report and could not answer at his deposition whether there *even was* an insider at each of these companies that held at least $400 million worth of sellable stock.  (*See* Ex. 2 ¶ 67; Ex. 3 at 269:2-7.)  Accordingly, Taylor's use of a fixed threshold was not just arbitrary; it biased his study towards finding "large" trades "uncommon."

Furthermore, in applying his $400 million threshold, Taylor ignored the relevant academic literature by neglecting to aggregate trades made over the course of consecutive trading days, even though large trades are often broken up over

several days to minimize market impact. (*See* Ex. 1 ¶ 45 n.75; Ex. 2 ¶ 73 & n.128 (citing the relevant literature).) Taylor's "peer comparisons" accordingly do not capture such potentially comparable trades, including, for example, a $848 million trade by Larry Ellison in June 2023 made over three days. (*See* Ex. 2 ¶ 73.) Because Taylor's decision not to aggregate sales across consecutive trading days is, yet again, a "minor change[] in [an] arbitrarily selected model parameter[]" that could "entirely alter the model's conclusions," it forms another basis for exclusion. *Reed*, 49 F. Supp. 3d at 407.

## CONCLUSION

The Court should exclude Taylor's proffered expert testimony as to (i) the "unusualness" of the approval process for the RHI block sale, and (ii) his "peer comparisons."

July 16, 2024

Respectfully submitted,

*/s/ Nick Gorga*

Nick Gorga (P72297)
HONIGMAN LLP
(Additional counsel listed on cover)

*Counsel for Rocket Companies, Inc.*

*/s/ Jeffrey T. Scott*

Jeffrey T. Scott (N.Y. 2890374)
SULLIVAN & CROMWELL LLP
(Additional counsel listed on cover)

*Counsel for Rock Holdings Inc., Jay Farner, and Daniel Gilbert*

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2024, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all parties of record, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:  None.

Respectfully submitted,

*/s/ Jeffrey T. Scott*
Jeffrey T. Scott (N.Y. 2890374)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000

*Counsel for Defendants Rock Holdings Inc.,*
*Jay Farner, and Daniel Gilbert*

July 16, 2024