IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

—————————————————— x

CARL SHUPE and CONSTRUCTION LABORERS
PENSION TRUST FOR SOUTHERN CALIFORNIA,
Individually and on Behalf of All Others
Similarly Situated,

    Plaintiffs,

v.

ROCKET COMPANIES, INC., JAY D. FARNER,
DANIEL GILBERT and ROCK HOLDINGS INC.,

    Defendants.

—————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 21-cv-11528

Honorable Thomas L. Ludington
District Judge

Honorable Anthony P. Patti
Magistrate Judge

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Nick Gorga (P72297)
Jeremy D. Lockhart (P76500)
Carsten A. Parmenter (P86425)
HONIGMAN LLP
660 Woodward Avenue
2290 First National Building
Detroit, Michigan 48226
Tel:  (313) 465-7000
*ngorga@honigman.com*
*jlockhart@honigman.com*
*cparmenter@honigman.com*

Deborah S. Birnbach
Adam Slutsky
Kate MacLeman
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel:  (617) 570-1000
*dbirnbach@goodwinlaw.com*
*aslutsky@goodwinlaw.com*
*kmacleman@goodwinlaw.com*

*Counsel for Defendant Rocket Companies, Inc.*

July 16, 2024

Jeffrey B. Morganroth (P41670)
MORGANROTH & MORGANROTH, PLLC
344 North Old Woodward Avenue,
Suite 200
Birmingham, Michigan 48009
Tel:  (248) 864-4000
*jmorganroth@morganrothlaw.com*

Sharon L. Nelles (N.Y. 2613073)
Jeffrey T. Scott (N.Y. 2890374)
Julia A. Malkina (N.Y. 5054572)
Jacob E. Cohen (N.Y. 4787271)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel:  (212) 558-4000
*nelless@sullcrom.com*
*scottj@sullcrom.com*
*malkinaj@sullcrom.com*
*cohenja@sullcrom.com*

*Counsel for Defendants Rock Holdings
Inc., Jay Farner, and Daniel Gilbert*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Rocket Companies, Inc., Rock Holdings Inc., Jay Farner, and Daniel Gilbert, by and through their attorneys, Morganroth & Morganroth, PLLC, Sullivan & Cromwell LLP, Honigman LLP, and Goodwin Procter LLP, move this Court to grant summary judgment in favor of Defendants and dismiss all claims against them with prejudice. The grounds for summary judgment are explained more fully in the accompanying Memorandum of Law.

Pursuant to Local Rule 7.1(a), Defendants' counsel conferred with Plaintiffs' counsel by telephone to seek concurrence in the relief sought by this Motion and explained the nature of the motion and its legal bases, but Plaintiffs declined to agree to voluntarily dismiss this case with prejudice.

WHEREFORE, Defendants respectfully request that this Court grant their Motion and enter summary judgment in favor of Defendants.

July 16, 2024

*/s/ Nick Gorga*
Nick Gorga (P72297)
HONIGMAN LLP
(Additional counsel listed on cover)

*Counsel for Rocket Companies, Inc.*

Respectfully submitted,

*/s/ Jeffrey T. Scott*
Jeffrey T. Scott (N.Y. 2890374)
SULLIVAN & CROMWELL LLP
(Additional counsel listed on cover)

*Counsel for Rock Holdings Inc., Jay Farner, and Daniel Gilbert*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

———————————————————— x

CARL SHUPE and CONSTRUCTION
LABORERS PENSION TRUST FOR SOUTHERN
CALIFORNIA, Individually and on Behalf of
All Others Similarly Situated,

     Plaintiffs,

v.

ROCKET COMPANIES, INC., JAY D. FARNER,
DANIEL GILBERT and ROCK HOLDINGS INC.,

     Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 21-cv-11528

Honorable Thomas L. Ludington
District Judge

Honorable Anthony P. Patti
Magistrate Judge

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

Nick Gorga (P72297)
Jeremy D. Lockhart (P76500)
Carsten A. Parmenter (P86425)
HONIGMAN LLP
660 Woodward Avenue
2290 First National Building
Detroit, Michigan 48226
Tel:  (313) 465-7000
*ngorga@honigman.com*
*jlockhart@honigman.com*
*cparmenter@honigman.com*

Deborah S. Birnbach
Adam Slutsky
Kate MacLeman
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel:  (617) 570-1000
*dbirnbach@goodwinlaw.com*
*aslutsky@goodwinlaw.com*
*kmacleman@goodwinlaw.com*

*Counsel for Defendant Rocket Companies, Inc.*

July 16, 2024

Jeffrey B. Morganroth (P41670)
MORGANROTH & MORGANROTH, PLLC
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
Tel:  (248) 864-4000
*jmorganroth@morganrothlaw.com*

Sharon L. Nelles (N.Y. 2613073)
Jeffrey T. Scott (N.Y. 2890374)
Julia A. Malkina (N.Y. 5054572)
Jacob E. Cohen (N.Y. 4787271)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel:  (212) 558-4000
*nelless@sullcrom.com*
*scottj@sullcrom.com*
*malkinaj@sullcrom.com*
*cohenja@sullcrom.com*

*Counsel for Defendants Rock Holdings Inc.,
Jay Farner, and Daniel Gilbert*

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................1

BACKGROUND ........................................................................................6

    A.    Rocket's Business and IPO ........................................................6

    B.    The Mortgage Market in 2020 Was Unprecedented ...........................7

    C.    Rocket's 2020 Disclosures .........................................................9

    D.    Rocket's February 25, 2021 Earnings Release and the Challenged Earnings Call Statement .................................................10

    E.    Farner's March 2021 Statements .........................................................12

    F.    RHI's March 29, 2021 Block Sale ........................................................14

    G.    Rocket's May 5, 2021 Earnings Release ..............................................18

ARGUMENT .............................................................................................20

I.    There Is No Triable Issue Over Plaintiffs' Misstatements Claim .................20

    A.    Farner's February 25 and March 11, 2021 Comments About Rocket's Response to Rising Interest Rates Were Not Fraudulent .........................................................................................20

        1.    Farner's statements were true .......................................20

        2.    Farner's statements were not material .........................24

        3.    Farner's February 25 statement was protected by the PSLRA safe harbor for forward-looking statements ...............26

        4.    Farner did not act with scienter .................................28

    B.    Farner's March 3, 2021 Comment Was Not Fraudulent ....................30

        1.    Farner's statement was true .......................................30

2. Farner did not act with scienter.................................................33

C. There Is No Triable Issue Over Loss Causation and Damages ..........35

II. There Is No Triable Issue Over Plaintiffs' Insider Trading Claim ..............37

A. Plaintiffs Have No Evidence That a Revision to the Annual GOSM Projection Was Material Nonpublic Information ..................37

B. Plaintiffs Have No Evidence That the Stock Sale Was Motivated by Material Nonpublic Information....................................40

III. Summary Judgment Is Warranted on the Control Person Liability Claim Against Gilbert.....................................................................................44

CONCLUSION ..........................................................................................................45

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
  77 F.4th 74 (2d Cir. 2023) ...........................................................................24, 36

*Asher* v. *Baxter Int'l Inc.*,
  377 F.3d 727 (7th Cir. 2004) ..............................................................................32

*Atlantica Holdings, Inc.* v. *Samruk-Kazyna JSC*,
  477 F. Supp. 3d 88 (S.D.N.Y. 2020) ...............................................................3, 22

*Beleson* v. *Schwartz*,
  419 F. App'x 38 (2d Cir. 2011) ............................................................................24

*Dalberth* v. *Xerox Corp.*,
  766 F.3d 172 (2d Cir. 2014) ................................................................................31

*Dirks* v. *SEC*,
  463 U.S. 646 (1983).............................................................................................40

*Dura Pharms., Inc.* v. *Broudo*,
  544 U.S. 336 (2005).............................................................................................20

*Fosbre* v. *Las Vegas Sands Corp.*,
  2017 WL 55878 (D. Nev. Jan. 3, 2017)..............................................3, 20, 24, 29

*Freeman* v. *Decio*,
  584 F.2d 186 (7th Cir. 1978) ...............................................................................39

*Furher* v. *Ericsson*,
  363 F. App'x 763 (2d Cir. 2009) ..........................................................................34

*Hartel* v. *GEO Grp., Inc.*,
  2021 WL 4397841 (S.D. Fla. Sept. 23, 2021) .....................................................33

*In re Hayes Lemmerz Int'l, Inc.*,
  271 F. Supp. 2d 1007 (E.D. Mich. 2003) .............................................................45

*Heinze* v. *Tesco Corp.*,
  971 F.3d 475 (5th Cir. 2020) ...............................................................................38

*Hutchison* v. *Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011) .................................................................25

*J & R Mktg.* v. *GMC*,
  549 F.3d 384 (6th Cir. 2008) ...............................................................25

*JRS Partners, GP* v. *Leech Tishman Fuscaldo & Lampl, LLC*,
  2024 WL 2874575 (6th Cir. June 7, 2024)..........................................29

*In re Merck & Co. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005) .................................................................28

*Miller* v. *Champion Enters., Inc.*,
  346 F.3d 660 (6th Cir. 2003) ...................................................26, 27, 28

*Miss. Pub. Emps' Ret. Sys.* v. *Bos. Sci. Corp.*,
  649 F.3d 5 (1st Cir. 2011).........................................................23, 24, 34

*Murphy* v. *Precision Castparts Corp.*,
  2020 WL 4040827 (D. Or. July 17, 2020)......................................5, 45

*OFI Asset Mgmt.* v. *Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016) .................................................................27

*Omnicare, Inc.* v. *Laborers Dist. Council*,
  575 U.S. 175 (2015)..............................................................................32

*Pension Fund Grp.* v. *Tempur-Pedic Int'l, Inc.*,
  614 F. App'x 237 (6th Cir. 2015) ...................................................27, 28

*In re Philip Morris Int'l Inc.*,
  89 F.4th 408 (2d Cir. 2023) .................................................................31

*Picard Chem. Inc. Profit Sharing Plan* v. *Perrigo Co.*,
  940 F. Supp. 1101 (W.D. Mich. 1996) .................................................37

*Roofer's Pension Fund* v. *Papa*,
  687 F. Supp. 3d 604 (D.N.J. 2023) ......................................................22

*Saxe* v. *Dlusky*,
  268 F. App'x 438 (6th Cir. 2008) .........................................................25

*SEC* v. *Fox*,
    855 F.2d 247, 253 (5th Cir. 1988) ....................................................37

*Shupe* v. *Rocket Cos.*,
    660 F. Supp. 3d 647 (E.D. Mich. 2023) ......................................*passim*

*In re Sofamor Danek Grp., Inc.*,
    123 F.3d 394 (6th Cir. 1997) ......................................................40

*In re Symbol Techs. Class Action Litig.*,
    950 F. Supp. 1237 (E.D.N.Y. 1997) .............................................23

*Teamsters* v. *ServiceMaster Glob. Holdings, Inc.*,
    83 F.4th 514 (6th Cir. 2023) ......................................................29

*In re Wash. Prime Grp., Inc. Sec. Litig.*,
    2024 WL 1307103 (S.D. Ohio Mar. 27, 2024)..............................4, 35

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020) .........................................33

*Witham* v. *Intown Suites Louisville Ne., LLC*,
    815 F.3d 260 (6th Cir. 2016) ......................................................29

*Wochos* v. *Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ....................................................27

*Wyatt* v. *Nissan N. Am., Inc.*,
    999 F.3d 400 (6th Cir. 2021) ......................................................5

**Statute**

15 U.S.C § 78u-5.......................................................................*passim*

**Other Authority**

United States, CFPB, *2021 Mortgage Market Activity & Trends* (Sept. 2022) ......20

## STATEMENT OF ISSUES PRESENTED

1.      Should the Court grant summary judgment for Defendants on the misstatements claim because the three remaining statements (i) were true and/or not material, (ii) were not made with the intent to defraud shareholders, and (iii) did not cause investor losses?

2.      Should the Court grant summary judgment for Defendants on the insider trading claim because Rock Holdings Inc. ("RHI") did not sell stock in Rocket Companies, Inc. ("Rocket") based on material nonpublic information?

3.      Should the Court grant summary judgment for Rocket's founder and Chairman Daniel Gilbert on the control person liability claim because he did not control how Rocket's former CEO responded to questions on an earnings call and in the media and because he had no knowledge of the stock sale until after it occurred?

## STATEMENT OF CONTROLLING OR
## MOST APPROPRIATE AUTHORITIES

The controlling or most appropriate authorities for the relief that Defendants seek include:

**There is no triable issue on Plaintiffs' misstatements claim:**

1. 15 U.S.C. § 78u-5(c)(1)

2. *Atlantica Holdings, Inc.* v. *Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88 (S.D.N.Y. 2020)

3. *Fosbre* v. *Las Vegas Sands Corp.*, 2017 WL 55878 (D. Nev. Jan. 3, 2017)

4. *Miller* v. *Champion Enters., Inc.*, 346 F.3d 660 (6th Cir. 2003)

5. *Miss. Pub. Emps.' Ret. Sys.* v. *Bos. Sci. Corp.*, 649 F.3d 5 (1st Cir. 2011)

6. *Pension Fund Grp.* v. *Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237 (6th Cir. 2015)

**There is no triable issue on Plaintiffs' insider trading claim:**

7. *Heinze* v. *Tesco Corp.*, 971 F.3d 475 (5th Cir. 2020)

8. *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394 (6th Cir. 1997)

9. *Picard Chem. Inc. Profit Sharing Plan* v. *Perrigo Co.*, 940 F. Supp. 1101 (W.D. Mich. 1996)

**There is no triable issue on Plaintiffs' control person liability claim:**

10. *In re Hayes Lemmerz Int'l, Inc.*, 271 F. Supp. 2d 1007 (E.D. Mich. 2003)

11. *Murphy* v. *Precision Castparts Corp.*, 2020 WL 4040827 (D. Or. July 17, 2020)

## PRELIMINARY STATEMENT

In February and March 2021, Rocket's then-CEO Jay Farner truthfully told the market that Rocket expected to continue growing its business in the face of rising interest rates. He explained that Rocket's unique technology platform and scale gave it a chance to "grab market share" and "an opportunity to grow" during a rising rate environment. And that's just what it did. Despite strong economic headwinds, Rocket achieved its highest closed loan volume of $351 billion in 2021—10% *higher* than the volume record it set in 2020—and grew its market share by 13%. (Ex. 12 at 60.) Farner's statements reflecting Rocket's business expectations had accurately predicted this success. Nonetheless, Plaintiffs try to challenge these forward-looking statements as securities fraud. No evidence supports this claim.

Plaintiffs' insider trading claim also is entirely refuted by the record. Indeed, Plaintiffs have dropped their claim that Rocket's Chairman and controlling shareholder Daniel Gilbert traded on material nonpublic information ("MNPI") when his holding company, RHI, sold a block of shares on March 29, 2021 (ECF 163) because discovery has shown that Gilbert had *zero* to do with the sale. Instead, Plaintiffs now argue that RHI engaged in insider trading based on Farner's purported knowledge that Rocket would later project a faster-than-anticipated decline in its Q2 2021 gain-on-sale margin ("GOSM"). But the record shows that RHI had been planning a large secondary sale of Rocket shares since August 2020, as a follow-on

to Rocket's IPO. Content to wait for a fair price, RHI did not transact in fall 2020. When the stock price rose following Rocket's strong earnings announcement on February 25, 2021, concrete preparations for a sale began on March 10, *two weeks before* the March 23 Board meeting at which Plaintiffs allege Farner learned MNPI. On March 24—one day *after* purportedly learning MNPI that Plaintiffs falsely claim was the impetus for the sale—Farner declined to move forward with a sale because the stock price was too *low*. Farner's decision not to sell negates any inference that he, or others, believed the stock price was inflated and were desperate to sell 1% of RHI's holding in Rocket. In fact, a completely outside event—the collapse of the Archegos hedge fund and sudden spike in demand for Rocket stock—created an unexpected opportunity for a private block sale on March 29 at the price Farner had long sought.

The Court should grant summary judgment to Defendants on all claims:

***The Misstatements Claim.*** Plaintiffs were forced to voluntarily dismiss their claim challenging a March 17, 2021 tweet and March 19, 2021 retweet (ECF 163) after discovery showed the tweet was true. But Plaintiffs persist in alleging that they were defrauded by forward-looking remarks about Rocket's business strategy and opportunity for market-share growth in a rising interest rate environment that Farner made on an earnings call and in the media in February and March 2021.[1] This claim

---

[1] The full text of the challenged statements is set forth in Exhibit 1. Throughout the

fails.  Farner's statements that Rocket expected to invest money to grow its business despite rising rates were not only true when made, but turned out to accurately predict its success:  2021 saw record-breaking closed loan volume and market share gains for Rocket.  "[T]he fact that the challenged prediction came true largely eviscerates any claim that the projection was false."  *Atlantica Holdings, Inc.* v. *Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 105 (S.D.N.Y. 2020) (granting summary judgment).  Trying to salvage this claim, Plaintiffs paint isolated words—wrenched from their context as part of much longer statements—as misleading.  But there is no evidence that the market reacted to those words in the manner Plaintiffs allege.

In addition, there is no triable issue on scienter.  Farner testified emphatically that he intended his words to be interpreted just as he meant them—"our ability to lean in and gain market share . . . gives us an opportunity to accelerate our business, [including by spending more on] marketing. . . .  I've witnessed that in the 27 years I was there[,] some of our best times came after the movement of interest rates." (Ex. 23 at 125:18-128:6.)   There is **no** record evidence contrary to Farner's testimony that he "firmly believe[d]" those statements to be true.  (*Id.* at 138:22-24.) *See Fosbre* v. *Las Vegas Sands Corp.*, 2017 WL 55878, at *22 (D. Nev. Jan. 3, 2017) (granting summary judgment to defendant where speaker "aver[red] that he believed his statements were accurate").

---

brief, all internal citations, quotation marks, and alterations are omitted.

There also is no triable issue over loss causation and damages.  Plaintiffs'
expert's (Chad Coffman) "model" for measuring artificial inflation depends on his
assumption that at the start of the putative class period on February 25, 2021, Rocket
concealed the "impact that the steep rise in interest rates observed in the first quarter
of 2021 would have on Rocket's profitability," which he contends was disclosed and
caused a stock price decline on May 5, 2021, when Rocket issued its Q2 guidance.
(Ex. 13 ¶¶ 7, 11-14.)  But Plaintiffs' own mortgage market expert (Michael Trickey)
shows that Coffman's assumption is wrong and that Rocket had no such expectation
on February 25.  Thus, Plaintiffs cannot prove that "fraud-induced inflation . . . was
baked into [Plaintiffs'] purchase price" that, when removed, "caus[ed] losses."  *In
re Wash. Prime Grp.*, 2024 WL 1307103, at *11 (S.D. Ohio Mar. 27, 2024).

***The Insider Trading Claim.***  Having voluntarily dismissed their meritless
insider trading claim against Gilbert, Plaintiffs now claim that RHI sold Rocket stock
on March 29, 2021 because of an internal forecast of annual GOSM presented to
Rocket's Board of Directors on March 23, 2021.  But the record conclusively
establishes that the stock sale had been long planned, and that the actual trigger for
the sale was an outside event entirely unrelated to any GOSM projection.  When
Rocket's August 2020 IPO fell short of its target of raising $3+ billion, Gilbert
authorized Farner to execute a transaction to make up the shortfall without Gilbert's
involvement.  Farner testified that he was "in no rush to sell" and would authorize a

sale only at what he considered a "fair price." (Ex. 20 148:24-149:1, 294:14-25, 346:4-348:7.)[2]  After Rocket's stock price rose in February, Farner instructed his team to prepare for a sale *two weeks before* the March 23 Board meeting. (Ex. 54.) Despite having authorization to do so, RHI did not sell in the days following the Board meeting because Farner did not believe that Rocket's stock—then trading around $23—reflected the company's value.  Rather, RHI sold on March 29 only after Archegos's collapse led to a sudden spike in demand for Rocket stock—raising the price to $26.82—because Archegos's bank counterparties were covering short positions.  These undisputed facts completely refute Plaintiffs' theory.

**The Control Person Claim Against Gilbert.**  Plaintiffs dismissed all claims against Gilbert save for one—that he "controlled [Farner's] conduct" in allegedly making false statements and approving the stock sale.  (ECF 109, PageID.8557 ¶ 345.)  But Plaintiffs have no evidence that Gilbert—who was not present when the statements were made—had "control over what words came out of [Farner's] mouth" when Farner answered questions on the spot.  *Murphy* v. *Precision Castparts Corp.*, 2020 WL 4040827, at *25 (D. Or. July 17, 2020).[3]  Nor did Gilbert have any

---

[2]  Plaintiffs took virtually no discovery on the insider trading claim.  The transcripts in the related Delaware derivative action can be considered here because the testimony will be provided at trial "in an admissible form" through live testimony. *Wyatt* v. *Nissan N. Am., Inc.*, 999 F.3d 400, 423 (6th Cir. 2021).

[3]  If the Court denies class certification on the ground that no presumption of investor reliance applies, summary judgment should be granted on the misstatements claim

knowledge of the stock sale until after it occurred.

## BACKGROUND

### A.     Rocket's Business and IPO

Daniel Gilbert founded what became Rocket in 1985 in a Detroit suburb.  (Ex. 2 at 1.)  In 1998, Gilbert saw "the opportunity that the internet presented" and "pioneered the digitization of mortgages in America."  (*Id.* at Letter to S'holders.)  By 2019, Rocket had grown to become the nation's largest mortgage lender; that year, Rocket enjoyed $5 billion in revenue.  (*Id.* at 111.)

In 2019, Gilbert, who by then had become the company's Chairman and had ceded day-to-day business operations to Jay Farner (the company's CEO since 2017), suffered a stroke.  (Ex. 23 17:24-25, 231:22-25.)  Following the stroke, Gilbert decided to take part of the company public for two main purposes:  to ensure that Rocket's subsidiaries had funds available if needed to weather difficult economic periods and to ensure that Gilbert would have liquidity available, as necessary, to fund his philanthropic endeavors, including his widely publicized work to relieve blight and revitalize Detroit.  (*Id.* at 254:13-22; Ex. 26 36:21-37:1.)

On August 6, 2020, RHI sold a small portion (6%) of the equity it held in its controlled companies to the public through Rocket's IPO.  (Ex. 2 at 25.)  Gilbert and

---

because Plaintiffs have no evidence of individual reliance.  Defendants do not repeat their arguments that Plaintiff Construction Laborers Pension Trust For Southern California lacks Article III and statutory standing to assert an insider trading claim, but they preserve them for appeal, if necessary.  (ECF 120.)

his team set a target of $3+ billion for the IPO.  (Ex. 23 254:13-22.)  But Rocket faced unique challenges marketing the IPO during the COVID pandemic, including conducting the roadshow and educating potential investors via videoconference.  (*Id.* at 231:22-232:18.)  The IPO fell short of its target, raising $2 billion.  (*Id.* at 254:23-255:1.)  The company almost immediately began planning a secondary offering to make up the shortfall.  (*Id.* at 254:13-255:8; Ex. 21 22:24-23:13.)

## B.    The Mortgage Market in 2020 Was Unprecedented

Rocket's mortgage origination business includes:  (i) its "Direct to Consumer" ("DTC") channel, in which clients interact with Rocket's sales team directly or through Rocket's online platform, and (ii) its "Partner Network," in which Rocket partners with mortgage brokers, banks, and consumer-focused companies to connect with clients.  (Ex. 9 at 6.)  Like most mortgage lenders, Rocket sells the loans it originates to government-sponsored enterprises ("GSEs") (*e.g.*, Fannie Mae, Freddie Mac), which then bundle loans into mortgage-backed securities that they sell in the secondary market.  (Ex. 24 34:7-37:7; Ex. 22 88:3-13.)  Rocket calculates its revenue on sold loans as its "gain-on-sale net":  the difference between the value of the loans at closing and the value as sold to the GSEs.  (Ex. 2 at 116.)  In percentage terms, the figure is Rocket's GOSM.  (Ex. 24 39:10-16.)  Changes in Rocket's GOSM closely track changes in the public primary-secondary spread:  the difference between the primary mortgage loan interest rates (*i.e.*, the rates consumers pay) and

the secondary mortgage-backed security yields (*i.e.*, the return on securities), both of which are market driven. (Ex. 17 ¶¶ 186-87, 199-201.)

Since 2012, the primary-secondary spread has remained relatively constant, hovering around 0.75%. (Ex. 18 at Ex. 14.) In that same period, Rocket's GOSM remained similarly consistent at approximately 4% in its DTC channel and 1% in its Partner channel, with firm-level GOSM around 3%. (*Id.* at Ex. 11.)[4]

In March 2020, in response to COVID's impact, the federal government began initiatives that immediately affected the mortgage market. *First*, the Federal Reserve cut interest rates drastically, and already low mortgage rates hit new historic lows. (Ex. 17 ¶¶ 32-41, 127, 199.) As Plaintiffs' mortgage market expert (Trickey) explained, this drop "caus[ed] [a] refinance boom to erupt." (*Id.* ¶¶ 175, 178.) *Second*, the government increased GSE purchases of mortgages, which further "contributed to a surge in homebuying and refinancing activities." (*Id.* ¶¶ 44-50.)

Those two government policies led to a historically high primary-secondary spread in Q2 2020 of 1.81%, nearly double the historical average of around 1%. (*Id.* ¶ 215; Ex. 18 at Ex. 14.) As Plaintiffs' expert explained, "[m]ortgage lenders . . . saw a huge spike in the primary-secondary spread, their [GOSMs], and . . . volume." (Ex. 17 ¶ 178.) Rocket benefited from the historically high spreads, with its GOSM

---

[4] Although Rocket's Partner channel GOSM is lower than its DTC channel GOSM, the Partner channel also has lower expenses, meaning that those differences do not translate directly to bottom-line profitability. (Ex. 27 677:4-680:3.)

reaching a historic high of 5.19% in Q2 2020.  (*Id.* ¶¶ 176, 219; Ex. 18 at Ex. 11.)

## C.    Rocket's 2020 Disclosures

At the time of the August 2020 IPO, Rocket's closed loan volume and GOSM remained at previously unseen highs due to these unprecedented macroeconomic conditions.  (Ex. 17 ¶ 176.)  Rocket expressly warned investors in its August 2020 prospectus that these favorable conditions were the result of "interest rates [being at] historic lows" during the COVID-19 pandemic and that the inevitable rise in rates would "significantly impact[]" its business.  (Ex. 2 at 14, 45-46.)  Rocket also disclosed that "the low interest rate environment" had led to "strong demand and origination volume," but warned that "[w]e do not know how long these favorable market conditions will continue going forward."  (*Id.* at 16.)

After Rocket's IPO, securities analysts began to cover Rocket.  Those analysts recognized that "lenders are experiencing the strongest [GOSM]s since 2012," but that "margins should subside in 2021 and 2022," and that the mortgage market, especially refinancing, would shrink.  (Ex. 31; *see* Ex. 30; Ex. 14 ¶¶ 46-47.)

Rocket's post-IPO disclosures reiterated that conditions were expected to normalize.  On September 2, 2020, Rocket's then-CFO, Julie Booth, publicly stated, "we'll probably see those margins come back to more normalized levels."  (Ex. 3 at 8.)  By November 2020, Rocket reported that its GOSM had fallen from a high of 5.19% in Q2 2020 to 4.52% in Q3 2020—a drop of 67 basis points.  (Ex. 4 at 1.)

### D.    Rocket's February 25, 2021 Earnings Release and the Challenged Earnings Call Statement

On February 25, 2021—the first day of the putative class period—Rocket disclosed that the road to normalized pre-2020 levels was continuing.  Rocket reported that its GOSM dropped to 4.41% in Q4 2020.  (Ex. 5 at 2.)  It further provided guidance that it expected that decline to accelerate in Q1 2021, projecting a GOSM of 3.60% to 3.90%, a 50 to 80 basis point decline from Q4 2020.  (*Id.* at 2, 4.)  Rocket also disclosed projected Q1 closed loan volume of $98 to $103 billion, lower than Q4 2020 but still one of the strongest quarters in its history.  (*Id.*)

During the earnings call that day, Farner emphasized Rocket's strategy to grow through investments in its platform and marketing.  (Ex. 6 at 10.)  For example, Farner noted that Rocket was growing its Partner channel through partnerships with Morgan Stanley and E*TRADE (*id.* at 4), and explained that "rates will tick up and rates will tick down.  Our real focus is . . . grow[ing] market share" (*id.* at 10).

It was on that call that Farner made the first challenged statement.  In response to an analyst asking him to comment on the "competitive dynamics you're seeing, given the changing rate backdrop," Farner explained:

> [A]s the market becomes more challenging and others experienc[e] headwind, typically, what we find is that large partners like [Morgan Stanley] will look for the steady driving force in the market, and that's us.  And so that usually bodes well for our opportunity to grow market share and grow partnerships.

(*Id.* at 12.)  Farner continued:

> [A]s we see these interest rates tick up a bit, what we're going to see is an opportunity for us to lean in to spend more money [on] . . . marketing opportunities . . . as others tend to step away or back away.

(*Id.*)  And Farner concluded:

> [T]his is where we can lean in.  We can grab market share.  And not only are we thinking about the profitability that we achieve on the first transaction, we're thinking about the lifetime value of that client . . . , not only over mortgage but . . . auto [loans] and these additional businesses that we'll be adding.  So I guess you can tell we're pretty excited about it and *don't see interest rates going up or down, really having an impact on our business one way or the other.*

(*Id.* (challenged statement italicized).)  Farner was clear that he was discussing the

opportunity for market share growth, which would lead to future profitability:

> [T]here can be ups and downs in margin and interest rate for a short period of time as that kind of works it through, but as we get to the other side of that, what you find is, usually, fewer competitors.  And so for those remaining, not only does the margin stabilize . . . but it also gives you . . . great opportunity to grow market share.

(*Id.* at 17.)

In keeping with Rocket's Q1 guidance, analysts recognized market headwinds

would affect Rocket (Ex. 14 ¶ 67 & Ex. 7A), noting that Rocket's closed loan

volume was expected to decline and GOSM was expected to normalize.[5]  The market

plainly understood Farner's remarks that Rocket's strategy in the face of rising rates

would be to grow volume and market share.  (*E.g.*, Ex. 35 (Wolfe: "RKT is uniquely

---

[5]   *See, e.g.*, Ex. 36 (GS:  "[I]nvestors will likely remain concerned about the trajectory of [GOSM]s given the recent back up in interest rates."); Ex. 37 (Zelman: "[GOSM]s are compressing from historically-robust levels in 2020."); Ex. 38 (JPM).

positioned to take [market] share . . . in 2021," but "normalization in GOS[M]s should be expected.").)    There is no evidence that the market construed Farner's statement as a guarantee that "rising interest rates would not have any effect on [Rocket's] mortgage business," as Plaintiffs now argue.  (ECF 111, PageID.8591.)

### E.    Farner's March 2021 Statements

***March 3, 2021 Morgan Stanley Conference.***    On March 3, Farner attended a Morgan Stanley-sponsored investor conference at which he reiterated much of what he said during the earnings call and answered further investor questions.    After commenting on Rocket's "various channels," which Rocket's earnings do not separately break out, Farner was asked:

> Can you talk a little bit about what portion each of those *types of channels or processes* are of the overall volume and business today? What their relative growth rates are?  And how—what you think that looks like in the very long run?

(Ex. 7 at 7 (emphasis added).)    In response, Farner discussed the steps Rocket was taking to grow *its channels*, including partnering with Charles Schwab and E*TRADE in the Partner channel, hiring "30,000 real estate agents" for a new "Insight channel," building out its "Pro network" of financial planners, and expanding advertising to reach new customers.  (*Id.* at 7-8.)    Farner concluded with:

> [W]e don't break down the percentages, and I'm probably not going to go any further than what we've already laid out in our earnings call, but as you can probably sense from my passion, *they're all growing*.  And with—what about, less than 10% market share wherever we are, it's hard to say today if you think about all those different channels that can

grow and give us reach, that's why we get excited about what this company looks like in the years to come.

(*Id.* at 8.)  Plaintiffs allege the three italicized words falsely conveyed that "closed loan volume was currently 'growing'—for 'all' its channels" (ECF 111, PageID.8591), even though (i) Farner was not asked about closed loan volume, which he never mentioned; (ii) he instead discussed growing the footprint of Rocket's channels through investments with the goal of expanding market share; and (iii) Rocket had already disclosed in its earnings release that it expected *lower* closed loan volume in Q1 2021.  There is no evidence that the market had any reaction to Farner's statement.

**March 11, 2021 Fox Business Interview.**  On March 11, Farner participated in a brief televised interview on Fox Business.  Farner reiterated his prior statements about Rocket's strategy to grow market share as rates rise, stating:

> [W]e're going to see interest rates tick up a little bit here, we're all aware of that.  But over the 35 years that we've been in business, we take that as an opportunity to grow [market share].

(Ex. 8 at 2.)  He expanded on why Rocket's historical ability to grow market share in a declining market meant that "interest rates moving around are a great benefit to us"—the 10 words Plaintiffs allege were false while ignoring Farner's explanation:

> [W]hen [interest rates] drop back down, we've got a 90% retention rate on our servicing book, we'll help those clients refinance their mortgage and save money.  So cycles are good, . . . and I think that's what we're going to see here this year.

(*Id.*)[6]   There is neither evidence the market construed Farner's statement as representing that "rising interest rates would not have any effect on [Rocket's] mortgage business" (ECF 111, PageID.8591), nor evidence the market reacted to it.

### F.    RHI's March 29, 2021 Block Sale

As noted above, since August 2020, RHI had been hoping to conduct a secondary sale to make up for the IPO shortfall. (Ex. 23 254:13-255:8; Ex. 21 22:24-23:13; Ex. 44.) Because Gilbert remained focused on rehabilitation from his stroke, Gilbert told Farner and Scott Elkins (Gilbert's financial advisor) that they could decide when and how to conduct that sale. (Ex. 19 20:9-16; Ex. 20 345:4-14.)

Throughout fall 2020, Rocket continued to discuss a secondary offering both internally and with Morgan Stanley (lead underwriter for Rocket's IPO). (*See, e.g.*, Ex. 44; Ex. 45; Ex. 21 23:23-25.) Those discussions progressed to filing a prospectus confidentially with the SEC for a 57.5 million-share offering on October 30, 2020. (Ex. 46.) But Farner and Elkins did not move forward with the secondary because Rocket's stock price—trading between $20 and $22—did not, in Farner's view, reflect the value of Rocket's business. (Ex. 23 256:13-16; Ex. 20 142:13-14.)

---

[6]  When Rocket serviced its customers' loans (meaning Rocket itself collected the mortgage payments), 90% of those customers did their next loan with Rocket. As Brian Brown (Rocket's then-CAO) testified, the "next client's loan is generally worth more . . . than all of those servicing cash flows combined." (Ex. 25 97:21-99:13.) So even in a declining market where the profit margin per loan may shrink, Rocket's ability to gain market share and retain new customers was why Farner believed cycles are good. (*See* Ex. 23 35:25-38:3, 193:20-194:19.)

Rather, Farner was targeting a transaction that would net at least $22 per share after fees and costs, which meant that the stock needed to be trading in the mid-$20s. (Ex. 20 285:9-12; Ex. 23 261:18-264:9, 274:10-15; Ex. 21 29:2-13.) Market conditions foreclosed such a sale during Q4 2020. (Ex. 21 28:8-17; *see* Ex. 48 (Brown: "I don[']t see us transacting until the stock price is north of $22.").)

By March 10, 2021, Rocket's stock price stabilized at around $25 per share—in the zone Farner had been targeting—following an unusual "meme-stock" frenzy and short squeeze in early March. (ECF 120-28, PageID.9939.) After being approached by Morgan Stanley, Elkins raised with Farner "sell[ing] $500+ M shares via a [Rule] 144 a [sale]" (a block sale instead of a secondary offering), and Farner instructed Elkins to "be ready to pull the trigger." (Ex. 54; *see* Ex. 55.) But Farner and Elkins could not execute a block sale immediately because (i) RHI holds its Rocket interest in the form of Class D shares, which are not publicly traded but may be converted to publicly traded Class A shares with Audit Committee approval (Ex. 43); (ii) Rocket's Insider Trading Policy required RHI to pre-clear any sale with Rocket's General Counsel (Ex. 67); and (iii) any sale of this size needed to be negotiated and arranged with Rocket's investment banks (Ex. 23 262:8-264:9).

Thus, on March 11, Elkins asked Rocket's internal lawyers, outside counsel at Paul Weiss, and finance personnel to begin preparing for a potential sale. (Ex. 56.) After initial preparations, on March 19, Rocket's General Counsel and his deputy—

after consulting with Paul Weiss—held due diligence sessions with Farner, Bob Walters (Rocket's then-COO), Booth, and Brown.  (Ex. 65.)  Those discussions focused on "assess[ing] the risk of [RHI's request to sell Rocket stock] being prompted by material non-public information." (*Id.*)

On March 22, Rocket's internal counsel and Paul Weiss made a presentation to the independent members of Rocket's Audit Committee to determine whether to approve the share exchange and to open a trading window. (Ex. 66.)  After "ask[ing] questions," which "[m]anagement and outside counsel fully answered," the independent Audit Committee members unanimously approved the exchange request and opened a trading window from March 23 to 24. (Ex. 57 at 2.)  Rocket's General Counsel also pre-cleared a sale during that opened window. (*Id.* at 2-3.)

On March 24, Rocket filed with the SEC its annual report on Form 10-K. Rocket reiterated that its "business is significantly impacted by interest rates," and that as interest rates rise from their "near record lows," it "could adversely affect our revenues," "lead[] to a decrease in loan originations," and "place downward pressure on margins." (Ex. 9 at 27-28.)

Despite the lengthy approval process, RHI did *not* sell on March 23 or 24.  By then, Rocket's stock price had fallen from the mid-$20s goal to between $22 and $23 (ECF 120-28, PageID.9939), so the trading window closed without a sale (Ex. 60).  Farner and Elkins continued to consider a sale in the following days, but, as

Farner told Elkins in a text message on March 24, he would not sell at the prevailing market price, believing that it undervalued the stock: "Well let's ho[p]e the stock goes up. Otherwise f[*]ck it." (*Id.*)

Unknown to Rocket, however, that same week the Archegos hedge fund, which had taken a large short position in Rocket through synthetic trades with various banks, began to collapse. As a result, its counterparties sought to quickly unwind their positions by buying up Rocket shares. (Ex. 15 ¶¶ 35, 86.) On Friday, March 26, Elkins observed Rocket's stock price tick up slightly at the end of trading, which he, not knowing the true cause, attributed to unusual options trading. (Ex. 21 112:11-23.) Elkins told Farner that he thought the uptick would not persist, and Farner responded there was "no reason to rush" preparations for a sale as there likely would be no opportunity to sell when trading resumed on Monday. (Ex. 61.)

On the morning of Monday, March 29, neither Farner nor Elkins was in the office: Farner was visiting colleges with his daughter, and Elkins had slept in because he was sick with COVID. (Ex. 23 256:13-23; Ex. 21 112:20-22.) Yet the situation evolved rapidly. At 7:33 AM, while he was sleeping, Elkins received a voicemail from a Goldman Sachs trader inquiring about interest in a block sale in light of a "hedge fund unwind." (Ex. 62.) And when trading opened, Rocket's stock price jumped from $24 to $26—into the target range. (Ex. 15 at Ex. 10.B.)

Responding to the Goldman Sachs call and rising stock price, Elkins realized

there was an immediate opportunity to complete the sale RHI had been planning for months, and requested bids from several banks around 9:30 AM.   (Ex. 63.) Meanwhile, in preparation for a potential sale, at 10:00 AM, Rocket's General Counsel conducted a bring-down due diligence session with Rocket's senior executives to confirm that there had been no material changes since the previous due diligence session on March 19, meaning that the trading window could reopen.  (Ex. 23 266:22-267:18; Ex. 64; Ex. 65.)  Following the due diligence session, Rocket's General Counsel re-cleared a sale by RHI.  (Ex. 65.)

At 10:21 AM, Elkins reported that Morgan Stanley had offered to buy $500 million of Rocket stock, then trading at $26.82 per share, at $24.75 per share; *i.e.*, exceeding Farner's target price.  (Ex. 63.)   At 10:28 AM, Farner accepted Morgan Stanley's offer, and the trade was confirmed at 10:52 AM.  (*Id.*)

### G.    Rocket's May 5, 2021 Earnings Release

On May 5, 2021, Rocket disclosed its Q1 2021 financial results and Q2 2021 guidance.  Rocket reported Q1 2021 GOSM of 3.74% (within the 3.60% to 3.90% guidance provided on February 25, 2021), and projected Q2 2021 GOSM to further decline to 2.65% to 2.95%.  (Ex. 10.)   Rocket also reported Q1 2021 volume of $103.5 billion (above the $98 to $103 billion guidance provided on February 25), and projected Q2 2021 volume to further decline to $82.5 to $87.5 billion.  (*Id.*)

These results were met with some surprise by the market, which (like Rocket itself) had not expected worsening macroeconomic conditions to impact Rocket's business so quickly,[7] and Rocket's stock price declined.  Critically, however, no analysts referenced—much less attributed the market's reaction to—any supposed correction of Farner's prior statements.  (*See* Ex. 14 ¶¶ 90-93.)

Nor had Rocket expected macroeconomic conditions to worsen so quickly when Farner made the challenged statements.  As Plaintiffs' mortgage market expert (Trickey) recognized, Rocket's finance team had predicted Q2 GOSM of 3.6% when Farner made the February 25 statement, and 3.4% when Farner made the March 3 and 11 statements—materially above the guidance provided on May 5.  (Ex. 17 at Tbl. 1.)  It was not until April that Rocket's finance team projected Q2 GOSM would decline to the levels Rocket guided to in May.  (*Id.*)  That is consistent with what Rocket said on the May 5 earnings call, that the long-expected GOSM normalization had accelerated because the "primary, secondary spread" had "compress[ed]" at the end of March into April, and that Rocket also saw GOSM fall with a change in channel mix and its pricing strategy to gain market share.  (Ex. 11 at 11.)

Plaintiffs' argument that Rocket revealed a drop in closed loan volume on May 5 (ECF 109, PageID.8420 ¶ 9) is also incorrect.  As noted, Rocket's Q1 2021

---

[7]   *See, e.g.*, Ex. 41 (Barclays: "The increase in rates has led to strengthening competition and pressuring margins faster than anticipated."); Ex. 42 (MS).

closed loan volume was *above* the top of the range of its guidance and two times higher than Q1 2020. Rocket's guidance for Q2 built upon its Q1 results, predicting a small drop in the Q2 guidance range that would still be a year-over-year increase in Q2 volume. And, significantly, by the end of 2021, Farner's statements that Rocket viewed rising interest rates as an opportunity to grow market share proved prescient as Rocket executed on its strategy and had its second-best year on record:

- Rocket's 2021 closed loan volume *grew* to $351 billion, higher than 2020 ($320 billion) and more than double 2019 ($145 billion). (Ex. 12 at 61.)

- Rocket's 2021 market share *grew* to 8.8%, well above its market share in 2020 (7.8%) and 2019 (6.4%) (*id.*), maintaining Rocket's position as the largest originator by market share in the United States, CFPB, *2021 Mortgage Market Activity & Trends* at 60 (Sept. 2022) < tinyurl.com/537hwvvw >.

- Rocket's revenue was $12.9 billion, lower than the all-time high of $15.6 billion in 2020 but more than double the $5 billion in 2019. (Ex. 12 at 65.)

## ARGUMENT

## I.   There Is No Triable Issue Over Plaintiffs' Misstatements Claim.

Plaintiffs have no evidence to support three independently essential elements of their misstatements claim:  (i) "a material misrepresentation"; (ii) "scienter"; and (iii) "loss causation." *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005).

### A.   Farner's February 25 and March 11, 2021 Comments About Rocket's Response to Rising Interest Rates Were Not Fraudulent.

#### 1.   Farner's statements were true.

Farner's "statements on the [earnings] call" and in an interview "must be taken in context." *Fosbre*, 2017 WL 55878, at *24 (granting summary judgment to

defendant).   There is no evidence that reasonable investors construed Farner's February 25 and March 11 statements in a way that would render them false.

In February 2021, the market knew that 2020 had been an extraordinary year for the mortgage industry.  (*Supra* 7-9.)  But interest rates were rising, and Rocket's GOSM was expected to fall for the third straight quarter since its all-time high in Q2 2020.  (*Supra* 9-10.)  On the February 25, 2021 earnings call, Farner addressed Rocket's strategy for growing market share and volumes in a declining market. Farner acknowledged the market was becoming "more challenging," "interest rates [will] tick up a bit," and, as a result, "there can be ups and downs in margins."  (Ex. 6 at 9-10, 12, 16-17.)  But those circumstances created a "great opportunity to grow market share" for the reasons Farner noted, including growing partnerships and making investments while competitors pulled back.  (*Id.* at 16-17.)  Against that backdrop, Farner concluded:  "So, I guess you can tell we're pretty excited about it and *don't see interest rates going up or down really having an impact on our business one way or the other*" because, over the long-term, Rocket's strategy "leads to market share growth and . . . a l[ine] of sight to really strong future profitability as well for us."  (*Id.* at 12, 17 (challenged statement italicized).)

During a March 11 interview on Fox Business, Farner reiterated those points, stating, "interest rates moving around are a great benefit to us" because "over the 35 years that we've been in business, we take that as an opportunity to grow [market

share]." (Ex. 8 at 2.) As on February 25, Farner acknowledged "we're going to see interest rates tick up a little bit here, we're all aware of that," but emphasized that "[o]ur focus on our platform" means that "as other people pull back and capacity shrinks in the mortgage industry, it gives us a great opportunity to grow market share." (*Id.*) Farner concluded that "cycles are good, at least for our business . . . , and I think that's what we're going to see here this year." (*Id.*)

Farner's statements about Rocket's hope to grow market share and volume were indisputably true and fairly described Rocket's consistent strategy in all market conditions.[8] Indeed, Farner's prediction came true: in 2021, Rocket grew its volume and market share. (*Supra* 20.) "[T]he fact that the challenged prediction came true largely eviscerates any claim that the projection was false or misleading." *Atlantica Holdings*, 477 F. Supp. 3d at 105. Considering the context, no reasonable investor could have construed Farner's remarks as promising that rising interest rates would not "impact" Rocket's business—Rocket simultaneously disclosed that margins were declining and Farner himself noted "ups and downs"—or that Rocket's business was immune to market conditions. "Plaintiffs cherry-pick[ed]" one sentence from defendant's remarks on an earnings call "in a misleading effort to manufacture an issue of fact." *Roofer's Pension Fund* v. *Papa*, 687 F. Supp. 3d 604, 627 (D.N.J. 2023) (granting summary judgment to defendant). But "[w]hen placed

---

[8] Ex. 32 (demonstrating Rocket's market share growth from 2012-2020).

in proper context, there is no 'issue for trial' on what [defendant] said." *Id.*

Further, *zero* securities analysts—whom Plaintiffs' expert Coffman agrees are a proxy for "what the market is focused on" (Ex. 28 344:24-345:7; *see* Ex. 13 ¶ 52 (citing analyst reports))—construed Farner's statements to mean that changing market conditions would not affect Rocket's business (Ex. 14 ¶ 23). To the contrary, analysts recognized that rising rates and normalizing margins *would* affect Rocket. (*Supra* 11-12.)[9] In other words, analysts understood that GOSM was declining, and none suggested that the words Plaintiffs rely on could be plucked from their context to imply anything else.

Courts grant summary judgment to defendants where, as here, fraud allegations depend on removing language from context and giving it a meaning not ascribed to it by analysts. *See*, *e.g.*, *Miss. Pub. Emps.' Ret. Sys.* v. *Bos. Sci. Corp.*, 649 F.3d 5, 25-26 & 27 n.20 (1st Cir. 2011) (no evidence analysts were misled). Here, "[n]o rational juror could find" that the market construed Farner's words as Plaintiffs allege, in light of "[t]he statement itself" read in "context" and analysts' interpretation of it. *In re Symbol Techs.*, 950 F. Supp. 1237, 1244 (E.D.N.Y. 1997).

Finally, no reasonable investor could have construed Farner's words to imply

---

[9] In fact, the only analyst to mention Farner's February 25 statement "remain[ed] Neutral on [Rocket] given recently . . . rising interest rates," because "the magnitude at which rates move should affect volumes" and the "effect on GOS margins (pushing them lower) should start to be felt more fully in Q2." (Ex. 33 at 1, 3.)

that Rocket's GOSM or volume would never decline because on February 25 Rocket disclosed that those same metrics were declining and were expected to decline further.  (*Supra* 10.)  *See Beleson* v. *Schwartz*, 419 F. App'x 38, 40 (2d Cir. 2011) (summary judgment to defendant where "[n]otwithstanding the [allegedly false] positive business developments," defendant "adequately informed" the market of its declining metrics in the annual report filed three months earlier); *see also Fosbre*, 2017 WL 55878, at *24 (similar); *Bos. Sci.*, 649 F.3d at 29-30 (similar).

Likewise, Rocket reiterated to the market in its March 24, 2021 10-K that its "business is significantly impacted by interest rates."  (Ex. 9 at 4.)  That statement would have been "corrective" under Plaintiffs' theory, and yet precipitated no response, showing that the market did not interpret Farner's statements as Plaintiffs claim.  *See Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74, 102-03 (2d Cir. 2023).  Plaintiffs have no evidence to the contrary; indeed, their own expert (Trickey) agreed that Farner was "basically saying, hey, when things are bad, that's when everybody else is having a problem and we can go grab market share."  (Ex. 29 175:12-15.)  That is exactly what Rocket did.

### 2.   Farner's statements were not material.

The discovery record also confirms that the statements were not material to investors.  No analyst covering Rocket referred to the statements in the manner Plaintiffs allege, and there is no other evidence that the market reacted as Plaintiffs

claim.  (*Supra* 23.)  The best Plaintiffs can do is point to:  (i) the opinion of their "materiality" and damages expert (Coffman) that, at a high level of generality, information about "the effect of interest rates on Rocket's business and profitability would be important to investors" (Ex. 13 ¶ 43), and (ii) Rocket's stock price decline after its May 5, 2021 announcement of Q1 2021 earnings and Q2 2021 guidance (*id.* ¶ 66).  Neither creates a genuine issue for trial.

*First*, Coffman's view that investors cared about the topic of interest rates is irrelevant and cannot create a triable issue because "[t]he importance of the topic of the representation does not . . . make it material." *J & R Mktg.* v. *GMC*, 549 F.3d 384, 396 (6th Cir. 2008).  Rather, "materiality hinges on what particularly was represented." *Id.*  For example, although the state of a company's finances may be important, not every statement on that topic is material.  *See, e.g.*, *Saxe* v. *Dlusky*, 268 F. App'x 438, 441 (6th Cir. 2008) (defendant's "opinion about the quality of [company's] profitability" was immaterial).  Here, there is no evidence that the market cared about the words in Farner's challenged remarks.  *Second*, "market reaction to [an alleged corrective] disclosure . . . is by itself too blunt an instrument to be depended on in considering whether a fact is material." *Hutchison* v. *Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) (quoting SEC Staff Accounting Bulletin No. 99).  Standing alone, the mere fact that the stock price declined—the basis for every securities fraud case—is meaningless.

Critically, after Rocket's May 5 guidance, not one analyst mentioned the challenged statements or attributed the market's reaction to learning that the statements were untrue. Indeed, analysts at Morgan Stanley concluded that Rocket's May 5 disclosure *confirmed* that Rocket's statements since the IPO had "clearly communicated" Rocket's strategy for responding to changing market conditions:

> [Since the IPO] we had expected [Rocket's GOSM] would gradually return to more normalized level of ~2.5-3%, vs the 5.2% at the peak in 2020. And *anticipating that eventual normalization, [Rocket] management has always clearly communicated* that the plan is to *sustain investment with the intention of gaining [market] share, which would be best monetized in future market upswings*. As such, we generally see evolving conditions and the company's reaction as generally consistent with our medium-term views, even as *rising interest rates and the cooling of the mortgage market may have started a bit sooner than we had anticipated earlier in the year*.

(Ex. 42 at 1 (emphases added).) At most, the market's reaction in May showed that the market was responding to Rocket's results (about which it had offered accurate guidance in February) and future guidance in light of changing market conditions.

### 3. Farner's February 25 statement was protected by the PSLRA safe harbor for forward-looking statements.

Under the Private Securities Litigation Reform Act's ("PSLRA") safe harbor provision, "if the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind." *Miller* v. *Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir.

2003); *see* 15 U.S.C. § 78u-5(c)(1).[10]  Here, Farner referred to "what *we're going to see*" in the future "*as we see* these interest rates tick up a bit," describing it as presenting "*an opportunity*" to "lean in, [and] grab market share," which the company was "pretty excited about," meaning that it did not "*see* interest rates going up or down *really having an impact on our business one way or the other*."  (Ex. 6 at 12.)  Farner was predicting, in particular, that, when "we get to the other side" of the up-and-down interest rate cycle, Rocket's anticipated business growth and market share would not be affected.  (*Id.* at 17.)  That is a quintessential forward-looking statement.  *See Pension Fund Grp.* v. *Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 247 (6th Cir. 2015) (statement that "[w]e continue to see . . . a long runway of opportunity . . . to improve gross margins" is forward-looking).

At the outset of the earnings call, Rocket referred to the meaningful cautionary language contained in its SEC filings warning of risks (Ex. 6 at 2), as permitted by the PSLRA safe harbor.  In its prospectus, Rocket warned that interest rates were likely to rise from their historically low 2020 levels and stated that "[o]ur financial performance may decrease or be subject to substantial volatility because of changes

---

[10]  "No investigation of defendant's state of mind is required" to determine if a statement is forward-looking.  *Miller*, 346 F.3d at 678.  The focus is instead on whether the statement itself is about the "future" or "the assumptions underlying or relating to any [such] statement" about the future.  *See, e.g.*, *id.* at 672 n.4, 678 (citing 15 U.S.C § 78u-5(i)(1)); *Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021); *OFI Asset Mgmt.* v. *Cooper Tire & Rubber*, 834 F.3d 481, 502-03 (3d Cir. 2016).  In any event, Farner's opinions were honestly held.  (*See infra* 28-29.)

in prevailing interest rates." (Ex. 2 at 45.)  It also cautioned that rising rates could put "downward pressure on margins, thus compounding the effect of the deteriorating market conditions" (*id.* at 44), and detailed the ways rising rates affect various parts of its business (*id.* at 45-46).  Rocket also reiterated those risks in its March 24, 2021 Form 10-K. (*Supra* 16.)  Rocket thus "disclosed the exact risk that occurred," which is all the PSLRA requires; it was "not required to detail every facet or extent of that risk to have adequately disclosed the nature of the risk." *Miller*, 346 F.3d at 678; *see Tempur-Pedic*, 614 F. App'x at 244 (holding similar risk disclosures constituted sufficient cautionary language); *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005) (holding that cautionary language in 10-K filed more than a year before forward-looking statements was sufficient).

### 4.    Farner did not act with scienter.

Under the PSLRA safe harbor, Plaintiffs must prove that Farner had "actual knowledge" that his statements on February 25 and March 11 were false. *Tempur-Pedic*, 614 F. App'x at 242.  All evidence is to the contrary.  As Farner testified:

- "So as I said here, I viewed the movement of interest rates—and I've witnessed that in the 27 years I was there—some of our best times came after the movement of interest rates. . . .  So, no, I wasn't concerned [about how interest rates might affect Rocket's business]." (Ex. 23 125:18-127:6.)

- "[M]y understanding of and belief in the strategies that we were implementing allowed me to feel pretty comfortable about what was going to happen with the company, regardless of interest rate movement." (*Id.* 129:3-7.)

- "[M]ovement in interest rate[s] will usually do a few things.  Number one, a

competitor that's less capitalized will back away from the business . . . , which allows us to gain market share.  Number two, a competitor that is less efficient [will] back away from the marketing before we do."  (*Id.* 186:23-187:15.)

Nor do Plaintiffs have any evidence under the conscious recklessness standard that would apply even if the Court determines that Farner's predictions were not forward-looking.[11]  Plaintiffs' case rests on their own interpretation of a few phrases pulled from Farner's remarks.  Farner has now testified unequivocally that he did not intend the statements to mean what Plaintiffs say (Ex. 23 102:20-103:1), and there is no evidence that the market construed them in that manner (*supra* 23).  Thus, as in *Fosbre*, Defendants "are entitled to summary judgment" because Farner "avers that he believed his statements were accurate," and Plaintiffs "have not presented evidence that [Farner] knew when he made the challenged statements that they were actually false or that some analysts would interpret his comments to mean" something different than what he intended.  2017 WL 55878, at *22.  Plaintiffs "may not point to the bare possibility that a jury might *disbelieve* [Farner's] testimony" to survive summary judgment.  *Witham* v. *Intown Suites Louisville Ne., LLC*, 815 F.3d

---

[11]  Recklessness is "more than negligence and is akin to conscious disregard, and typically requires multiple, obvious red flags, demonstrating an egregious refusal to see the obvious, or to investigate the doubtful."  *Teamsters* v. *ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 526 (6th Cir. 2023).  At the motion-to-dismiss stage, the Court analyzed whether Plaintiffs adequately pled scienter by considering the *Helwig* factors.  At summary judgment, Plaintiffs are required to "put forth evidence to create a genuine dispute as to [Defendants'] state of mind."  *JRS Partners, GP* v. *Leech Tishman Fuscaldo & Lampl, LLC*, 2024 WL 2874575, at *11 (6th Cir. June 7, 2024) (citing *SEC* v. *George*, 426 F.3d 786, 795 (6th Cir. 2005)).

260, 265 (6th Cir. 2016).  Moreover, the record demonstrates that everyone involved was working in good faith to provide truthful disclosures:  there was extensive preparation for Farner's earnings call and Fox Business remarks, with individuals from the Finance, Accounting, Investor Relations, and Internal Legal groups, who vetted Farner's earnings call script, reviewed company data, and considered potential Q&A topics and responses, all in a meticulous effort to back up each point with hard data.  (Ex. 49; Ex. 16 ¶¶ 153-58, 162.)  That is not fraud.

## B.   Farner's March 3, 2021 Comment Was Not Fraudulent.

### 1.   Farner's statement was true.

Plaintiffs have no evidence that investors construed Farner's March 3 statement in a way that would render it false.  Instead, the content and context of this remark makes clear that it was true.  Farner was responding to a question about how each channel contributes to Rocket's overall "business," the "growth rates" of each channel, and "what [Farner thought] that [would] look[] like in the very long run." (Ex. 7 at 7.)  In response, he discussed the investments Rocket was making to grow its channels—partnering with Charles Schwab, hiring real estate agents, expanding its financial planner network, etc.—and concluded:

> [W]e don't break down the percentages [that each channel contributes], . . . but as you can probably sense from my passion, *they're all growing*. . . .  [I]f you think about all those different channels that can grow and give us reach, that's why we get excited about what this company looks like in the years to come.

(*Id.* at 7-8 (challenged statement italicized).)  Plaintiffs have no evidence that Rocket

was not taking the stated steps to grow its channels.  *See Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 187 (2d Cir. 2014) (plaintiffs' "inaccurate description of what [CEO] actually said at the investor conference" did not create triable issue).

Further, even if the market had construed Farner's remark as stating that Rocket's "closed loan volume was currently 'growing'—for 'all' its channels" as Plaintiffs allege (ECF 111, PageID.8591), that statement still was indisputably true. When the statement was made in Q1 2021, Rocket's channels *were* growing as compared to the same quarter in 2020, a normal measure of growth in a seasonal business like the mortgage industry.  (Ex. 17 ¶ 169.)[12]  In addition, Rocket's 2021 closed loan volume was the highest in the company's history.  (*Supra* 20.)  This evidence "*conclusively* establishes" that Farner's statement was "reasonable, and therefore not actionable."  *In re Philip Morris Int'l Inc.*, 89 F.4th 408, 422-23 (2d Cir. 2023).

Plaintiffs also have no evidence that any reasonable investor assumed Farner meant that closed loan volume in each of Rocket's channels was experiencing material instantaneous or short-term growth at the time of the statement.  And no reasonable investor would do so as (i) Farner made no reference to short-term closed loan volume, instead referencing increasing "market share" over the "long term,"

---

[12]  Rocket disclosed in its prospectus that "origination of loans can be seasonal," with "reduced activity in the first and fourth quarters."  (Ex. 2 at 45.)  It also was well known that Q1 "is typically a seasonally weak qtr."  (Ex. 34 at 1.)

and (ii) Rocket had disclosed six days earlier, in its February 25 earnings release, that its closed loan volume was expected to *decline* in Q1 2021—disclosures that must be considered in evaluating Farner's statement.[13]

Furthermore, not a single analyst discussed the *three* allegedly misleading words Plaintiffs single out of Farner's comment (which, as construed by Plaintiffs, would have meant a sea change from the guidance Rocket had provided just days earlier). Morgan Stanley, Farner's host, was the only analyst to even discuss Farner's March 3 remarks, and it construed Farner's overall discussion of "rising interest rates"—a part of Farner's remarks Plaintiffs do not allege was false—not as a representation that closed loan volume would rise but instead that "the company believes that its diverse portfolio of offerings will help it weather challenging interest environments better than its competitors, potentially offering market share gain opportunities." (Ex. 39 at 1.) Far from relying on Farner's statement as representing that volume would increase, Morgan Stanley projected *a 12% decline* (from $99.3 to $87.3 billion) in Rocket's Q2 versus Q1 closed loan volume. (Ex. 40 at 5.)

---

[13] Because Plaintiffs' case now depends on their expert's opinion that Rocket's stock trades in an efficient market (ECF 74-2, PageID.2481 ¶ 6), the Court can no longer assume that the market would have construed Farner's remarks in isolation without regard to Rocket's earlier disclosures. *See Shupe*, 660 F. Supp. 3d at 671. "When markets are informationally efficient, it is impossible to segment information" that way. *Asher* v. *Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004). Thus, Rocket's prior disclosures "must be treated as if attached to every one of its oral and written statements," *id.*, including all "hedges, disclaimers, and apparently conflicting information," *Omnicare, Inc.* v. *Laborers Dist. Council*, 575 U.S. 175, 190 (2015).

## 2.    Farner did not act with scienter.

Farner's statement predicting "continued growth is a forward-looking statement protected by the safe harbor provision of the PSLRA," and therefore requires actual knowledge of falsity.  *Hartel* v. *GEO Grp., Inc.*, 2021 WL 4397841, at *9 (S.D. Fla. Sept. 23, 2021); *see In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 254 (S.D.N.Y. 2020) (similar).  In particular, Farner was responding to a question about how the business would grow "in the long term," and his view about the channels was expressed as continuing ("growing"), rather than as a statement about past performance.  Accordingly, because Plaintiffs have no evidence of Farner's knowledge of falsity, they cannot satisfy the PSLRA standard.

Plaintiffs also have no evidence to create a triable issue even if the normal scienter standard applies.  Farner testified that he believed his statement was true— the data he reviewed before the interview showed that Rocket was growing its various channels.[14]  Farner further testified that he never intended to suggest that Rocket's initiatives would result in volumes growing in Q1 over Q4 specifically because "that would not be an accurate way to look at it" given the time horizon for

---

[14]  Farner testified:  "[T]here are ups and downs at all businesses.  You're not going to have a consistent hockey stick, but over the course of time, and as we demonstrated from '17 to '18 to '19 to '20, . . . we had the strategies to continue to grow these channels.  And, again, according to the data that I was provided, and I have no reason not to believe it, it seemed very accurate based on how we were growing, that all those channels were growing."  (Ex. 23 170:14-24; *see* Ex. 50 (prep materials for Morgan Stanley conference); Ex. 53 (same); Ex. 16 ¶¶ 159-63.)

Rocket's initiatives and the seasonality of mortgages. (Ex. 23 170:10-171:19.) That is why Farner testified that if "you look through my response and you read my explanation of these things, I believe it's very obvious to the listener that these are long-term strategies": "As I talk about signing long-term deals, as I talk about building one of the largest brands in the [] mortgage space and beyond, as I talk about here the last 12 months . . . I'm [] conveying that [] these are longer term thoughts . . . , not short run daily or weekly or quarterly thoughts." (*Id.* 172:8-21.)

There are two more reasons why there is no triable issue on scienter. *First*, Farner did his best to answer the question in the moment as he understood it: he did not view the question as "putting a date range on it" or to be "about the exact loan business and volume happening on March 3," which he "wouldn't even know." (*Id.* 175:19-176:5; 180:11-17.) Moreover, as CEO, Farner understood he was speaking about "the long-term view of our [] company." (*Id.* 175:19-176:5.) Because Plaintiffs "fail[] to identify any evidence that draws this testimony into question," summary judgment should be granted. *Bos. Sci.*, 649 F.3d at 27; *see Furher* v. *Ericsson*, 363 F. App'x 763, 765 (2d Cir. 2009) (no inference of scienter where "[t]he statements were made in the context of an informal back-and-forth with analysts—partially in response to questions that were themselves imprecise and potentially ambiguous").

*Second*, Farner testified that even if he had seen data suggesting a decline in

the first few months of the year versus the prior quarter, that would not have cast doubt on his beliefs about Rocket's strategies based on his review of data showing year-over-year growth and his knowledge of the seasonality of the mortgage market. (Ex. 23 176:10-25.)  No evidence calls that testimony into question either.

### C.    There Is No Triable Issue Over Loss Causation and Damages.

Plaintiffs "must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff."  *Wash. Prime*, 2024 WL 1307103, at *11. Here, Plaintiffs' expert (Coffman) opines that Rocket's GOSM guidance for Q2 2021 of 2.65% to 2.95% on May 5, 2021 was a corrective disclosure that dissipated the inflation purportedly introduced into Rocket's stock price on February 25, 2021, "the first day of the Class Period."  (Ex. 13 ¶¶ 11-14, 29, 70, 73, 80, 96.)[15]  Put otherwise, Coffman's model for establishing loss causation and damages tries to quantify the artificial inflation in the stock price, which depends on his "assumption[]" that on February 25, Rocket knew and concealed from the market that its "demand and/or profitability" was "being impacted and would continue to be severely impacted by the rise in interest rates" in Q2.  (*Id.* ¶¶ 44, 80, 96; *see* Ex. 28

---

[15]  Coffman testified that the March 3 and 11 statements did not add any artificial inflation into the stock price but instead, at most, maintained the inflation that was introduced into the market on February 25.  (Ex. 28 62:18-25.)

256:10-25.)  Coffman also assumes that "the nature of the concealed information in this matter did not change over the Class Period."  (Ex. 13 ¶ 96.)

But Plaintiffs' mortgage expert (Trickey) refutes Coffman's assumptions. Trickey's report analyzes information from weekly internal projections at Rocket, and shows that "right before the February [25,] 2021 earnings call," Rocket projected a Q2 2021 GOSM of 3.60%, *100 basis points higher* than the low end of the Q2 guidance that Rocket disclosed on May 5, 2021.  (Ex. 17 ¶ 261.)  As Trickey testified, the internal projection for Q2 at the time of the challenged statements was "substantially higher" than what Rocket disclosed on May 5.  (Ex. 29 269:9-24.)

According to Trickey's analysis, it was only *after* the challenged statements were made that Rocket's internal projections for Q2 began to reflect the more rapid decline in GOSM that was ultimately disclosed on May 5.  (Ex. 17 at Tbl. 1.)  As Trickey testified, the "meaningful changes" to GOSM predictions came "after the end of the first quarter of 2021."  (Ex. 29 71:16-72:5.)  The same is true for closed loan volume.  (Ex. 17 at Tbl. 5.)  In short, Trickey agrees that Coffman's assumption that Rocket projected on February 25 that its GOSM and volume would decline in Q2 2021 to the same extent that it disclosed on May 5 is wrong.[16]

---

[16]  In addition, Plaintiffs' causation theory is refuted by Rocket's March 24, 2021 10-K disclosures, which reiterated that its business "is significantly impacted by interest rates," with no effect on the market.  (*Supra* 16.)  *See Goldman*, 77 F.4th at 102-03.

## II.    There Is No Triable Issue Over Plaintiffs' Insider Trading Claim.

To prevail on an insider trading claim against RHI under Sections 10(b) and

20A of the Exchange Act, Plaintiffs must prove that RHI (i) "breach[ed] [] a duty to

. . . abstain from trading" on "material and nonpublic" information, (ii) with

"scienter."  *Picard Chem. Inc. Profit Sharing Plan* v. *Perrigo Co.*, 940 F. Supp.

1101, 1128 (W.D. Mich. 1996).  There is no triable issue on either element.

### A.    Plaintiffs Have No Evidence That a Revision to the Annual GOSM Projection Was Material Nonpublic Information.

Internal projections "are only material when they can be calculated with

substantial certainty."  *SEC* v. *Fox*, 855 F.2d 247, 253 (5th Cir. 1988).  At the

motion-to-dismiss stage, the Court necessarily accepted Plaintiffs' allegation that

"Rocket[] internal[ly] view[ed]" the internal annual 2021 GOSM projection as

"significant" and substantially certain.  *Shupe* v. *Rocket Cos.*, 660 F. Supp. 3d 647,

686 (E.D. Mich. 2023).  But at summary judgment, no evidence supports that

allegation.  Witness after witness testified that the annual projection for 2021 was

strictly a guess and did not drive any business decisions:

- **Walters:** "**Q.**  Do you have any opinion of whether Rocket's forecasting was accurate? **A.**  I'm laughing because I used to say this a lot, I'd say, 'We know it's wrong, the question is to what degree.'  Because I used to laugh at, like, Fannie Mae and Freddie Mac's forecasts every year because of just how wildly incorrect they'd be. . . .  [I]t's just because guessing the future is so hard.  So [] I would say [] the further you got out, guessing for a year was almost impossible."  (Ex. 24 86:5-17; *see id.* at 99:9-100:1.)

- **Brown:**  "This business is very difficult to predict. . . .   [I]t involves

knowledge of many things that we don't really know what would happen, like the overall mortgage market size, primary-secondary spreads, consumer demand, the competitive landscape, interest rates, all of those things go into it. . . . When you're only 45 days through the year and you have 300 and some days to go, in this business you don't really know what will happen. . . . [Y]ou'll be wrong. The only question you should ask yourself is how wrong you'll be." (Ex. 25 49:12-51:15, 85:18-86:1; *see id.* 89:2-18, 125:15-21.)

- **Emerson:** "[M]y experience in [] this business in 30 years is [] you really can't with any accuracy, forecast out beyond the quarter that you're in. And anything beyond that is just, you know, a guess." (Ex. 22 299:23-300:2.)

- **Farner:** "[W]e've had this happen multiple times—you set one strategy early in the year and you have to pivot and completely change that strategy as you get into the year, because you [] cannot rely on a guesstimate of what might occur as the year goes on. . . . I did not feel it was relevant to me to look at these long-term forecasts, again, because my experience told me that it's anybody's guess as to what will happen." (Ex. 23 111:14-19, 163:1-10.)

Yet again, Plaintiffs have no evidence to the contrary. In fact, Trickey testified that it is impossible to predict even the basic direction (up or down) that interest rates would move in the span of 24 hours, let alone pinpoint where rates will be weeks or months in the future. (Ex. 29 54:3-57:22, 254:15-22; *see* Ex. 13 ¶ 25 ("no indication" whether the upward trend in rates would continue).) Indeed, the annual closed loan volume number in the Board presentation of $300 billion was off by $50 billion—Rocket's actual 2021 volume was $351 billion. (Ex. 59 at 12.)

In addition, because neither public data nor conclusions drawn from public data constitute MNPI, Plaintiffs must prove that the projection was revised based on an analysis of *nonpublic* information about the company, as opposed to *public* data. *See, e.g.*, *Heinze* v. *Tesco Corp.*, 971 F.3d 475, 481-82 (5th Cir. 2020). In sustaining

the Complaint, the Court accepted Plaintiffs' allegation that discovery would show that "Rocket's forecasted [GOSM] would have been calculated based on numerous nonpublic factors that only Rocket insiders could know." *Shupe*, 660 F. Supp. 3d at 689. But, at summary judgment, Plaintiffs have no such evidence.

To the contrary, Rocket's 30(b)(6) witness testified that while the internal projections for the current quarter (*i.e.*, Q1 2021) were based on "actual performance" data, "anything beyond that doesn't have any real data to support. There is no real data that would give us any indication of what the second quarter would be like, even [] less data for the third and fourth." (Ex. 22 306:11-307:3.) And the March 23 Board minutes show that company forecasts were driven by public macroeconomic data (the "10-year treasury yield," the "compress[ing] [] primary-secondary spread," and the fact that the "Mortgage Bankers Association is forecasting an 80% decrease in refinance from QI to Q4 of 2021"). (Ex. 58 at 6.) As Trickey opined, anyone following Rocket's performance knew that its GOSM "tracked the movements in the primary-secondary spread, with about a 30-day lag time" (Ex. 17 ¶ 187), meaning that the key factor for predicting Rocket's GOSM was one's views about how the primary-secondary spread (a public data point) would move in 2021, which was anyone's guess. *See, e.g.*, *Freeman* v. *Decio*, 584 F.2d 186, 199-200 (7th Cir. 1978) (company's "prediction[]" not MNPI because the "facts" about rising lumber prices underlying the projection were "public[ly"

availab[le]"); *cf. In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 402 (6th Cir. 1997) (company's views on significance of FDA warning letter not MNPI because "any analyst could . . . make an independent judgment of its significance").

### B. Plaintiffs Have No Evidence That the Stock Sale Was Motivated by Material Nonpublic Information.

Scienter requires "intent to deceive, manipulate, or defraud," which turns on the insider's "motivation" for the stock sale. *Dirks* v. *SEC*, 463 U.S. 646, 664 n.23 (1983). Although the timing of the stock sale six days after the March 23 Board presentation supported a pleading-stage inference that Gilbert "learn[ed] adverse facts about Rocket's key performance indicators" at that meeting and decided to sell stock as a result, *Shupe*, 660 F. Supp. 3d at 682, 686, here too discovery has shown otherwise: Gilbert had no involvement in the stock sale, and the sale was long planned and in no way motivated by a revision to Rocket's internal annual projections or anything else presented at the March 23 Board meeting.

The idea to sell stock did not appear like a bolt from the blue after the March 23 Board meeting, as Plaintiffs alleged in order to allow this claim to proceed to discovery. *See Shupe*, 660 F. Supp. 3d at 682, 686. Rather, as it became clear that the August 2020 IPO would not meet its goal of raising roughly $3 billion, the decision was made to sell additional stock. The record demonstrates that between the IPO and the stock sale seven months later on March 29, 2021, Farner and Elkins continuously looked for opportunities to sell. (*See supra* 14-18.) As Farner testified

and the contemporaneous record shows, he was in no rush to sell and was emphatic that he would only authorize a sale at a price in the mid-$20s, given his belief that the stock was undervalued throughout fall 2020 and winter 2021.  (Ex. 23 255:2-256:21; Ex. 20 148:24-149:1, 176:18-177:1, 294:14-295:3, 346:4-348:7.)[17]

The timeline of events in March 2021 conclusively refutes Plaintiffs' theory. As Rocket's stock price began to stabilize in the mid-$20s range following the February 25, 2021 announcement of 2020 earnings:

- On March 1, 2021, Farner asked about a secondary offering, and he, Elkins, and others discussed preparing for a stock sale if the price was fair.[18]

- On March 10, 2021, Elkins approached Farner with the idea for a $500 million block sale, and Farner instructed Elkins to "be ready to pull the trigger" if a sale opportunity arose.  (Ex. 54.)

- On March 11, 2021, Elkins asked Rocket's internal lawyers, outside counsel at Paul Weiss, and finance personnel to undertake preparations for a potential sale.  (Ex. 56.)

- On March 22, 2021, after completing due diligence with Paul Weiss's assistance, Rocket's General Counsel and Audit Committee opened Rocket's trading window for two days for a potential sale of Rocket stock on March 23 or 24, 2021.  (Ex. 57; Ex. 60.)

---

[17]   Indeed, after RHI filed a confidential prospectus for a secondary offering in November 2020 (Ex. 46), Farner declined to approve the offering because he believed Rocket's stock price did not reflect Rocket's value (Ex. 47).  Farner's statement on March 3 that Gilbert "had not sold shares" to that point because he believed in the long-term value of the company was also true and consistent with these facts.  *See Shupe*, 660 F. Supp. 3d at 681-82.

[18]   Ex. 51 (3/1/2021 Farner text asking Elkins about a "[s]econdary"); Ex. 52 (3/1/2021 Elkins text that Morgan Stanley would buy "$500 m at $2 below where shares are trading," but that Farner "wants to wait for a higher price").

And after RHI had gone through this lengthy process of consulting with outside advisors, including an outside law firm, conducting due diligence to ensure compliance with Rocket's insider trading policy, and obtaining approval from the independent members of the Audit Committee, Farner declined to sell on March 23 or 24—after he had supposedly learned MNPI about Rocket's GOSM projection—because he continued to believe the market price was too *low* and did not reflect the fair value of the company.  (Ex. 60.)  This is the exact opposite of Plaintiffs' theory that Farner sought to sell due to a "sharply declining" projection he learned on March 23.  (ECF 109, PageID.8537 ¶ 279.)  A March 24 text exchange made this explicit:

> **Elkins:**  Julie [Booth] called to get my thoughts on selling shares in RKT—told her unlikely at these price levels (+ we'd have to take a discount)—and she's going to call you to discuss.
>
> **Farner:**  I'll sell if we can net $22
>
> **Elkins:**  Going to be close.  Stock is at $23.31 and MS [Morgan Stanley] preliminarily told us $2 discount last time.
>
> ***Farner:  Well let's ho[p]e the stock price goes up.  Otherwise f[*]ck it.***

(Ex. 60.)  As a result, the trading window that opened on March 22 closed without a stock sale.  The undisputed record shows instead that the sale occurred on March 29 because Rocket's stock price unexpectedly spiked due to the "unusual market conditions" created by Archegos's collapse.  (Ex. 15 ¶ 105; *see supra* 17-18.)

Were these facts not clear enough, Farner testified unequivocally that the revision to the annual projections presented to the Board on March 23 did not

motivate his decision to authorize the stock sale because the mortgage market is so unpredictable that he would never rely on an annual projection in the first place. (Ex. 23 111:17-113:15, 274:7-10.)  Farner elaborated that "there's just no way, on March 23rd, you could be predicting what is going to happen in most of Q2, let alone Q3 and Q4," especially given the unprecedented circumstances at that time.  (Ex. 20 234:21-235:7, 236:24-237:12.)  Thus, the annual projection did not "cross [his] mind when thinking about selling."  (*Id.* 343:20-344:9, 360:13-361:24.)[19]  Other senior leaders at Rocket confirmed that they, too, never relied on annual projections to run the business.[20]  Nothing in the record contradicts that testimony.

At the pleading stage, the Court relied on two allegations to support an inference of scienter, both of which the discovery record now refutes.  *First*, the Complaint alleged that "Farner" personally, "rather than Rocket's General Counsel,"

---

[19]  Farner made the same point repeatedly.  (Ex. 23 77:18-23 ("I don't know where interest rates are going.  No one does.  So spending a lot of time thinking about that is not going to be beneficial."); *id.* 82:5-9, 96:21-24 ("[I]t is incredibly challenging to do projections . . . , because you have so little control over the economy, which is what's driving housing markets, interest rates. . . .   [W]e would take Fannie's forecasts, MBA forecasts.  They were all over the board, and so, eventually, you say to yourself, no one can predict what's going on here, so let's not worry about it.").)

[20]  Ex. 19 97:5-8 (Gilbert:  "[W]e don't take much credence in annual projections because . . . interest rates can fluctuate daily."); Ex. 22 299:24-300:2 (Emerson: "[Y]ou really can't with any accuracy, forecast out beyond the quarter that you're in.  And anything beyond that is just, you know, a guess."); Ex. 25 125:15-19 (Brown:  "[A]s a preparer of this document as someone who presented to the board, I would not agree that I think this is going to happen or expect this is going to happen, because in reality I don't know what will happen."); Ex. 24 99:9-100:1 (Walters).

approved the stock sale, which "strongly infers scienter." *Shupe*, 660 F. Supp. 3d at 682. In fact, Rocket's General Counsel, supported by his Deputy General Counsel and the law firm Paul Weiss, conducted diligence and then approved the sale (with the share exchange and prior window opening also approved by the independent members of Rocket's Audit Committee). (*Supra* 15-18.)

*Second*, the Court questioned why, "[i]f Gilbert was already planning to sell Rocket stock—rather than reacting to learning adverse facts about Rocket's key performance indicators" at the March 23 Board meeting—he did not "avoid the difficulty by selling during the open trading window mere days earlier?" *Shupe*, 660 F. Supp. 3d at 682. The record shows that the plan to sell the shares *was* initiated during the open window on March 10, but RHI needed to go through a process to convert the shares, obtain required approvals, and negotiate with its banks. (*Supra* 15-18.) It was only because this process had already been completed that RHI was in a position to take advantage of the unexpected market opportunity presented by the Archegos collapse on March 29, 2021.

## III.   Summary Judgment Is Warranted on the Control Person Liability Claim Against Gilbert.

The Court should grant summary judgment to Gilbert on the claim that he "controlled" Farner's challenged statements and decision to authorize the March 29 stock sale on RHI's behalf. (ECF 109, PageID.8557-60 ¶¶ 343-54.) *First*, as discussed, there is no triable issue that Farner is liable for a misstatements claim or

that RHI is liable for an insider trading claim, and thus summary judgment is warranted on the control person liability claim against Gilbert.[21] *Second*, Plaintiffs must prove that Gilbert "possessed the power to control the transaction or activity upon which the primary violation is predicated." *In re Hayes Lemmerz Int'l, Inc.*, 271 F. Supp. 2d 1007, 1021 (E.D. Mich. 2003).  Gilbert was focused on rehabilitation from his stroke, and he was neither in the room when Farner made any of the challenged statements nor involved in any of the prep meetings for the earnings call and appearances.  (*Supra* 10-14.)  And Gilbert plainly had no "meaningful control over what words came out of [Farner's] mouth" when he responded to questions extemporaneously during an earnings call, at a Morgan Stanley conference, and during a TV interview.  *Murphy*, 2020 WL 4040827, at *25.  Nor did Gilbert exert any control over the March 29 sale, which he did not even know had occurred until after the fact.  (*Supra* 14.)  Thus, the claim must be dismissed.

## CONCLUSION

The Court should grant summary judgment to Defendants on all claims.

July 16, 2024                                      Respectfully submitted,

*/s/ Nick Gorga*                                  */s/ Jeffrey T. Scott*
Nick Gorga (P72297)                       Jeffrey T. Scott (N.Y. 2890374)
HONIGMAN LLP                              SULLIVAN & CROMWELL LLP

(Additional counsel listed on cover)      (Additional counsel listed on cover)

*Counsel for Rocket Companies, Inc.*      *Counsel for Rock Holdings Inc., Jay Farner, and Daniel Gilbert*

---

[21] For this reason, summary judgment is warranted for all Defendants on this claim.

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2024, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all parties of record, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:  None.

Respectfully submitted,

*/s/ Jeffrey T. Scott*
Jeffrey T. Scott (N.Y. 2890374)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000

*Counsel for Defendants Rock Holdings Inc.,*
*Jay Farner, and Daniel Gilbert*

July 16, 2024