# Exhibit 19

Docusign Envelope ID: 77464976-684C-47F3-805C-2B2608D34AEA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

|  |  |
|---|---|
| CARL SHUPE and CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>v.<br><br>ROCKET COMPANIES, INC., JAY D. FARNER, DANIEL GILBERT and ROCK HOLDINGS INC.,<br><br>     Defendants. | No. 21-cv-11528<br><br>Honorable Thomas L. Ludington<br>District Judge<br><br>Honorable Anthony P. Patti<br>Magistrate Judge |

## <u>DECLARATION OF DANIEL GILBERT</u>

I, Daniel Gilbert, hereby declare as follows:

1.    I am over the age of 18 and currently reside in the United States.

2.    On November 29, 2023, I was deposed under oath in *In re Rocket Companies, Inc. Stockholder Derivative Litigation*, No. 2021-1021-KSJM (Del. Ch.) (the "Delaware Action"). Attached hereto as <u>Exhibit A</u> is a true and correct copy of a transcript of my deposition testimony in the Delaware Action.

3.    I have reviewed the transcript of my deposition testimony in the Delaware Action and aver that my testimony was truthful, complete, and based on my personal knowledge.

4.      I understand that I may be called upon to testify under oath at trial in *Shupe* v. *Rocket Companies, Inc.*, No. 21-cv-11528 (E.D. Mich.) (the "Michigan Trial"). If I were called upon to testify in the Michigan Trial and asked the same or substantially the same questions as I was asked at my deposition in the Delaware Action, I would offer in response the same or substantially the same testimony as I offered during my deposition.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in the United States on
July 16, 2024

DocuSigned by:

*Daniel Gilbert*

AACFB68F6D2C484...

Daniel Gilbert



**In the Matter Of:**

*In Re: Rocket Companies Inc. Stockholder Derivative Litigation*

*DANIEL GILBERT*

*November 29, 2023*

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CONSOLIDATED CA NO. 2021-1021-KSJM

-------------------------------------------------

IN RE ROCKET COMPANIES, INC.

STOCKHOLDER DERIVATIVE LITIGATION

-------------------------------------------------

CONFIDENTIAL - DISCOVERY MATERIAL UNDER PROTECTIVE ORDER

TESTIMONY OF DANIEL GILBERT

1 CAMPUS MARTIUS, DETROIT, MICHIGAN

NOVEMBER 29, 2023 - 11:22 a.m. EST

JOB NO. 919538

**2**

1  NOVEMBER 29, 2023
2  11:22 A.M. EST
3
4  DEPOSITION of DANIEL GILBERT, before
5  Laura Steenbergh, Certified Court Reporter,
6  Certified Realtime Reporter, and Notary Public
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**3**

1  COUNSEL FOR PLAINTIFF:
2  BY - VIVEK UPADHYA, ESQ.
3     MICHAEL BARRY, ESQ.
4     LAWRENCE KEMPNER, ESQ. (Via Zoom)
5  GRANT & EISENHOFER, P.A.
6  123 Justison Street
7  Wilmington, Delaware 19801
8
9  BY - LEE SQUITIERI, ESQ. (Via Zoom)
10  SQUITIERI & FEARON, LLP
11  305 Broadway, 7th Floor
12  New York, New York 10007
13
14
15
16
17
18
19
20
21
22
23
24

**4**

1  COUNSEL FOR NOMINAL DEFENDANT ROCKET COMPANIES:
2  BY - ADAM SLUTSKY, ESQ.
3  GOODWIN PROCTOR
4  100 Northern Avenue
5  Boston, Massachusetts 02210
6
7  COUNSEL FOR DANIEL GILBERT AND ROCK HOLDINGS, INC.:
8  BY - JEFFREY SCOTT, ESQ.
9  SULLIVAN & CROMWELL
10  125 Broad Street
11  New York, New York 10004-2498
12
13  BY - JEFFREY B. MORGANROTH, ESQ.
14  MORGANROTH & MORGANROTH, PLLC
15  344 Old Woodward Avenue
16  Birmingham, Michigan 48009
17
18  ALSO PRESENT:    Brandon Vosburgh - Videographer
19                   Brian Smith - Zoom Videographer
20
21
22        *    *    *    *
23
24

**5**

1         TABLE OF CONTENTS
2
3  Witness                        Page
4  DANIEL GILBERT
5  EXAMINATION BY MR. BARRY:            8
6
7
8         INDEX TO EXHIBITS
9      (Exhibits attached to transcript)
10
11
12  Exhibit                        Page
13  GILBERT EXHIBIT 1 Org Chart - Rocket Delaware      11
14  00037523
15  GILBERT EXHIBIT 2 Email/Presentation - Rocket      17
16  Delaware 00036686
17  GILBERT EXHIBIT 3 Insider Trading Policy - Rocket      28
18  Delaware 00064847
19  GILBERT EXHIBIT 4 3/1/21 Email - Rocket Delaware      45
20  00070799
21  GILBERT EXHIBIT 5 2/8/21 Email with Attachment      47
22  GILBERT EXHIBIT 6 2/26/21 Email - Rocket Delaware      51
23  00087551
24  GILBERT EXHIBIT 7 3/26/21 Email - Rocket Delaware      58
25  00025592

**6**

1  GILBERT EXHIBIT 8 Defendant's Responses and          61
2  Objections to Plaintiff's Second Set of
3  Interrogatories
4  GILBERT EXHIBIT 9 Text - Rocket Delaware 00097663    66
5  GILBERT EXHIBIT 10 Notice of Exchange - Rocket       69
6  Delaware 00037803
7  GILBERT EXHIBIT 11 3/23/21 Rocket Companies, Inc.    72
8  Board of Directors Meeting Minutes
9  GILBERT EXHIBIT 12 3/22/21 Audit Committee Meeting   74
10 Minutes - Rocket Delaware 00065027
11 GILBERT EXHIBIT 13 Email and Document - Rocket       82
12 Delaware 00076347
13 GILBERT EXHIBIT 14 3/23/21 Finance Overview -        87
14 Q1 2021 Board Meeting - Rocket Delaware 00086838
15 GILBERT EXHIBIT 15 Email and Attachment -            98
16 Rocket Delaware 00025566
17 GILBERT EXHIBIT 16 5/5/21 Email and Attachment -    110
18 Rocket Delaware 00075416
19 GILBERT EXHIBIT 17 5/6/21 Email with Attachment -   116
20 Rocket Delaware 00000635
21
22
23
24
25

**7**

1       THE VIDEOGRAPHER: Good morning. Today is
2  Wednesday, November 29th, 2023, and we are going on the
3  record at 11:22 a.m. Eastern Standard Time. This marks
4  the beginning of Media Unit Number 1 in the video
5  recorded deposition of Mr. Dan Gilbert. This deposition
6  is being held at Rocket Central, 1 Campus Martius,
7  Detroit, Michigan, 48226.
8       My name is Brandon Vosburgh, the official
9  legal videographer, and our court stenographer is Laura
10 Steenbergh, in association with Lexitas.
11      Counsel, please identify yourselves for the
12 record and whom you represent, and then we will have our
13 court stenographer swear in the witness.
14      MR. BARRY: This is Michael Barry, I represent
15 the plaintiffs, I'm from Grant & Eisenhofer, in
16 Wilmington, Delaware.
17      MR. UPADHYA: Vivek Upadhya, from Grant &
18 Eisenhofer, for the plaintiffs.
19      MR. MORGANROTH: Jeffrey Morganroth, on behalf
20 of Rock Holdings, Inc. and Daniel Gilbert.
21      MR. SCOTT: Jeffrey Scott, from Sullivan &
22 Cromwell, on behalf of Mr. Gilbert and Rock Holdings,
23 Inc.
24      MR. SLUTSKY: Adam Slutsky, from Goodwin

**8**

1  Proctor, for the Nominal Defendant Rocket Companies.
2       DANIEL GILBERT,
3  having first been duly sworn, was examined and testified
4  on his oath as follows:
5       MR. BARRY: Mr. Gilbert, it's nice to meet
6  you. As I said, I'm Michael Barry, from Grant &
7  Eisenhofer, I represent the plaintiffs in this
8  litigation. Thank you very much for your time today.
9       THE WITNESS: Sure.
10 EXAMINATION BY MR. BARRY:
11 Q.  Before we get started, have you ever been deposed
12     before?
13 A.  Yes.
14 Q.  So I will skip a lot of the formalities, other than just
15     to remind you that all of your answers have to be
16     verbal. We're video recording it, but she's
17     transcribing things.
18 A.  Yeah.
19 Q.  If you need to take a break at any time, and for however
20     long, you just let us know and we'll accommodate you.
21 A.  Sure.
22 Q.  I'll just ask that if there's a question pending we
23     answer the question before we go on the break.
24       Is there any reason you can't testify

**9**

1  truthfully today?
2  A.  No.
3  Q.  Are you on any medications that would impair your
4      judgment –
5  A.  No.
6  Q.  – or your ability to testify truthfully?
7  A.  No.
8  Q.  Thank you.
9       What did you do to prepare for the deposition
10     today?
11 A.  Nothing. I mean, we – my counsel and myself have had
12     just a few verbal discussions about what it's about in
13     general, but no – no specific kind of issues or
14     anything.
15 Q.  How many times did you have such discussions?
16 A.  I think, what, twice maybe.
17 Q.  When did they take place?
18 A.  Late last week was one of them. And I think there was
19     some discussion maybe the week before where we just, in
20     broad strokes told me how long it's going to be, where
21     we're going to be.
22       MR. MORGANROTH: Don't – okay. Don't talk
23     about our discussion. You can just talk about when and
24     how long.

10

1       THE WITNESS: Okay.
2  BY MR. BARRY:
3  Q.  Were they in person or by video or by telephone?
4  A.  I think one was by telephone, one was in person.
5  Q.  Was anybody else there, in the -- when it was in person?
6  A.  Not that I recall.
7  Q.  On the telephone, was anybody else on the phone?
8  A.  No.
9  Q.  Okay. In connection with those meetings did you review
10     any documents?
11 A.  No.
12 Q.  So I'm going to, just for purposes of today, we're going
13     to -- there's a lot of different Rocket entities.
14 A.  Sure.
15 Q.  So when we talk about Rocket -- Rocket, Inc., I'll refer
16     to Rocket. If I'm going to talk about Rock Holdings,
17     I'll refer to RHI.
18 A.  Okay.
19 Q.  If I talk about the Gilbert Family Foundation I'll refer
20     to it as the foundation, or GFF, okay?
21 A.  That's fine, sure.
22 Q.  Okay. I'm going to introduce as Exhibit Number 1 an
23     organizational chart, which has been produced at Rocket
24     Delaware 00037523.

11

1       GILBERT EXHIBIT 1
2       Org Chart - Rocket Delaware 00037523
3       WAS MARKED BY THE REPORTER
4       FOR IDENTIFICATION
5  BY MR. BARRY:
6  Q.  Have you ever seen this document before?
7  A.  This specific document, no.
8  Q.  Okay. The specifics of the document don't matter so
9      much. My question is I want to use it as a kind of --
10     to help frame the questioning. So we have Rock
11     Holdings, Inc. at the top left corner, a Michigan
12     corporation. Who are the owners of RHI?
13 A.  I mean, there's multiple shareholders of RHI, probably
14     about 30 or 40.
15 Q.  30 or 40. And what is the relationship among the
16     shareholders?
17 A.  A lot of them are employees.
18 Q.  Okay. Employees of what?
19 A.  Of what is now Rocket Companies.
20 Q.  Okay. What percentage of RHI do you own or you control
21     beneficially?
22 A.  It's about 75, I think.
23 Q.  And other than employees and you, are there any other
24     stockholders of RHI?

12

1  A.  There's a handful of outside shareholders, friends and
2      family.
3  Q.  And what percentage would they own of RHI?
4  A.  Under 10.
5  Q.  Does RHI have any employees itself?
6  A.  No, not that I'm aware of.
7  Q.  How are decisions made at RHI?
8       MR. MORGANROTH: Objection as to form.
9  BY MR. BARRY:
10 Q.  You can answer the question.
11      MR. MORGANROTH: You can answer, if you can.
12      THE WITNESS: I generally make most decisions,
13     but Matt Rizik is involved a little bit, but I think I
14     make most decisions. They bring those -- they bring
15     issues to me.
16 BY MR. BARRY:
17 Q.  So let's look at the second page of the document, the
18     exhibit. It identifies directors and officers of RHI.
19      Do you see that?
20 A.  Yes.
21 Q.  What are the responsibilities of the officers of RHI?
22      MR. MORGANROTH: Objection as to form.
23      THE WITNESS: You said the responsibilities of
24     the officers?

13

1  BY MR. BARRY:
2  Q.  Yes. Do they have any responsibilities on a day-to-day
3      basis?
4  A.  No. I mean, this is a holding company, it's not really
5      an operating business.
6  Q.  Okay. During the 2020 to 2021 time frame did you have
7      regular communications with any of the directors or
8      officers of Rock Holdings, Inc.?
9       MR. MORGANROTH: Objection as to form.
10      THE WITNESS: Want me to answer the question?
11      MR. MORGANROTH: Yes.
12      THE WITNESS: Can you repeat it, please?
13      MR. BARRY: Could you read it back?
14      (Record repeated as requested)
15      THE WITNESS: Yes, I did. But it wasn't in
16     relation to really the holding company and Rock
17     Holdings, Inc., it would be more in relationship to the
18     operating businesses, which some of the officers and
19     directors also are officers and directors of those
20     companies.
21 BY MR. BARRY:
22 Q.  Okay. So what was your -- what methods or means of
23     communications did you use with those individuals?
24 A.  It would be either in person or on the telephone.

Confidential                    Daniel Gilbert - November 29, 2023

---

14

1  Q. Did you use email?
2  A. No.
3  Q. Do you use texting?
4  A. I would probably once in a while text with them, but
5     it's mostly in person, we would have scheduled meetings
6     maybe every other week. Then there would be some times
7     I'd just be in the office and bump into them or talk
8     though them, bring them aside or something. Although in
9     that time frame I was in heavy recovery from my stroke
10    that I had in 2019, so I was in the office a lot less.
11 Q. This is in the middle of – April – this is the – the
12    pandemic was still going on back then, right?
13 A. Yes, I believe. '20 and '21, right?
14 Q. Yeah.
15 A. That sounds right, yep.
16 Q. So how often were people in the office in the spring of
17    2021?
18       MR. MORGANROTH: Objection as to form.
19       THE WITNESS: Well, it depends on who and
20    where they're working, because we had a lot of different
21    programs. Some people were on three days at home, two
22    days in the office, some it was the reverse. Some
23    people had to be in the office the whole time, some none
24    at all. It just depends on their function and what area

---

15

1  they were in.
2  BY MR. BARRY:
3  Q. Let's talk – let's shift and talk about the foundation.
4  A. Yeah.
5  Q. Does the foundation have any employees?
6  A. There's a handful of employees, yeah.
7  Q. About how many, do you know?
8  A. Well, now there's more than there was in that – are you
9     talking about in that time frame?
10 Q. Sure. Let's focus on the fall of 2020 to spring of
11    2021.
12 A. I think there was a handful of employees, probably three
13    or four.
14 Q. And did you have regular communications with those
15    employees?
16       MR. MORGANROTH: Objection to form.
17 BY MR. BARRY:
18 Q. At the time.
19       THE WITNESS: Do you want me to answer it?
20       MR. MORGANROTH: Yes.
21       THE WITNESS: Laura Grannemann was my point
22    person there.
23 BY MR. BARRY:
24 Q. And you had regular communications with Laura

---

16

1  Grannemann?
2        MR. MORGANROTH: Objection as to form.
3        THE WITNESS: I would say periodic, not
4     regular.
5  BY MR. BARRY:
6  Q. And how would you communicate with Ms. Grannemann?
7  A. The same way, either in person or on the telephone.
8  Q. Texting?
9  A. Once in a while.
10 Q. Email?
11 A. No. At least that I – I don't recall any emails. I
12    generally don't communicate on email.
13 Q. How was the decision to take Rocket public in 2020 made?
14       MR. MORGANROTH: Objection as to form.
15       THE WITNESS: Well, Jay Farner, Matt Rizik,
16    and Scott Elkins made the recommendation, and I – then
17    I agreed with it.
18 BY MR. BARRY:
19 Q. When was that?
20 A. We went public, I think, in 2020, so it must have been
21    the year before or six months before.
22 Q. Why did they make their – did they explain to you why
23    they were recommending that Rocket should go public?
24 A. Well, there's probably the regular reasons companies go

---

17

1  public. I mean, raising capital, potentially using the
2  stock for acquisitions, which I'm not sure we ended up
3  doing in the last few years, but we still have that
4  option now. Bring liquidity to the stock.
5  Q. Did they recommend any goals for the IPO?
6  A. Can you describe what you mean by goals?
7  Q. How much they wanted to raise in connection with the
8     IPO?
9  A. Yeah. In discussion with the investment bankers, the
10    idea was to raise 3 to 4 billion, maybe more, but the
11    price we were expecting to get per share was in the 22
12    to 24 range.
13 Q. Do you recall what you got?
14 A. I think it was around 18, so it didn't achieve the goals
15    that we were shooting for.
16 Q. Sure.
17       Let's introduce as Exhibit Gilbert 2 an email
18    and a presentation produced at Rocket Delaware 00036686.
19       GILBERT EXHIBIT 2
20       Email/Presentation - Rocket Delaware 00036686
21       WAS MARKED BY THE REPORTER
22       FOR IDENTIFICATION
23 BY MR. BARRY:
24 Q. Have you ever seen this email or the document attached

---

## 18

1   to it?
2   A. This is the 10-Q?
3   Q. No. Why don't you just take a look and flip through the
4   first couple pages if you want to. There's discussion
5   materials attached on the back end.
6   A. I don't recall seeing this specific email, no.
7   Q. Okay. Have you ever seen the discussion materials that
8   are attached?
9   A. I don't recall seeing these, no.
10   Q. Okay. These discussion materials, which are dated
11   October of 2020, they appear to contemplate a secondary
12   offering --
13   A. Yeah.
14   Q. -- by Rocket, is that correct?
15   A. Where are you looking, what page?
16   Q. Well, let's look at, for example, page seven of the
17   document.
18      MR. MORGANROTH: Numbered page 7?
19      MR. BARRY: Numbered page 7 of the attachment,
20   which starts Offering Overview, Section 2. If you flip
21   through those couple pages, it --
22      THE WITNESS: Can you repeat your question
23   again?
24

## 19

1   BY MR. BARRY:
2   Q. This document, these discussion materials, contemplate a
3   secondary offering by Rocket.
4      Do you see that?
5   A. Well, this is a thick document, I still don't see where
6   you're talking about.
7   Q. Okay. Let's flip back to -- go to 35, internal page 35
8   of the document, which is Appendix B, as in boy.
9      Do you see this?
10   A. I'm -- yeah.
11   Q. I'm sorry.
12   A. Page 3 --
13   Q. It says, Concurrent share repurchase with a secondary
14   offering.
15      Do you see that?
16   A. I see that, yeah.
17   Q. And the next page, it talks about concurrent share
18   purchase by Rocket. And it refers to, the first bullet
19   says, An offering concurrent with a share repurchase
20   provides an effective execution for a larger equity
21   monetization.
22      Do you see that?
23   A. Yes.
24   Q. So do you understand that this is talking about a

## 20

1   secondary offering by Rocket?
2      MR. MORGANROTH: Objection as to form.
3      THE WITNESS: That's what it looks like here,
4   yes.
5   BY MR. BARRY:
6   Q. Okay. In the fall of 2020, do you recall having any
7   discussions with anyone about a secondary offering by
8   Rocket?
9   A. Well, I can't tell you dates like that, but after the
10   IPO I talked to Jay Farner and Scott Elkins, and we
11   talked about the price that we got for the IPO and that
12   it was below what we were looking for, the capital was
13   not as such, and I gave them the green light to do a
14   secondary or block sales to get us to where we wanted to
15   be, but they would determine when and where and the
16   details of that.
17   Q. Okay. And if you flip to page 15 of the document,
18   internal page 15 of the document.
19      MR. MORGANROTH: Of the attachment.
20      MR. BARRY: Of the attachment, yes. I'm
21   sorry.
22   BY MR. BARRY:
23   Q. On the bottom left you see a little table that says
24   Achieving Parity With the IPO.

## 21

1      Do you see that?
2   A. Yes, I do see that.
3   Q. Okay. And this is what you were talking about, the
4   original IPO target of about $3 billion, the IPO
5   outcome, 100 million shares at $18 per share, and then
6   the price to achieve parity, 50 million shares, it says
7   $1.2 to $1.5 billion dollars between 22 to 30 stock
8   prices, right?
9   A. Are you talking about the blue shaded area?
10   Q. Yeah, the little blue shaded area, that's what you're
11   talking about?
12   A. Yes.
13   Q. So you said you gave them the green light to, let's --
14   explain what your green light was.
15   A. To potentially do a secondary offering or block sales
16   that would get us up to the original amount that we were
17   trying to raise.
18   Q. How did you determine the original amount you were
19   trying to raise?
20   A. We had discussions for six months before the IPO
21   probably, and said what would be, based on our financial
22   performance, what would be a reasonable multiple and,
23   you know, how much would that raise at various prices,
24   and then we just -- are you asking why 3 billion?

Daniel Gilbert - November 29, 2023

22

1   Q.  Yeah, why 3 billion.
2   A.  Well, most mortgage lenders fund their – the loans
3       temporarily on what we call warehouse lines of credit,
4       and in 2008 a lot of those banks kind of just pulled out
5       in the middle and didn't – and left mortgage companies
6       hanging dry, so if we could fund them all by – with our
7       own cash that would be a much safer way, so raising that
8       much capital would be very safe to keep it there in case
9       we needed to tap into that to fund our loans before we
10      sold them off.
11  Q.  Did Rocket Companies, Inc. make any money in connection
12      with the IPO?
13          MR. MORGANROTH:  Objection as to form.
14          THE WITNESS:  What do you mean by make money?
15  BY MR. BARRY:
16  Q.  Did cash that was raised through the IPO of Rocket
17      Companies stay with Rocket Companies?
18  A.  Well, some of it – I think we pushed up cash
19      periodically to RHI, so our CFO makes the determination
20      how much money is needed at Rocket Companies to operate
21      and how much should be pushed up to RHI.
22  Q.  Was the IPO achieved through the conversion of Class D
23      shares at RHI and selling common shares on the market
24      based on that – on those converted shares?

23

1   A.  I'm not that familiar with the technicalities of what
2       you're talking about, so I wouldn't know the answer to
3       that.
4   Q.  In connection with a secondary offering, when you gave
5       the green light, was the green light to sell common
6       shares of Rocket Companies, Inc. or to sell shares of
7       RHI?
8   A.  It was in the same format that the IPO was, whatever
9       that was, so if the IPO was – I think it was common
10      shares of Rocket Companies, if that's what it was, then
11      secondary would be the same.
12  Q.  So let's go back to the Morgan Stanley presentation.
13      And going back to page 3 – internal page 36 of the
14      presentation, and talking about the concurrent
15      repurchase by Rocket with shares sold to the market.
16      This is contemplating that Rocket would sell shares to
17      the market and at the same time purchase Class D shares
18      from RHI, right?
19  A.  Where are you looking?
20  Q.  Let's look at the left column.  There are two key
21      options to execute a share repurchase from Dan Gilbert.
22          Do you see that?
23  A.  Yes.
24  Q.  One, sell-down by Dan to the market with the concurrent

24

1       share repurchase by Rocket; or two, a privately
2       negotiated trade.
3           Do you see that?
4   A.  I do see it.
5   Q.  So in both situations, the concept of the secondary
6       offering is purchasing shares from you, correct?
7           MR. MORGANROTH:  Objection as to form.
8           THE WITNESS:  I don't see where this says
9       secondary offering for this paragraph here.
10  BY MR. BARRY:
11  Q.  Sure.  But this paragraph's just talking about a
12      concurrent repurchase in connection with any offering, a
13      concurrent repurchase from you in connection with any
14      offering that the company was going to be making, right?
15          MR. MORGANROTH:  Objection as to form.
16          THE WITNESS:  I've got to tell you, I just am
17      not that familiar technically with how this all works,
18      but a concurrent repurchase – I don't even know what
19      that means, a concurrent share repurchase by Rocket.  I
20      don't know what that means.
21  BY MR. BARRY:
22  Q.  Was there any discussion in the fall of 2020 of Rocket
23      selling shares, offering common shares to the public
24      without converting Class D shares from RHI into common

25

1       for purposes of such sale?
2   A.  Once again, I don't recall the technicalities of how
3       this works.
4   Q.  When you gave Mr. Farner the green light to – you said
5       either execute a secondary or privately negotiated
6       transaction.
7   A.  Yes.
8   Q.  What did you mean by that?
9           MR. MORGANROTH:  Objection as to form.
10          THE WITNESS:  Well, Morgan Stanley told us
11      from time to time there are large block sales that
12      become available, would that would be okay to supplement
13      a secondary market or in lieu of a secondary market if
14      it achieved our goals.  That's what we meant.
15  BY MR. BARRY:
16  Q.  Did you provide any restrictions on that green light to
17      Mr. Farner?
18  A.  What kind of restrictions are you referring to?
19  Q.  Any restrictions in terms of timing or amount.
20  A.  No.  I left that up to them because they're much closer
21      to it.  Scott Elkins is sort of internal investment
22      banker and point person, also Matt Rizik, who was
23      involved in a lot of our financial decisions, and Jay
24      Farner, who was the CEO, I let them determine that.

26

1  Q.  Were there any discussion or any restrictions put on --
2  let me scratch that.
3       Were there -- did you ever have any
4  discussions with them regarding the sale by Rocket
5  Companies, Inc. of common shares in a manner that would
6  dilute the ownership of RHI?
7  A.  Can you repeat the question again, please?
8  Q.  Did you have any discussions with them, with Mr. Farner
9  and his team, regarding the sale by Rocket Companies,
10  Inc. of common shares in a manner that would dilute the
11  holdings of RHI?
12       MR. MORGANROTH:  Objection as to form.
13       THE WITNESS:  I don't understand fully what
14  you're asking, but I don't think I had discussions on
15  what you're talking about.  I mean, I think all stock
16  sales dilute ownership if you're going to issue new
17  shares.
18  BY MR. BARRY:
19  Q.  And Rocket Holdings, Inc. -- Rocket Companies, Inc. had
20  common shares that were authorized that could be sold
21  without purchasing back Class D shares from RHI, right?
22  A.  I believe so, but I -- again, as I said earlier, I'm not
23  very familiar with the technicalities of how these
24  things go.

27

1  Q.  Do you know if there was discussions in the fall of 2020
2  about effecting a secondary offering or a block sale by
3  RHI that did not involve transferring cash raised from
4  such an offering or a block sale to RHI?
5  A.  Discussions with who?
6  Q.  Let me rephrase that question.  I think I said it wrong.
7       Were there any discussions in the fall of 2020
8  about a secondary offering or block sale by Rocket
9  Companies, Inc. that did not include any concurrent
10  repurchase or block sale by RHI?
11  A.  I can't dis -- recall the fall of 2020 and know what
12  discussions I had almost four years ago now, but I can
13  tell you that whatever the format or form was of the
14  IPO, that was -- that was how we would do a secondary or
15  a block purchase or sale.
16  Q.  So the secondary offering that was contemplated in these
17  Morgan Stanley materials did not happen in the fall of
18  2020, correct?
19  A.  I don't believe so.
20  Q.  Do you know why?
21  A.  No, I don't know why.  I just -- maybe the -- I left it
22  up to the people I stated earlier, but maybe they felt
23  the price wasn't there in the market.
24  Q.  Did anyone have any conversations with you about not

28

1  proceeding with it at the time?
2  A.  No, they didn't.  Again, my orders -- not my orders, but
3  my directives were that they had decision-making and
4  they were going to let me know after they made such
5  moves, which they didn't.  There was no secondary market
6  done, secondary offering done.
7  Q.  In the fall of 2020 RHI did have any pressing need for
8  cash?
9  A.  RHI itself?
10  Q.  Yes, RHI itself.
11       MR. MORGANROTH:  Objection as to form.
12       THE WITNESS:  RHI's not an operating business,
13  so it would not have a need for cash in itself.
14  BY MR. BARRY:
15  Q.  I'm going to get Exhibit 3, please.
16       GILBERT EXHIBIT 3
17       Insider Trading Policy -
18       Rocket Delaware 00064847
19       WAS MARKED BY THE REPORTER
20       FOR IDENTIFICATION
21  BY MR. BARRY:
22  Q.  Actually before we get into this exhibit I just want to
23  follow up on one final question on that.
24       So you said that the secondary offering or

29

1  block sale that you authorized on the green light was
2  going to be the same format as however the IPO was
3  executed, right?
4  A.  That would be my understanding of it.
5  Q.  Okay.  So if Rocket Companies, Inc. did not raise any
6  cash in connection with the IPO because the cash was
7  transferred to RHI, then what you were contemplating on
8  the secondary offering or block purchase is that also
9  Rocket Companies, Inc. would not raise any cash and that
10  such cash would be transferred to RHI, right?
11  A.  I'm sorry, you've got to repeat that question.
12  Q.  I understand.
13       MR. BARRY:  Could you read that back, please?
14       (Record repeated as requested)
15       THE WITNESS:  Well, post offering Rocket
16  Companies moved cash to RHI, it doesn't mean they didn't
17  raise cash in the offering.
18  BY MR. BARRY:
19  Q.  But the cash was given to RHI, which has its own
20  shareholders, right?
21       MR. MORGANROTH:  Objection as to form.
22       THE WITNESS:  No, the cash would be raised,
23  the company that went public was the company that raised
24  the cash, right.  Like I said earlier, from time to time

30

1   they pushed cash up to RHI.
2   BY MR. BARRY:
3   Q.  And the shareholders of RHI are different from the
4   shareholders of Rocket Companies, Inc.?
5       MR. MORGANROTH:  Objection as to form and
6   foundation.
7       THE WITNESS:  There's some that are common and
8   some that are different, right.
9   BY MR. BARRY:
10  Q.  Right.  And the ones that are -- the public shares,
11  they're different, the people will own -- who bought it
12  on the IPO, they don't own shares of RHI.
13      MR. MORGANROTH:  Objection as to form.
14      THE WITNESS:  I think they own some of RHI.
15  Probably six percent, eight percent, something like
16  that, I think.
17  BY MR. BARRY:
18  Q.  The document I just handed out is the insider trading
19  policy of Rocket Companies, Inc. produced at Rocket
20  Delaware 00064847.
21  A.  Okay.
22  Q.  Have you ever seen this document?
23  A.  Well, I don't recall specifically seeing it, but if it
24  went to the board then I'm sure I saw it.  Because I was

31

1   a board member.
2   Q.  Did you have any involvement in drafting this document?
3   A.  None.
4   Q.  Did you have any involvement in approving this document?
5   A.  If the board was asked to approve it, then I would have
6   been part of that.
7   Q.  Do you have any recollection of the board being asked to
8   approve it?
9   A.  I don't.
10  Q.  So this insider trading policy sets restrictions on the
11  ability of corporate insiders to sell securities of
12  Rocket Companies, Inc., right?
13  A.  That's what it looks like.  I haven't read it recently,
14  or I'm not sure if I ever read it.
15  Q.  Sure.  So let's look at the first paragraph under the
16  third line at the end.  It starts, It is intended to
17  ensure that all officers, directors, and team members of
18  the company comply with the applicable laws and
19  regulations concerning securities trading, commonly
20  known as insider trading.
21      Do you see that?
22  A.  No, I really don't see it.  The first paragraph?
23  Q.  The first paragraph on the -- I started in the second
24  sentence, which starts at the end of the third line.

32

1   A.  Sure.  Do you want to read that again?  It is intended
2   --
3   Q.  It is intended to ensure that all officers, directors,
4   and team members of the company comply with the
5   applicable laws and regulations concerning securities
6   trading, commonly known as insider trading.
7   A.  So what's your question?
8   Q.  So just, that's what -- so that was the purpose of the
9   insider trading policy, correct?
10  A.  Yes.
11      MR. MORGANROTH:  Objection as to form.
12      THE WITNESS:  Well, I think it was to cover
13  all insider trading.  I mean, I don't know if that's the
14  only specific reason for this document, but it was
15  probably to cover all insider trading policy.  This is a
16  -- I don't know how many page document here, but -- like
17  a 10-page document, so there's a lot more in here.
18  BY MR. BARRY:
19  Q.  Sure.  I'm just talking about the purpose, not the
20  specifics.  We can get into some of the specifics.  For
21  example, under Scope it says, This policy applies to the
22  company, its officers, directors, and team members,
23  collectively Rocket personnel.
24      Do you see that?

33

1   A.  Yes.
2   Q.  Okay.  It also applies to related parties in that same
3   paragraph, which would be the same restrictions applied
4   to each Rocket personnel spouse, minor children, et
5   cetera, collectively related parties, correct?
6   A.  Where is that, is that at the bottom?
7   Q.  It's the same paragraph.
8   A.  Is it at the bottom of it?  I don't see where --
9   Q.  Yeah.  Just keep reading.
10  A.  Okay.
11  Q.  All right.  So it applies to -- it defines Rocket
12  personnel and defines related parties, right?
13  A.  I still don't see it.
14  Q.  Okay.  The second sentence, let's read it, The same
15  restrictions described in this policy also apply to each
16  Rocket personnel's spouse, minor children, and anyone
17  else living in a Rocket personnel's household,
18  partnerships in which Rocket personnel are a general
19  partner, trusts of which Rocket personnel are a trustee,
20  estates of which Rocket personnel are an executor, and
21  investment funds or other similar vehicles with which
22  Rocket personnel are affiliated, collectively related
23  parties.
24  A.  You're talking about the next paragraph, not the first

34

1 paragraph.
2 Q. I'm talking about the paragraph under Scope.
3 A. Yeah.
4 Q. That's where it defines who the Rocket personnel are and
5   who the related parties are.
6 A. Yes, I see that.
7 Q. Okay. So you would be considered Rocket personnel,
8   correct?
9 A. I guess.
10 Q. Then Mr. Farner would be considered Rocket personnel,
11   right?
12 A. Yes.
13 Q. And RHI would be considered a related party under this
14   definition, right?
15 A. Where do you – how do you – I mean, what's the theory
16   of RHI being a related party? I don't really see –
17 Q. Do you think RHI is a related party or not a related
18   party?
19     MR. MORGANROTH: I'm going to object to form
20   and foundation.
21     THE WITNESS: To Rocket Companies?
22 BY MR. BARRY:
23 Q. To Rocket personnel.
24 A. It says Rocket personnel are – or trustee estates and

35

1 then executor investment funds or other similar vehicles
2 which Rocket personnel are affiliated, related parties.
3 I don't see where this paragraph says that a company
4 like RHI is related.
5 Q. So is it your position that RHI is not a related party
6 for purposes of the insider trade policy?
7     MR. MORGANROTH: Objection as to form and
8 foundation.
9     THE WITNESS: No, that is not my position. I
10 just don't see in this specific paragraph where it
11 defines the concept of the holding company being
12 related.
13 BY MR. BARRY:
14 Q. So let's look at, under Application, do you see where it
15   says Application?
16 A. Yes.
17 Q. It says, The company requires all Rocket personnel to
18   comply with applicable securities laws. Rocket
19   personnel and their related parties must never: Buy,
20   sell, or engage in transactions in company securities at
21   any time while aware of material non-public information
22   about the company.
23     Do you see that?
24 A. I see that, yes.

36

1 Q. So let's look at the next page. The first full
2   paragraph after the number 3 starts, Non-public
3   information is sometimes referred to as confidential
4   information and means information about the company that
5   is not known to the public at large.
6     Do you see that?
7 A. Yes. I do.
8 Q. And it continues, the next paragraph, it says,
9   Information is considered material if a reasonable
10   investor would consider it important in making an
11   investment decision.
12     Do you see that?
13 A. Yes, I do.
14 Q. We'll skip two sentences, and then its says, Examples of
15   material information include expected earnings or
16   revenues for a calendar period, as well as company
17   projections as to future earnings or revenues.
18     Do you see that?
19 A. Yes.
20 Q. Okay. So then the last paragraph in that page starts,
21   While in possession of material non-public information,
22   Rocket personnel and their related parties are
23   prohibited from trading in any company securities as to
24   which Rocket personnel and their related parties have a

37

1 beneficial or financial interest.
2     Do you see that?
3 A. Yes.
4 Q. Okay. You have a beneficial or financial interest in
5   shares held by RHI, correct?
6 A. Yes.
7 Q. Now, let's look at – skip to page four of the document.
8   It establishes something called a, it says something
9   called a trading window.
10     Do you see that?
11 A. No.
12 Q. The very top line on page four.
13 A. Okay.
14 Q. It says trading window. Do you see that?
15 A. Yes, I do.
16 Q. Do you know what this provision talks about?
17 A. I mean, it's five paragraphs, what specifically are you
18   talking about?
19 Q. Without reading it, do you know what this section is
20   about?
21 A. Well, I know what a trading window is.
22 Q. Okay. Do you know what this – do you know what the
23   trading window of Rocket Companies, Inc.'s insider
24   trading policy provided in the spring of 2021?

38

1  A. No. I would have to re-read this right now to give you
2     an answer to that.
3  Q. So let's -- we'll walk through it.
4        The first paragraph says, The company imposes
5     certain restrictions on specified senior officers,
6     management, directors, and team members and their
7     related parts when trading in company securities. These
8     restrictions govern, even though the transactions may be
9     permissible under law, and apply to the following
10    persons hereafter defined as the window group.
11       Do you see that?
12 A. Yes.
13 Q. There's four bullet points.
14 A. Yes, I do.
15 Q. It says, the first bullet point is all members of boards
16    of directors of the company, right?
17 A. Yes.
18 Q. And you were a member of the board of directors in the
19    spring of 2021?
20 A. Yes.
21 Q. So you're a member of the window group.
22 A. That appears to be the case.
23 Q. And the second bullet point says, All senior executives
24    of the company, meaning the chief executive officer, the

39

1     chairman, the chief financial officer, the president,
2     their specified direct reports, and any other officers
3     subject to Section 16 of the Securities Exchange Act of
4     1934.
5        Do you see that?
6  A. Yes.
7  Q. Mr. Farner is both a member of the board and a senior
8     executive at the company, correct?
9  A. Correct.
10 Q. So he's a member of the window group, right?
11 A. Yes.
12 Q. And that was true in the spring of 2021, right?
13 A. I don't know. What's the date of this document?
14 Q. The date of this document is August 5th, 2020 on the
15    first page.
16 A. Yeah. So I assume that would be the case, yep.
17 Q. So --
18 A. Is that referring to his personal shares here?
19 Q. This is talking about any trading in any securities of
20    the company.
21 A. Okay.
22 Q. Okay. So let's look at the third paragraph beginning
23    Notwithstanding.
24       Do you see that?

40

1  A. Third paragraph.
2        MR. MORGANROTH: Right here (indicating).
3        THE WITNESS: Okay. Yeah, I see that.
4  BY MR. BARRY:
5  Q. It says, Notwithstanding transactions made to an
6     approved 10b5-1 trading plan, members of the window
7     group and their household and immediate family members
8     may only enter into transactions in company securities,
9     including option exercises and gifts, during an open
10    trading window that commences one business day after the
11    public release of the company's quarterly or annual
12    financial results and ends on the date two weeks before
13    the end of each fiscal quarter.
14       Do you see that?
15 A. Yes, I do.
16 Q. Okay. So that is the trading window that's set up by
17    the insider trading policy, right?
18 A. Yes. Does this -- I don't see where this applies to the
19    company itself, though.
20 Q. I'm not there yet.
21 A. Okay.
22 Q. And then it continues, After the close of the trading
23    window, the window group and the respective household
24    and immediate family members may not purchase, sell, or

41

1     otherwise dispose of any of the company securities.
2        Do you see that?
3  A. Yes.
4  Q. Okay. Now, you're right, let's go to the next
5     paragraph. The next paragraph says, These restrictions
6     shall not apply with respect to a public offering of
7     company securities specifically authorized by board of
8     directors or Rocket Companies or duly authorized board
9     committee.
10 A. Yes.
11 Q. Do you see that?
12 A. Yes, I do.
13 Q. Okay. So the insider trading policy restricts trading
14    of the personal interests of the Rocket personnel or
15    related parties. It does not apply to an offering
16    directly by the company, right?
17 A. Yeah. I assume trading by the company as well, block
18    purchases or sales.
19 Q. So -- oh, I want to go back to the previous paragraph.
20    In the last two sentences it says, The prohibition
21    against trading while aware of or tipping of material
22    non-public information applies even during an open
23    trading window. For example, if during an open trading
24    window you are aware of material -- of a material

42

1  acquisition is pending, you may not trade in the company
2  securities.
3       Do you see that?
4  A. Not really, no.
5  Q. Okay. Let's start again at the sentence –
6       MR. MORGANROTH: Well, you're in the
7  notwithstanding –
8       MR. BARRY: I'm in the notwithstanding
9  paragraph, so –
10      MR. MORGANROTH: Hang on. Let me find that
11 for him.
12      MR. BARRY: Sure.
13      MR. MORGANROTH: I think it starts here, the
14 prohibition (indicating).
15      THE WITNESS: Okay. Go ahead.
16 BY MR. BARRY:
17 Q. Yeah. So it says, The prohibition against trading while
18 aware of or tipping of material non-public information
19 applies even during an open trading window. For
20 example, if during an open trading window you are aware
21 that a material acquisition is pending, you may not
22 trade in the company securities.
23 A. Yes.
24 Q. Right?

43

1  A. I see it.
2  Q. So under the terms of the trading policies, corporate
3  insiders are precluded from trading while in possession
4  of material non-public information, even if the trading
5  window is open, right?
6  A. Yes. That's what it says.
7  Q. And that would be true even if a trading window was
8  reopened, right?
9  A. I mean, I don't – I don't see where it says that, but,
10 you know, I – that's an assumption.
11 Q. So, but getting to this next paragraph, it says, The
12 restrictions shall not apply with respect to public
13 offerings of the company securities specifically
14 authorized by the board of directors or Rocket
15 Companies.
16      So that's talking about a direct offering by
17 the company, right?
18 A. Yeah.
19 Q. Okay. So – but a sale by a stock by you would be
20 covered by the insider trading policy, right?
21 A. A personal –
22      MR. MORGANROTH: Objection.
23      THE WITNESS: – sale?
24      MR. BARRY: Personal sale.

44

1       THE WITNESS: Yes. That appears to be the
2  case, yes.
3  BY MR. BARRY:
4  Q. Or a sale by – of your wife, Mrs. Gilbert, right?
5  A. Yes.
6  Q. Or any related party that is defined under the terms of
7  the insider trading policy, right?
8       MR. MORGANROTH: Objection as to form.
9       THE WITNESS: Well, you were asking me a
10 question about RHI being a related party or not earlier,
11 and you said that it, by the definition, is a related
12 party, and I didn't see where it covered that, but wife
13 and myself for sure.
14 BY MR. BARRY:
15 Q. And Mr. Farner?
16 A. Yes.
17 Q. Just to clear this up, you didn't, in the spring of
18 2021, you didn't have a 10b5-1 plan?
19 A. What is that?
20 Q. Are you aware of what a 10b5-1 plan is?
21 A. No.
22 Q. A 10b5-1 plan is a plan that is filed and approved with
23 the – or not filed publicly, filed with the company,
24 that establishes a plan by which you will sell

45

1  securities on a – on a predetermined basis?
2       MR. MORGANROTH: Objection as to form.
3       THE WITNESS: I don't recall having that plan
4  in place, no.
5  BY MR. BARRY:
6  Q. Okay. And do you know if RHI had a 10b5-1 plan in the
7  spring of 2021?
8  A. I don't recall that. I mean, would RHI need a 10b5-1
9  plan? I don't see where they would if it – I don't
10 think they had one.
11 Q. Okay. Exhibit 4.
12      GILBERT EXHIBIT 4
13      3/1/21 Email - Rocket Delaware 00070799
14      WAS MARKED BY THE REPORTER
15      FOR IDENTIFICATION
16      MR. MORGANROTH: Are you done with 3?
17      MR. BARRY: Yeah.
18 BY MR. BARRY:
19 Q. Exhibit 4 is an email dated March 1st, 2021, produced at
20 Rocket Delaware 00070799.
21      Have you ever seen this email?
22 A. I don't recall seeing this specific email, no.
23 Q. Okay. It says it's addressed to "Rocket Companies
24 Insiders".

46

1      Do you see that?
2  A.  Yes.
3  Q.  Do you know if you're included in the distribution of
4     Rocket Companies Insiders?
5  A.  I don't know, but I assume I am.
6  Q.  Do you know if Mr. Farner was included in the
7     distribution of Rocket Companies Insiders?
8  A.  I assume he would be.
9  Q.  So this email indicates that the trading window is now
10    open, the trading window will close when markets close
11    on Wednesday, March 17th.
12      Do you see that?
13  A.  Yes, I do.
14  Q.  Were you aware of the trading window when it was
15    reopened in March of 2021?
16  A.  No, I was not aware of that, that I remember.
17  Q.  But Mr. Farner would have been aware of it, right?
18      MR. MORGANROTH:  Objection as to form and
19    foundation.
20      THE WITNESS:  I think you'll have to ask Mr.
21    Farner, because I wouldn't know if he would know.
22  BY MR. BARRY:
23  Q.  I want to pivot a little bit and talk about -- this is
24    Exhibit 5 -- about a plan that you and the Gilbert

47

1    Family Foundation to provide a financial commitment to
2    the City of Detroit.
3  A.  Yeah.
4  Q.  In framing the discussion let's take a look at this.
5      GILBERT EXHIBIT 5
6      2/8/21 Email with Attachment
7      WAS MARKED BY THE REPORTER
8      FOR IDENTIFICATION
9  BY MR. BARRY:
10  Q.  Please take a look at this and the attachment.
11      MR. MORGANROTH:  Do you want him to read the
12    whole thing or --
13      MR. BARRY:  Just take a look through it, just
14    see if it --
15  BY MR. BARRY:
16  Q.  My question is, have you ever seen these documents
17    before?
18  A.  I don't recall, but I think it's -- my assistant is on
19    here, so I assume she gave it to me.
20  Q.  So let's -- well, do you know what these documents are?
21  A.  Well, it looks like it's talking about our in and outs
22    that we had about our gift to the City of Detroit.
23  Q.  Sure.  And this is dated, the first -- the email and the
24    first page attachment's dated February 18th, 2021,

48

1    right?
2  A.  Yep.
3  Q.  So when did you first come up with the idea of a
4    financial commitment for the City of Detroit?
5  A.  I couldn't tell you the date, but we discussed that for
6    years before this time frame.
7  Q.  So when did -- why did you discuss -- this refers to a
8    Detroit launch event.
9  A.  Yeah.
10  Q.  What was -- when was the first discussion about having
11    the launch event in Detroit, in February of 2021?
12  A.  I couldn't tell you exactly.  This is headed by Laura
13    Grannemann.  I don't know when she first started
14    thinking about a launch or not.
15  Q.  Well, this refers to, there was a meeting on February
16    18th.  Did you attend this meeting?
17  A.  Where were you looking?
18  Q.  The first page after the email.  Under Attendees, number
19    one.
20  A.  I don't recall attending the meeting, but I'm -- it
21    looks like, but based on this document I would have been
22    invited to it, I probably would have attended it.
23  Q.  So you don't know sitting here today if you actually
24    attended the meeting or if the meeting happened?

49

1  A.  I'm going to make an assumption that it did.
2  Q.  So do you recall being there?
3  A.  I don't specifically recall being there.  I go to
4    multiple meetings a day.  And this is three or four
5    years ago, so --
6  Q.  Sure.  So the next page refers to Gilbert Family
7    Foundation Announcement, Run of Show, March 25th, 2021.
8  A.  Okay.  Yep.
9  Q.  Explain the March 25th, 2021 date to me, please.  Why
10    was that chosen and when was it chosen?
11  A.  Why was March 25th chosen?
12  Q.  Yep.
13  A.  I couldn't tell you exactly why March 25th was chosen,
14    but --
15  Q.  So who chose it?
16  A.  I'm sure Laura organized it and decided that would be a
17    good date to do this.
18  Q.  Do you know why she chose that date?
19  A.  I don't.
20  Q.  Did you have anything to do with choosing that date?
21  A.  I don't think so.  I don't recall.
22  Q.  I'm sorry, what was the idea of what was going to be
23    announced on March 25th?
24  A.  We were going to announce a $500 million commitment that

50

1 would be deployed mostly in the neighborhoods of
2 Detroit, neighborhood initiatives.
3 Q. So if you look at page – flip two pages back and it
4 says, there's a big page that says Purpose.
5 A. Yes.
6 Q. And it says, Amplify the announcement of GFF investing
7 $500 million over 10 years for the residents of Detroit.
8 Is that what you're talking about?
9 A. I'm not sure why she put the word amplify, I'm not sure
10 what she means by that, but –
11 Q. So when's the first time – first of all, who decided to
12 make the $500 million commitment for the residents of
13 Detroit?
14 A. It would be my wife and myself.
15 Q. And when did you make that decision?
16 A. I don't – I could not recall exactly, but we had talked
17 about doing this commitment for Detroit for a long
18 period of time.
19 Q. So it was before February of 2021?
20 A. That we had initial discussions on it, yes.
21 Q. Was it before the IPO?
22 A. There were probably discussions for years.
23 Q. So when did you come up with the $500 million number
24 specifically?

51

1 A. I can't recall exactly, but it would have been sometime
2 within a couple years prior to this.
3 Q. So it was a couple years prior, so before the IPO you
4 came up with the $500 million number specifically?
5 A. Most likely at some point before, but I couldn't tell
6 you when.
7 THE VIDEOGRAPHER: Sir, could we go off the
8 record for one second?
9 MR. BARRY: Yes.
10 THE VIDEOGRAPHER: This marks the end of Media
11 Unit Number 1, we are off the record at 12:17.
12 (An off-the-record discussion was held)
13 THE VIDEOGRAPHER: This marks the beginning of
14 Media Unit Number 2, we're back on the record at 12:18.
15 BY MR. BARRY:
16 Q. Looking at Exhibit Number 6.
17 GILBERT EXHIBIT 6
18 2/26/21 Email - Rocket Delaware 00087551
19 WAS MARKED BY THE REPORTER
20 FOR IDENTIFICATION
21 BY MR. BARRY:
22 Q. Exhibit Number 6 is an email dated February 26th, 2021,
23 produced at Rocket Delaware 00087551.
24 Have you ever seen this document or the

52

1 attachment?
2 A. I've got to look through the attachment.
3 Q. Sure.
4 A. I don't recall seeing this, no.
5 Q. Or the attachment?
6 A. No.
7 Q. Okay. This refers to a CBS This Morning interview for
8 Tuesday, March 22nd, 2021.
9 Did that interview take place?
10 A. I don't recall exactly, but I assume it did.
11 Q. Do you remember having an interview with CBS Morning?
12 A. My personally?
13 Q. Yes.
14 A. No.
15 Q. Let's look on page two of the attachment under – it
16 says, Taking Points, GFF Announcement, The Basics.
17 A. Okay.
18 Q. First paragraph, number 1, says, The Rock Family of
19 Companies, through the Gilbert Family Foundation and
20 Rocket Community Fund, will be making a $500 million
21 commitment to supporting Detroit residents over the next
22 10 years. This commitment will be announced on March
23 25th.
24 That's the commitment we were just talking

53

1 about in the previous document, right?
2 A. Right.
3 Q. And it says, Reminder, 350 GFF, 150 Rocket Community
4 Fund, right?
5 A. That looks right.
6 Q. Why was it divided like that?
7 A. I don't know exactly. We wanted Rock Community Funds to
8 participate in this and Gilbert Family Foundation at
9 that time probably had a little bit more liquidity or
10 assets, and it was – it was more – I controlled it
11 more or owned it more, so –
12 Q. So how's the foundation, the GFF funded?
13 A. It's funded by capital I contribute to it.
14 Q. And how's the Rocket Community Fund funded?
15 A. That's by the company itself, Rocket Companies.
16 Q. So the commitment, this $500 million commitment, wasn't
17 contemplated as a one-time donation of cash to the city
18 that the city could use for whatever it wanted to do,
19 right?
20 A. I don't think any of it was directly to the city, that I
21 recall.
22 Q. But the – and the commitment, it was over a 10-year
23 plan, it wasn't for the spring of 2021.
24 A. Yes, that's correct. 15 million a year for 10 years.

Confidential                    Daniel Gilbert - November 29, 2023

---

**54**

1  Q. Yeah. So -- sorry, 50 million a year for 10 years is --
2  A. Yeah.
3  Q. So let's look at the next page, GFF Talking Points, GFF
4     -- I'm sorry, Talking Points, GFF Announcement --
5  A. Are we on page 3 or 2?
6  Q. This is -- it's not really --
7  A. Yeah, I see it.
8  Q. The second bullet, number 2, paragraph number 2, it
9     says, Each year at the beginning of the year the Gilbert
10    Family Foundation will make a large-scale investment to
11    support wealth building among families in Detroit and
12    Cleveland. We will then stay connected with those
13    families throughout the year to tailor additional
14    investments that will further support their economic
15    stability, right?
16 A. Yes.
17 Q. Okay. So neither the foundation nor the community fund
18    expected to donate $500 million to any particular or
19    specific entity in the spring of 2021, right?
20 A. I don't believe so.
21 Q. Or in the calendar year of 2021, right?
22 A. 50 million during that calendar year.
23 Q. Okay. What was the plan for the 50 million in the
24    calendar year 2021?

---

**55**

1         MR. MORGANROTH: Objection as to form.
2         THE WITNESS: Well, I think it lays it out
3     right here on page -- is this page two or three? I
4     can't tell, there's no page numbers.
5         MR. BARRY: There's no page numbers.
6  BY MR. BARRY:
7  Q. What are you looking at?
8  A. Where it talks about 9.3, supporting access to digital
9     resources and increasing access to transportation,
10    pathways to employment, access to home repair resources.
11    Also we were paying off the back taxes of Detroiters as
12    well. I don't know why that's not in here. I don't see
13    it. It might be somewhere else.
14 Q. Okay. Now, this commitment, this $500 million 10-year
15    commitment, was not contingent on RHI selling any of its
16    shares of stock in Rocket Companies, right?
17 A. No, it wasn't contingent on it, but I was personally
18    trying to get liquidity for these kinds of things in
19    investments in real estate and other investments.
20 Q. But RHI did not need to sell any shares of stock of
21    Rocket Companies in the spring of 2021 in order to make
22    this $500 million 10-year commitment, correct?
23        MR. MORGANROTH: Objection as to form.
24        THE WITNESS: You said Rocket Holdings or

---

**56**

1     Rocket Companies?
2  BY MR. BARRY:
3  Q. Rocket Holdings. RHI did not need to sell any shares in
4     order for the Gilbert Family Foundation and the Rocket
5     Community Fund to make this commitment in the spring of
6     2021.
7  A. I don't think Rock Holdings really ever sells shares,
8     it's not a public company and --
9  Q. So RHI did not have to sell any shares in order for the
10    Gilbert Family Foundation and Rocket Community Fund to
11    make this commitment in the spring of 2021, correct?
12        MR. MORGANROTH: Objection as to form.
13 BY MR. BARRY:
14 Q. Correct?
15 A. Again, RHI doesn't sell shares, so I don't know how they
16    would even sell any shares to make this -- needed to
17    make this commitment.
18 Q. But it, therefore, did not need to sell any shares for
19    Rocket Community Fund -- or the Gilbert Family Fund or
20    the Rocket Community Fund to be able to make this
21    commitment, correct?
22        MR. MORGANROTH: Objection as to form.
23        THE WITNESS: Well, it didn't sell shares,
24    because it never sells shares, under any circumstances,

---

**57**

1     that I'm aware of.
2  BY MR. BARRY:
3  Q. Are you aware if RHI sold shares in connection with the
4     IPO?
5         MR. MORGANROTH: Objection as to form.
6         THE WITNESS: There might have been some
7     technical exchange that I'm not that up-to-speed on
8     between Rocket Companies and RHI, but I don't know the
9     details of that. But as far as them selling shares and
10    getting money for those shares, like, in the public or
11    elsewhere, I'm not aware -- I'm not aware -- they don't
12    do that.
13 BY MR. BARRY:
14 Q. Let me put it this way. The commitment that the Gilbert
15    Family Foundation and Rocket Community Fund were making
16    over a 10-year period was $500 million.
17 A. Correct.
18 Q. The $500 million was not contemplated to be paid in
19    calendar year 2021.
20 A. It was contemplated over time, as we discussed already.
21        MR. MORGANROTH: And I'm going to object as to
22    form, asked and answered.
23 BY MR. BARRY:
24 Q. So in the spring of 2021, RHI had almost $5 million in

---

58

1  cash on hand, correct?
2  A.  I'm not aware of the exact number.
3  Q.  Let's take a look at Exhibit Number 7, please.
4        GILBERT EXHIBIT 7
5        3/26/21 Email - Rocket Delaware 00025592
6        WAS MARKED BY THE REPORTER
7        FOR IDENTIFICATION
8        MR. MORGANROTH:  Do you want him to keep out
9  Exhibit 6 or –
10        MR. BARRY:  No.  You can put away Exhibit 6.
11  Thank you though.
12  BY MR. BARRY:
13  Q.  There is an email dated March 26th, 2021, produced at
14  Rocket Delaware 00025592.
15        Have you ever seen this document?
16  A.  I've got to look at it.
17  Q.  Sure.  And my apologies, it's not particularly easy to
18  read the attachment.
19  A.  This is our capital summary.  I think this is issued on
20  a biweekly basis or something like that.
21  Q.  So you're familiar with this document?
22  A.  Not this specific one, but the format of it.
23  Q.  Thank you.
24        If you look at the first page of the

59

1  attachment, which is Cash Summary, dated March 25th,
2  2021.
3  A.  Yeah, I see that.
4  Q.  On line 94, at the very bottom, it's very tiny, but it
5  says, Total RHI and other RHI entities, cash and cash
6  equivalents, and it's $4.9 billion?
7  A.  Yes.
8  Q.  Okay.  So in the spring of 2021 RHI had cash equivalents
9  of almost $5 billion, right?
10        MR. MORGANROTH:  Objection as to form.
11  BY MR. BARRY:
12  Q.  Right?
13  A.  According to this document it did, yes.
14  Q.  So at the time when you were talking about the $500
15  million commitment, you never told anyone that the $500
16  million commitment was contingent on RHI being able to
17  sell any shares, correct?
18        MR. MORGANROTH:  Objection as to form.
19        THE WITNESS:  Once again, RHI does not sell
20  shares.
21  BY MR. BARRY:
22  Q.  Do you know if RHI has ever sold shares?
23  A.  I don't believe it ever has, unless it was regarded
24  technically needed to be done in relation to the IPO.

60

1        MR. MORGANROTH:  And I'm going to object as to
2  form to your question.
3  BY MR. BARRY:
4  Q.  Let me put it this way.  If RHI wanted to transfer funds
5  to the foundation or the Rocket Community Fund to create
6  a cash fund of $500 million that could be set aside to
7  satisfy the commitment in the spring of 2021, RHI could
8  have done so without selling a single share of stock,
9  correct?
10        MR. MORGANROTH:  Objection as to form.
11        THE WITNESS:  It doesn't sell shares of stock,
12  but –
13  BY MR. BARRY:
14  Q.  It could have donated cash, correct?
15  A.  If it came directly from RHI.  But I don't think RHI had
16  any commitment to the fund or to the City of Detroit.
17  The GFF did and so did the Rocket Community Fund.
18  Q.  In 2021 though not a single dollar from the proceeds,
19  let's just be clear, from the proceeds of any sale of
20  shares by RHI were used to fund charitable purposes of
21  the $500 million commitment, right?
22        MR. MORGANROTH:  Objection as to form.
23        THE WITNESS:  Once again, RHI does not sell
24  stock, so they wouldn't have sold any stock to raise

61

1  money.
2        MR. BARRY:  This is going to be Exhibit 8.
3        GILBERT EXHIBIT 8
4        Defendant's Responses and Objections
5        To Plaintiff's Second Set of Interrogatories
6        WAS MARKED BY THE REPORTER
7        FOR IDENTIFICATION
8        MR. MORGANROTH:  They're both marked Exhibit
9  8.
10        MR. BARRY:  They're both Exhibit 8.
11        MR. MORGANROTH:  That's okay.  Yeah, I'm good.
12  BY MR. BARRY:
13  Q.  Sure.  Exhibit 8 are Defendant's Responses and
14  Objections to Plaintiff's Second Set of Interrogatories
15  Directed to Defendants Rock Holding, Inc. and Daniel
16  Gilbert.  And the second document, which is part of
17  Exhibit 8, is the verification.
18  A.  Okay.
19  Q.  So let's start with the verification.  First off, have
20  you ever seen these documents before?
21  A.  No.
22  Q.  Is that your signature on the verification?
23  A.  Yes.
24  Q.  Did you read the defendant's responses and objections

**62**

1    before signing that verification?
2    A.  Did I read this document before signing this one
3    (indicating)?
4    Q.  Yes.
5    A.  I don't recall doing that, no.  But people put documents
6    in front of me all the time, and I sign them.
7    Q.  So let's read the verification.  It says, I, Daniel
8    Gilbert, having been duly sworn, do hereby depose and
9    state that I have reviewed the foregoing defendant's
10   responses and objections to plaintiff's second set of
11   interrogatories directed to defendants Rock Holdings,
12   Inc. and Daniel Gilbert, and the statements set forth
13   therein are true and correct to the best of my
14   knowledge, information, and belief.
15         And that's your signature?
16   A.  It is.  If I would have gotten a document like this I
17   would have asked the lawyer who gave to it me did you do
18   this on behalf of me, and if he said yes I'd sign the
19   document.
20   Q.  Without even reading the underlying --
21   A.  As long as I trusted the lawyer and had asked the lawyer
22   if he read it and agrees with it.
23   Q.  Okay.  Well, let's look at the document that you
24   verified.

**63**

1         First off, do you have an understanding what
2    the claims in this case are about?
3    A.  Somewhat.
4    Q.  Tell me your understanding of what the claims in this
5    case are about.
6    A.  Well, I think it's about a plaintiff law firm going out
7    and suing every company that it does an IPO, and then
8    through a lens of 2020, and getting interrogatories and
9    depositions, trying to find a claim that would fit under
10   some law that would allow them to gain a big fee.
11   That's my understanding.
12   Q.  So you don't have an understanding of what the actual
13   allegations in the Complaint are about?
14         MR. MORGANROTH:  Objection as to form.
15         THE WITNESS:  Yeah, that there was some kind
16   of information that some combination of people here or
17   the company knew and then made a block trade with
18   Morgan Stanley.
19   BY MR. BARRY:
20   Q.  And that block trade was made by whom?
21   A.  I think it was Scott Elkins.
22   Q.  Whose shares were involved in that block trade?
23   A.  I don't know exactly where the shares were, but I assume
24   it's the company, it's Rock Companies.

**64**

1    Q.  So let's look at response to interrogatory number 5,
2    which is on page 15.
3         Let's actually start on page 14.  So it's
4    response to interrogatory number 4 on page 14.
5    A.  Okay.
6    Q.  So the first full paragraph on this page starts, Subject
7    to and without waiving the foregoing objections,
8    defendants respond to interrogatory 4 by stating that
9    the proceeds from RHI's March 2021 sale of Rocket Class
10   A common stock are maintained as part of RHI's cash
11   reserves to satisfy potential funding needs, including
12   potential necessary distributions to fund the ongoing
13   10-year philanthropic commitment by the Gilbert Family
14   Foundation and Rocket Community Fund.
15         Do you see that?
16   A.  Yes, I do.
17   Q.  So this refers to RHI's sale of Class A common stock on
18   March 29th, 2021.  Are you aware that RHI sold common
19   stock, Class A common stock on March 29th, 2021?
20   A.  No, I'm not aware of that.  That's -- who did they sell
21   the stock to?  Class A common stock --
22   Q.  Now look at -- let's look at interrogatory number 5 on
23   page 15.  It says, Subject to and without -- the second
24   paragraph -- it says, Subject to and without waiving the

**65**

1    foregoing objections, defendants state that no proceeds
2    of RHI's March 29th, 2021 sale of Rocket Class A common
3    stock were donated or disbursed for charitable or
4    philanthropic purposes in 2021, correct?
5    A.  I read it, yes.
6    Q.  So did the Gilbert Family Foundation or the Rocket
7    Community Fund provide financial benefits to the -- or
8    distributions to the residents of Detroit in calendar
9    year 2021?
10   A.  Did RHI, or did the foundations?
11   Q.  I'm asking about the foundation or the Rocket Community
12   Fund.  They provided -- did the Rocket Community Fund or
13   the Gilbert Family Foundation provide financial benefits
14   to the -- in any way to these residents of Detroit in
15   calendar year 2021?
16   A.  Yes.
17   Q.  And it did so -- they did so without having any
18   distributions from RHI for purposes of making that
19   donation, correct?
20         MR. MORGANROTH:  Objection as to form.
21         THE WITNESS:  Well, the commitment was 50
22   million for that year, and -- what's your question
23   again?
24

66

1   BY MR. BARRY:
2   Q.  And they didn't need any distribution from RHI in order
3       to make that, to satisfy that commitment in calendar
4       year 2021, right?
5   A.  I don't believe so.
6   Q.  Did you ever have any discussions as to whether or not
7       it would be more tax efficient for RHI to donate shares
8       of Rocket Companies instead of making any sort of cash
9       distribution to the Rocket Community Fund or the Gilbert
10      Family Foundation?
11  A.  I don't recall having discussions like that.
12  Q.  Exhibit 9.
13          GILBERT EXHIBIT 9
14          Text - Rocket Delaware 00097663
15          WAS MARKED BY THE REPORTER
16          FOR IDENTIFICATION
17  BY MR. BARRY:
18  Q.  Exhibit 9 is a text produced at Rocket Delaware
19      00097663.
20  A.  Okay.
21  Q.  Have you ever seen this document?
22  A.  No.
23  Q.  Who's Scott Elkins?
24  A.  Who is he?

67

1   Q.  Yes, who's Scott Elkins?
2   A.  He works for us, he's an inside, like, investment
3       banker, M&A guy.
4   Q.  So let's look at the text on the second page at the very
5       top.
6   A.  Yeah.
7   Q.  It says, RKT could accelerate the 10-K filing to the
8       24th, and depending on the RKT share price, then RHI
9       sell 500 plus M shares via a 144A in the market.
10          Do you see that?
11  A.  Yes.
12  Q.  Do you know what this is talking about?
13  A.  No, I don't understand any of this.
14  Q.  Do you know what a 144A sale is?
15  A.  No.
16  Q.  Do you know if a 144A sale is different from a secondary
17      offering by the company?
18  A.  I don't know what a 144 sale is, so I couldn't know
19      what's different about it.
20  Q.  Do you know if that -- if this is different from the
21      concept of a secondary offering that was being discussed
22      in the fall of 2020?
23          MR. MORGANROTH:  Objection as to form.
24          THE WITNESS:  No.  I don't know what a 144A

68

1   is, so I couldn't know an answer to that question.
2   BY MR. BARRY:
3   Q.  Did Mr. Farner have authority to approve a Section 144A
4       sale by RHI in March of 2021?
5           MR. MORGANROTH:  Objection as to form and
6   foundation.
7           THE WITNESS:  Once again, I don't know what a
8       144A sale is, so I couldn't answer that question.
9   BY MR. BARRY:
10  Q.  So let's -- let's agree on this.  A 144A sale can be
11      referred to as a block sale transaction.
12  A.  Okay.
13          MR. MORGANROTH:  Objection as to form.
14  BY MR. BARRY:
15  Q.  Did Mr. Elkins -- I'm sorry, Mr. Farner have authority
16      in March of 2021 to execute a block sale of shares owned
17      by RHI?
18          MR. MORGANROTH:  Objection as to form.
19          THE WITNESS:  First of all, the date, I can't
20      recall dates.  That's a long time ago, so I -- Mr.
21      Farner and Elkins combined have the green light to try
22      to make up what we didn't get in the IPO, through either
23      a secondary offering or some other format like a block
24      sale that would close the gap.

69

1   BY MR. BARRY:
2   Q.  And were they required to go back and get authority from
3       the RHI board in order to get a clearance, the specifics
4       of any transactions that they contemplated?
5   A.  Not that I'm aware of, no.
6   Q.  Exhibit 10.
7           GILBERT EXHIBIT 10
8           Notice of Exchange - Rocket Delaware 00037803
9           WAS MARKED BY THE REPORTER
10          FOR IDENTIFICATION
11  BY MR. BARRY:
12  Q.  Exhibit 10 is a Notice of Exchange produced at Rocket
13      Delaware 00037803.
14          Have you ever seen this document?
15  A.  No.
16  Q.  Do you know what this document is?
17  A.  No.  I can read it.
18  Q.  Do you know if you authorized this document to be
19      submitted?
20  A.  I don't recall.
21          MR. MORGANROTH:  Objection as to form.
22  BY MR. BARRY:
23  Q.  This -- let's look at the second paragraph.  It says,
24      Contingent upon the consummation of the transaction, as

70

1  defined below, the undersigned holder desires to
2  transfer to Rocket Co up to the number of Class D common
3  stock plus holdings units set forth below, together
4  paired interests, in exchange for shares of Class B
5  common stock, the deliverable common stock, to be issued
6  in its name as set forth in the supplemental notice as
7  defined below in accordance with the terms of this
8  exchange agreement.
9      Do you see that?
10 A. I do see that.
11 Q. Do you know what that means?
12 A. I do not.
13 Q. Okay. The names of -- it says that -- there's a chart,
14    and it says name of legal holder is Rock Holdings, Inc.
15    and there's a maximum number of paired interests to be
16    exchanged at 47 million.
17      Do you see that?
18 A. Yes.
19 Q. Did you have anything to do with coming up with the
20    number of 47 million?
21 A. Not that I recall, no.
22      MR. MORGANROTH: I'm wondering if we should
23    take a break.
24      MR. BARRY: Yeah. Do you want to --

71

1      THE VIDEOGRAPHER: Should we go off first?
2      MR. BARRY: Let's go off the record.
3      THE VIDEOGRAPHER: This marks the end of Media
4    Unit Number 2, we are off the record at 12:45.
5      (A lunch recess was taken)
6      THE VIDEOGRAPHER: This marks the beginning of
7    Media Unit Number 3, we are back on the record at 1:22
8    p.m.
9  BY MR. BARRY:
10 Q. Before the -- welcome back.
11    Before the lunch break we were looking at
12    Exhibit 10, which is the Notice of Exchange.
13 A. Yep.
14 Q. And you said, I believe you said you hadn't seen this
15    document until today?
16 A. I don't recall seeing it until today, no.
17 Q. I'm sorry, over the lunch break did you talk to your
18    lawyers about the case?
19 A. Not about the case. I asked about his kids, he asked
20    about my kids.
21 Q. Prior to reading this Notice of Exchange were you aware
22    that in March of 2021 RHI submitted a request to
23    exchange up to 47 million shares for the purposes of
24    selling them in a block -- in a transaction as described

72

1  in this document?
2      MR. MORGANROTH: Objection as to form. Go
3    ahead.
4      THE WITNESS: I knew they had done something
5    similar in the IPO, so the green light was, look, let's
6    do everything the same as the IPO, and let's just try to
7    raise the difference. So I couldn't tell you about the
8    technical nature, if I read this and realized this is
9    how it worked, because I didn't even actually
10   technically know how this exchange stuff worked in the
11   IPO. As long as it was the same, I was okay with it.
12 BY MR. BARRY:
13 Q. Let's look at Exhibit 11.
14      GILBERT EXHIBIT 11
15      3/23/21 Rocket Companies, Inc.
16      Board of Directors Meeting Minutes
17      WAS MARKED BY THE REPORTER
18      FOR IDENTIFICATION
19 BY MR. BARRY:
20 Q. Exhibit 11 are minutes of the Board of Directors Meeting
21    of Rocket Companies, Inc., March 23rd, 2021.
22 A. Okay.
23 Q. Have you ever seen these minutes?
24 A. I don't recall, but they do distribute minutes at

73

1  subsequent board meetings related to the previous one.
2  Q. Do you recall being at this meeting on March 3rd, 2021?
3  A. During this time I was -- because I had a stroke in
4    2019, I was in very intense rehab for a few years, so I
5    -- I do these by Zoom from my house, and I would
6    generally stay for the first couple of hours, and then
7    get back to my rehab.
8  Q. All right. So it says, the first paragraph indicates
9    it's held via videoconference at 11:00 a.m., do you see
10   that?
11 A. Yes.
12 Q. All right. And under the second paragraph it says, The
13   following directors participated in the meeting, and
14   you're the first one, right?
15 A. Yeah.
16 Q. So do you recall participating in this meeting?
17 A. Not this specific meeting. I just remember all the
18   board meetings were done in the same way.
19 Q. Okay. Could you flip back to page 7 of 9?
20 A. Yep.
21 Q. Under Audit Committee Update. It says, The chairman of
22   the audit committee provided the board with an update of
23   the audit committee's meetings and approvals since the
24   previous board meeting.

74

1      Do you see that?
2  A.  Yes.
3  Q.  Do you recall what that report was, what that update
4      was?
5  A.  No.
6  Q.  Do you know if the audit committee reported on RHI's
7      Notice of Exchange?
8  A.  I don't know.
9      MR. MORGANROTH:  Objection as to form.
10     THE WITNESS:  I don't recall.
11 BY MR. BARRY:
12 Q.  Okay.  And let's look at Exhibit 12.
13     GILBERT EXHIBIT 12
14     3/22/21 Audit Committee Meeting Minutes -
15     Rocket Delaware 00065027
16     WAS MARKED BY THE REPORTER
17     FOR IDENTIFICATION
18     THE WITNESS:  I'm sorry, I've got to tell my
19 assistant one thing.  I'll just be on this for, like –
20 give me 30 seconds here.
21     MR. BARRY:  Sure.
22     MR. UPADHYA:  Should we go off for a second?
23     MR. MORGANROTH:  Yeah, let's go off the
24 record.

75

1      THE VIDEOGRAPHER:  This marks the end of Media
2  Unit Number 3, the time is 1:26 p.m., we're off the
3  record.
4      (An off-the-record discussion was held.)
5      THE VIDEOGRAPHER:  This marks the beginning of
6  Media Unit Number 4, the time is 1:27, we are back on
7  the record.
8  BY MR. BARRY:
9  Q.  I've just handed out Exhibit Number 12, which is the
10     minutes of the special meeting of the audit committee
11     dated March 22nd, 2021.
12 A.  Okay.
13 Q.  This was a day before the board meeting of March 23rd
14     that we just went over on Exhibit Number 11.
15     Have you ever seen these minutes?
16 A.  I don't recall seeing these minutes, no.
17 Q.  Just for the record, they were produced at Rocket
18     Delaware 00065027.
19     You were not at this meeting, correct?
20 A.  No.  It says the audit committee.  I'm not on the audit
21     committee, so no.
22 Q.  So let's look at the next page, under Exchange Notice
23     Discussion.
24 A.  Okay.

76

1  Q.  Under Exchange Notice Discussion is says, Ms. John
2      explained that the purpose of today's special meeting of
3      the committee is to consider a request for a Notice of
4      Exchange from Rock Holdings, Inc., RHI, and to consider
5      opening the company's currently closed trading window
6      for a limited purpose.
7      Do you see that?
8  A.  Yes, I do.
9  Q.  Were you aware of this meeting?
10 A.  No.
11 Q.  Do you know if this meeting was reported to the full
12     board on the 23rd, the next day?
13     MR. MORGANROTH:  Objection as to form.
14     THE WITNESS:  I don't recall, but I assume it
15     was.
16 BY MR. BARRY:
17 Q.  The third paragraph, and I don't know if I asked, I
18     can't remember if I asked this about the Notice of
19     Exchange can this refers to the Notice of Exchange
20     of the 47 million shares.
21 A.  Yes.
22 Q.  Do you know how the 47 million shares number was
23     calculated, was determined?
24 A.  No, I don't know.

77

1      MR. MORGANROTH:  Hang on a second.  Objection
2  as to form, asked and answered.  Go ahead.
3      THE WITNESS:  You know, these technical
4  details, as I said earlier, same as the IPO, that I just
5  wasn't familiar with these.  I relied on several
6  lawyers, including Angelo Vitale, and – I forgot the
7  name of the law firm.
8  BY MR. BARRY:
9  Q.  Under Trading Window Limited Opening, Roman Numeral II.
10     It says, Ms. John explained that the company's insider
11     trading policy provides that directors and their related
12     parties, such as RHI, can only trade the company's
13     securities, A, in an open trading window; and B, upon
14     preclearance by the company's general counsel.
15     Do you see that?
16 A.  Yes, I do.
17 Q.  Okay.  That's not complete, is it?
18     MR. MORGANROTH:  Objection as to form.
19     THE WITNESS:  I don't know.
20 BY MR. BARRY:
21 Q.  We reviewed the – do you recall sitting here reviewing
22     the insider trading policy with me?
23 A.  Yes.
24 Q.  And one of the requirements were that even in an open

Confidential                    Daniel Gilbert - November 29, 2023

78

1    trading window you can't -- company insiders or their
2    related parties cannot trade if they're in possession of
3    material non-public information, do you remember?
4    A.  Yeah, I remember that it was relatives, and then I asked
5        you several times where -- what language said -- where
6        RHI would be covered by it, and we never resolved that.
7    Q.  My question though is related to the, even related to
8        the company insiders, in addition to being required to
9        only be allowed in an open trading window and upon
10       predearance, they still cannot trade if in possession
11       of material non-public information, correct?
12           MR. MORGANROTH:  Objection as to form.
13           THE WITNESS:  I mean, it sounds accurate to
14       me.
15           MR. BARRY:  Okay.
16           THE WITNESS:  That was probably about 70
17       questions ago.
18   BY MR. BARRY:
19   Q.  And it says here, it says, The company's trading window
20       closed on March 17th, and is not expected to open in the
21       ordinary course until May 12th.
22           Do you see that?
23   A.  No.
24   Q.  I'm sorry, the next paragraph after Ms. John explained,

79

1    the second paragraph under Trading Window Limited
2    Opening, it begins, The company's trading window?
3    A.  Yes.  I see it, yes.
4    Q.  Okay.  So this is saying that as of March 22nd the
5        trading window was closed.  Let's look back at Exhibit
6        Number 9, which is the Elkins text.
7            Do you have Exhibit 9?
8            MR. MORGANROTH:  Yeah.  I'll pull it out.
9            MR. BARRY:  Thank you.
10   BY MR. BARRY:
11   Q.  So this is asking -- noting that the trading window was
12       closed as of the minutes or reflecting that the trading
13       window was closed as of March 22nd, but --
14   A.  I think it says March 17th here, right?
15   Q.  Yes, it was closed on March 17th, it was closed as of --
16       on March 22nd when this meeting happened.  But the
17       Exhibit 9 text is dated March 10th.  And the window is
18       open at that time, right?  It was before March 17th.
19   A.  I've got to look at the date here, where -- I don't know
20       where it says it's closed or where he texted it's closed
21       here.
22   Q.  Okay.  Let's look back at the minutes, which is Exhibit
23       12, which is the March 22nd minutes.
24   A.  Yes.

80

1    Q.  And it says, "The company's trading window closed on
2        March 17th and is not expected to open in the ordinary
3        course until May 12th", right?
4    A.  Yes.
5    Q.  So let's look back at Exhibit 9, and that is dated March
6        10th, 2021, right?
7    A.  Yep.
8    Q.  That's before March 17th.
9    A.  Yes.
10   Q.  The trading window was open on March 10th, 2021, right?
11   A.  I don't know when it opened.  This just says when it
12       closed.
13   Q.  Let's look back at Exhibit 4.  Exhibit 4 is the email
14       from Angelo Vitale dated March 1st.  And it says, The
15       trading window's now open, on March 1st, 2021.
16           Do you have an understanding as to when the
17       trading window opened then?
18   A.  According to this email, yes, March 1st.
19   Q.  Okay.  So on March 10th the trading window was open,
20       right?
21   A.  Yes.
22   Q.  So do you know -- if the trading window was open on
23       March 10th, do you know why Mr. Farner and Mr. Elkins
24       did not proceed with the sale when the trading window

81

1    was open?
2            MR. MORGANROTH:  Objection as to form and
3        foundation.
4            THE WITNESS:  I don't know.  Maybe the market
5        wasn't where they thought it should be.  I really don't
6        know.
7    BY MR. BARRY:
8    Q.  Do you know if, in seeking permission to exchange, Mr.
9        Farner or RHI made any representations that RHI was
10       seeking a hardship, something called a hardship
11       exemption?
12   A.  No, I'm not aware of that.  But I do see in the minutes
13       that -- you didn't finish reading that paragraph.
14   Q.  Um-hum (affirmatively).
15   A.  It says, However, the insider trading policy provides
16       that a company can open a closed trading window early at
17       any time as deemed appropriate by general counsel or
18       other senior members of management.  So that's all I
19       know.
20   Q.  Did RHI, in March of 2021, did RHI have any need to
21       raise $500 million worth of stock prior to May 12th,
22       2021?
23           MR. MORGANROTH:  Objection as to form.
24           THE WITNESS:  Say that one more time.

Confidential      Daniel Gilbert - November 29, 2023

**82**

1  BY MR. BARRY:
2  Q. In March of 2021, did RHI have any need to raise $500
3     million through the sale of stock before May 12th, 2021?
4  A. Did it have a need to?
5  Q. Yeah.
6  A. I don't think it had a need to, but it -- part of the
7     strategy was to get more and more liquidity into RHI for
8     purposes of, as I mentioned earlier, funding our loans
9     and other corporate purposes.
10  Q. And it would be better to sell stock at a higher price
11    than sell stock at a lower price, correct?
12  A. I think that's pretty obvious, yes.
13  Q. Let's look at Exhibit -- let's look at Exhibit -- this
14    is going to be Exhibit Number 13.
15       GILBERT EXHIBIT 13
16       Email and Document - Rocket Delaware 00076347
17       WAS MARKED BY THE REPORTER
18       FOR IDENTIFICATION
19  BY MR. BARRY:
20  Q. Exhibit Number 13 is a cover email and a document
21    produced at Rocket Delaware 00076347. And I'd ask you
22    to flip to the second page, or the first page of the
23    memo.
24       Have you ever seen this document?

**83**

1  A. I don't recall seeing this document, no.
2  Q. The second paragraph of the memo begins, "On March 15th,
3    2021, Rock Holdings, Inc., the company's controlling
4    shareholder, requested the ability to sell the company's
5    common stock (sale request) during a closed window".
6       Do you see that?
7  A. Yes.
8  Q. If you look back at Exhibit Number 10, which is the
9    Notice of Exchange, it's dated March 19th, 2021.
10  A. I don't see Exhibit 10.
11  Q. It's Exhibit 10.
12       MR. MORGANROTH: (Indicating.)
13       THE WITNESS: So can you repeat that now?
14  BY MR. BARRY:
15  Q. On March -- the memo in Exhibit Number 13 says, "On
16    March 15, 2021, Rock Holdings, Inc., RHI, the company's
17    controlling shareholder, requested the ability to sell
18    the company's common stock (sale request) during a
19    closed window."
20       Do you see that?
21  A. Yeah.
22  Q. The Notice of Exchange was dated March 19th, 2021, which
23    is Exhibit 10, correct?
24  A. That's what it says, yes.

**84**

1  Q. Do you know if Rock Holdings, Inc. made any request to
2    make such a sale prior to March 19th, 2021?
3  A. I really don't know that, no.
4  Q. Do you know why the memo reflects March 15th, 2021?
5  A. No.
6  Q. If the request had been made on March 15th, 2021, that
7    would have been within the open trading window that
8    didn't close until the 17th, correct?
9  A. Yes.
10  Q. The paragraph on the memo continues, Following the
11    request, the general counsel and deputy general counsel,
12    collectively the counsel, of the company considered the
13    timing of the sale request with the company's most
14    recent earnings released for FY 2020 on February 25th,
15    2021, and the upcoming filing of the Form 10-K --
16    Are you on 10 or 12?
17  Q. This is on 13. I'm looking on 13, the memo. 13.
18  A. This is 13?
19  Q. Yes.
20  A. Okay.
21  Q. The second sentence of the second paragraph.
22  A. Okay. Go ahead.
23  Q. Sure. It says, Following this request, the general
24    counsel and the deputy general counsel, collectively the

**85**

1    counsel, of the company considered the timing of the
2    sale request with the company's most recent earnings
3    released for FY 2020 on February 25th, 2021, and the
4    upcoming filing of the Form 10-K on March 24, 2021 in
5    order to assess the risk of the sale request being
6    prompted by material non-public information, MNPI.
7    Following advice from counsel -- then there's a section
8    that's redacted for privilege.
9       Do you see that?
10  A. Yes.
11  Q. So the next page below says, In order to confirm the
12    questions above, counsel generally discussed these
13    topics with the following members of senior management
14    both before the sale request was approved on March 19th,
15    2021 and the morning of the execution of the sale
16    request on March 29, 2021.
17       Do you see that?
18  A. Yes.
19  Q. You're not listed on any of the people under RKT Sale
20    Request Due Diligence Discussions, correct?
21  A. No, my name is not listed.
22  Q. Did you have any communications at all with Jay Farner
23    about RHI selling stock in March of 2021?
24  A. No.

86

1  Q.  Did you have any communications at all with Bob Walters
2      regarding RHI selling stock in March of 2021?
3  A.  No.
4  Q.  With Ms. Booth in March of 2021?
5  A.  No.
6  Q.  With Mr. Brown in March of 2021?
7  A.  No.
8  Q.  Did you have any discussions at all with anyone
9      regarding RHI's sale of stock in March of 2021?
10 A.  No. I learned of the sale after the sale occurred.
11 Q.  Let's go back to the minutes, which is Exhibit 11, from
12     March 23, 2021. Let's flip to page 6 of 9, please.
13 A.  Um-hum (affirmatively). Okay.
14 Q.  Under Finance Overview on paragraph B, Market and
15     Forecast, it says, Mr. Brown discussed the recent rise
16     of the 10-year treasury yield and its impact on the
17     company's metrics. He explained that the rising 10-year
18     yield has compressed the primary/secondary spread,
19     resulting in a decrease and gain on sale margin. The
20     Mortgage Bankers Association is forecasting an 80
21     percent decrease in refinance from Q1 to Q4 of 2021, but
22     expects an increase in purchase transactions. Mr. Brown
23     expects Rocket Mortgage to originate 300 billion in
24     2021. He reviewed the revised adjusted metrics for 2021

87

1      and compared the revised forecasts with previous
2      guidance for Q1 2021 and with the analysts' consensus.
3      Mr. Brown also reviewed the metrics for Amrock, Rocket
4      Homes, and Rocket Auto.
5          Did I read that correctly?
6  A.  Which paragraph were you reading?
7  Q.  Under Market and Forecast.
8  A.  Yeah, I see it. Yeah, I think you read it correctly.
9  Q.  Okay. Was this the first time the board discussed these
10     revised forecasts referred to by Mr. Brown?
11         MR. MORGANROTH: Objection as to form and
12     foundation.
13         THE WITNESS: I can't recall.
14 BY MR. BARRY:
15 Q.  Okay. Let's look at Exhibit 14, please.
16         GILBERT EXHIBIT 14
17         3/2321 Finance Overview -
18         Q1 2021 Board Meeting -
19         Rocket Delaware 00086838
20         WAS MARKED BY THE REPORTER
21         FOR IDENTIFICATION
22 BY MR. BARRY:
23 Q.  So Exhibit 14 are a presentation titled Finance
24     Overview - Q1 2021 Board Meeting, dated March 23rd,

88

1      2021, produced at Rocket Delaware 00086838.
2  A.  Yep.
3  Q.  Have you ever seen this document?
4  A.  I don't recall seeing it, no, I don't.
5  Q.  Do you know if these are the materials that were
6      distributed to the board in connection with the March
7      23rd, 2021 board meeting?
8          MR. MORGANROTH: Objection as to foundation.
9          THE WITNESS: I don't recall that.
10 BY MR. BARRY:
11 Q.  How are board materials typically distributed to
12     directors at Rocket Companies, Inc.?
13 A.  My --
14         MR. MORGANROTH: Objection as to form and
15     foundation. Go ahead.
16         THE WITNESS: Sometimes they're not even
17     available till right before the board meeting. I think
18     in the past they may have emailed them.
19 BY MR. BARRY:
20 Q.  Do you know if the board materials were made available
21     to the board before the March 23rd, 2021 board meeting,
22     or at the March 23rd, 2021 board meeting.
23 A.  There was a lot of board meetings. I can't recall which
24     one's which.

89

1  Q.  Was there a formal protocol for how the board materials
2      were distributed to directors in 2021?
3  A.  Like I said earlier, I don't know if it was a formal
4      protocol, but the way it happened was either -- my
5      recollection it was either they distributed them right
6      before the board meeting, like an hour before, or they
7      emailed them ahead of time.
8  Q.  Would Mr. Farner have knowledge of the contents of the
9      board meetings before the board meeting?
10         MR. MORGANROTH: Objection as to foundation.
11         THE WITNESS: I cannot be aware of what he's
12     aware of.
13 BY MR. BARRY:
14 Q.  But he was the CEO, correct?
15 A.  Yeah, he was.
16 Q.  He was the CEO in March of 2021, right?
17         MR. MORGANROTH: Objection as to form.
18         THE WITNESS: I believe so.
19 BY MR. BARRY:
20 Q.  These materials are marked confidential by your lawyers,
21     do you see that on the bottom left?
22 A.  On the cover?
23 Q.  Yeah, the cover. It's on every page actually.
24 A.  Okay.

90

1  Q.  Do you consider these materials confidential?
2        MR. MORGANROTH:  Objection to form and
3  foundation.
4        THE WITNESS:  I don't -- yeah, I would assume
5  the financials of the company are confidential.
6  BY MR. BARRY:
7  Q.  Let's look at page 8 --
8        MR. MORGANROTH:  Yeah, I --
9        MR. SCOTT:  Yeah, the record's got to be clear
10  here, right, the lawyers put this on now, not anybody
11  contemporaneously at the time.  I just wanted to make
12  sure that was clear.
13        MR. BARRY:  Could you read back my question.
14        MR. MORGANROTH:  In production --
15        MR. BARRY:  Could you read back my question,
16  please.
17        (Record repeated as requested)
18        MR. MORGANROTH:  Yeah, but the question is if
19  it's during discovery in production, not at the time of
20  --
21        MR. BARRY:  If you have an objection, you can
22  make an objection.
23        MR. MORGANROTH:  Yeah.
24        MR. BARRY:  You're making a speaking

91

1  objection, it's improper to Delaware law.  Note your
2  objection and move on.
3        My question was, these are marked confidential
4  by your lawyers, do you agree with that.  There was
5  nothing wrong that question, there's nothing -- no basis
6  for your speaking objection on it.
7        THE WITNESS:  Can I answer the question?  Let
8  me answer the question.
9        MR. BARRY:  Yes.
10        MR. MORGANROTH:  I think there's a lot wrong
11  with the question.  I'll object as to form and
12  foundation, and I'll leave it at that.
13        THE WITNESS:  So I believe the confidential
14  was put on there during discovery, not at the time.
15  BY MR. BARRY:
16  Q.  But you consider internal forecasts of the company to be
17  confidential information, right?
18        MR. MORGANROTH:  Objection as to form.
19        THE WITNESS:  I would think that most
20  financials of companies are confidential.
21  BY MR. BARRY:
22  Q.  All right.  Let's look at page 8 of 25.
23  A.  Okay.
24  Q.  This starts Market and Financial Forecasts, right?

92

1  A.  Yeah.
2  Q.  Right, do you see that?
3  A.  Yes, I do.
4  Q.  So the next page reflects the 10-year treasury bond.
5  A.  Yes.
6  Q.  Now, that's not confidential, that's public information.
7  A.  Yeah.  I can get that anywhere, that's right.
8  Q.  Right.  Let's look at the next page, which is
9  Compressing Primary and Secondary Spreads.  That's also
10  public information, right?  I can download that from --
11  A.  Bloomberg you can probably get to it on.
12  Q.  Do you know what the NMCMFUS index is?
13  A.  Where is that?  I do not know what that is.  I can look
14  it up, but I don't know now.
15  Q.  But anybody can download these, there's nothing
16  non-public on this page, right?
17  A.  I don't think so.
18  Q.  Let's look at the next page, Market Overview.  Now, this
19  contains historical market information for the market
20  industry in 2000, and then forecasts from the Mortgage
21  Bankers Association in -- for 2021, right?
22  A.  Yes.
23  Q.  Okay.  But -- so, again, I could either get the historic
24  information or buy it from Mortgage Bankers Association,

93

1  right?
2  A.  I would think so, yes.
3  Q.  So, again, this is not internal information to Rocket
4  though, right?
5  A.  I don't think so.
6  Q.  Yeah.  So let's look at page 12 of 25.
7  A.  Yep.
8  Q.  Now, this is forecasting for the full fiscal 2021 year
9  for revenues, right?  This is -- these are forecasts
10  from -- that were generated by Rocket, right?
11  A.  I believe so.
12  Q.  Okay.  So this is showing that in December of 2020 the
13  board forecasted Rocket's 2021 revenue on total closed
14  volume to be $300 billion, right?
15  A.  Yes.
16  Q.  And for the revised forecast in March of 2021 that's
17  still that same $300 billion, right?
18  A.  Yes.
19  Q.  But here the average gain on sale margin goes down kind
20  of considerably from 3.5 to 3.9 percent, right?
21        MR. MORGANROTH:  Objection as to form.
22  Objection as to form.
23  BY MR. BARRY:
24  Q.  3.19 percent.

94

1  A.  That's what it says.
2  Q.  Okay.  And according to this, that's a nine percent
3     decline, right?
4  A.  31 basis points, nine percent decline, yes.  But that's
5     over a year forecast.
6  Q.  Yeah, it's for the full year, yes.
7  A.  Yeah.
8  Q.  So let's look at the Net Servicing Revenue.
9  A.  Okay.
10  Q.  So the Net Servicing Revenue actually goes up from the
11     board forecast in December of 2020 to the March revised
12     forecast from 124 to 167, right?
13  A.  Yes.
14  Q.  That's actually – that's a 35 percent increase.
15  A.  Yeah.  The way that comes in, they just evaluate the
16     servicing portfolio, and when rates go up it pays off
17     quicker, so, therefore, the value is lower and so you
18     have to push that through to the P&L.
19  Q.  Okay.  And the other Rocket revenue also increased from
20     the December 2020 to the March 21st revised forecast,
21     right?
22  A.  That's right.
23  Q.  It goes up about five percent, right?
24  A.  That's what it looks like, yeah.

95

1  Q.  But total – so all metrics either stayed the same or
2     went up, but Total Rocket Adjusted – except GOSM, and
3     Total Rocket Adjusted Revenues went down from 12061 to
4     11223, do you see that?
5  A.  Yes.
6     MR. MORGANROTH:  Objection as to form.
7  BY MR. BARRY:
8  Q.  Can you explain what the average gain on sale margin is?
9  A.  That's – if you had $100,000 loan and we brought in
10     revenue of, let's just say $3,000, that would be a 300
11     basis points in revenue.
12  Q.  When the company has a revised forecast of 3.19, are
13     they – is the company generating the – what it expects
14     the GOSM number to be or is it – or is the GOSM number
15     that is being calculated based on projections that are
16     created by the company?
17     MR. MORGANROTH:  Objection as to form.
18     THE WITNESS:  What was the first – say that
19     again.
20     MR. BARRY:  Let me back up.
21  BY MR. BARRY:
22  Q.  Does Rocket have a staff of financial people that create
23     forecasts for the company's business operations?
24  A.  It's not a large staff, but I think there's a couple

96

1     people that do this, yes.
2  Q.  When they are presenting the GOSM forecasts for the
3     upcoming year, are they basing their financial
4     projections on the margin they expect to receive, or is
5     the margins that they're disclosing a product of the
6     projections that they're making?
7     MR. MORGANROTH:  Objection as to form and
8     foundation.
9     THE WITNESS:  I still don't understand the
10     difference of what you're saying.
11  BY MR. BARRY:
12  Q.  Okay.  Do you know if the people who are preparing
13     forecasts for Rocket –
14  A.  Yep.
15  Q.  – are preparing forecasts of this is how much we expect
16     to purchase the mortgages for and this is how much we're
17     expecting to sell the mortgages for, and then
18     calculating an implied GOSM based on those forecasts, or
19     are they projecting these are the numbers we expect to
20     sell, this is the margin I expect to receive, and then
21     creating a forecast of the sale – the gain on sale
22     revenue based on an assumed margin?
23     MR. MORGANROTH:  Objection as to form and
24     foundation.

97

1     THE WITNESS:  I think what they do is they
2     just – they look at the market conditions and take in a
3     bunch of inputs, like you were saying earlier, the MBA
4     and the 10-year treasuries, and make an educated
5     forecast on what they think our margin would be.  But we
6     don't take much credence in annual projections because,
7     as you probably know, interest rates can fluctuate
8     daily.  I mean, you could move 31 basis points in a day,
9     let alone a year, in a changed forecast.  I mean, we
10     looked more closely at the next quarter's forecast than
11     we would a full year in advance.
12  BY MR. BARRY:
13  Q.  So a significant change in the next quarter's forecast
14     could be a material change, right?
15     MR. MORGANROTH:  Objection as to form.
16     THE WITNESS:  I mean, it's still not
17     necessarily very accurate.  It's more accurate than an
18     annual one.
19  BY MR. BARRY:
20  Q.  Are Rocket's internal financial forecasts public?
21  A.  No.
22  Q.  In preparing Rocket's internal forecasts –
23     MR. MORGANROTH:  I'm just going to object as
24     to form.  Go ahead.  To the prior question.

98

1  BY MR. BARRY:
2  Q.  In preparing Rocket's internal forecasts do you know if
3     the people responsible for preparing such forecasts rely
4     on their knowledge of the company's operations?
5        MR. MORGANROTH: Objection as to form and
6  foundation.
7        THE WITNESS: I mean, it's more market-based
8  on the secondary market and the treasuries and all of
9  that. There might be some knowledge of operations, but
10 not a lot because there's not a lot that affects these
11 numbers here, like, the margins anyway.
12 BY MR. BARRY:
13 Q.  Look at 15, Exhibit 15, please.
14       GILBERT EXHIBIT 15
15       Email and Attachment -
16       Rocket Delaware 00025566
17       WAS MARKED BY THE REPORTER
18       FOR IDENTIFICATION
19 BY MR. BARRY:
20 Q.  Are you familiar with The Compass?
21 A.  Yes.
22 Q.  Okay. What I've handed out as Exhibit 15 is an email,
23    and then an attached file produced at Rocket Delaware
24    00025566.

99

1        Have you ever seen this document?
2  A.  Not this specific one. I don't recall seeing this
3     specific one.
4  Q.  But you know what the document is, right?
5  A.  I've seen it before in the past.
6  Q.  This is a weekly -- it says The Compass Weekly Financial
7     Forecast, March 23, 2021.
8        Do you see that? If you look at the attached
9     file, not the cover email.
10 A.  Yes.
11 Q.  Okay. The Compass was a financial -- or is The Compass
12    a -- was The Compass prepared weekly and distributed
13    within Rocket?
14 A.  It looks like it was, yes.
15 Q.  Was this prepared -- scratch that.
16       What's the purpose of this report?
17 A.  To kind of just give people a dashboard of our key
18    metrics and where things are going.
19 Q.  Were you on the weekly distribution -- I'm going to
20    rephrase that.
21       Did you receive every weekly distribution of
22    The Compass report in 2021?
23 A.  I don't recall. Because, again, I was going through a
24    very serious medical issue, so at some point I probably

100

1     stopped getting this, as I did a lot of reports.
2  Q.  Well, one of the -- one of the purposes of this report
3     is to track the company's internal forecasts against
4     analysts' expectation, right?
5        MR. MORGANROTH: Objection as to form.
6        THE WITNESS: I'm not sure. I haven't looked
7     it over.
8  BY MR. BARRY:
9  Q.  Do you know how -- do you know who was responsible for
10    preparing The Compass reports?
11 A.  Well, if you look on the second page, the third page --
12    or second page of The Compass.
13 Q.  Yep.
14 A.  It gives you every single person who's responsible for
15    each part in the blue that's under the black print.
16 Q.  And generally speaking who do you think has more
17    specialized knowledge of Rocket's operations, the people
18    who were employed by Rocket, or market analysts looking
19    at only public information?
20       MR. MORGANROTH: Objection as to form and
21 foundation.
22       THE WITNESS: Well, Julie Booth, the CFO at
23 the time, would be most familiar with all these metrics.
24

101

1  BY MR. BARRY:
2  Q.  So let's look at page 33 of 72.
3        Now, this is the report from March 23rd, 2021,
4     which is the same day --
5        MR. MORGANROTH: Hang on a second. He hasn't
6     gotten there yet.
7        MR. BARRY: Sure.
8        THE WITNESS: Okay, I'm looking at it.
9  BY MR. BARRY:
10 Q.  All right. So the date on this is March 23rd, 2021,
11    which is the same date as the board meeting that we were
12    talking about earlier, do you remember that?
13 A.  Yes.
14 Q.  Okay. So this page on 33 of 72, this contains the
15    quarterly forecasts for all of 2021, right?
16 A.  I can't really read that red on the top.
17 Q.  Yeah. It says RKT Forecast, FCST 12, and then it says
18    Q1 2021 Forecast, Column C is Q2 2021 forecast, Column D
19    is Q3 2021 forecast, Column E is Q4 2021 forecast, and
20    Column F says CY 2021 forecast.
21 A.  Yes, I see it.
22 Q.  So that's Rocket's internal financial forecast for 2021,
23    right?
24 A.  Yes.

Confidential                     Daniel Gilbert - November 29, 2023

---

102

1      MR. MORGANROTH: Objection as to form.
2   BY MR. BARRY:
3   Q.  Let's look at line 13, please. It says, Rate lock gain
4      on sale margin excluding repurchase provision rock pile.
5         Do you see that?
6   A.  Yes.
7   Q.  What does excluding repurchase provision rock pile mean?
8   A.  Well, the rock pile are just loans that we couldn't
9      sell. There's always a small percentage of loans that
10     --
11  Q.  Okay.
12  A.  And there's reserve taken against those loans.
13  Q.  Okay. So this shows that Rocket is estimating its GOSM
14     for the first quarter of 2021 at 3.69, right?
15  A.  What line are you looking at?
16  Q.  Line 13.
17  A.  Say that again.
18  Q.  This shows that for the first quarter of 2021 Rocket is
19     internally forecasting its Q1 GOSM at 3.69 percent,
20     right?
21  A.  Yes.
22  Q.  And the second quarter at 3.05 percent, right?
23  A.  I don't see 3.05.
24  Q.  It's Column C, Q2 2021, it's right next -- immediately

---

103

1      to the right of 3.69.
2   A.  I don't even see the 3.69.
3   Q.  If you look on line 13.
4   A.  Okay. Yeah, I see. Yes. I'm not sure if that's just
5      for the rock pile or it's for the whole company.
6   Q.  Well, it says, Rate lock on gain for sale margin
7      excluding repurchase provision rock pile 3.69, and then
8      3.05 for second quarter, right?
9   A.  Where do you see 3.05, Jeff?
10     MR. MORGANROTH: Let's see. Line 13.
11     THE WITNESS: It's 3.18.
12     MR. BARRY: Do you want me to highlight the --
13     MR. MORGANROTH: No, no, no. He's turned to
14  another page. He's on 34.
15     MR. BARRY: Oh, thank you.
16     MR. MORGANROTH: Okay. So he's reading this
17  (indicating).
18     THE WITNESS: Yeah, I see that.
19  BY MR. BARRY:
20  Q.  Okay. So this is Rocket's internal forecast for first
21     quarter is 3.69 percent GOSM.
22  A.  Yep.
23  Q.  Second quarter's 3.05 percent GOSM.
24  A.  Yep.

---

104

1   Q.  Third quarter's 2.95 percent GOSM.
2   A.  Yes.
3   Q.  And fourth quarter, 2.86 GOSM.
4   A.  Yep.
5   Q.  So for the full year it's forecasting 3.18 percent,
6      right?
7   A.  Yep.
8   Q.  So this forecast was showing a significant -- a drop
9      from 3.69 to 3.05 from the first to the second quarter,
10     right?
11  A.  Yes.
12  Q.  And that's a decline of about 17 percent, right?
13  A.  Yep.
14  Q.  And then after that 17 percent decline for the next two
15     quarters it's about another three percent decline each
16     quarter, right?
17  A.  Yeah. Those are very small declines, considering the
18     volatility of the market.
19  Q.  Right. So the biggest drop was from the first to the
20     second quarter, right?
21  A.  Yes.
22  Q.  So let's look at revenue, projected adjusted revenue for
23     Rocket on line 16. So it's showing about $4 billion for
24     the first quarter, $3.2 billion for the second quarter,

---

105

1      2.695 for the third, and 2.317 for the fourth quarter,
2      right?
3   A.  Yep.
4   Q.  And for a total adjusted revenue of 12, 2, and 4 billion
5      for 2021, right?
6   A.  Yep.
7   Q.  And that was, if you look over two more columns over,
8      that was $439 million less than Rocket's prior internal
9      forecasts, right?
10  A.  Well, I don't see Rock's prior forecast.
11  Q.  Well, if you look at Columns G and H. Do you see DIFF
12     FCS 12 versus FCS 11, do you know what those numbers
13     are?
14  A.  What line are you looking at?
15  Q.  You have to look at the very top.
16  A.  Okay.
17  Q.  In the black boxes, under G and H, it says, DIF FCST 12,
18     v. FCST 11.
19        Do you know what that means?
20     MR. MORGANROTH: He can't see that because of
21  the paperclip. Hold on.
22     THE WITNESS: Forecast versus forecast.
23  Forecast 12 versus forecast 11.
24

---

106

1 BY MR. BARRY:
2 Q. Right. So this is saying – so looking at the adjusted
3    revenue on line 16 for the calendar year 2021, they're
4    saying these revised forecasts are $439 million less for
5    the year than the prior forecast, right?
6 A. But I'm not sure why it says 11 – I mean, 12 versus 11.
7    I don't really understand that.
8 Q. Okay. But this is referring to the prior forecast.
9       MR. MORGANROTH: Objection.
10 BY MR. BARRY:
11 Q. Comparison to the prior forecast, right?
12       MR. MORGANROTH: Objection as to form and
13 foundation.
14       THE WITNESS: I am not sure it's for the prior
15    forecast or how far back it goes.
16 BY MR. BARRY:
17 Q. All right. So let's look at page 34 of 72, which is the
18    next page.
19 A. Okay.
20 Q. This page compares Rocket's forecasts with analyst
21    consensus forecasts.
22 A. Okay.
23 Q. Right?
24 A. That's what it says at the top, yep.

107

1 Q. Okay. Here – so it's showing Rocket's GOSM for the
2    first quarter at 3.69 percent, which is the same number
3    we saw – this is going to line 13, that 3.69, which is
4    the same number we saw on the prior page.
5 A. Yes.
6 Q. And its calendar year 2021 at 3.18, also the same
7    numbers we saw on the prior page, right?
8 A. Yep.
9 Q. And the same revenue, adjusted revenue numbers from the
10    prior page at about $4 billion for the first quarter and
11    $12.2 billion for the year. So those are the same
12    numbers as the prior page.
13 A. Yes.
14 Q. Okay. So now it's showing what analysts' consensus
15    says, right? And for the first quarter it was showing
16    3.81 percent with adjusted revenue at 4.075, right?
17 A. Yep.
18 Q. But for calendar year 2021 the analysts were showing 3.5
19    percent with $13 billion in revenue, right?
20 A. Yes.
21 Q. So as of March 23rd, 2021, Rocket's internal models were
22    showing 2021 performance materially lower than what the
23    analysts' consensus was showing, right?
24       MR. MORGANROTH: Objection as to form.

108

1    Objection as to form.
2       THE WITNESS: You're looking at Column G, of
3    the DIFF of that?
4 BY MR. BARRY:
5 Q. Well, the Column G difference, for example, in revenue
6    was just the analysts' expectations are $830 million
7    higher than what Rocket's forecast was, right?
8 A. I don't see that DIFF.
9 Q. Do you see Column G, line 16?
10 A. Yes.
11 Q. Okay. So 13043 minus 12214 is 830, right? Rounded.
12 A. Yes.
13 Q. Okay. So as of March 23rd, 2023 – 2021, Rocket's
14    internal forecasts were showing – were projecting
15    performance almost $830 million less on an annual basis
16    than analysts' consensus, right?
17       MR. MORGANROTH: Objection as to form.
18    Objection as to form.
19       THE WITNESS: Yeah. That's what it looks like
20    here.
21 BY MR. BARRY:
22 Q. And Rocket's internal forecasts, as we discussed, were
23    non-public, right?
24       MR. MORGANROTH: Objection as to form.

109

1       THE WITNESS: Yep.
2 BY MR. BARRY:
3 Q. In Rocket's quarterly earnings announcements, Rocket
4    typically will disclose both the results of the prior
5    quarter and disclose guidance for its upcoming quarter,
6    correct?
7 A. Guidance with all those disclosures, yes.
8 Q. So, for example, when Rocket announced its fourth
9    quarter 2020 results in February of 2021 it disclosed
10    what those quarterly results were and provided guidance
11    for what it expected its first quarter results would
12    look like, right?
13 A. I mean, I don't know that for sure, but I think so.
14 Q. And The Compass reports like this was a tool that
15    Rocket's management and senior executives would use to
16    help formulate that guidance.
17       MR. MORGANROTH: Objection as to foundation.
18 BY MR. BARRY:
19 Q. Right?
20       MR. MORGANROTH: Objection as to foundation.
21 BY MR. BARRY:
22 Q. Right?
23 A. It's not the only one. There would probably be – I
24    assume that Jay had discussions with the CFO and

Confidential                    Daniel Gilbert - November 29, 2023

---

110

1  everybody else.
2  Q. Right. But in the discussions The Compass was – I
3     described it as a tool, would you agree that it's a
4     tool?
5  A. Yes, it's a tool.
6  Q. Let's look at Exhibit 16.
7          GILBERT EXHIBIT 16
8          5/5/21 Email and Attachment -
9          Rocket Delaware 00075416
10         WAS MARKED BY THE REPORTER
11         FOR IDENTIFICATION
12  BY MR. BARRY:
13  Q. Exhibit 16 is an email with an attachment produced at –
14     it's dated March 5th, 2021 – May 5th, 2021, produced at
15     Rocket Delaware 00075416.
16         Have you ever seen this document?
17  A. I do not recall seeing this document, no.
18  Q. Flip to the third page of the document. It begins,
19     Rocket Companies Announces First Quarter Results.
20  A. Yep.
21  Q. Do you know what this document is now?
22  A. No.
23  Q. This is the earnings announcement from Rocket Companies
24     that was published in May of 2021.

---

111

1  A. Okay.
2  Q. Did you see this document before it was published?
3  A. No.
4  Q. Have you ever seen this document?
5  A. This specific document?
6  Q. This specific document.
7  A. I don't recall seeing this specific quarterly document.
8  Q. Okay. But does this look familiar with the kind of
9     earnings report that Rocket would typically issue on a
10    quarterly basis?
11         MR. MORGANROTH: Objection as to form.
12         THE WITNESS: I mean, it looks familiar like
13    any company would release, to me.
14  BY MR. BARRY:
15  Q. Well, let's look at the announcement – the materials
16    that were provided. Let's look at the first – on the
17    first page of the earning – the announcement itself.
18    We have the bullets at the top. We have Grew Revenue,
19    Net to 4.6 billion, Up 236 percent year over year.
20         Do you see that?
21  A. Yes.
22  Q. It says, Increased adjusted revenue to 4 billion, up 91
23    percent year over year, right?
24  A. Yep.

---

112

1  Q. And it says, Grew net income to 2.8 billion up 28 times
2     year over year, right?
3  A. Yes.
4  Q. It says, Increased adjusted net income to 1.8 billion,
5     up 170 percent year over year, right?
6  A. They're talking about the previous year over the year
7     before that.
8  Q. Correct.
9  A. Yep.
10  Q. You would consider these to be very good results for the
11     company, right?
12  A. Yes, yes.
13  Q. Let's look at the second page, under The First Quarter
14     Highlights – one, two, three, four – the fifth bullet
15     down, it says, Increased, gain on sale margin by 49
16     basis points year over year to 3.7 to 4 percent.
17         Do you see that?
18  A. Yes.
19  Q. That's actually better than what was being projected in
20     March, right, that 3.69?
21  A. The projection in March, isn't that for the year that –
22     this is a different year, right?
23         MR. MORGANROTH: And I'm going to object as to
24     form.

---

113

1  BY MR. BARRY:
2  Q. You can look back at page –
3         MR. MORGANROTH: Which exhibit?
4         MR. BARRY: Let's do Exhibit 15.
5         MR. MORGANROTH: Okay.
6         MR. BARRY: On page 33 of 72.
7         THE WITNESS: This is talking about the 12
8     months ended 2021.
9         MR. BARRY: Right.
10  BY MR. BARRY:
11  Q. Now, if you look at page – on Exhibit 15, page 33 of
12     72, under the Column B, First Quarter Forecast, the
13     internal forecast for GOSM for the first quarter was
14     3.69 percent, right?
15  A. Yep.
16  Q. And the actual results for the first quarter as
17     disclosed in Exhibit 16 is 3.74 percent, right?
18  A. Yes.
19  Q. Okay. So I'm just saying that the disclosed GOSM
20     performance for the actual first quarter was a little
21     higher than what was – what the company was expecting
22     in March of 2021, right?
23  A. Yes.
24  Q. Okay.

---

Confidential                     Daniel Gilbert - November 29, 2023

---

114

1   A.  As I said earlier, these margins can fluctuate daily,
2       let alone quarterly or yearly.
3   Q.  All right.
4   A.  Significantly.
5   Q.  But the second quarter outlook, let's look at the second
6       quarter guidance that the company provided on page
7       three.  Okay?
8   A.  Yeah.
9   Q.  So second quarter 2021 outlook, do you see that at the
10      very bottom of the page?
11  A.  Yes, I do.
12  Q.  It says, We expect the following ranges in Q2 2021: It
13      says, Closed loan volume of between 82.5 billion and
14      89.5 billion, bullet, Net rate lock volume of between
15      81.5 billion and 88.5 billion, and bullet, Gain on sale
16      margins of 2.65 percent to 2.95 percent.
17          Do you see that?
18  A.  Yes.
19  Q.  Now, on the low end that's a drop of over an entire
20      percentage point from the GOSM for the first quarter,
21      right?
22  A.  I've got to see that again.
23  Q.  Well the previous page said the increased gain on sale
24      margin for the first quarter was 3.74 percent, and the

---

115

1       gain on sale margin here for the second quarter is going
2       to be 2.65 and 2.95 percent.
3   A.  Yes.
4   Q.  All right.  So that's a drop of an entire percentage
5       point.
6   A.  Yeah.  We were in a significantly rising rate in the
7       market.  The Fed was moving, like, every other month, or
8       every month they were moving rates up.
9   Q.  Well, do you consider that a material change from the
10      first quarter to the second quarter?
11          MR. MORGANROTH:  Objection as to form.
12          THE WITNESS:  We went from –
13  BY MR. BARRY:
14  Q.  3.74 to 2.65 to 2.95.  That would be a material change,
15      right?
16          MR. MORGANROTH:  Objection as to form.
17          THE WITNESS:  Well, the low end was – I'm
18      just confused at where everything was here.
19          MR. BARRY:  Sure.
20          THE WITNESS:  The low end is 2.65, and the
21      previous forecast was –
22  BY MR. BARRY:
23  Q.  The previous results was 2.74.
24  A.  3.74.

---

116

1   Q.  3.74.  So the drop from 3.74 to 2.65 is a material drop,
2       right?
3           MR. MORGANROTH:  Objection as to form.
4           THE WITNESS:  Not considering where rates were
5       going it's not a material drop.
6   BY MR. BARRY:
7   Q.  Well, the market thought it was a material drop, right?
8           MR. MORGANROTH:  Objection as to form and
9       foundation.
10  BY MR. BARRY:
11  Q.  The market thought it was a considerable drop, right?
12          MR. MORGANROTH:  Same objection.
13          THE WITNESS:  I don't know.
14  BY MR. BARRY:
15  Q.  Okay.  Let's look at Exhibit 17.
16          GILBERT EXHIBIT 17
17          5/6/21 Email with Attachment -
18          Rocket Delaware 00000635
19          WAS MARKED BY THE REPORTER
20          FOR IDENTIFICATION
21          MR. MORGANROTH:  Were you done with those
22      exhibits?
23          MR. BARRY:  Yes.
24  BY MR. BARRY:

---

117

1   Q.  Exhibit 17 is an email attaching some analyst reports
2       produced at Rocket Delaware 00000635, dated May 6th,
3       2021.
4           This email is dated the day after the earnings
5       announcement that we just reviewed.  Have you ever seen
6       this email?
7   A.  No.
8   Q.  It attaches some analyst reports.
9   A.  Okay.
10  Q.  And I'd like to look at a few of them.  Look at page –
11      look at the third page of the document, which is ending
12      637.  Rocket Delaware 637.  Looking at this sideways.
13  A.  Yeah.
14  Q.  This is the second page, if you look at the first page
15      it's the analyst report from B of A Global Research,
16      right?
17  A.  Yep.
18  Q.  And this says, Key Takeaways, Expect RKT shares to
19      underperform tomorrow after it provided underwhelming 2Q
20      guidance.
21          Do you see that?
22  A.  Yes.
23  Q.  And it highlighted the second bullet, 2Q gain on margin
24      guidance of 2.65 to 2.95 is meaningfully below consensus

---

118

1   at 3.4.
2       Do you see that?
3   A.  Yes.
4   Q.  So Bank of America thought the drop was a material drop,
5       right?
6       MR. MORGANROTH:  Objection as to form.
7       THE WITNESS:  Yeah.  These analysts can be all
8   over the place, but --
9   BY MR. BARRY:
10  Q.  But Bank of America thought it was a material drop,
11      right?
12  A.  Yes.
13  Q.  So let's look at page ending Rocket Delaware 648, which
14      is the Citigroup analyst report.
15  A.  I don't know where that is.
16  Q.  You see this is the Citigroup analyst report dated May
17      6th, 2021, right?
18  A.  Yes.
19  Q.  And it says, First 1Q '21 review, GOS reset sooner and
20      lower than expected.  It says, We knew that gain on sale
21      margins were going to come down after record high levels
22      in 2020, but we thought it would be a more gradual, but
23      take a bit longer.  After posting still above average
24      margins in 1Q the guide for GOS margins of 2.65 to 2.95

119

1   takes some of the wind out of RKT's sales, right?
2   A.  Yep.
3   Q.  And if you look at the last -- the third paragraph,
4       Solid Q1 results but guidance soft, the last sentence
5       there says, Gain on sale margin in the range of 2.65
6       percent and 2.95 percent is also below our prior
7       estimates of 3.24 percent, right?
8   A.  Yep.
9   Q.  Looking at Delaware 660.
10      This is Credit Suisse, under the first bullet
11      point, again highlighting the lowered guidance.
12  A.  I mean, this is what you would fully expect, we guided
13      lower, so they lowered their estimates.
14  Q.  Right.
15  A.  And reported the margin differences.
16  Q.  And if you look at page 679, which is JP Morgan.
17      MR. MORGANROTH:  You're skipping 660?
18      MR. BARRY:  Yeah.
19  BY MR. BARRY:
20  Q.  Let's look at page 679, which is JP Morgan.  Just look
21      at the last bolded sentence on the first paragraph.
22      MR. MORGANROTH:  Hang on a second.
23      MR. BARRY:  Sure, sure, sure.
24      MR. MORGANROTH:  We're not there yet.

120

1       MR. BARRY:  Sure.
2       THE WITNESS:  Okay.
3   BY MR. BARRY:
4   Q.  JP Morgan, in bold, We expect shares to trade lower on
5       guidance that suggests GOS margins are normalizing more
6       rapidly than previously assumed.
7       Do you see that?
8   A.  Yep.
9   Q.  Do you know what the company's stock price did after the
10      earnings results were released and the guidance was
11      released on --
12  A.  I don't really pay attention to stock price, so I didn't
13      know.  We're a thinly-traded stock so --
14  Q.  Do you know that the stock fell 27 percent following
15      these announcements?
16  A.  Well, 27 percent on a low, we're trading at a buck or
17      under a buck or whatever we were, I can't remember what
18      we are trading at.
19  Q.  Sitting here today, do you remember it fell 27 percent
20      after this announcement?
21  A.  No.
22      MR. BARRY:  I may be done.  Could you just
23  give me a few minutes?
24      MR. MORGANROTH:  Sure.

121

1       THE VIDEOGRAPHER:  This marks the end of Media
2   Unit Number 4, we are off the record at 2:27.
3       (A short recess was taken)
4       THE VIDEOGRAPHER:  This marks the beginning of
5   Media Unit Number 5, the time is 2:29 p.m., we are back
6   on the record.
7       MR. BARRY:  I have no further questions.
8       MR. MORGANROTH:  No questions.
9       THE VIDEOGRAPHER:  This concludes today's
10  testimony, given to us by Mr. Dan Gilbert.  The total
11  number of media units --
12      MR. MORGANROTH:  Wait one second.  We need to
13  designate the transcript as confidential, including the
14  exhibits that have been marked confidential by the
15  attorneys in discovery.
16      MR. BARRY:  Okay.
17      THE VIDEOGRAPHER:  This concludes today's
18  testimony, given to us by Mr. Dan Gilbert.  The total
19  number of media units used was 5.  We are off the record
20  at 2:30 p.m.
21      (The deposition was concluded at 2:30 p.m.)
22
23
24

122

1          CERTIFICATE OF NOTARY

2

3    STATE OF MICHIGAN        )

4                    ) SS

5    COUNTY OF MACOMB         )

6

7         I, LAURA J. STEENBERGH, Certified Shorthand

8    Reporter, a Notary Public in and for the above county

9    and state, do hereby certify that the above deposition

10   was taken before me at the time and place hereinbefore

11   set forth; that the witness was by me first duly sworn

12   to testify to the truth, and nothing but the truth, that

13   the foregoing questions asked and answers made by the

14   witness were duly recorded by me stenographically and

15   reduced to computer transcription; that this is a true,

16   full and correct transcript of my stenographic notes so

17   taken; and that I am not related to, nor of counsel to

18   either party nor interested in the event of this cause.

19

20         _____

21         LAURA J. STEENBERGH

22         CSR 3707 Notary Public,

23         Macomb County, Michigan

24   My Commission expires:  2/14/28

**$**

**$1.2** 21:7

**$1.5** 21:7

**$100,000** 95:9

**$12.2** 107:11

**$13** 107:19

**$18** 21:5

**$3** 21:4

**$3,000** 95:10

**$3.2** 104:24

**$300** 93:14,17

**$4** 104:23 107:10

**$4.9** 59:6

**$439** 105:8 106:4

**$5** 57:24 59:9

**$500** 49:24 50:7,12,23 51:4 52:20 53:16 54:18 55:14,22 57:16,18 59:14, 15 60:6,21 81:21 82:2

**$830** 108:6,15

**0**

**00000635** 116:18 117:2

**00025566** 98:16,24

**00025592** 58:5,14

**00036686** 17:18,20

**00037523** 10:24 11:2

**00037803** 69:8,13

**00064847** 28:18 30:20

**00065027** 74:15 75:18

**00070799** 45:13,20

**00075416** 110:9,15

**00076347** 82:16,21

**00086838** 87:19 88:1

**00087551** 51:18,23

**00097663** 66:14,19

**1**

**1** 7:4,6 10:22 11:1 51:11 52:18

**1.8** 112:4

**10** 12:4 50:7 52:22 53:24 54:1 69:6,7, 12 71:12 83:8,10,11,23 84:16

**10-K** 67:7 84:15 85:4

**10-page** 32:17

**10-Q** 18:2

**10-year** 53:22 55:14,22 57:16 64:13 86:16,17 92:4 97:4

**100** 21:5

**10b5-1** 40:6 44:18,20,22 45:6,8

**10th** 79:17 80:6,10,19,23

**11** 72:13,14,20 75:14 86:11 105:12, 18,23 106:6

**11223** 95:4

**11:00** 73:9

**11:22** 7:3

**12** 74:12,13 75:9 79:23 84:16 93:6 101:17 105:4,12,17,23 106:6 113:7

**12061** 95:3

**12214** 108:11

**124** 94:12

**12:17** 51:11

**12:18** 51:14

**12:45** 71:4

**12th** 78:21 80:3 81:21 82:3

**13** 82:14,15,20 83:15 84:17,18 102:3, 16 103:3,10 107:3

**13043** 108:11

**14** 64:3,4 87:15,16,23

**144** 67:18

**144A** 67:9,14,16,24 68:3,8,10

**15** 20:17,18 53:24 64:2,23 83:16 98:13,14,22 113:4,11

**150** 53:3

**15th** 83:2 84:4,6

**16** 39:3 104:23 106:3 108:9 110:6,7, 13 113:17

**167** 94:12

**17** 104:12,14 116:15,16 117:1

**170** 112:5

**17th** 46:11 78:20 79:14,15,18 80:2,8 84:8

**18** 17:14

**18th** 47:24 48:16

**1934** 39:4

**19th** 83:9,22 84:2 85:14

**1:22** 71:7

**1:26** 75:2

**1:27** 75:6

**1Q** 118:19,24

**1st** 45:19 80:14,15,18

**2**

**2** 17:17,19 18:20 51:14 54:5,8 71:4 105:4

**2.317** 105:1

**2.65** 114:16 115:2,14,20 116:1 117:24 118:24 119:5

**2.695** 105:1

**2.74** 115:23

**2.8** 112:1

**2.86** 104:3

**2.95** 104:1 114:16 115:2,14 117:24 118:24 119:6

**2/26/21** 51:18

**2/8/21** 47:6

**20** 14:13

**2000** 92:20

**2008** 22:4

**2019** 14:10 73:4

**2020** 13:6 15:10 16:13,20 18:11 20:6 24:22 27:1,7,11,18 28:7 39:14 63:8 67:22 84:14 85:3 93:12 94:11,20 109:9 118:22

**2021** 13:6 14:17 15:11 37:24 38:19 39:12 44:18 45:7,19 46:15 47:24 48:11 49:7,9 50:19 51:22 52:8 53:23 54:19,21,24 55:21 56:6,11 57:19,24

58:13 59:2,8 60:7,18 64:9,18,19 65:2,
4,9,15 66:4 68:4,16 71:22 72:21 73:2
75:11 80:6,10,15 81:20,22 82:2,3
83:3,9,16,22 84:2,4,6,15 85:3,4,15,
16,23 86:2,4,6,9,12,21,24 87:2,18,24
88:1,7,21,22 89:2,16 92:21 93:8,13,
16 99:7,22 101:3,10,15,18,19,20,22
102:14,18,24 105:5 106:3 107:6,18,
21,22 108:13 109:9 110:14,24 113:8,
22 114:9,12 117:3 118:17

**2023** 7:2 108:13

**21** 14:13 118:19

**21st** 94:20

**22** 17:11 21:7

**22nd** 52:8 75:11 79:4,13,16,23

**23** 86:12 99:7

**236** 111:19

**23rd** 72:21 73:2 75:13 76:12 87:24
88:7,21,22 101:3,10 107:21 108:13

**24** 17:12 85:4

**24th** 67:8

**25** 91:22 93:6

**25th** 49:7,9,11,13,23 52:23 59:1
84:14 85:3

**26th** 51:22 58:13

**27** 120:14,16,19

**28** 112:1

**29** 85:16

**29th** 7:2 64:18,19 65:2

**2:27** 121:2

**2:29** 121:5

**2:30** 121:20,21

**2Q** 117:19,23

---

### 3

**3** 17:10 19:12 21:24 22:1 23:13 28:15,
16 36:2 45:16 54:5 71:7 75:2

**3.05** 102:22,23 103:8,9,23 104:9

**3.18** 103:11 104:5 107:6

**3.19** 93:24 95:12

**3.24** 119:7

**3.4** 118:1

**3.5** 93:20 107:18

**3.69** 102:14,19 103:1,2,7,21 104:9
107:2,3 112:20 113:14

**3.7** 112:16

**3.74** 113:17 114:24 115:14,24 116:1

**3.81** 107:16

**3.9** 93:20

**3/1/21** 45:13

**3/22/21** 74:14

**3/23/21** 72:15 87:17

**3/26/21** 58:5

**30** 11:14,15 21:7 74:20

**300** 86:23 95:10

**31** 94:4 97:8

**33** 101:2,14 113:6,11

**34** 103:14 106:17

**35** 19:7 94:14

**350** 53:3

**36** 23:13

---

### 4

**4** 17:10 45:11,12,19 64:4,8 75:6 80:13
105:4 111:22 112:16 121:2

**4.075** 107:16

**4.6** 111:19

**40** 11:14,15

**47** 70:16,20 71:23 76:20,22

**48226** 7:7

**49** 112:15

---

### 5

**5** 46:24 47:5 64:1,22 121:5,19

**5/5/21** 110:8

**5/6/21** 116:17

**50** 21:6 54:1,22,23 65:21

**500** 67:9

**5th** 39:14 110:14

---

### 6

**6** 51:16,17,22 58:9,10 86:12

**637** 117:12

**648** 118:13

**660** 119:9,17

**679** 119:16,20

**6th** 117:2 118:17

---

### 7

**7** 18:18,19 58:3,4 73:19

**70** 78:16

**72** 101:2,14 106:17 113:6,12

**75** 11:22

---

### 8

**8** 61:2,3,9,10,13,17 90:7 91:22

**80** 86:20

**81.5** 114:15

**82.5** 114:13

**830** 108:11

**88.5** 114:15

**89.5** 114:14

---

### 9

**9** 66:12,13,18 73:19 79:6,7,17 80:5
86:12

**9.3** 55:8

**91** 111:22

**94** 59:4

---

### A

**a.m.** 7:3 73:9

**ability** 9:6 31:11 83:4,17

**accelerate** 67:7

**access** 55:8,9,10

**accommodate** 8:20

accordance 70:7

accurate 78:13 97:17

achieve 17:14 21:6

achieved 22:22 25:14

Achieving 20:24

acquisition 42:1,21

acquisitions 17:2

Act 39:3

actual 63:12 113:16,20

Adam 7:24

addition 78:8

additional 54:13

addressed 45:23

adjusted 86:24 95:2,3 104:22 105:4 106:2 107:9,16 111:22 112:4

advance 97:11

advice 85:7

affects 98:10

affiliated 33:22 35:2

affirmatively 81:14 86:13

agree 68:10 91:4 110:3

agreed 16:17

agreement 70:8

agrees 62:22

ahead 42:15 72:3 77:2 84:22 88:15 89:7 97:24

allegations 63:13

allowed 78:9

America 118:4,10

amount 21:16,18 25:19

amplify 50:6,9

Amrock 87:3

analyst 106:20 117:1,8,15 118:14,16

analysts 100:18 107:18 118:7

analysts' 87:2 100:4 107:14,23 108:6,16

Angelo 77:6 80:14

announce 49:24

announced 49:23 52:22 109:8

announcement 49:7 50:6 52:16 54:4 110:23 111:15,17 117:5 120:20

announcements 109:3 120:15

Announces 110:19

annual 40:11 97:6,18 108:15

answers 8:15

apologies 58:17

appears 38:22 44:1

Appendix 19:8

applicable 31:18 32:5 35:18

Application 35:14,15

applied 33:3

applies 32:21 33:2,11 40:18 41:22 42:19

apply 33:15 38:9 41:6,15 43:12

approvals 73:23

approve 31:5,8 68:3

approved 40:6 44:22 85:14

approving 31:4

April 14:11

area 14:24 21:9,10

assess 85:5

assets 53:10

assistant 47:18 74:19

association 7:10 86:20 92:21,24

assume 39:16 41:17 46:5,8 47:19 52:10 63:23 76:14 90:4 109:24

assumed 96:22 120:6

assumption 43:10 49:1

attached 17:24 18:5,8 98:23 99:8

attaches 117:8

attaching 117:1

attachment 18:19 20:19,20 47:6,10 52:1,2,5,15 58:18 59:1 98:15 110:8, 13 116:17

attachment's 47:24

attend 48:16

attended 48:22,24

Attendees 48:18

attending 48:20

attention 120:12

attorneys 121:15

audit 73:21,22,23 74:6,14 75:10,20

August 39:14

authority 68:3,15 69:2

authorized 26:20 29:1 41:7,8 43:14 69:18

Auto 87:4

average 93:19 95:8 118:23

aware 12:6 35:21 41:21,24 42:18,20 44:20 46:14,16,17 57:1,3,11 58:2 64:18,20 69:5 71:21 76:9 81:12 89:11,12

**B**

back 13:13 14:12 18:5 19:7 23:12,13 26:21 29:13 41:19 50:3 51:14 55:11 69:2 71:7,10 73:7,19 75:6 79:5,22 80:5,13 83:8 86:11 90:13,15 95:20 106:15 113:2 121:5

Bank 118:4,10

banker 25:22 67:3

bankers 17:9 86:20 92:21,24

banks 22:4

Barry 7:14 8:5,6,10 10:2 11:5 12:9,16 13:1,13,21 15:2,17,23 16:5,18 17:23 18:19 19:1 20:5,20,22 22:15 24:10,21 25:15 26:18 28:14,21 29:13,18 30:2, 9,17 32:18 34:22 35:13 40:4 42:8,12, 16 43:24 44:3,14 45:5,17,18 46:22 47:9,13,15 51:9,15,21 55:5,6 56:2,13 57:2,13,23 58:10,12 59:11,21 60:3,13 61:2,10,12 63:19 66:1,17 68:2,9,14 69:1,11,22 70:24 71:2,9 72:12,19 74:11,21 75:8 76:16 77:8,20 78:15,18 79:9,10 81:7 82:1,19 83:14 87:14,22 88:10,19 89:13,19 90:6,13,15,21,24 91:9,15,21 93:23 95:7,20,21 96:11 97:12,19 98:1,12,19 100:8 101:1,7,9 102:2 103:12,15,19 106:1,10,16 108:4,21 109:2,18,21 110:12 111:14 113:1,4,6,9,10 115:13,19,22 116:6, 10,14,23,24 118:9 119:18,19,23 120:1,3,22 121:7,16

**based** 21:21 22:24 48:21 95:15 96:18,22

**Basics** 52:16

**basing** 96:3

**basis** 13:3 45:1 58:20 91:5 94:4 95:11 97:8 108:15 111:10 112:16

**beginning** 7:4 39:22 51:13 54:9 71:6 75:5 121:4

**begins** 79:2 83:2 110:18

**behalf** 7:19,22 62:18

**belief** 62:14

**beneficial** 37:1,4

**beneficially** 11:21

**benefits** 65:7,13

**big** 50:4 63:10

**biggest** 104:19

**billion** 17:10 21:4,7,24 22:1 59:6,9 86:23 93:14,17 104:23,24 105:4 107:10,11,19 111:19,22 112:1,4 114:13,14,15

**bit** 12:13 46:23 53:9 118:23

**biweekly** 58:20

**black** 100:15 105:17

**block** 20:14 21:15 25:11 27:2,4,8,10, 15 29:1,8 41:17 63:17,20,22 68:11, 16,23 71:24

**Bloomberg** 92:11

**blue** 21:9,10 100:15

**board** 30:24 31:1,5,7 38:18 39:7 41:7,8 43:14 69:3 72:16,20 73:1,18, 22,24 75:13 76:12 87:9,18,24 88:6,7, 11,17,20,21,22,23 89:1,6,9 93:13 94:11 101:11

**boards** 38:15

**Bob** 86:1

**bold** 120:4

**bolded** 119:21

**bond** 92:4

**Booth** 86:4 100:22

**bottom** 20:23 33:6,8 59:4 89:21 114:10

**bought** 30:11

**boxes** 105:17

**boy** 19:8

**Brandon** 7:8

**break** 8:19,23 70:23 71:11,17

**bring** 12:14 14:8 17:4

**broad** 9:20

**brought** 95:9

**Brown** 86:6,15,22 87:3,10

**buck** 120:16,17

**building** 54:11

**bullet** 19:18 38:13,15,23 54:8 112:14 114:14,15 117:23 119:10

**bullets** 111:18

**bump** 14:7

**bunch** 97:3

**business** 13:5 28:12 40:10 95:23

**businesses** 13:18

**buy** 35:19 92:24

### C

**calculated** 76:23 95:15

**calculating** 96:18

**calendar** 36:16 54:21,22,24 57:19 65:8,15 66:3 106:3 107:6,18

**call** 22:3

**called** 37:8,9 81:10

**Campus** 7:6

**capital** 17:1 20:12 22:8 53:13 58:19

**case** 22:8 38:22 39:16 44:2 63:2,5 71:18,19

**cash** 22:7,16,18 27:3 28:8,13 29:6,9, 10,16,17,19,22,24 30:1 53:17 58:1 59:1,5,8 60:6,14 64:10 66:8

**CBS** 52:7,11

**Central** 7:6

**CEO** 25:24 89:14,16

**cetera** 33:5

**CFO** 22:19 100:22 109:24

**chairman** 39:1 73:21

**change** 97:13,14 115:9,14

**changed** 97:9

**charitable** 60:20 65:3

**chart** 10:23 11:2 70:13

**chief** 38:24 39:1

**children** 33:4,16

**choosing** 49:20

**chose** 49:15,18

**chosen** 49:10,11,13

**circumstances** 56:24

**Citigroup** 118:14,16

**city** 47:2,22 48:4 53:17,18,20 60:16

**claim** 63:9

**claims** 63:2,4

**Class** 22:22 23:17 24:24 26:21 64:9, 17,19,21 65:2 70:2,4

**clear** 44:17 60:19 90:9,12

**clearance** 69:3

**Cleveland** 54:12

**close** 40:22 46:10 68:24 84:8

**closed** 76:5 78:20 79:5,12,13,15,20 80:1,12 81:16 83:5,19 93:13 114:13

**closely** 97:10

**closer** 25:20

**collectively** 32:23 33:5,22 84:12,24

**column** 23:20 101:18,19,20 102:24 108:2,5,9 113:12

**columns** 105:7,11

**combination** 63:16

**combined** 68:21

**commences** 40:10

**commitment** 47:1 48:4 49:24 50:12, 17 52:21,22,24 53:16,22 55:14,15,22 56:5,11,17,21 57:14 59:15,16 60:7, 16,21 64:13 65:21 66:3

**committee** 41:9 73:21,22 74:6,14 75:10,20,21 76:3

**committee's** 73:23

**common** 22:23 23:5,9 24:23,24 26:5,10,20 30:7 64:10,17,18,19,21 65:2 70:2,5 83:5,18

**commonly** 31:19 32:6

**communicate** 16:6,12

**communications** 13:7,23 15:14,24 85:22 86:1

**community** 52:20 53:3,7,14 54:17 56:5,10,19,20 57:15 60:5,17 64:14 65:7,11,12 66:9

**companies** 8:1 11:19 13:20 16:24 22:5,11,17,20 23:6,10 26:5,9,19 27:9 29:5,9,16 30:4,19 31:12 34:21 37:23 41:8 43:15 45:23 46:4,7 52:19 53:15 55:16,21 56:1 57:8 63:24 66:8 72:15, 21 88:12 91:20 110:19,23

**company** 13:4,16 24:14 29:23 31:18 32:4,22 35:3,11,17,20,22 36:4,16,23 38:4,7,16,24 39:8,20 40:8,19 41:1,7, 16,17 42:1,22 43:13,17 44:23 53:15 56:8 63:7,17,24 67:17 78:1,8 81:16 84:12 85:1 90:5 91:16 95:12,13,16 103:5 111:13 112:11 113:21 114:6

**company's** 40:11 76:5 77:10,12,14 78:19 79:2 80:1 83:3,4,16,18 84:13 85:2 86:17 95:23 98:4 100:3 120:9

**compared** 87:1

**compares** 106:20

**Comparison** 106:11

**Compass** 98:20 99:6,11,12,22 100:10,12 109:14 110:2

**Complaint** 63:13

**complete** 77:17

**comply** 31:18 32:4 35:18

**compressed** 86:18

**Compressing** 92:9

**concept** 24:5 35:11 67:21

**concluded** 121:21

**concludes** 121:9,17

**concurrent** 19:13,17,19 23:14,24 24:12,13,18,19 27:9

**conditions** 97:2

**confidential** 36:3 89:20 90:1,5 91:3, 13,17,20 92:6 121:13,14

**confirm** 85:11

**confused** 115:18

**connected** 54:12

**connection** 10:9 17:7 22:11 23:4 24:12,13 29:6 57:3 88:6

**consensus** 87:2 106:21 107:14,23 108:16 117:24

**considerable** 116:11

**considerably** 93:20

**considered** 34:7,10,13 36:9 84:12 85:1

**consummation** 69:24

**contemplate** 18:11 19:2

**contemplated** 27:16 53:17 57:18,20 69:4

**contemplating** 23:16 29:7

**contemporaneously** 90:11

**contents** 89:8

**contingent** 55:15,17 59:16 69:24

**continues** 36:8 40:22 84:10

**contribute** 53:13

**control** 11:20

**controlled** 53:10

**controlling** 83:3,17

**conversations** 27:24

**conversion** 22:22

**converted** 22:24

**converting** 24:24

**corner** 11:11

**corporate** 31:11 43:2 82:9

**corporation** 11:12

**correct** 18:14 24:6 27:18 32:9 33:5 34:8 37:5 39:8,9 53:24 55:22 56:11, 14,21 57:17 58:1 59:17 60:9,14 62:13 65:4,19 75:19 78:11 82:11 83:23 84:8 85:20 89:14 109:6 112:8

**correctly** 87:5,8

**counsel** 7:11 9:11 77:14 81:17 84:11,12,24 85:1,7,12

**couple** 18:4,21 51:2,3 73:6 95:24

**court** 7:9,13

**cover** 32:12,15 82:20 89:22,23 99:9

**covered** 43:20 44:12 78:6

**create** 60:5 95:22

**created** 95:16

**creating** 96:21

**credence** 97:6

**credit** 22:3 119:10

**Cromwell** 7:22

**CY** 101:20

---

**D**

**daily** 97:8 114:1

**Dan** 7:5 23:21,24 121:10,18

**Daniel** 7:20 8:2 61:15 62:7,12

**dashboard** 99:17

**date** 39:13,14 40:12 48:5 49:9,17,18, 20 68:19 79:19 101:10,11

**dated** 18:10 45:19 47:23,24 51:22 58:13 59:1 75:11 79:17 80:5,14 83:9, 22 87:24 110:14 117:2,4 118:16

**dates** 20:9 68:20

**day** 40:10 49:4 75:13 76:12 97:8 101:4 117:4

**day-to-day** 13:2

**days** 14:21,22

**December** 93:12 94:11,20

**decided** 49:16 50:11

**decision** 16:13 36:11 50:15

**decision-making** 28:3

**decisions** 12:7,12,14 25:23

**decline** 94:3,4 104:12,14,15

**declines** 104:17

**decrease** 86:19,21

**deemed** 81:17

**Defendant** 8:1

**defendant's** 61:4,13,24 62:9

**defendants** 61:15 62:11 64:8 65:1

**defined** 38:10 44:6 70:1,7

**defines** 33:11,12 34:4 35:11

**definition** 34:14 44:11

www.LexitasLegal.com/Premier
Lexitas 888-267-1200
Index: commonly–definition

**Delaware** 7:16 10:24 11:2 17:18,20 28:18 30:20 45:13,20 51:18,23 58:5, 14 66:14,18 69:8,13 74:15 75:18 82:16,21 87:19 88:1 91:1 98:16,23 110:9,15 116:18 117:2,12 118:13 119:9

**deliverable** 70:5

**depending** 67:8

**depends** 14:19,24

**deployed** 50:1

**depose** 62:8

**deposed** 8:11

**deposition** 7:5 9:9 121:21

**depositions** 63:9

**deputy** 84:11,24

**describe** 17:6

**designate** 121:13

**desires** 70:1

**details** 20:16 57:9 77:4

**determination** 22:19

**determine** 20:15 21:18 25:24

**determined** 76:23

**Detroit** 7:7 47:2,22 48:4,8,11 50:2,7, 13,17 52:21 54:11 60:16 65:8,14

**Detroiters** 55:11

**DIF** 105:17

**DIFF** 105:11 108:3,8

**difference** 72:7 96:10 108:5

**differences** 119:15

**digital** 55:8

**Diligence** 85:20

**dilute** 26:6,10,16

**direct** 39:2 43:16

**directed** 61:15 62:11

**directives** 28:3

**directly** 41:16 53:20 60:15

**directors** 12:18 13:7,19 31:17 32:3, 22 38:6,16,18 41:8 43:14 72:16,20 73:13 77:11 88:12 89:2

**dis** 27:11

**disbursed** 65:3

**disclose** 109:4,5

**disclosed** 109:9 113:17,19

**disclosing** 96:5

**disclosures** 109:7

**discovery** 90:19 91:14 121:15

**discuss** 48:7

**discussed** 48:5 57:20 67:21 85:12 86:15 87:9 108:22

**discussion** 9:19,23 17:9 18:4,7,10 19:2 24:22 26:1 47:4 48:10 51:12 75:4,23 76:1

**discussions** 9:12,15 20:7 21:20 26:4,8,14 27:1,5,7,12 50:20,22 66:6, 11 85:20 86:8 109:24 110:2

**dispose** 41:1

**distribute** 72:24

**distributed** 88:6,11 89:2,5 99:12

**distribution** 46:3,7 66:2,9 99:19,21

**distributions** 64:12 65:8,18

**divided** 53:6

**document** 11:6,7,8 12:17 17:24 18:17 19:2,5,8 20:17,18 30:18,22 31:2,4 32:14,16,17 37:7 39:13,14 48:21 51:24 53:1 58:15,21 59:13 61:16 62:2,16,19,23 66:21 69:14,16, 18 71:15 72:1 82:16,20,24 83:1 88:3 99:1,4 110:16,17,18,21 111:2,4,5,6,7 117:11

**documents** 10:10 47:16,20 61:20 62:5

**dollar** 60:18

**dollars** 21:7

**donate** 54:18 66:7

**donated** 60:14 65:3

**donation** 53:17 65:19

**download** 92:10,15

**drafting** 31:2

**drop** 104:8,19 114:19 115:4 116:1,5, 7,11 118:4,10

**dry** 22:6

**Due** 85:20

**duly** 8:3 41:8 62:8

---

**E**

**earlier** 26:22 27:22 29:24 44:10 77:4 82:8 89:3 97:3 101:12 114:1

**early** 81:16

**earning** 111:17

**earnings** 36:15,17 84:14 85:2 109:3 110:23 111:9 117:4 120:10

**Eastern** 7:3

**easy** 58:17

**economic** 54:14

**educated** 97:4

**effecting** 27:2

**effective** 19:20

**efficient** 66:7

**Eisenhofer** 7:15,18 8:7

**Elkins** 16:16 20:10 25:21 63:21 66:23 67:1 68:15,21 79:6 80:23

**email** 14:1 16:10,12 17:17,24 18:6 45:13,19,21,22 46:9 47:6,23 48:18 51:18,22 58:5,13 80:13,18 82:16,20 98:15,22 99:9 110:8,13 116:17 117:1, 4,6

**Email/presentation** 17:20

**emailed** 88:18 89:7

**emails** 16:11

**employed** 100:18

**employees** 11:17,18,23 12:5 15:5,6, 12,15

**employment** 55:10

**end** 18:5 31:16,24 40:13 51:10 71:3 75:1 114:19 115:17,20 121:1

**ended** 17:2 113:8

**ending** 117:11 118:13

**ends** 40:12

**engage** 35:20

**ensure** 31:17 32:3

**enter** 40:8

**entire** 114:19 115:4

entities 10:13 59:5

entity 54:19

equity 19:20

equivalents 59:6,8

establishes 37:8 44:24

estate 55:19

estates 33:20 34:24

estimates 119:7,13

estimating 102:13

evaluate 94:15

event 48:8,11

exact 58:2

EXAMINATION 8:10

examined 8:3

Examples 36:14

exchange 39:3 57:7 69:8,12 70:4,8 71:12,21,23 72:10 74:7 75:22 76:1,4, 19 81:8 83:9,22

exchanged 70:16

excluding 102:4,7 103:7

execute 23:21 25:5 68:16

executed 29:3

execution 19:20 85:15

executive 38:24 39:8

executives 38:23 109:15

executor 33:20 35:1

exemption 81:11

exercises 40:9

exhibit 10:22 11:1 12:18 17:17,19 28:15,16,22 45:11,12,19 46:24 47:5 51:16,17,22 58:3,4,9,10 61:2,3,8,10, 13,17 66:12,13,18 69:6,7,12 71:12 72:13,14,20 74:12,13 75:9,14 79:5,7, 17,22 80:5,13 82:13,14,15,20 83:8, 10,11,15,23 86:11 87:15,16,23 98:13, 14,22 110:6,7,13 113:3,4,11,17 116:15,16 117:1

exhibits 116:22 121:14

expect 96:4,15,19,20 114:12 117:18 119:12 120:4

expectation 100:4

expectations 108:6

expected 36:15 54:18 78:20 80:2 109:11 118:20

expecting 17:11 96:17 113:21

expects 86:22,23 95:13

explain 16:22 21:14 49:9 95:8

explained 76:2 77:10 78:24 86:17

**F**

fall 15:10 20:6 24:22 27:1,7,11,17 28:7 67:22

familiar 23:1 24:17 26:23 58:21 77:5 98:20 100:23 111:8,12

families 54:11,13

family 10:19 12:2 40:7,24 47:1 49:6 52:18,19 53:8 54:10 56:4,10,19 57:15 64:13 65:6,13 66:10

Farnen 68:21

Farner 16:15 20:10 25:4,17,24 26:8 34:10 39:7 44:15 46:6,17,21 68:3,15 80:23 81:9 85:22 89:8

FCS 105:12

FCST 101:17 105:17,18

February 47:24 48:11,15 50:19 51:22 84:14 85:3 109:9

Fed 115:7

fee 63:10

fell 120:14,19

felt 27:22

file 98:23 99:9

filed 44:22,23

filing 67:7 84:15 85:4

final 28:23

Finance 86:14 87:17,23

financial 21:21 25:23 37:1,4 39:1 40:12 47:1 48:4 65:7,13 91:24 95:22 96:3 97:20 99:6,11 101:22

financials 90:5 91:20

find 42:10 63:9

fine 10:21

finish 81:13

firm 63:6 77:7

fiscal 40:13 93:8

fit 63:9

flip 18:3,20 19:7 20:17 50:3 73:19 82:22 86:12 110:18

fluctuate 97:7 114:1

focus 15:10

follow 28:23

forecast 86:15 87:7 93:16 94:5,11, 12,20 95:12 96:21 97:5,9,10,13 99:7 101:17,18,19,20,22 103:20 104:8 105:10,22,23 106:5,8,11,15 108:7 113:12,13 115:21

forecasted 93:13

forecasting 86:20 93:8 102:19 104:5

forecasts 87:1,10 91:16,24 92:20 93:9 95:23 96:2,13,15,18 97:20,22 98:2,3 100:3 101:15 105:9 106:4,20, 21 108:14,22

foregoing 62:9 64:7 65:1

forgot 77:6

form 12:8,22 13:9 14:18 15:16 16:2, 14 20:2 22:13 24:7,15 25:9 26:12 27:13 28:11 29:21 30:5,13 32:11 34:19 35:7 44:8 45:2 46:18 55:1,23 56:12,22 57:5,22 59:10,18 60:2,10,22 63:14 65:20 67:23 68:5,13,18 69:21 72:2 74:9 76:13 77:2,18 78:12 81:2, 23 84:15 85:4 87:11 88:14 89:17 90:2 91:11,18 93:21,22 95:6,17 96:7,23 97:15,24 98:5 100:5,20 102:1 106:12 107:24 108:1,17,18,24 111:11 112:24 115:11,16 116:3,8 118:6

formal 89:1,3

formalities 8:14

format 23:8 27:13 29:2 58:22 68:23

formulate 109:16

foundation 10:19,20 15:3,5 30:6 34:20 35:8 46:19 47:1 49:7 52:19 53:8,12 54:10,17 56:4,10 57:15 60:5 64:14 65:6,11,13 66:10 68:6 81:3 87:12 88:8,15 89:10 90:3 91:12 96:8, 24 98:6 100:21 106:13 109:17,20 116:9

**foundations** 65:10

**fourth** 104:3 105:1 109:8

**frame** 11:10 13:6 14:9 15:9 48:6

**framing** 47:4

**friends** 12:1

**front** 62:6

**full** 36:1 64:6 76:11 93:8 94:6 97:11 104:5

**fully** 26:13 119:12

**function** 14:24

**fund** 22:2,6,9 52:20 53:4,14 54:17 56:5,10,19,20 57:15 60:5,6,16,17,20 64:12,14 65:7,12 66:9

**funded** 53:12,13,14

**funding** 64:11 82:8

**funds** 33:21 35:1 53:7 60:4

**future** 36:17

**FY** 84:14 85:3

                    **G**

**gain** 63:10 86:19 93:19 95:8 96:21 102:3 103:6 112:15 114:15,23 115:1 117:23 118:20 119:5

**gap** 68:24

**gave** 20:13 21:13 23:4 25:4 47:19 62:17

**general** 9:13 33:18 77:14 81:17 84:11,23,24

**generally** 12:12 16:12 73:6 85:12 100:16

**generated** 93:10

**generating** 95:13

**GFF** 10:20 50:6 52:16 53:3,12 54:3,4 60:17

**gift** 47:22

**gifts** 40:9

**Gilbert** 7:5,20,22 8:2,5 10:19 11:1 17:17,19 23:21 28:16 44:4 45:12 46:24 47:5 49:6 51:17 52:19 53:8 54:9 56:4,10,19 57:14 58:4 61:3,16 62:8,12 64:13 65:6,13 66:9,13 69:7 72:14 74:13 82:15 87:16 98:14 110:7 116:16 121:10,18

**give** 38:1 74:20 99:17 120:23

**Global** 117:15

**goals** 17:5,6,14 25:14

**good** 7:1 49:17 61:11 112:10

**Goodwin** 7:24

**GOS** 118:19,24 120:5

**GOSM** 95:2,14 96:2,18 102:13,19 103:21,23 104:1,3 107:1 113:13,19 114:20

**govern** 38:8

**gradual** 118:22

**Grannemann** 15:21 16:1,6 48:13

**Grant** 7:15,17 8:6

**green** 20:13 21:13,14 23:5 25:4,16 29:1 68:21 72:5

**Grew** 111:18 112:1

**group** 38:10,21 39:10 40:7,23

**guess** 34:9

**guidance** 87:2 109:5,7,10,16 114:6 117:20,24 119:4,11 120:5,10

**guide** 118:24

**guided** 119:12

**guy** 67:3

                    **H**

**hand** 58:1

**handed** 30:18 75:9 98:22

**handful** 12:1 15:6,12

**Hang** 42:10 77:1 101:5 119:22

**hanging** 22:6

**happen** 27:17

**happened** 48:24 79:16 89:4

**hardship** 81:10

**headed** 48:12

**heavy** 14:9

**held** 7:6 37:5 51:12 73:9 75:4

**high** 118:21

**higher** 82:10 108:7 113:21

**highlight** 103:12

**highlighted** 117:23

**highlighting** 119:11

**Highlights** 112:14

**historic** 92:23

**historical** 92:19

**Hold** 105:21

**holder** 70:1,14

**holding** 13:4,16 35:11 61:15

**holdings** 7:20,22 10:16 11:11 13:8, 17 26:11,19 55:24 56:3,7 62:11 70:3, 14 76:4 83:3,16 84:1

**home** 14:21 55:10

**Homes** 87:4

**hour** 89:6

**hours** 73:6

**house** 73:5

**household** 33:17 40:7,23

**how's** 53:12,14

                    **I**

**idea** 17:10 48:3 49:22

**IDENTIFICATION** 11:4 17:22 28:20 45:15 47:8 51:20 58:7 61:7 66:16 69:10 72:18 74:17 82:18 87:21 98:18 110:11 116:20

**identifies** 12:18

**identify** 7:11

**II** 77:9

**immediately** 102:24

**impact** 86:16

**impair** 9:3

**implied** 96:18

**important** 36:10

**imposes** 38:4

**improper** 91:1

**Inc.'s** 37:23

**include** 27:9 36:15

**included** 46:3,6

including 40:9 64:11 77:6 121:13

income 112:1,4

increase 86:22 94:14

increased 94:19 111:22 112:4,15 114:23

increasing 55:9

index 92:12

indicating 40:2 42:14 62:3 83:12 103:17

individuals 13:23

industry 92:20

information 35:21 36:3,4,9,15,21 41:22 42:18 43:4 62:14 63:16 78:3,11 85:6 91:17 92:6,10,19,24 93:3 100:19

initial 50:20

initiatives 50:2

inputs 97:3

inside 67:2

insider 28:17 30:18 31:10,20 32:6,9, 13,15 35:6 37:23 40:17 41:13 43:20 44:7 77:10,22 81:15

insiders 31:11 43:3 45:24 46:4,7 78:1,8

intended 31:16 32:1,3

intense 73:4

interest 37:1,4 97:7

interests 41:14 70:4,15

internal 19:7 20:18 23:13 25:21 91:16 93:3 97:20,22 98:2 100:3 101:22 103:20 105:8 107:21 108:14, 22 113:13

internally 102:19

interrogatories 61:5,14 62:11 63:8

interrogatory 64:1,4,8,22

interview 52:7,9,11

introduce 10:22 17:17

investing 50:6

investment 17:9 25:21 33:21 35:1 36:11 54:10 67:2

investments 54:14 55:19

investor 36:10

invited 48:22

involve 27:3

involved 12:13 25:23 63:22

involvement 31:2,4

IPO 17:5,8 20:10,11,24 21:4,20 22:12,16,22 23:8,9 27:14 29:2,6 30:12 50:21 51:3 57:4 59:24 63:7 68:22 72:5,6,11 77:4

issue 26:16 99:24 111:9

issued 58:19 70:5

issues 9:13 12:15

**J**

Jay 16:15 20:10 25:23 85:22 109:24

Jeff 103:9

Jeffrey 7:19,21

John 76:1 77:10 78:24

JP 119:16,20 120:4

judgment 9:4

Julie 100:22

**K**

key 23:20 99:17 117:18

kids 71:19,20

kind 9:13 11:9 22:4 25:18 63:15 93:19 99:17 111:8

kinds 55:18

knew 63:17 72:4 118:20

knowledge 62:14 89:8 98:4,9 100:17

**L**

language 78:5

large 25:11 36:5 95:24

large-scale 54:10

larger 19:20

Late 9:18

launch 48:8,11,14

Laura 7:9 15:21,24 48:12 49:16

law 38:9 63:6,10 77:7 91:1

laws 31:18 32:5 35:18

lawyer 62:17,21

lawyers 71:18 77:6 89:20 90:10 91:4

lays 55:2

learned 86:10

leave 91:12

left 11:11 20:23 22:5 23:20 25:20 27:21 89:21

legal 7:9 70:14

lenders 22:2

lens 63:8

let alone 97:9 114:2

levels 118:21

Lexitas 7:10

lieu 25:13

light 20:13 21:13,14 23:5 25:4,16 29:1 68:21 72:5

limited 76:6 77:9 79:1

lines 22:3

liquidity 17:4 53:9 55:18 82:7

listed 85:19,21

litigation 8:8

living 33:17

loan 95:9 114:13

loans 22:2,9 82:8 102:8,9,12

lock 102:3 103:6 114:14

long 8:20 9:20,24 50:17 62:21 68:20 72:11

longer 118:23

looked 97:10 100:6

lot 8:14 10:13 11:17 14:10,20 22:4 25:23 32:17 88:23 91:10 98:10 100:1

low 114:19 115:17,20 120:16

lower 82:11 94:17 107:22 118:20 119:13 120:4

lowered 119:11,13

lunch 71:5,11,17

**M**

**M&a** 67:3

**made** 12:7 16:13,16 28:4 40:5 63:17, 20 81:9 84:1,6 88:20

**maintained** 64:10

**make** 12:12,14 16:22 22:11,14 49:1 50:12,15 54:10 55:21 56:5,11,16,17, 20 66:3 68:22 84:2 90:11,22 97:4

**makes** 22:19

**making** 24:14 36:10 52:20 57:15 65:18 66:8 90:24 96:6

**management** 38:6 81:18 85:13 109:15

**manner** 26:5,10

**March** 45:19 46:11,15 49:7,9,11,13, 23 52:8,22 58:13 59:1 64:9,18,19 65:2 68:4,16 71:22 72:21 73:2 75:11, 13 78:20 79:4,13,14,15,16,17,18,23 80:2,5,8,10,14,15,18,19,23 81:20 82:2 83:2,9,15,16,22 84:2,4,6 85:4, 14,16,23 86:2,4,6,9,12 87:24 88:6,21, 22 89:16 93:16 94:11,20 99:7 101:3, 10 107:21 108:13 110:14 112:20,21 113:22

**margin** 86:19 93:19 95:8 96:4,20,22 97:5 102:4 103:6 112:15 114:24 115:1 117:23 119:5,15

**margins** 96:5 98:11 114:1,16 118:21,24 120:5

**marked** 11:3 17:21 28:19 45:14 47:7 51:19 58:6 61:6,8 66:15 69:9 72:17 74:16 82:17 87:20 89:20 91:3 98:17 110:10 116:19 121:14

**market** 22:23 23:15,17,24 25:13 27:23 28:5 67:9 81:4 86:14 87:7 91:24 92:18,19 97:2 98:8 100:18 104:18 115:7 116:7,11

**market-based** 98:7

**markets** 46:10

**marks** 7:3 51:10,13 71:3,6 75:1,5 121:1,4

**Martius** 7:6

**material** 35:21 36:9,15,21 41:21,24 42:18,21 43:4 78:3,11 85:6 97:14 115:9,14 116:1,5,7 118:4,10

**materially** 107:22

**materials** 18:5,7,10 19:2 27:17 88:5, 11,20 89:1,20 90:1 111:15

**Matt** 12:13 16:15 25:22

**matter** 11:8

**maximum** 70:15

**MBA** 97:3

**meaning** 38:24

**meaningfully** 117:24

**means** 13:22 24:19,20 36:4 50:10 70:11 105:19

**meant** 25:14

**media** 7:4 51:10,14 71:3,7 75:1,6 121:1,5,11,19

**medical** 99:24

**medications** 9:3

**meet** 8:5

**meeting** 48:15,16,20,24 72:16,20 73:2,13,16,17,24 74:14 75:10,13,19 76:2,9,11 79:16 87:18,24 88:7,17,21, 22 89:6,9 101:11

**meetings** 10:9 14:5 49:4 73:1,18,23 88:23 89:9

**member** 31:1 38:18,21 39:7,10

**members** 31:17 32:4,22 38:6,15 40:6,7,24 81:18 85:13

**memo** 82:23 83:2,15 84:4,10,17

**mentioned** 82:8

**methods** 13:22

**metrics** 86:17,24 87:3 95:1 99:18 100:23

**Michael** 7:14 8:6

**Michigan** 7:7 11:11

**middle** 14:11 22:5

**million** 21:5,6 49:24 50:7,12,23 51:4 52:20 53:16,24 54:1,18,22,23 55:14, 22 57:16,18,24 59:15,16 60:6,21 65:22 70:16,20 71:23 76:20,22 81:21 82:3 105:8 106:4 108:6,15

**minor** 33:4,16

**minus** 108:11

**minutes** 72:16,20,23,24 74:14 75:10,

15,16 79:12,22,23 81:12 86:11 120:23

**MNPI** 85:6

**models** 107:21

**monetization** 19:21

**money** 22:11,14,20 57:10 61:1

**month** 115:7,8

**months** 16:21 21:20 113:8

**Morgan** 23:12 25:10 27:17 63:18 119:16,20 120:4

**Morganroth** 7:19 9:22 12:8,11,22 13:9,11 14:18 15:16,20 16:2,14 18:18 20:2,19 22:13 24:7,15 25:9 26:12 28:11 29:21 30:5,13 32:11 34:19 35:7 40:2 42:6,10,13 43:22 44:8 45:2,16 46:18 47:11 55:1,23 56:12,22 57:5,21 58:8 59:10,18 60:1,10,22 61:8,11 63:14 65:20 67:23 68:5,13,18 69:21 70:22 72:2 74:9,23 76:13 77:1,18 78:12 79:8 81:2,23 83:12 87:11 88:8, 14 89:10,17 90:2,8,14,18,23 91:10,18 93:21 95:6,17 96:7,23 97:15,23 98:5 100:5,20 101:5 102:1 103:10,13,16 105:20 106:9,12 107:24 108:17,24 109:17,20 111:11 112:23 113:3,5 115:11,16 116:3,8,12,21 118:6 119:17,22,24 120:24 121:8,12

**morning** 7:1 52:7,11 85:15

**mortgage** 22:2,5 86:20,23 92:20,24

**mortgages** 96:16,17

**move** 91:2 97:8

**moved** 29:16

**moves** 28:5

**moving** 115:7,8

**multiple** 11:13 21:22 49:4

**N**

**names** 70:13

**nature** 72:8

**necessarily** 97:17

**needed** 22:9,20 56:16 59:24

**negotiated** 24:2 25:5

**neighborhood** 50:2

**neighborhoods** 50:1

**net** 94:8,10 111:19 112:1,4 114:14

**nice** 8:5

**NMCMFUS** 92:12

**Nominal** 8:1

**non-public** 35:21 36:2,21 41:22 42:18 43:4 78:3,11 85:6 92:16 108:23

**normalizing** 120:5

**Note** 91:1

**notice** 69:8,12 70:6 71:12,21 74:7 75:22 76:1,3,18,19 83:9,22

**noting** 79:11

**notwithstanding** 39:23 40:5 42:7,8

**November** 7:2

**number** 7:4 10:22 36:2 48:18 50:23 51:4,11,14,16,22 52:18 54:8 58:2,3 64:1,4,22 70:2,15,20 71:4,7 75:2,6,9, 14 76:22 79:6 82:14,20 83:8,15 95:14 107:2,4 121:2,5,11,19

**Numbered** 18:18,19

**numbers** 55:4,5 96:19 98:11 105:12 107:7,9,12

**Numeral** 77:9

---

**O**

**oath** 8:4

**object** 34:19 57:21 60:1 91:11 97:23 112:23

**objection** 12:8,22 13:9 14:18 15:16 16:2,14 20:2 22:13 24:7,15 25:9 26:12 28:11 29:21 30:5,13 32:11 35:7 43:22 44:8 45:2 46:18 55:1,23 56:12, 22 57:5 59:10,18 60:10,22 63:14 65:20 67:23 68:5,13,18 69:21 72:2 74:9 76:13 77:1,18 78:12 81:2,23 87:11 88:8,14 89:10,17 90:2,21,22 91:1,2,6,18 93:21,22 95:6,17 96:7,23 97:15 98:5 100:5,20 102:1 106:9,12 107:24 108:1,17,18,24 109:17,20 111:11 115:11,16 116:3,8,12 118:6

**objections** 61:4,14,24 62:10 64:7 65:1

**obvious** 82:12

**occurred** 86:10

**October** 18:11

**off-the-record** 51:12 75:4

**offering** 18:12,20 19:3,14,19 20:1,7 21:15 23:4 24:6,9,12,14,23 27:2,4,8, 16 28:6,24 29:8,15,17 41:6,15 43:16 67:17,21 68:23

**offerings** 43:13

**office** 14:7,10,16,22,23

**officer** 38:24 39:1

**officers** 12:18,21,24 13:8,18,19 31:17 32:3,22 38:5 39:2

**official** 7:8

**one's** 88:24

**one-time** 53:17

**ongoing** 64:12

**open** 40:9 41:22,23 42:19,20 43:5 46:10 77:13,24 78:9,20 79:18 80:2, 10,15,19,22 81:1,16 84:7

**opened** 80:11,17

**opening** 76:5 77:9 79:2

**operate** 22:20

**operating** 13:5,18 28:12

**operations** 95:23 98:4,9 100:17

**option** 17:4 40:9

**options** 23:21

**order** 55:21 56:4,9 66:2 69:3 85:5,11

**orders** 28:2

**ordinary** 78:21 80:2

**Org** 11:2

**organizational** 10:23

**organized** 49:16

**original** 21:4,16,18

**originate** 86:23

**outcome** 21:5

**outlook** 114:5,9

**outs** 47:21

**Overview** 18:20 86:14 87:17,24 92:18

**owned** 53:11 68:16

**owners** 11:12

**ownership** 26:6,16

---

**P**

**P&I** 94:18

**p.m.** 71:8 75:2 121:5,20,21

**pages** 18:4,21 50:3

**paid** 57:18

**paired** 70:4,15

**pandemic** 14:12

**paperclip** 105:21

**paragraph** 24:9 31:15,22,23 33:3,7, 24 34:1,2 35:3,10 36:2,8,20 38:4 39:22 40:1 41:5,19 42:9 43:11 52:18 54:8 64:6,24 69:23 73:8,12 76:17 78:24 79:1 81:13 83:2 84:10,21 86:14 87:6 119:3,21

**paragraph's** 24:11

**paragraphs** 37:17

**parity** 20:24 21:6

**part** 31:6 61:16 64:10 82:6 100:15

**participate** 53:8

**participated** 73:13

**participating** 73:16

**parties** 33:2,5,12,23 34:5 35:2,19 36:22,24 41:15 77:12 78:2

**partner** 33:19

**partnerships** 33:18

**parts** 38:7

**party** 34:13,16,17,18 35:5 44:6,10,12

**past** 88:18 99:5

**pathways** 55:10

**pay** 120:12

**paying** 55:11

**pays** 94:16

**pending** 8:22 42:1,21

**people** 14:16,21,23 27:22 30:11 62:5 63:16 85:19 95:22 96:1,12 98:3 99:17 100:17

**percent** 30:15 86:21 93:20,24 94:2,4, 14,23 102:19,22 103:21,23 104:1,5, 12,14,15 107:2,16,19 111:19,23

112:5,16 113:14,17 114:16,24 115:2 119:6,7 120:14,16,19

**percentage** 11:20 12:3 102:9 114:20 115:4

**performance** 21:22 107:22 108:15 113:20

**period** 36:16 50:18 57:16

**periodic** 16:3

**periodically** 22:19

**permissible** 38:9

**permission** 81:8

**person** 10:3,4,5 13:24 14:5 15:22 16:7 25:22 100:14

**personal** 39:18 41:14 43:21,24

**personally** 52:12 55:17

**personnel** 32:23 33:4,12,18,19,20, 22 34:4,7,10,23,24 35:2,17,19 36:22, 24 41:14

**personnel's** 33:16,17

**persons** 38:10

**philanthropic** 64:13 65:4

**phone** 10:7

**pile** 102:4,7,8 103:5,7

**pivot** 46:23

**place** 9:17 45:4 52:9 118:8

**plaintiff** 63:6

**plaintiff's** 61:5,14 62:10

**plaintiffs** 7:15,18 8:7

**plan** 40:6 44:18,20,22,24 45:3,6,9 46:24 53:23 54:23

**point** 15:21 25:22 38:15,23 51:5 99:24 114:20 115:5 119:11

**points** 38:13 52:16 54:3,4 94:4 95:11 97:8 112:16

**policies** 43:2

**policy** 28:17 30:19 31:10 32:9,15,21 33:15 35:6 37:24 40:17 41:13 43:20 44:7 77:11,22 81:15

**portfolio** 94:16

**position** 35:5,9

**possession** 36:21 43:3 78:2,10

**post** 29:15

**posting** 118:23

**potential** 64:11,12

**potentially** 17:1 21:15

**preclearance** 77:14 78:10

**precluded** 43:3

**predetermined** 45:1

**prepare** 9:9

**prepared** 99:12,15

**preparing** 96:12,15 97:22 98:2,3 100:10

**presentation** 17:18 23:12,14 87:23

**presenting** 96:2

**president** 39:1

**pressing** 28:7

**pretty** 82:12

**previous** 41:19 53:1 73:1,24 87:1 112:6 114:23 115:21,23

**previously** 120:6

**price** 17:11 20:11 21:6 27:23 67:8 82:10,11 120:9,12

**prices** 21:8,23

**Primary** 92:9

**primary/secondary** 86:18

**print** 100:15

**prior** 51:2,3 71:21 81:21 84:2 97:24 105:8,10 106:5,8,11,14 107:4,7,10,12 109:4 119:6

**privately** 24:1 25:5

**privilege** 85:8

**proceed** 80:24

**proceeding** 28:1

**proceeds** 60:18,19 64:9 65:1

**Proctor** 8:1

**produced** 10:23 17:18 30:19 45:19 51:23 58:13 66:18 69:12 75:17 82:21 88:1 98:23 110:13,14 117:2

**product** 96:5

**production** 90:14,19

**programs** 14:21

**prohibited** 36:23

**prohibition** 41:20 42:14,17

**projected** 104:22 112:19

**projecting** 96:19 108:14

**projection** 112:21

**projections** 36:17 95:15 96:4,6 97:6

**prompted** 85:6

**protocol** 89:1,4

**provide** 25:16 47:1 65:7,13

**provided** 37:24 65:12 73:22 109:10 111:16 114:6 117:19

**provision** 37:16 102:4,7 103:7

**public** 16:13,20,23 17:1 24:23 29:23 30:10 36:5 40:11 41:6 43:12 56:8 57:10 92:6,10 97:20 100:19

**publicly** 44:23

**published** 110:24 111:2

**pull** 79:8

**pulled** 22:4

**purchase** 19:18 23:17 27:15 29:8 40:24 86:22 96:16

**purchases** 41:18

**purchasing** 24:6 26:21

**purpose** 32:8,19 50:4 76:2,6 99:16

**purposes** 10:12 25:1 35:6 60:20 65:4,18 71:23 82:8,9 100:2

**push** 94:18

**pushed** 22:18,21 30:1

**put** 26:1 50:9 57:14 58:10 60:4 62:5 90:10 91:14

---

## Q

**Q1** 86:21 87:2,18,24 101:18 102:19 119:4

**Q2** 101:18 102:24 114:12

**Q3** 101:19

**Q4** 86:21 101:19

**quarter** 40:13 102:14,18,22 103:8,21 104:3,9,16,20,24 105:1 107:2,10,15 109:5,9,11 110:19 112:13 113:12,13, 16,20 114:5,6,9,20,24 115:1,10

quarter's 97:10,13 103:23 104:1

quarterly 40:11 101:15 109:3,10
111:7,10 114:2

quarters 104:15

question 8:22,23 11:9 12:10 13:10
18:22 26:7 27:6 28:23 29:11 32:7
44:10 47:16 60:2 65:22 68:1,8 78:7
90:13,15,18 91:3,5,7,8,11 97:24

questioning 11:10

questions 78:17 85:12 121:7,8

quicker 94:17

_____

R

raise 17:7,10 21:17,19,23 29:5,9,17
60:24 72:7 81:21 82:2

raised 22:16 27:3 29:22,23

raising 17:1 22:7

range 17:12 119:5

ranges 114:12

rapidly 120:6

rate 102:3 103:6 114:14 115:6

rates 94:16 97:7 115:8 116:4

re-read 38:1

read 13:13 29:13 31:13,14 32:1 33:14
47:11 58:18 61:24 62:2,7,22 65:5
69:17 72:8 87:5,8 90:13,15 101:16

reading 33:9 37:19 62:20 71:21
81:13 87:6 103:16

real 55:19

realized 72:8

reason 8:24 32:14

reasonable 21:22 36:9

reasons 16:24

recall 10:6 16:11 17:13 18:6,9 20:6
25:2 27:11 30:23 45:3,8,22 47:18
48:20 49:2,3,21 50:16 51:1 52:4,10
53:21 62:5 66:11 68:20 69:20 70:21
71:16 72:24 73:2,16 74:3,10 75:16
76:14 77:21 83:1 87:13 88:4,9,23
99:2,23 110:17 111:7

receive 96:4,20 99:21

recent 84:14 85:2 86:15

recently 31:13

recess 71:5 121:3

recollection 31:7 89:5

recommend 17:5

recommendation 16:16

recommending 16:23

record 7:3,12 13:14 29:14 51:8,11,14
71:2,4,7 74:24 75:3,7,17 90:17
118:21 121:2,6,19

record's 90:9

recorded 7:5

recording 8:16

recovery 14:9

red 101:16

redacted 85:8

refer 10:15,17,19

referred 36:3 68:11 87:10

referring 25:18 39:18 106:8

refers 19:18 48:7,15 49:6 52:7 64:17
76:19

refinance 86:21

reflecting 79:12

reflects 84:4 92:4

regarded 59:23

regular 13:7 15:14,24 16:4,24

regulations 31:19 32:5

rehab 73:4,7

related 33:2,5,12,22 34:5,13,16,17
35:2,4,5,12,19 36:22,24 38:7 41:15
44:6,10,11 73:1 77:11 78:2,7

relation 13:16 59:24

relationship 11:15 13:17

relatives 78:4

release 40:11 111:13

released 84:14 85:3 120:10,11

relied 77:5

rely 98:3

remember 46:16 52:11 73:17 76:18
78:3,4 101:12 120:17,19

remind 8:15

Reminder 53:3

reopened 43:8 46:15

repair 55:10

repeat 13:12 18:22 26:7 29:11 83:13

repeated 13:14 29:14 90:17

rephrase 27:6 99:20

report 74:3 99:16,22 100:2 101:3
111:9 117:15 118:14,16

reported 74:6 76:11 119:15

REPORTER 11:3 17:21 28:19 45:14
47:7 51:19 58:6 61:6 66:15 69:9
72:17 74:16 82:17 87:20 98:17
110:10 116:19

reports 39:2 100:1,10 109:14 117:1,
8

represent 7:12,14 8:7

representations 81:9

repurchase 19:13,19 23:15,21 24:1,
12,13,18,19 27:10 102:4,7 103:7

request 71:22 76:3 83:5,18 84:1,6,
11,13,23 85:2,5,14,16,20

requested 13:14 29:14 83:4,17
90:17

required 69:2 78:8

requirements 77:24

requires 35:17

Research 117:15

reserve 102:12

reserves 64:11

reset 118:19

residents 50:7,12 52:21 65:8,14

resolved 78:6

resources 55:9,10

respect 41:6 43:12

respective 40:23

respond 64:8

response 64:1,4

responses 61:4,13,24 62:10

responsibilities 12:21,23 13:2

**responsible** 98:3 100:9,14

**restrictions** 25:16,18,19 26:1 31:10 33:3,15 38:5,8 41:5 43:12

**restricts** 41:13

**resulting** 86:19

**results** 40:12 109:4,9,10,11 110:19 112:10 113:16 115:23 119:4 120:10

**revenue** 93:13 94:8,10,19 95:10,11 96:22 104:22 105:4 106:3 107:9,16, 19 108:5 111:18,22

**revenues** 36:16,17 93:9 95:3

**reverse** 14:22

**review** 10:9 118:19

**reviewed** 62:9 77:21 86:24 87:3 117:5

**reviewing** 77:21

**revised** 86:24 87:1,10 93:16 94:11, 20 95:12 106:4

**RHI** 10:17 11:12,13,20,24 12:3,5,7, 18,21 22:19,21,23 23:7,18 24:24 26:6,11,21 27:3,4,10 28:7,9,10 29:7, 10,16,19 30:1,3,12,14 34:13,16,17 35:4,5 37:5 44:10 45:6,8 55:15,20 56:3,9,15 57:3,8,24 59:5,8,16,19,22 60:4,7,15,20,23 64:18 65:10,18 66:2, 7 67:8 68:4,17 69:3 71:22 76:4 77:12 78:6 81:9,20 82:2,7 83:16 85:23 86:2

**RHI's** 28:12 64:9,10,17 65:2 74:6 86:9

**rise** 86:15

**rising** 86:17 115:6

**risk** 85:5

**Rizik** 12:13 16:15 25:22

**RKT** 67:7,8 85:19 101:17 117:18

**RKT's** 119:1

**rock** 7:20,22 10:16 11:10 13:8,16 52:18 53:7 56:7 61:15 62:11 63:24 70:14 76:4 83:3,16 84:1 102:4,7,8 103:5,7

**Rock's** 105:10

**Rocket** 7:6 8:1 10:13,15,16,23 11:2, 19 16:13,23 17:18,20 18:14 19:3,18 20:1,8 22:11,16,17,20 23:6,10,15,16 24:1,19,22 26:4,9,19 27:8 28:18 29:5, 9,15 30:4,19 31:12 32:23 33:4,11,16,

17,18,19,20,22 34:4,7,10,21,23,24 35:2,17,18 36:22,24 37:23 41:8,14 43:14 45:13,20,23 46:4,7 51:18,23 52:20 53:3,14,15 55:16,21,24 56:1,3, 4,10,19,20 57:8,15 58:5,14 60:5,17 64:9,14 65:2,6,11,12 66:8,9,14,18 69:8,12 70:2 72:15,21 74:15 75:17 82:16,21 86:23 87:3,4,19 88:1,12 93:3,10 94:19 95:2,3,22 96:13 98:16, 23 99:13 100:18 102:13,18 104:23 109:3,8 110:9,15,19,23 111:9 116:18 117:2,12 118:13

**Rocket's** 93:13 97:20,22 98:2 100:17 101:22 103:20 105:8 106:20 107:1,21 108:7,13,22 109:3,15

**Roman** 77:9

**Rounded** 108:11

**Run** 49:7

**S**

**safe** 22:8

**safer** 22:7

**sale** 25:1 26:4,9 27:2,4,8,10,15 29:1 43:19,23,24 44:4 60:19 64:9,17 65:2 67:14,16,18 68:4,8,10,11,16,24 80:24 82:3 83:5,18 84:2,13 85:2,5,14,15,19 86:9,10,19 93:19 95:8 96:21 102:4 103:6 112:15 114:15,23 115:1 118:20 119:5

**sales** 20:14 21:15 25:11 26:16 41:18 119:1

**satisfy** 60:7 64:11 66:3

**scheduled** 14:5

**Scope** 32:21 34:2

**Scott** 7:21 16:16 20:10 25:21 63:21 66:23 67:1 90:9

**scratch** 26:2 99:15

**secondary** 18:11 19:3,13 20:1,7,14 21:15 23:4,11 24:5,9 25:5,13 27:2,8, 14,16 28:5,6,24 29:8 67:16,21 68:23 92:9 98:8

**seconds** 74:20

**section** 18:20 37:19 39:3 68:3 85:7

**securities** 31:11,19 32:5 35:18,20 36:23 38:7 39:3,19 40:8 41:1,7 42:2, 22 43:13 45:1 77:13

**seeking** 81:8,10

**sell** 23:5,6,16 31:11 35:20 40:24 44:24 55:20 56:3,9,15,16,18,23 59:17,19 60:11,23 64:20 67:9 82:10, 11 83:4,17 96:17,20 102:9

**sell-down** 23:24

**selling** 22:23 24:23 55:15 57:9 60:8 71:24 85:23 86:2

**sells** 56:7,24

**senior** 38:5,23 39:7 81:18 85:13 109:15

**sentence** 31:24 33:14 42:5 84:21 119:4,21

**sentences** 36:14 41:20

**servicing** 94:8,10,16

**set** 40:16 60:6 61:5,14 62:10,12 70:3, 6

**sets** 31:10

**shaded** 21:9,10

**share** 17:11 19:13,17,19 21:5 23:21 24:1,19 60:8 67:8

**shareholder** 83:4,17

**shareholders** 11:13,16 12:1 29:20 30:3,4

**shares** 21:5,6 22:23,24 23:6,10,15, 16,17 24:6,23,24 26:5,10,17,20,21 30:10,12 37:5 39:18 55:16,20 56:3,7, 9,15,16,18,23,24 57:3,9,10 59:17,20, 22 60:11,20 63:22,23 66:7 67:9 68:16 70:4 71:23 76:20,22 117:18 120:4

**shift** 15:3

**shooting** 17:15

**short** 121:3

**Show** 49:7

**showing** 93:12 104:8,23 107:1,14, 15,18,22,23 108:14

**shows** 102:13,18

**sideways** 117:12

**sign** 62:6,18

**signature** 61:22 62:15

**significant** 97:13 104:8

**significantly** 114:4 115:6

Confidential                    Daniel Gilbert - November 29, 2023

**signing** 62:1,2

**similar** 33:21 35:1 72:5

**single** 60:8,18 100:14

**Sir** 51:7

**sitting** 48:23 77:21 120:19

**situations** 24:5

**skip** 8:14 36:14 37:7

**skipping** 119:17

**Slutsky** 7:24

**small** 102:9 104:17

**soft** 119:4

**sold** 22:10 23:15 26:20 57:3 59:22 60:24 64:18

**Solid** 119:4

**sooner** 118:19

**sort** 25:21 66:8

**sounds** 14:15 78:13

**speaking** 90:24 91:6 100:16

**special** 75:10 76:2

**specialized** 100:17

**specific** 9:13 11:7 18:6 32:14 35:10 45:22 54:19 58:22 73:17 99:2,3 111:5,6,7

**specifically** 30:23 37:17 41:7 43:13 49:3 50:24 51:4

**specifics** 11:8 32:20 69:3

**spouse** 33:4,16

**spread** 86:18

**Spreads** 92:9

**spring** 14:16 15:10 37:24 38:19 39:12 44:17 45:7 53:23 54:19 55:21 56:5,11 57:24 59:8 60:7

**stability** 54:15

**staff** 95:22,24

**Standard** 7:3

**Stanley** 23:12 25:10 27:17 63:18

**start** 42:5 61:19 64:3

**started** 8:11 31:23 48:13

**starts** 18:20 31:16,24 36:2,20 42:13 64:6 91:24

**state** 62:9 65:1

**stated** 27:22

**statements** 62:12

**stating** 64:8

**stay** 22:17 54:12 73:6

**stayed** 95:1

**Steenbergh** 7:10

**stenographer** 7:9,13

**stock** 17:2,4 21:7 26:15 43:19 55:16, 20 60:8,11,24 64:10,17,19,21 65:3 70:3,5 81:21 82:3,10,11 83:5,18 85:23 86:2,9 120:9,12,13,14

**stockholders** 11:24

**stopped** 100:1

**strategy** 82:7

**stroke** 14:9 73:3

**strokes** 9:20

**stuff** 72:10

**subject** 39:3 64:6,23,24

**submitted** 69:19 71:22

**subsequent** 73:1

**suggests** 120:5

**suing** 63:7

**Suisse** 119:10

**Sullivan** 7:21

**summary** 58:19 59:1

**supplement** 25:12

**supplemental** 70:6

**support** 54:11,14

**supporting** 52:21 55:8

**swear** 7:13

**sworn** 8:3 62:8

**T**

**table** 20:23

**tailor** 54:13

**Takeaways** 117:18

**takes** 119:1

**talk** 9:22,23 10:15,16,19 14:7 15:3 46:23 71:17

**talked** 20:10,11 50:16

**talking** 15:9 19:6,24 21:3,9,11 23:2, 14 24:11 26:15 32:19 33:24 34:2 37:18 39:19 43:16 47:21 50:8 52:16, 24 54:3,4 59:14 67:12 101:12 112:6 113:7

**talks** 19:17 37:16 55:8

**tap** 22:9

**target** 21:4

**tax** 66:7

**taxes** 55:11

**team** 26:9 31:17 32:4,22 38:6

**technical** 57:7 72:8 77:3

**technicalities** 23:1 25:2 26:23

**technically** 24:17 59:24 72:10

**telephone** 10:3,4,7 13:24 16:7

**temporarily** 22:3

**terms** 25:19 43:2 44:6 70:7

**testified** 8:3

**testify** 8:24 9:6

**testimony** 121:10,18

**text** 14:4 66:14,18 67:4 79:6,17

**texted** 79:20

**texting** 14:3 16:8

**theory** 34:15

**thick** 19:5

**thing** 47:12 74:19

**things** 8:17 26:24 55:18 99:18

**thinking** 48:14

**thinly-traded** 120:13

**thought** 81:5 116:7,11 118:4,10,22

**till** 88:17

**time** 7:3 8:8,19 13:6 14:9,23 15:9,18 23:17 25:11 28:1 29:24 35:21 48:6 50:11,18 53:9 57:20 59:14 62:6 68:20 73:3 75:2,6 79:18 81:17,24 87:9 89:7 90:11,19 91:14 100:23 121:5

**times** 9:15 14:6 78:5 112:1

**timing** 25:19 84:13 85:1

**tiny** 59:4

**tipping** 41:21 42:18

**titled** 87:23

**today** 7:1 8:8 9:1,10 10:12 48:23 71:15,16 120:19

**today's** 76:2 121:9,17

**told** 9:20 25:10 59:15

**tomorrow** 117:19

**tool** 109:14 110:3,4,5

**top** 11:11 37:12 67:5 101:16 105:15 106:24 111:18

**topics** 85:13

**total** 59:5 93:13 95:1,2,3 105:4 121:10,18

**track** 100:3

**trade** 24:2 35:6 42:1,22 63:17,20,22 77:12 78:2,10 120:4

**trading** 28:17 30:18 31:10,19,20 32:6,9,13,15 36:23 37:9,14,21,23,24 38:7 39:19 40:6,10,16,17,22 41:13, 17,21,23 42:17,19,20 43:2,3,4,7,20 44:7 46:9,10,14 76:5 77:9,11,13,22 78:1,9,19 79:1,2,5,11,12 80:1,10,15, 17,19,22,24 81:15,16 84:7 120:16,18

**transaction** 25:6 68:11 69:24 71:24

**transactions** 35:20 38:8 40:5,8 69:4 86:22

**transcribing** 8:17

**transcript** 121:13

**transfer** 60:4 70:2

**transferred** 29:7,10

**transferring** 27:3

**transportation** 55:9

**treasuries** 97:4 98:8

**treasury** 86:16 92:4

**true** 39:12 43:7 62:13

**trusted** 62:21

**trustee** 33:19 34:24

**trusts** 33:19

**truthfully** 9:1,6

**Tuesday** 52:8

**turned** 103:13

**typically** 88:11 109:4 111:9

---

**U**

**Um-hum** 81:14 86:13

**underlying** 62:20

**underperform** 117:19

**undersigned** 70:1

**understand** 19:24 26:13 29:12 67:13 96:9 106:7

**understanding** 29:4 63:1,4,11,12 80:16

**underwhelming** 117:19

**Unit** 7:4 51:11,14 71:4,7 75:2,6 121:2,5

**units** 70:3 121:11,19

**up-to-speed** 57:7

**Upadhya** 7:17 74:22

**upcoming** 84:15 85:4 96:3 109:5

**update** 73:21,22 74:3

---

**V**

**vehicles** 33:21 35:1

**verbal** 8:16 9:12

**verification** 61:17,19,22 62:1,7

**verified** 62:24

**versus** 105:12,22,23 106:6

**video** 7:4 8:16 10:3

**videoconference** 73:9

**Vitale** 77:6 80:14

**Vivek** 7:17

**volatility** 104:18

**volume** 93:14 114:13,14

**Vosburgh** 7:8

---

**W**

**Wait** 121:12

**waiving** 64:24

**walk** 38:3

**Walters** 86:1

**wanted** 17:7 20:14 53:7,18 60:4 90:11

**warehouse** 22:3

**waving** 64:7

**wealth** 54:11

**Wednesday** 7:2 46:11

**week** 9:18,19 14:6

**weekly** 99:6,12,19,21

**weeks** 40:12

**when's** 50:11

**wife** 44:4,12 50:14

**Wilmington** 7:16

**wind** 119:1

**window** 37:9,14,21,23 38:10,21 39:10 40:6,10,16,23 41:23,24 42:19, 20 43:5,7 46:9,10,14 76:5 77:9,13 78:1,9,19 79:1,2,5,11,13,17 80:1,10, 17,19,22,24 81:16 83:5,19 84:7

**window's** 80:15

**wondering** 70:22

**word** 50:9

**worked** 72:9,10

**working** 14:20

**works** 24:17 25:3 67:2

**worth** 81:21

**wrong** 27:6 91:5,10

---

**Y**

**year** 16:21 53:24 54:1,9,13,21,22,24 57:19 65:9,15,22 66:4 93:8 94:5,6 96:3 97:9,11 104:5 106:3,5 107:6,11, 18 111:19,23 112:2,5,6,16,21,22

**yearly** 114:2

**years** 17:3 27:12 48:6 49:5 50:7,22 51:2,3 52:22 53:24 54:1 73:4

**yield** 86:16,18

---

**Z**

---

**Zoom** 73:5