UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CARL SHUPE, and CONSTRUCTION
LABORERS PENSION TRUST FOR SOUTHERN
CALIFORNIA, individually and on behalf of all
others similarly situated,

Plaintiffs,                          Case No. 1:21-cv-11528

v.                                               Honorable Thomas L. Ludington
                                                      United States District Judge
ROCKET COMPANIES, INC., JAY FARNER,
DANIEL GILBERT, and ROCKET HOLDINGS, INC,

Defendants.

_____/

**OPINION AND ORDER DENYING PARTIES' EXPERT MOTIONS**

TABLE OF CONTENTS

Introduction ..................................................................................................................... 2
I. Background Facts .......................................................................................................... 3
   A. Rocket's Origins ...................................................................................................... 3
   B. Rocket's Key Performance Indicators ..................................................................... 6
   C. Farner's Alleged Misrepresentations ....................................................................... 9
   D. Gilbert's Alleged Insider Trading ........................................................................... 11
   E. Procedural Posture .................................................................................................. 13
II. *Basic* Background and Expert Reports ...................................................................... 14
   A. The *Basic* Presumption, Market Efficiency, and Price Impact ............................. 15
      1. Market Efficiency Factors ................................................................................. 17
   B. Plaintiff Expert Chad Coffman .............................................................................. 19
      1. Market Efficiency Conclusion ........................................................................... 20
      2. Class-Wide Damages Conclusion ...................................................................... 22
   C. Defense Expert Dr. René Stulz .............................................................................. 23
      1. Meme Stock and Market Inefficiency Conclusions .......................................... 23
      2. Rebuttal to Chad Coffman's Conclusions ......................................................... 29
   D. Defense Expert Dr. Laura Starks ........................................................................... 30
   E. Defense Expert Dr. Mark Garmaise ....................................................................... 32

**III.** ................................................................................................................................... **34**

A. Defendants' Motion to Exclude Chad Coffman's Testimony.................................... 35

   1. Coffman's Reliance on the *Cammer* and *Krogman* Factors................................ 36

   2. Coffman's Meme Stock Considerations................................................................ 38

   3. Coffman's Price-Impact Event Study.................................................................. 40

   4. Coffman's Public Float Analysis.......................................................................... 44

   5. Coffman's Damages Proposal............................................................................... 47

B. Plaintiffs' Motion to Exclude Dr. René Stulz's Testimony..................................... 49

   1. Qualifications....................................................................................................... 49

   2. Reliability ............................................................................................................ 50

C. Plaintiffs' Motion to Exclude Dr. Laura Starks's Testimony................................. 52

   1. Qualifications....................................................................................................... 52

   2. Relevancy ............................................................................................................ 53

   3. Reliability ............................................................................................................ 55

D. Plaintiffs' Motion to Exclude Dr. Mark Garmaise's Testimony............................ 58

   1. Qualifications....................................................................................................... 58

   2. Relevancy ............................................................................................................ 59

E. Defendants' Motion to Exclude Chad Coffman's "Rebuttal" Testimony ............... 62

**IV. Conclusion** ................................................................................................................ **66**

## Introduction

Plaintiffs Carl Shupe and Construction Laborers Pension Trust for Southern California ("SoCal") seek to certify a class of all individuals who traded Rocket Companies, Inc. ("Rocket") Class A common stock from February 25 through May 5, 2021 (the "Class Period"), alleging that the price of this stock was artificially inflated and maintained by a series of fraudulent misrepresentations made by Defendant Jay Farner. Within this Class, Plaintiffs also seek to certify a Subclass of all individuals who traded Rocket Class A common stock "contemporaneously" with Defendant Dan Gilbert's alleged insider trade of the same security on March 29, 2021.

The answers to three questions are central to class certification: (1) did Rocket stock trade in an "efficient market" throughout the Class Period?; (2) did Defendants Jay Farner's alleged

fraudulent misrepresentations have an impact on the price of Rocket stock?; and (3) can damages be calculated on a class-wide basis? If the answer to any of these questions is "no," the proposed Class cannot be certified because it does not satisfy Civil Rule 23(b)(3)'s predominance requirement. Yet the answers to these questions are buried under *thousands* of pages of pleadings which rely on the proposed testimony of *four* separate experts. And the Parties have filed *six* motions challenging each other's proposed experts under *Daubert* or seeking to strike each other's proposed expert reports as procedurally improper. These motions must be resolved before this Court can address the class certification question. For the reasons that follow, all motions will be denied.

## I. Background Facts

### A. Rocket's Origins

In 1985, Dan Gilbert founded Rocket Mortgage, LLC ("Rocket Mortgage"). *See* ECF No. 1 at PageID.6. Since its founding, Rocket Mortgage has, as its name implies, taken financial flight. In 1999, Rocket Mortgage pioneered online home mortgage applications. ECF No. 109 at PageID.8430. Nearly 15 years later, Rocket Mortgage launched a digital, "end-to-end completely online mortgage experience," through which customers "can go from application to approval and look at their rate online, without having to talk to a banker." *See id.*; *Our History*, ROCKET COMPANIES, https://www.rocketcompanies.com/press-room/our-history/ [https://perma.cc/N2VE-5TPZ]. Rocket Mortgage's digital mortgage platform has been highly successful and is largely responsible for propelling "Rocket" to its status as a household name within home financing. ECF No. 109 at PageID.8431 (noting Rocket Mortgage's online platform "has provided more than $1 trillion in home loans since its inception" and that "[b]y 1Q 2020, Rocket's market share grew to 9.2% of an over $2.0 trillion annual market[.]"). Indeed, Rocket Mortgage currently advertises

itself as "America's largest mortgage lender." *About Us*, ROCKET MORTGAGE, https://www.rocketmortgage.com/about (last visited Aug. 25, 2024) [https://perma.cc/7NL9-ZCLK].

The "Rocket" brand quickly expanded, growing beyond Rocket Mortgage to Rocket Companies, Inc. ("Rocket"), a constellation of 13 separate companies, spanning across multiple industries including home and personal financing, sales, technology, and marketing.[1] *See Our Companies*, ROCKET COMPANIES, https://www.rocketcompanies.com/our-companies/#sales-technology-marketing-services (last visited Aug. 25, 2024) [https://perma.cc/8J7P-GNUH]. Importantly, at all relevant times, Rocket was controlled by a separate company, Rocket Holdings, Inc. ("RHI"), which was, in turn, controlled by Dan Gilbert.[2] ECF No. 109 at PageID.8425–26.

---

[1] RCI currently consists of: (1) Rocket Mortgage; (2) Rocket Mortgage Canada; (3) Amrock; (4) Amrock Title Insurance Company; (5) Lendesk; (6) Rocket Homes; (7) ForSaleByOwner.com; (8) Rocket Loans; (9) Rocket Money; (10) Core Digital Media; (11) LowerMyBills.com; (12) Rocket Innovation Studio; and (13) Woodward Capital Management. Our Companies, ROCKET COMPANIES, https://www.rocketcompanies.com/our-companies/#sales-technology-marketing-services (last visited Aug. 25, 2024) [https://perma.cc/8J7P-GNUH].

[2] Rocket reported the following in its 2020 annual report, filed with the SEC:

> ***We are controlled by RHI, an entity controlled by Dan Gilbert, whose interests may conflict with our interests and the interests of other stockholders****.*
>
> RHI, an entity controlled by Dan Gilbert, our founder and Chairman, holds 99.94% of our issued and outstanding Class D common stock and controls 79% of the combined voting power of our common stock. As a result, RHI is able to control any action requiring the general approval of our stockholders, so long as it owns at least 10% of our issued and outstanding common stock, including the election of our board of directors, the adoption of amendments to our certificate of incorporation and bylaws and the approval of any merger or sale of substantially all of our assets. So long as RHI continues to directly or indirectly own a significant amount of our equity, even if such amount is less than a majority of the combined voting power of our common stock, RHI will continue to be able to substantially influence the outcome of votes on all matters requiring approval by the stockholders, including our ability to enter into certain corporate transactions. The interests of RHI could conflict with or differ from our interests or the interests of our other stockholders. For example, the concentration of ownership held by RHI

Despite this expansion, Rocket Mortgage remains Rocket's "flagship business." ECF No. 109 at PageID.8430. Rocket lends money—secured by mortgages—to consumers, both directly and through third-party partners such as private mortgage brokers and banks. *Id.* at PageID.8417, 8436–40. Notably, direct-to-consumer loans are more profitable than partner-network loans because Rocket need not share profits with third-party brokers or middlemen. *Id.* at PageID.8437–38 (noting direct-to-consumer sales accounted for "approximately 88%, 87%, 81%, 75%, and 82%" of Rocket's annual revenues "from 2017 to 2021, respectively). Through these two channels, Rocket sells two types of mortgages: new purchase mortgages and refinancing mortgages. *Id.* at PageID.8417. Unlike purchase mortgages, which allow homebuyers to finance a new home, refinancing mortgages allow homeowners with preexisting mortgages to change their mortgage rates and terms.

Regardless of loan type and whether a third-party broker is involved, Rocket primarily profits by selling repackaged consumer loans to government-sponsored entities ("GSEs") like Fannie Mae and Freddie Mac, which then "pool the loans sold by [Rocket] together . . . to issue and sell to the secondary market as mortgage-backed securities," ("MBS") which investors can buy, sell, and trade. *Id.* at PageID.8418; *see also id.* at PageID.8434 (noting Rocket sold 97% of its closed loans to GSEs, before that metric fell to 93% in 2021). Specifically, Rocket capitalizes on the "primary-secondary spread," or the difference between the interest rate that homeowners pay to purchase or refinance a home—the "primary" rate—and the interest rate paid to investors

---

could delay, defer or prevent a change of control of our Company or impede a merger, takeover or other business combination that may otherwise be favorable for us.

Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021) (emphasis in original).

who buy and hold MBSs—the "secondary" rate. *Id.* at PageID.8418; *see also id.* at PageID.8431–32 (noting Rocket's sale to the secondary market accounted for more than 85% of its revenue from 2017–2021).

In August 2020, Rocket launched its initial public offering ("IPO"), selling 100 million shares at $18.00 per share, raising $1.8 billion. ECF No. 109 at PageID.8431. At the time, Rocket's refinancing business was booming, due in large part to favorable home interest rates prompted by the COVID-19 pandemic. *See id.* at PageID.8417, 8434 (noting, that in 2020, "approximately 80% of Rocket's new loan applications were refinance loans" whereas only "20% were new purchase loans"); Erin Gobler, *Here's How COVID-19 Changed the Mortgage Process*, FOX BUSINESS (July 2, 2021), https://www.foxbusiness.com/money/how-covid-pandemic-changed-mortgage-process ("In March 2020, the Federal Reserve slashed interest rates to help stimulate the economy. Mortgage interest rates fell to their lowest levels ever, and the trend . . . continued into 2021[.]") [https://perma.cc/8G6Y-H3DJ]. Rocket's 2020 annual revenue surpassed $15.7 billion. ECF No. 109 at PageID.8431.

### B. Rocket's Key Performance Indicators

To ensure profits continued to soar, as well as to avoid potential obstacles along the way, Rocket closely monitored what it referred to as "Key Performance Indicators" ("KPIs"). ECF No. 109 at PageID.8440. As explained in Rocket's SEC filings, it monitored closed loan origination volume, total market share, and "gain on sale margins." Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021).

Closed loan origination volume represents the number of loans that Rocket originated, processed, and funded. ECF No. 109 at PageID.8445. Beyond this representation, the closed loan origination volume is also highly predictive of the number of probable loans that Rocket—through

GSEs—could sell on the secondary market as MBSs during the same period. *See id*. Accordingly, and as alleged, the higher Rocket's closed loan origination volume, the higher the primary-secondary spread, the higher "gain on sale of loans, net," and the higher "gain on sale margin," as explained below. *See id.* at PageID.8446 (emphasis omitted).

Rocket's "gain on sale margin" is calculated by dividing the "gain on sale of loans, net" by the "net rate lock volume for the period." *Id.* The former part of this equation—Rocket's gain on sale of loans, net—consists of "all components related to the origination and sale of mortgage loans, including:"

(1) Rocket's net gain on sale of loans, as reflected by the "primary-secondary spread";
(2) Loan origination fees and other "certain costs";
(3) Provisions for or benefits from investor reserves;
(4) The change in fair value of interest rate lock commitments ("IRLCs")[3] and loans held for sale;
(5) The gain or loss on forward commitments hedging loans held for sale and IRLCs; and
(6) The fair value of originated Mortgage Servicing Rights (MSRs)

*See id.* The latter part of this equation—the "net rate lock volume" for the period—is defined as the unpaid principal balance of all loans subject to IRLCs and Rocket's estimated "pull-through factor"—"a key assumption" which "estimates[] loan funding probability, as not all loans that reach IRLC status will result in a closed loan." *Id.*

As alleged, beginning in November 2020, Rocket executives knew—based on market trends and the company's review of KPIs—that the company's profitability was about to implode. Specifically, the "closed loan volume for each channel" of Rocket's loan sale business was

---

[3] An IRLC is an "agreement[] to lend to a client as long as there is no violation of any condition established in the contract. Commitments generally have fixed expiration dates or other termination clauses and may require payment of a fee." Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021); *accord* ECF No. 109 at PageID.8444–45.

trending downwards. ECF No. 109 at PageID.8470–72 (alleging "[c]losed loan volume fell significantly, declining from $40.25 billion in November 2020 to just $32.44 billion in December 2020 and then continued to decline to approximately $22.38 billion by May 2021"); *see also id.* at PageID.8516 (depicting closed mortgage volume declining in both Rocket's direct-to-consumer and partner networks, beginning in November 2020). In addition, new client inquiries and loan applications were down 20%. *Id.* at PageID.8474–75, 8511 (alleging "internal Company dashboards showed that consumer demand was not strong because web traffic and new loan applications began declining in 2020, which continued on to 1Q 2021"). Moreover, Rocket's net lock volume—the unpaid principal balance of all loans subject to IRLC discounted by Rocket's "pull-through" factor—grew stagnant and began declining. *Id.* at PageID.8476.

Compounding Rocket's alleged internal challenges, mortgage interest rates began rising in March 2021. *See Mortgage Rates*, Freddie Mac (last updated Aug. 22, 2024) https://www.freddiemac.com/pmms [https://perma.cc/8S7Z-R82T] *accord* ECF No. 109 at PageID.8480. By Rocket's own admission, increased interest rates correspond to a decrease in profitable refinancing loan volume, a decreased primary-secondary spread, and a decrease in overall net revenue. *See* Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021) (noting Rocket's profits have primarily derived from refinancing—rather than purchase— mortgages, explaining (1) "if interest rates rise and the market shifts to purchase [loan] originations, our market share could be adversely affected if we are unable to increase our share of purchase originations," and (2) "reductions in the overall level of refinancing activity or slow growth in the level of new home purchase activity can impact our ability to continue to grow our loan production volumes"). Around the same time, United Wholesale Mortgage ("United")—one of Rocket's key competitors—issued a public "ultimatum" to third-party brokers that, if they

continued to work with Rocket, they could no longer work with United. *See* ECF No. 109 at PageID.8483; *Okavage Grp., LLC v. United Wholesale Mortg., LLC*, No. 3:21-CV-448-WWB-LLL, 2024 WL 982380, at *2 (M.D. Fla. Feb. 6, 2024) (explaining that, at a March 4, 2021 recorded virtual event, United's CEO told third-party brokers "you have until March 15 to sign an addendum saying you're not working with [Rocket] . . . And if you don't sign the addendum . . . you and nobody at your company will be able to work with [United] anymore[.]"). As alleged, Rocket's market share of third-party broker loans decreased by nearly 7% in the three months following United's ultimatum. ECF No. 109 at PageID.8483.

### C. Farner's Alleged Misrepresentations

As alleged, despite this known turbulence, Rocket executives insisted to both investors and the market that Rocket would be financially successful. *See Shupe v. Rocket Companies, Inc.,* 660 F. Supp. 3d 647, 660 (E.D. Mich. 2023).

First, during a public investor conference call on February 25, 2021, Rocket CEO, RHI CEO, and Vice Chairman of Rocket's Board of Directors Jay Farner stated:

> We're seeing strong consumer demand, especially in the housing market. I mean, it's the strongest that its been here in the last decade . . . I'll draw your attention to the fact that, overall, we were able to grow volume twice as fast as the industry in 2020.

ECF Nos. 44 at PageID.1209; 109 at PageID.8510 (emphasis omitted). In response to a question about how increased interest rates may impact Rocket's performance, Farner additionally stated:

> [U]sually, as we see these interest rates tick up a bit, what we're going to see is an opportunity for us to lean in to spend more money and now to talk about the retail or Direct-to-Consumer space, same situation here. There are so many marketing opportunities out there for us. And as others tend to step away or back away from the space, this is where we can lean in, we can grab market share. And not only are we thinking about the profitability that we achieved on the first transaction, we're thinking about the lifetime value of that client and we're now thinking about the lifetime value not only over mortgage, but real estate, auto, and these additional businesses that we'll be adding. So, I guess you can tell we're pretty excited about

it and don't see interest rates going up or down, really having an impact on our business one way or the other.

*Id.* at PageID.8512–13 (emphasis omitted).

During a recorded interview at a Morgan Stanley technology conference on March 3, 2021,

Farner was asked about Rocket's direct-to-consumer and partner business channels and stated:

So I know we don't break down the percentages, and I'm probably not going to go any further than what we've already laid out in our earnings call, but as you can probably sense from my passion, they're all growing. And with what about less than 10% market share, wherever we are, it's hard to say today. If you think about all those different channels that can grow and give us reach, that's why we get excited about what this company looks like in the years to come.

*Id.* at PageID.8516 (emphasis omitted).

Lastly, on March 11, 2021, a Fox Business analyst publicly interviewed Farner and asked:

The pandemic is, I think, winding down. I'm not going to say it's over, but the effects of it are certainly winding down. Do you think that's good for Rocket companies?

ECF No. 109 at PageID.8518; *see also* Fox Business, *Rocket Companies CEO Jay Farner on Varney & Co.*, FACEBOOK (March 11, 2021), https://www.facebook.com/watch/?v=74390680632 7852 [https://perma.cc/84X9-58KC]. Farner responded:

I do. You know, we're going to see interest rates tick up a little bit here, we're all aware of that, but over the 35 years that we've been in business we take that as an opportunity to grow. Our focus on our platform and our tech platform really allows us to be very efficient when we're underwriting, processing, and closing mortgages. And so as other people pull back and capacity shrinks in the mortgage industry, it gives us a great opportunity to grow market share. And now, as we grow market share, not only are we capturing revenue with our mortgage, but title, real estate, auto, personal loans. So as we grow out all of those different services we're able to offer our clients that lifetime value of a client grows and grows for us. So, really, interest rates moving around are a great benefit to us. And then, of course, when they drop back down, we've got a 90% retention rate on our servicing book; we'll help those clients refinance their mortgage and save money. So, you know, cycles are good, at least for our business in the mortgage industry, and I think that's what we're going to see here this year."

ECF No. 109 at PageID.8518 (emphasis omitted); *see also* Fox Business, *Rocket Companies CEO*

*Jay Farner on Varney & Co.*, FACEBOOK (March 11, 2021), https://www.facebook.com/watch/?v

=74390680632 7852 [https://perma.cc/84X9-58KC].[4]

### D. Gilbert's Alleged Insider Trading

Despite assurances to the market that Rocket would financially thrive as interest rates rose

and rebounded from the COVID-19 pandemic, Dan Gilbert—Rocket's founder and, through RHI,

majority owner—sold nearly $500,000,000 of his shares in the company on March 29, 2021. *See*

ECF No. 109 at PageID.8496–508. Ten details illustrate the unusual nature of this trade:

(1) On March 3, 2021, 26 days before Gilbert sold his shares, Rocket CEO Farner publicly stated that Rocket had yet to sell any shares since going public "because [they] believe strongly in the future of what [they were] building." ECF No. 109 at PageID.8535 (emphasis omitted).

(2) On March 23, 2021—just six days before Gilbert's trade—Rocket's Board of Directors gave Gilbert a material, nonpublic report projecting that, during 2021, (1) Rocket would lose 80% of its refinancing volume; (2) Rocket's primary-secondary spread was shrinking; and (3) Rocket's gain on sale margin would decrease by 9%, or almost $1 billion. *Id.* at PageID.8498–500.

(3) Gilbert—through RHI, which he wholly controlled—"submitted an Exchange Notice" to make the trade one week after "the insider trading window has already closed." *Id.* at PageID.8535–36.

(4) Although Rocket's Insider Trading Policy prohibited the trade at the time, it permitted the "closed trading window" to be reopened "at any time, as deemed appropriate by the General Counsel or other senior members of management." *Id.* at PageID.8505.

(5) Gilbert and RHI own "99.9% of Rocket's outstanding Class D Common Stock and 93.1% of Rocket's Class A Common Stock on a fully exchanged and converted basis." ECF No. 44 at PageID.1209 (citations omitted).

---

[4] Plaintiffs' Amended Complaint also alleged Defendant Farner, in his capacity as Rocket CEO, made an additional false and misleading material statement on March 17, 2021, when he tweeted that, despite United's ultimatum to third-party brokers, Rocket's third-party partner network loan volume had increased "significantly." ECF No. 109 at PageID.8520; Jay Farner (@JDFarner), X (Mar. 17, 2021, 12:22 PM), https://x.com/JDFarner/status/1372221904694697991 [https://perma.cc/SYD5-M8Z3]. But Plaintiffs later voluntarily withdrew this allegation. ECF No. 163 at PageID.17949.

(6) Thus, Gilbert "had effective control over Rocket's board, management, and policies," which Rocket acknowledges in its Form 10-K filings with the SEC because Gilbert is "the controlling shareholder of Rocket." ECF No. 42 at PageID.1150–51; *see also* Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021) ("We are controlled by . . . Dan Gilbert, whose interests may conflict with our interests and the interests of other stockholders.").

(7) On March 22, 2021, "following discussions with Jay Farner," Rocket's Audit Committee "voted unanimously to approve opening the training window for a *limited sale by RHI*" and Gilbert. ECF No. 109 at PageID.8506 (emphasis added).

(8) Even with the extended trading window, Rocket's Insider Trading Policy still prohibited Gilbert's sale because he was "aware of . . . material non-public information"—namely Rocket's financial forecast, which he was briefed on just six days earlier. *Id.* at PageID.8507 (emphasis omitted).

(9) Before his $500,000,000 March 29, 2021 sale, Gilbert "had never publicly sold a single share of Rocket stock." *Id.* at PageID.8420.

(10) Gilbert sold his 20,200,000 shares in March 2021 for *33% more* "than the closing market price of Rocket stock just *one week* after" Rocket revealed the material information about its financial forecast in May 2021. *See* ECF No. 109 at PageID.8535.

Indeed, on May 5, 2021, through a Press Release and an Earnings Call, Rocket informed the market, for the first time, that it was expecting a decrease of $18.5 billion in actual closed loan volume. *See* ECF No. 109 at PageID.8523. The Press Release also conceded that Rocket's business was impacted by rising interest rates, such that the company was focusing on its less-profitable partner-network channel and new purchase loans, rather than its direct-to-consumer channel and refinancing loans. *Id.* at PageID.8525. Rocket's May 2021 Press Release further reported Rocket's lowest gain on sale margin since the company went public in 2020. *Id.* at PageID.8525. The next day, the price of Rocket stock dropped from $22.80 per share to $19.01 per share. *Id.* at PageID.8421. By the end of the week, the price of Rocket stock had fallen to $16.48 per share. *Id.*

**E. Procedural Posture**

Plaintiffs Carl Shupe and SoCal filed their Amended Complaint, on behalf of themselves and all others similarly situated, on February 12, 2024.[5] ECF No. 109. In Count I, Plaintiffs allege RHI committed insider trading in violation of the Exchange Act and Rule 10b-5 when Gilbert—RHI's majority shareholder and Chairman—sold over 20 million shares of Rocket Class A common stock on March 29, 2021 armed with material, non-public information about Rocket's financial forecast.[6] *Id.* at PageID.8551–53. In Count II, Plaintiffs allege that SoCal—and the proposed Subclass of those who, like SoCal, traded "contemporaneously" with Defendant Gilbert's March 29, 2021 alleged insider trade—may recover from RHI under Section 20A of the Exchange Act, which provides a private right of action to those who trade "securities of the same class" "contemporaneously" with an inside trade.[7] *Id.* at PageID.8553–55; 15 U.S.C. § 78t-1; *see also Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377, at *7 (E.D. Mich. Feb. 5, 2024). In Count III, Plaintiffs allege Defendant Rocket—through its CEO Farner—defrauded the market in violation of the Exchange Act through a series of materially false and misleading statements that "artificially inflated" the prices of Rocket's Class A common stock.[8] ECF No. 109 at PageID.8555–57. And, in Count IV, Plaintiffs allege Defendants RHI and Gilbert effectively controlled Rocket, and are thus similarly liable for these false and misleading under Section 20(a) of the Exchange Act. *Id.* at PageID.8557–60.

---

[5] For a thorough description of the above-captioned case's procedural posture, *see Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377, at *1–3 (E.D. Mich. Feb. 5, 2024).
[6] Initially, Count I was also asserted against Defendant Gilbert. ECF No. 109 at PageID.8551. But Plaintiffs voluntarily dismissed Gilbert from Count I in July 2024. ECF No. 163 at PageID.17950.
[7] Initially, Count II was also asserted against Defendant Gilbert. ECF No. 109 at PageID.8553. But Plaintiffs voluntarily dismissed Gilbert from Count II in July 2024. ECF No. 163 at PageID.17950.
[8] Initially, Count III was also asserted against Defendant Gilbert. ECF No. 109 at PageID.8555. But Plaintiffs voluntarily dismissed Gilbert from Count III in July 2024. ECF No. 163 at PageID.17950.

Plaintiffs' Amended Complaint is summarized as follows:

| Count | Claim | Defendants |
|-------|-------|------------|
| I | Insider Trading;<br>Section 10(b) and Rule 10b-5 of the Exchange Act | RHI |
| II | Private Right of Action For Those Who Traded "Contemporaneously" With RHI's Alleged Insider Trade;<br>Section 20A of the Exchange Act | RHI |
| III | Materially False and Misleading Statements;<br>Section 10(b) and Rule 10b-5 of the Exchange Act | RCI, Farner |
| IV | Materially False and Misleading Statements—Controller Liability;<br>Section 20(a) of the Exchange Act | RHI, Gilbert |

On February 12, 2024, Plaintiffs filed their renewed Motion for Class Certification.[9] ECF No. 111. Three issues are central to certification: (1) whether Rocket stock was traded on an "efficient market" during the Class Period; (2) whether Defendant Farner's alleged misrepresentations impacted the price of Rocket stock; and (3) whether damages can be calculated on a class-wide basis.  Both Parties have retained several proposed experts to support their arguments relative to this issue and have filed several motions challenging each other's experts. These expert motions must be resolved before this Court can rule on class certification.

## II. *Basic* Background and Expert Reports

But, before this Court turns to the merits of each *Daubert* motion, this Court will first provide necessary context concerning (1) the *Basic* presumption of class-wide investor reliance and the ancillary importance of market efficiency and price impact; and (2) the Parties' proposed expert testimony.

---

[9] Plaintiffs' initial motion for class certification was withdrawn after the Court granted Plaintiffs' Motion to Substitute SoCal as the proposed subclass representative. *Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377, at *10 (E.D. Mich. Feb. 5, 2024).

### A. The *Basic* Presumption, Market Efficiency, and Price Impact

To obtain class certification, Plaintiffs must prove—among other requirements—that common questions of law or fact shared by the proposed Class predominate over the individual questions presented by each putative Class member. FED. R. CIV. P. 23(b)(3); *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (internal quotations omitted). In their renewed Motion for Class Certification, Plaintiffs argue that this predominance requirement "is established with respect to reliance" because "Plaintiffs are entitled to rely on the fraud-on-the-market presumption articulated by the Supreme Court in" *Basic Inc. v. Levinson*. ECF No. 111 at PageID.8603.

The fraud-on-the-market presumption is a judicial fix to the complications that arise when the evidentiary requirements of Section 10(b) securities fraud claims intersect with the procedural requirements for class certification. Plaintiffs' Section 10(b) fraudulent misrepresentation claims require, among other elements, poof of reliance on Defendant Farner's alleged fraudulent misrepresentations when trading Rocket Class A common stock. *See Shupe v. Rocket Companies, Inc.*, 660 F. Supp. 3d 647, 667 (E.D. Mich. 2023). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement" and purchased or sold stock "based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) [hereinafter *Halliburton I*].

But, in 1988, the Supreme Court recognized that requiring proof of direct reliance would practically preclude securities class actions, because individualized issues of reliance would necessarily overwhelm common questions of law and fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988). Accordingly, the *Basic* Court held that, through the "fraud-on-the-market" theory, a class can satisfy the reliance element of a Section 10(b) and Rule 10b-5 claim by invoking a

*rebuttable presumption of reliance*, rather than proving *direct* reliance on an allegedly fraudulent misrepresentation.[10] *Id.* at 247. According to this fraud-on-the-market theory, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 246. Because efficient markets "transmit[] information to the investor in the processed form of a market price," courts can presume—subject to rebuttal— that investors rely on public misstatements whenever he or she "buys or sells stock at the price set by the market." *Id.* at 244, 247.

> To establish the *Basic* presumption of class-wide investor reliance, a plaintiff must prove:
>
> (1) The alleged misrepresentations were publicly known;
> (2) The alleged misrepresentations were material;
> (3) The stock traded in an efficient market; and
> (4) The plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277–78 (2014) (citing *Basic*, 485 U.S. at 248, n. 27) [hereinafter *Halliburton II*]. Critically, at the class certification stage, a plaintiff must *prove*—as opposed to *plead*—all elements other than materiality. *Id.* at 276, 283; *see also Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 467–70 (2013) (concluding plaintiff need not prove materiality at class certification stage because materiality is a dispositive issue that can be proved by evidence common to the class as a whole after certification).

But even if a plaintiff proves market efficiency, publicity, and trading timing at the class certification stage, defendants may rebut the *Basic* presumption by showing, among other things,

---

[10] "What is called the *Basic* presumption actually incorporates two constituent presumptions: First, if a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market, he is entitled to a presumption that the misrepresentation affected the stock price. Second, if the plaintiff also shows that he purchased the stock at the market price during the relevant period, he is entitled to a further presumption that he purchased the stock in reliance on the defendant's misrepresentation." *Halliburton II*, 573 U.S. 258, 279 (2014).

that the alleged misrepresentations had no price impact. *Halliburton II*, at 280; *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (noting "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade . . . will be sufficient to rebut the presumption of reliance").

In this case, Defendants do not dispute that Jay Farner's three alleged fraudulent misrepresentations were publicly known. *See generally* ECF No. 120 at PageID.9133–44. Defendants also do not dispute that, as defined, all members of the proposed Class would have traded Rocket Class A common stock after Jay Farner's alleged misrepresentations began but before "the truth was revealed" during Rocket's May 5, 2021 public earnings call. *See generally id.*; *see also* ECF No. 111 at PageID.8589 (defining the proposed Class as those who acquired Rocket stock "between February 25, 2021 and Mary 5, 2021"). So, Plaintiffs' ability to invoke the *Basic* presumption—and certify the proposed Class—hinges on whether they can prove that Rocket Class A common stock traded on an efficient market during the Class Period, and whether Defendants can nevertheless prove that Defendant Farner's alleged misrepresentations had no price impact.

### 1. Market Efficiency Factors

An efficient market is generally open, developed, and rapidly reflects new information in price. *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (citing *Cammer v. Bloom*, 711 F.Supp. 1264, 1276 n. 17 (D.N.J. 1989)). But there is no bright-line test for market efficiency. The Sixth Circuit has historically applied the "*Crammer* factors," promulgated in 1989 by the United States District Court for the District of New Jersey. *Id.* These factors include:

(1) **A large weekly trading volume**. A large weekly trading volume is indicative of an efficient market because "it implies significant investor interest in the company" which, "in turn, implies a likelihood that many investors are

executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F.Supp. at 1286 (D.N.J. 1989).

(2) **A significant number of security analyst reports.** The more securities analysts who report on a company's stock during the class period, the more likely the market was efficient because significant analyst coverage implies interest in a company's securities and a wide distribution of relevant information. *Crammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989).

(3) **Market makers and arbitrageurs.** Market makers are institutional firms which stand ready to buy or sell a particular stock on a regular and continuous basis. ECF No. 111-2 at PageID.8637; *see also* 17 C.F.R. § 240.15c3–1(c)(8). In contrast, "arbitrageurs" are "traders who identify and eliminate differences between [t]he price [of a security] and [its] value." *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 862 (7th Cir. 1995). "The existence of market makers and arbitrageurs" bolsters market efficiency because these players "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Crammer*, 711 F. Supp. at 1286 (D.N.J. 1989).

(4) **S-3 Registration Statement eligibility**. "According to SEC regulations, certain companies may use the S-3 short form, rather than Form S-1, to register securities if they are sufficient large and have filed reports with the SEC for the requisite period of time." *Krogman v. Sterritt*, 202 F.R.D. 467, 476 (N.D. Tex. 2001). Thus, inherently, "information on companies which file on Form S-3 is widely available in the market," indicative of an efficient market for that company's stock. *Crammer v. Bloom*, 711 F. Supp. 1264, 1284 (D.N.J. 1989).

(5) **A history of immediate movement of stock price caused by unexpected corporate events or financial releases**. A pattern of significant price impact in response to corporate disclosures suggests that public information has a causal effect on a security's price, suggesting the modern market is efficient. *See Crammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989).

*Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (citing *Cammer*, 711 F.Supp. at 1286–87 (D.N.J. 1989)). This Court, like many other district courts within the Sixth Circuit, has additionally recognized the three "*Krogman* factors" as relevant to the market efficiency analysis:

(6) **Market capitalization**. Calculated as "the number of shares multiplied by the prevailing share price," market capitalization "may [indicate] market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

(7) **The "bid-ask" spread**. The "bid-ask spread" is defined as "the difference between the price which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). A small spread suggests an efficient market, because the at-issue stock is not disproportionately pricey to trade. *See id.* ("A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade.").

(8) **The "float."** The "float" of a security is the "percentage of shares held by the public, rather than insiders." *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). If the publicly issued stock of a company is primarily owned by the company's own leadership, those stocks are less likely to be traded on an efficient market because the "insiders may have private information that is not yet reflected in stock prices" such that these prices "are less likely to accurately reflect all available information about the security." *Id*. (internal quotations omitted).

*Dougherty v. Esperion Therapeutics, Inc*., No. 16-10089, 2020 WL 6793326, at *3 (E.D. Mich. Nov. 19, 2020) (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001)).

Importantly, although this Court and the Sixth Circuit recognize these factors as relevant, the *Cammer* and *Krogman* factors are neither exhaustive nor mandatory. *Weiner v. Tivity Health, Inc*., 334 F.R.D. 123, 133 (M.D. Tenn. 2020) (collecting cases) (noting "the Sixth Circuit has not mandated use of" the *Cammer* or *Krogman* factors, "and even in those cases where the factors are utilized, they are generally deemed to be an analytical tool rather than a checklist").

### B. Plaintiff Expert Chad Coffman

Plaintiffs' retained expert is Chad Coffman. Coffman has a bachelor's degree in economics, a master's degree in public policy, and is a chartered financial analyst (CFA). ECF No. 111-2 at PageID.8622. He has over twenty years of experience in financial analytics and has spent his career "analyzing how securities prices react to new information and evaluating damages in securities-related matters." *Id*. at PageID.8622, 8677. Indeed, Coffman has been retained as a securities expert "more than one hundred times" by plaintiffs, defendants, insurers, and mediators alike. *Id*. Coffman offered two expert opinions related to class certification. First, Coffman

concluded that Rocket Class A common stock traded on an efficient market during the class period. *Id.* at PageID.8623. Second, Coffman concluded that damages could be calculated on a class-wide basis using a "well-accepted" "out-of-pocket" methodology. *Id.* at PageID.8655. Each opinion will be discussed in greater detail below.

### 1. Market Efficiency Conclusion

To support his market efficiency conclusion, Coffman tailored his own empirical analysis to the above-identified *Cammer* and *Krogman* factors. *See generally* ECF No. 111-2.

(1) **A large weekly trading volume**. Coffman concluded that the average weekly trading volume of Rocket stock during the Class Period was 130.2 million shares, or "over 110% of shares outstanding," indicative of an efficient market. *Id.* at PageID.8633.

(2) **A significant number of security analyst reports.** Coffman concluded this factor favors market efficiency because "there were at least thirty-five analyst reports issued during the Class Period" from "eighteen separate firms" including "UBS, Morgan Stanley, Barclays, and J.P. Morgan," all of which "disseminat[ed] publicly available information" about Rocket stock. *Id.* at PageID.8653; *see also id.* at PageID.8663 (noting this conclusion is "almost certainly understate[d]" because many analyst reports are not publicly available through third-party data providers).

(3) **Market makers and arbitrageurs.** Relying on data from Bloomberg, Coffman concluded there were 80 market makers for Rocket Common Stock during the Class Period, supporting market efficiency. *Id.* at PageID.8638.

(4) **S-3 Registration Statement eligibility**. Coffman conceded that Rocket has not filed a S-3 Registration Statement, in part because the company only recently went public. *See id.* at PageID.8639. However, Coffman concluded the "spirit" of this market efficiency factor is satisfied because Rocket has "filed all [reporting] documents in a timely manner and did not fail to meet its debt obligations." *Id.* at PageID.8639.

(5) **A history of immediate movement of stock price caused by unexpected corporate events or financial releases**. To analyze this factor, Coffman conducted an "event study." *Id.* at PageID.8640 (noting event studies are "well-accepted" in the economics community and are frequently used in academia to "isolate the impact of information on market prices"). Specifically, Coffman created a "regression model" for a two-and-a-half year "Analysis Period,"

which included the two-month Class Period.[11] *Id.* at PageID.8631, n. 33 (noting the Analysis Period "is from September 4, 2020 through May 5, 2023). Coffman identified eleven earnings announcements which Rocket released to the public during this Analysis Period and examined how the prices of Rocket Class A common stock responded. *Id.* at PageID.8666 (identifying earnings statements). Coffman concluded that six of the eleven earnings announcements "resulted in statistically significant price movements." *Id.* at PageID.8647. Compared to the 3.29% of statistically significant prices movements throughout the rest of the Analysis Period, Coffman concluded this "is powerful scientific evidence of a cause-and-effect relationship between new, publicly released information concerning the Company and changes in the price of Rocket Common Stock." *Id.* at PageID.8647. Coffman also found evidence of market efficiency because "the average magnitude of stock price movement" on the days in which Rocket released an earnings statement was 6.42%, whereas the average movement magnitude on days with "no news" was only 1.69%. *Id.*

(6) **Market capitalization**. Coffman reported that Rocket's market capitalization was $2.98 billion during the Class Period. *Id.* at PageID.8651. Coffman concluded this suggests market efficiency because Rocket's market capitalization was higher than "at least 68%" of publicly traded companies at the time. *Id.*

(7) **The "bid-ask" spread**. Coffman concluded that Rocket's bid-ask spread during the Class Period fluctuated between .01% and .018%, which, even at its peak, was "well below the average and median bid-ask spread of a random sample of 100 other common stocks" of publicly traded companies at the time. *Id.* at PageID.8652.

(8) **The "float."** Coffman concluded that Rocket's insiders owned only .44% of the company's Class A common stock during the Class Period, "meaning that approximately 99% of Rocket's shares were held by non-insiders," suggesting market efficiency. *Id.* at PageID.8653.

After analyzing all eight *Cammer* and *Krogman* factors, Coffman also analyzed three "additional factor[s]." *Id.* at PageID.8653–55. First, Coffman opined that a large number of institutional investors in a given security favors market efficiency because "[i]nstitutional investors are . . . sophisticated and well-informed with access to most publicly available information for the

---

[11] Notably, as discussed in greater detail *supra* Section II.C.2, Coffman excluded March 2 and 3, 2021 from his event study as statistical "outliers" because these dates revealed a "spike in trading volume . . . apparently fueled by investors on the Reddit forum site 'r/wallstreetbets' encouraging each other to buy Rocket Common Stock[.]" ECF No. 111-2 at PageID.8643, n. 64.

stocks that they own." *Id.* at PageID.8653. And Coffman concluded that 357 separate institutions invested in Rocket Stock during the Class Period, suggesting market efficiency. *Id.* Second, Coffman opined that a substantial "autocorrelation"—the ability of prior price movements to predict future price movements—suggests market *inefficiency* because investors could transact with minimal risk. *Id.* at PageID.8654. But Coffman found "no evidence of autocorrelation" in Rocket stock during the Class Period. *Id.* Lastly, Coffman concluded that the significant amount of options trading of Rocket Stock during the class period indicates market efficiency because economic studies suggest increased options trading correlates with increased trading volume, transaction size, and "an overall improvement of the market quality of the underlying stocks." *Id.* at PageID.8655 (highlighting data that "there were 2,353,231 Rocket Common stock put contracts and 6,857,940 Rocket Common Stock call contracts that traded during the Class Period").

## 2. Class-Wide Damages Conclusion

Coffman also concluded that, if the Class succeeds on the merits, damages can be calculated on a class-wide basis. ECF No. 111-2 at PageID.8655. Specifically, Coffman concluded that, under the "well-accepted" "out-of-pocket" method, damages are "equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of the sale."[12] *Id.* at PageID.8655–56. Coffman explains that the artificial inflation in the share price—also known as loss causation—is a calculation common to the entire Class. *Id.* at PageID.8656. Accordingly, "[o]nce the inflation per share has been quantified," Coffman concludes, "the computation of damages for each class member is formulaically based upon

---

[12] Coffman notes that, if the putative class member sold their Rocket shares *before* Rocket released its financial forecast on May 5, 2021, the damages for that class member would be subject to the PSLRA's formulaic 90-day "lookback" provision. ECF 111-2 at PageID.8656 (citing 15 U.S.C. § 78u-4(e)(1)).

information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security[]).*" *Id.* at PageID.8656 (emphasis in original).

### C. Defense Expert Dr. René Stulz

Defendants have retained three separate experts in opposition to Plaintiffs' renewed motion for class certification, each of whom has offered opinions about separate topics. Defendants' first retained expert is Dr. René Stulz. Dr. Stulz received his Ph.D. in economics from the Massachusetts Institute of Technology in 1980. ECF No. 120-2 at PageID.9232. He currently serves as the Chair of Banking and Monetary Economics at the Ohio State University, the Director of the Dice Center for Research in Financial Economics at the Ohio State University, and a Research Associate of the National Bureau of Economics Research. *Id.* at PageID.9170. Dr. Stulz previously served as the editor of *The Journal of Finance* and the co-editor of the *Journal of Financial Economics*, and has written more than 100 articles in peer-reviewed finance and economics journals. *Id.*

Dr. Stulz's proposed expert conclusion is twofold: (1) Rocket stock did *not* trade on an efficient market during the Class Period because it was meme-stock, and (2) Chad Coffman's contrary conclusions are unreliable. *See* ECF No. 120-2.

### 1. Meme Stock and Market Inefficiency Conclusions

Dr. Stulz first concludes that Rocket stock was not traded on an efficient market during the Class Period because a two-day "meme stock" trading frenzy occurred on March 2 and 3, 2021. *Id.* at PageID.9191–215.

"Meme stocks are a relatively new phenomenon" which began in late 2020 and early 2021 as online investing groups expanded throughout the COVID-19 pandemic. Michelle Lodge, *What is a Meme Stock? A Quick Guide*, FORBES (June 18, 2024, 3:42 PM)

https://www.forbes.com/sites/investor-hub/article/what-is-a-meme-stock/ (last updated Sep. 4, 2024, 10:22 AM) [https://perma.cc/JG47-ZEMH]. Meme stocks "became popular through the social media platform Reddit.com," and the subreddit—or forum— "r/wallstreetbets." *Id.*; *see also* John Egan, *Wall Street Bets: the Story of How a Mob Became a Movement, and the Anti-Heroes of the Digital Age. Part 1 – Diamond Hands*, FORBES (Feb. 2, 2021, 5:14 PM), https://www.forbes.com/sites/johnegan/2021/02/02/smoothbrainsthe-story-of-how-a-mob-becam e-a-movement-and-a-group-of-smooth-brained-apes-on-the-internet-became-the-anti-heroes-of-the-digital-age/?sh=6f31d2625a89 (noting r/wallstreetbets is "ostensibly, a forum for ill-disciplined gamblers to exchange the money they've finagled out of friends and relatives for internet points through anxiety-inducing financial loss. It is a place where people with little to no training, bereft of inside knowledge and minimal attention to detail will wager everything they have and more (much more) on an earnings report or an Elon Musk meme") [https://perma.cc/3VG5-NZ8B] [hereinafter Egan I].

Investors increasingly use social media—including Reddit and r/wallstreetbets—to coordinate "short squeezes" which drastically impact the market for a given security. "Short selling refers to the sale of a security that the seller does not own, where the delivered security is borrowed by the short seller." *The Long and Short of Short Squeezes*, S&P GLOBAL: MARKIT FACTOR INSIGHTS (Nov. 27, 2013), https://cdn.ihsmarkit.com/www/pdf/0321/Markit_RN_- _The_Long_and_Short_of_Short_Squeezes.pdf [https://perma.cc/QNK2-BLME]. A short seller gambles that the stock price will *decrease*. *See id.* When this gamble pays off, the short seller profits from the difference between the high value they sold the borrowed stock at and the low value they repurchased the stock at. *See id.* But, when the stock price *increases*, short sellers are pressured to "cover" their short position by repurchasing the stock at the higher price and returning

the stock to the lending investor at a loss. *Id.* Additionally, short sellers may be forced to cover if the short positions for a stock surpass the amount of publicly traded shares and the lending investor recalls the borrowed stock. *See id.* A "short squeeze" occurs when many short sellers rush to cover and repurchase the same stock at the same time, which only causes the stock price to increase further, which cyclically pressures even more short sellers to cover, and so on. *See id.*; *see also* Henry David Gale, *"Buy Gamestop!": The Need to Rethink the Approach to Market Manipulation in a Wallstreetbets World*, 108 IOWA L. REV. 1923, 1942 (2023) ("short sellers that cover their positions by repurchasing the underlying stock . . . cause additional upward price pressure on the stock which . . . force[s] other short sellers to exit their positions, adding further upward price pressure and so on." (internal quotations omitted)).

Reddit (r/wallstreetbets) and other social media platforms provide savvy investors—whether sophisticated or unsophisticated—with a platform to profit from a coordinated short squeeze. Yun Li, *GameStop Mania Explain: How the Reddit Retail Trading Crowd Ran Over Wall Street Pros*, CNBC (Jan. 27, 2021), https://www.cnbc.com/2021/01/27/gamestop-mania-explained-how-the-reddit-retail-trading-crowd-ran-over-wall-street-pros.html (noting Reddit provided retail investors with the ability to "attack[]" Wall Street as a "union") [https://perma.cc/DY98-4P9C].

The "quintessential" example of the meme stock "phenomenon" is the coordinated January 2021 trading of GameStop stock. ECF No. 120-2 at PageID.9193. A r/wallstreetbets user noticed that GameStop stock was being heavily shorted by institutional investors, in large part because GameStop—a "brick and mortar" video game retailer—was struggling during the COVID-19 pandemic. *See* Egan I. Institutional short sellers purchased GameStop stock in August 2020 at $4 per share, hoping to profit on a gamble that GameStop would become bankrupt. *Id.* But, by late

January 2021, GameStop stock was trading at $144 per share thanks to boons from a new billionaire investor and the relaxation of COVID-19 restrictions. *Id.*; John Egan, *Wall Street Bets: the Story of How a Mob Became a Movement, and the Anti-Heroes of the Digital Age. Part 2 – Stonks & Spartans*, FORBES (Feb. 12, 2021, 5:33 PM), https://www.forbes.com/sites/johnegan/2021/02/03/stonks-and-spartans/ [https://perma.cc/B3YF-Q5EP] [hereinafter Egan II]. Indeed, the same Reddit user who noticed that GameStop stock was being heavily shorted also noticed that institutional short sellers sold more shorts than were available to buy on the market, further suggesting a future pressure on these investors to cover. *See* Egan I. So, that Reddit user took to r/wallstreetbets and encouraged fellow Redditors to invest and profit at these institutional investors' expense. *See* Egan II (noting Reddit investors encouraged each other "hold the line" and not sell their purchased GameStop shares as a form of protesting systemic inequity between institutional and retail investors); *see also* Boutros Imad, *The Meme Stock Bidding War Viewed From the Lenses of the American and Canadian Securities Regulators*, 48 U. DAYTON L. REV. 193, 199 (2023) ("GameStop was no longer just a way to make a big profit or invest in a struggling firm, but also purchasing GameStop had become a strategy to combat institutional money."). As a result of the surge prompted by r/wallstreetbets investors, "the closing price of [GameStop] stock rose more than 700% between January 21 and January 27," 2021. *In re Jan. 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335, 1343 (11th Cir. 2023).

Like GameStop stock in January 2021, Dr. Stulz opines that Rocket stock was a meme stock during the Class Period, from early March through May 2021. ECF No. 120-2 at PageID.9193. "Although there is no single formal or technical definition of a meme stock," Dr. Stulz relies on SEC staff reports which identify meme stocks as characterized by (1) "frequent mentions on social media, including Reddit" and (2) "large price moves or increased trading

volume that significantly exceeded broader market movements" and "the amount of 'short interest' measured as the number of shares sold short as a portion of the total shares outstanding [exceeding the market average]." *Id.* at PageID.9193–94. Dr. Stulz concludes that Rocket Class A common stock exhibited both meme stock characteristics during the Class Period.[13]

First, Dr. Stulz identifies the following Reddit posts on March 2 and 3, 2021 as indicative of a meme stock and a coordinated effort of retail investors to short squeeze Rocket stock ("RKT"):

> "[GameStop] holders . . . Here is what you need to do . . . buy Rocket Mortgage. That's Rocket, with an R. RKT to the moon 🚀🚀🚀"

> "To anyone who feels like they missed the boat with [GameStop], this squeeze is about to happen with RKT. Shorts have 4 days to cover while RKT just announced a special dividend to be given out next week. The shorts will be [squeezed] so hard."

> "RKT IS THE NEW [GAMESTOP] 🚀🚀🚀🚀🚀"

> "[GameStop] is so last month. Get on the RKT 🚀🚀"

> "KEEP HOLDING [GAMESTOP]. KEEP HOLDING RKT. It will go up and the hedge fund[s] will cry."

> "RKT & [GameStop] to the moon! 🚀🚀👐👍"

> "41% shorted. They just increased the fees for borrowing stocks to short. Right now RKT looks like [GameStop] before it went to the moon for the first time."

---

[13] Dr. Stulz is not alone in his meme-stock conclusion. Indeed, as he recognizes, numerous news outlets publicly reported the "meme" nature of Rocket stock on March 2 and 3 2021. ECF No. 120-2 at PageID.9200–01; *see, e.g.*, Orla McCaffrey, *Rocket Stock is the New Meme Trade. Move Over, GameStop*, WALL ST. J. (Mar. 3, 2021 5:48 PM), https://www.wsj.com/articl es/rocket-is-becoming-the-new-meme-stock-move-over-gamestop-11614782903; Sinéad Carew, *Rocket Shares Soar More than 70% as Analysts Eye 'GameStop-Esque' Short Squeeze*, REUTERS (Mar. 2, 2021 6:20 PM), https://www.reuters.com/article/technology/rocket-shares-soar-more-than-70-as-analysts-eye-gamestop-esque-short-squeeze-idUSKCN2AU2F8/; Jonathan Ponciano, *Billionaire Dan Gilbert's Fortune Plunges $25 Billion as Rocket Companies' GameStop-Like Squeeze Unravels*, FORBES (Mar. 3, 2021 at 4:18 PM), https://www.forbes.com/sites/jonathanpon ciano/2021/03/03/billionaire-dan-gilberts-fortune-plunges-24-billion-as-rocket-companies-game stop-like-squeeze-unravels/.

ECF No. 120-2 at PageID.9196. Dr. Stulz notes that, on March 2 and 3, 2021, "Reddit daily mentions of Rocket reached a total of over 59,000" and that, throughout the entire two-month Class Period, "[t]he average daily number of mentions" was "27 times higher than the average daily number of mentions" before or after. *Id.* at PageID.9197. Dr. Stulz adds that Rocket was a prime target for a coordinated short squeeze because Rocket's short interest "hovered at or above 30% from the beginning [of] November 2020 through the end of February 2021." *Id* at PageID.9203. Dr. Stulz explains that, consistent with GameStop, Rocket's short interest sharply fell after February 26, 2021 as Rocket's stock price increased as short sellers began to cover. *Id.*

As a result of this social media frenzy and coordinated short squeeze, Dr. Stulz notes that "Rocket's stock price increased by over 70% on March 2, 2021 and over 376 million shares were traded," despite no "new, value-relevant public information" about the stock. *Id.* at PageID.9198. This increase was more than 1,480 times the average daily return (.05%) and more than 33 times the average daily volume traded (11 million shares) over the course of the previous 120 trading days[.]" *Id.* And, during the Class Period, Dr. Stulz notes that "the average daily trading volume of Rocket was 4.5 times higher than the average daily trading volume" before and after. *Id.* at PageID.9198–99.

Dr. Stulz ultimately concludes that Rocket's meme-stock status on March 2 and 3, 2021 rendered the trading market inefficient throughout the two-month Class Period. *Id.* at PageID.9205–11. Specifically, Dr. Stulz opines that the market for Rocket stock was inefficient because its price throughout the Class Period was primarily based on (1) investor coordination and (2) short squeezes arising from forced covers—rather than public statements and press releases about Rocket. *Id.* at PageID.9208. Although the social media frenzy on Reddit seemingly spiked on March 2 and 3, 2021, Dr. Stulz opines that this frenzy nevertheless caused "short-selling

frictions" throughout the remainder of the Class Period, during which short selling became far riskier for investors. *Id.* at PageID.9205–06. Dr. Stulz also identifies empirical research suggesting that, "independent of meme stock status," these short-selling frictions "impede the incorporation of . . . public information" into the price of a given security, further suggesting market inefficiency. *Id.* at PageID.9206–08 ("With short-sale constraints, academic research has found that stocks tend to underreact to negative news and overreact to positive news as arbitrageurs are unable to step in and correct mispricing due to high costs of borrowing."). Moreover, Dr. Stulz notes that, during and following short squeezes, "any purchaser" of a security "would be expected to earn a negative return, which is inconsistent with market efficiency as investors need compensation for the risk of investing in the stock." *Id.* at PageID.9208.

### 2. Rebuttal to Chad Coffman's Conclusions

Consistent with his conclusions that Rocket's meme-stock status rendered the trading market inefficient throughout the relevant Class Period, Dr. Stulz contests Chad Coffman's contrary conclusions. First, Dr. Stulz concludes that Coffman's event study and autocorrelation analysis were tainted selection bias because Coffman removed March 2 and 3, 2021 from his results as "outliers." *Id.* at PageID.9211–15 (adding Coffman problematically does not define the parameters for his "outlier" classification, making the classification arbitrary). Second, Dr. Stulz concludes that Coffman improperly narrowed his public float analysis to only Rocket Class A common stock, noting that, had he considered all outstanding shares of all classes of Rocket stock—including the convertible Class D common stock—the public float during the Class Period was 5%—not 99% as Coffman concluded—which suggests market inefficiency. *Id.* at PageID.9216–25. Lastly, Dr. Stulz takes issue with Coffman's two-and-a-half year Analysis Period used throughout his event study, arguing that Coffman cannot "infer market efficiency"

from this Analysis Period to the shorter, two-month Class Period it includes. *Id.* at PageID.9225–31.

### D. Defense Expert Dr. Laura Starks

Defendants' second retained expert is Dr. Laura Starks. Dr. Starks received her Ph.D. in finance from the University of Texas at Austin ("UT") and currently serves as UT's McCombs School of Business Chair of Finance. ECF No. 120-3 at PageID.9278. Throughout her career, Dr. Starks has taught undergraduate, masters, and Ph.D. courses in corporate finance and investments. *Id.* at PageID.9280. Among other accomplishments, Dr. Starks has published several articles in peer-reviewed journals on "the decision-making process of investors," including "how investors react to new information." *Id.* at PageID.9278.

While Defendants retained Dr. Stulz to opine that Rocket stock was traded on an inefficient market to preclude Plaintiffs from *invoking* the *Basic* presumption of class-wide reliance to satisfy predominance, Defendants retained Dt. Starks to *rebut* this presumption by opining that Defendant Farner's (and RHI's) alleged fraudulent misrepresentations had no price impact on the market. ECF No. 120-3 at PageID.9283; *see also supra* Section III.A.1 ("[E]ven if a plaintiff proves market efficiency, misrepresentation publicity, and trading timing at the class certification stage, defendants may rebut the *Basic* presumption by showing, among other things, that the alleged misrepresentations had no price impact.").

As discussed, Plaintiffs generally allege that Defendant Farner made fraudulent material misrepresentations touting Rocket's viability despite rising interest rates and Farner's internal knowledge that Rocket's key performance indicators were forecasted to decline substantially. *See supra* Section I.C.; ECF No. 109 at PageID.8469–95. Relevantly:

On February 25, Defendant Farner stated that Rocket was "seeing strong consumer demand" and that, as "interest rates tick up a bit," Rocket saw an "opportunity" to

invest in its Direct-to-Consumer network and "grab market share," such that Rocket did not view rising interest rates as "having an impact on [its] business one way or another." ECF Nos. 44 at PageID.1209; 109 at PageID.8510–13.

On March 3, 2021, Farner stated that Rocket's direct-to-consumer and partner networks were "all growing." *Id.* at PageID.8516.

On March 11, 2021, Farner stated that Rocket "take[s]" rising interest rates as "an opportunity to grow" such that, as other mortgage companies "pull back" and the mortgage industry shrinks, Rocket has an "opportunity to grow market share" and that he thinks the upcoming "cycles" will be good for Rocket's business throughout the coming fiscal year. *Id.* PageID.8518.

Plaintiffs allege that these statements were fraudulent misrepresentations that "artificially inflated or maintained the price of Rocket Class A common stock" during the Class Period. *Id.* at PageID.8543, 8556. Dr. Starks disagrees, both based on her review of relevant context and analyst reports.

Dr. Starks first explained how the broader context surrounding Plaintiffs' alleged fraudulent misrepresentations suggests that Defendant Farner's statements had no price impact. Dr. Starks notes, for example, that, simultaneous to Farner's February 25, 2025 earnings call *statement*, Rocket released a public earnings *announcement* that explained that Rocket's gain-on-sale margins and closed loan volumes significantly *decreased* since the previous quarter. ECF No. 120-3 at PageID.9295. And Dr. Starks notes that influential side-sell analysts within the market referenced this latter *announcement* rather than Jay Farner's *statement* when issuing reports to inform investors. *Id.* Similarly, Dr. Starks noted that all of Rocket's publicly available SEC filings and risk disclosures discussed how rising interest rates may be adverse to Rocket's business. *Id.* at PageID.9296–99. ("Consistent with the Company's [] disclosures, analyst[] reports prior to the [] Class Period had already noted the potentially negative impact of rising interest rates and intensifying competition, predicting a downward trend for Rocket's margins."). As an additional example of context suggesting Farner's statements had no impact on how the market viewed

Rocket's profitability, Dr. Starks explains that analyst reports at the time frequently referenced the publicly available Freddie Mac and Fannie Mae forecasts that Rocket's key performance metrics would—like other players in the mortgage industry—decline as interest rates rose. *Id.* at PageID.9300–02.

In addition to this broader context suggesting no price impact, Dr. Starks reviewed "sell-side" analyst reports about Rocket stock, authored before, during, and after the Class Period. ECF No. 120-3 at PageID.9284. Dr. Starks explains that these analysts "serve as important information intermediaries between companies and investors" and author reports which "provide[] a useful measure of public information that investors would deem important to the investment decision-making process." *Id.* Indeed, assuming an efficient market, Dr. Starks avers these reports would discuss or reference any statements made by Rocket executives which the analyst would interpret as important or indicative of a potential price impact. *Id.* at PageID.9290. So, if Farner's alleged misrepresentations had the price impact Plaintiffs suggest, Dr. Starks opines that these statements would have been at least referenced in relevant sell-side analyst reports. *See id.* But Dr. Starks found "no such evidence" within her review of "at least 50" sell-side analyst reports issued by 17 different analysts about Rocket stock during the Class Period.[14] *Id.* at PageID.9291, 9305–18.

### E. Defense Expert Dr. Mark Garmaise

The third proposed Defense Expert is Dr. Mark Garmaise. Dr. Garmaise received his Ph.D. in finance from Stanford University and currently serves as a tenured professor of corporate finance, venture capital, and private equity at the University of California, Los Angeles Anderson School of Management. ECF No. 120-4 at PageID.9399. Among other accomplishments, Dr.

---

[14] Dr. Starks found that *one* analyst report referenced Farner's February 25, 2021 interest rate statement, but notes that this report does not suggest that this statement was indicative of Rocket's profitability despite rising interest rates. ECF No. 120-3 at PageID.9305.

Garmaise has published several corporate finance and valuation articles in peer-reviewed academic journals. *Id.* Defendants specifically retained Dr. Garmaise to review and assess Chad Coffman's proposed expert conclusion that damages in this case can be calculated on a class-wide basis. *Id.* at PageID.9400.

Dr. Garmaise concludes that Coffman did not identify a methodology to measure damages on a class-wide basis because Coffman did not explain how the proposed artificial "inflation" variable—the difference between Rocket stock's actual trading price each day and the price it would have been traded had the alleged fraudulent statements not have been made—accounts for shifting uncertainty and risk throughout the Class Period prompted by (1) the COVID-19 pandemic and varying interest rates; (2) United's March 4, 2021 ultimatum to third-party network providers; and (3) the meme-stock status of Rocket stock and frenzied social media interest on March 2 and 3, 2021. *Id.* at PageID.120-4 at PageID.9401–02, 9412–35. Notably, Dr. Garmaise does not dispute the overall *equation* or *method* Coffman proposes to calculate damages. *See generally id.* And although Dr. Garmaise suggests that Rocket stock's artificial inflation—a single variable within Coffman's proposed "out-of-pocket" methodology—may shift throughout the Class Period such that *different days* have different levels of inflation, Dr. Garmaise does not suggest that the inflation variable would be unique to *different Class Members* who traded on the same day during the Class Period. *See generally id.* Instead, as Defendants summarize, Dr. Garmaise merely "identifies *challenges* Coffman will face in trying to build a class-wide damages model consistent with Plaintiffs' liability theory because of the unique features of this case." ECF No. 151 at PageID.15837 (emphasis added).

## III.

With this context in mind, this Court turns to the Parties' motions challenging each other's proposed expert testimony.[15]

Federal Rule of Evidence 702 allows certain witnesses with specialized knowledge to testify about their opinions as experts at trial. FED. R. EVID. 702. But admitting expert testimony is not a decision a court should make lightly, as factfinders tend to place extra weight on expert opinions. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993). Accordingly, courts serve an important gatekeeping role when assessing proffered expert testimony, striving to admit qualified, reliable, and relevant opinions but exclude unreliable and misleading "junk science." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The well-established *Daubert* "gatekeeping" framework "involves three basic inquiries."[16] *Navarro v. Procter & Gamble Co.*, No. 1:17-CV-406, 2021 WL 868586, at *2 (S.D. Ohio Mar. 8, 2021).

---

[15] The Parties have filed *twenty* expert motions to date. ECF Nos. 121; 131; 132; 138 (sealed); 139; 150; 169 (sealed); 170; 172 (sealed); 173; 175 (sealed); 176; 177; 180 (sealed); 181; 182 (sealed); 186; 184 (sealed); 185; 189. But only six motions challenge—or seek to strike—expert testimony relevant to class certification. These six motions are resolved by this Opinion and Order and the remaining motions—concerning proposed expert testimony related to the merits and the Parties' motions for summary judgment—will be resolved after this Court addresses class certification.

[16] Neither the Supreme Court nor the Sixth Circuit have squarely held that the *Daubert* analysis applies at the class certification stage. *See In re Carpenter Co.,* No. 14-0302, 2014 WL 12809636, at *3 (6th Cir. Sept. 29, 2014) (finding district court did not abuse its discretion in applying the *Daubert* framework at the class certification stage based on Supreme Court dicta). Yet, this Court has recognized that the weight of federal precedent "suggest[s] that it does." *Won v. Gen. Motors, LLC*, No. 19-11044, 2022 WL 3010886, at *3 (E.D. Mich. July 28, 2022) (collecting cases and noting "[t]he parties do not appear to seriously contest whether the *Daubert* analysis applies at this stage of the case"); *see also Prantil v. Arkema Inc.*, 986 F.3d 570 (5th Cir. 2021) (concluding *Daubert* applies at class certification); *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) (same); *Sher v. Raytheon Co.*, 419 F. App'x 887, 890–91 (11th Cir. 2011) (same); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir.2012) ("When an expert's report or testimony is critical to class certification, . . . a district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." (internal quotations omitted)).

- 34 -

First, a court must determine whether a proposed witness is qualified as an expert according to his or her "knowledge, experience, training, or education." FED. R. EVID. 702. Whatever the form, "[a]n expert's qualifications must provide a foundation for an expert to answer the specific questions in the expert report." *Thomas v. Lambert*, 606 F. Supp. 3d 592, 599 (E.D. Mich. 2022) (internal quotations and citations omitted). If satisfied that the proffered expert is sufficiently qualified, the court then turns to the expert's proffered testimony, asking whether such testimony is relevant and would assist the jury in understanding the evidence at trial or determining a genuine factual issue. FED. R. EVID. 702(a); *Daubert*, 509 U.S. at 587–89. Finally, a reviewing court considers whether the proffered expert testimony is reliable by analyzing a non-exclusive list of factors, including (1) whether the expert's theory or technique can or has been tested; (2) whether the expert's theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error; and (4) whether the expert's theory or technique has been generally accepted within the relevant field or industry. *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 593–94 (1993)).

Notably, "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d 517, 530 (6th Cir. 2008). Accordingly, a court's gatekeeping role under *Daubert* does not supplant the role of the factfinder or opposing counsel. *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### A. Defendants' Motion to Exclude Chad Coffman's Testimony

On February 26, 2024, Defendants filed a motion to exclude Chad Coffman's proposed expert testimony on five separate grounds. ECF No. 121. Each argument will be addressed in turn.

### 1. Coffman's Reliance on the *Cammer* and *Krogman* Factors

Defendants argue that Coffman's market efficiency conclusion is an improper "legal opinion" because he "plod[s] through" the *Cammer* and *Krogman* market efficiency factors without citing "any academic literature to support the notion that" these factors are actually indicative of an efficient market "from a financial economist's perspective." *Id.* at PageID.10444–46 (arguing "it is patently improper for Coffman to offer a legal opinion that he is not qualified to give under the guise of an expert opinion"). This argument fails for multiple reasons.

True, consistent with Rule 704, an expert witness "may not testify to a legal conclusion," *Hyland v. HomeServices of Am., Inc.,* 771 F.3d 310, 322 (6th Cir. 2014), and expert testimony which does nothing more than define legal terms or recite legal principles is inappropriate. *Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 593 (6th Cir. 2014). But Coffman's testimony does far more than simply define legal terms or recite legal principles. Coffman conducted his own empirical analysis, which he helpfully outlined by referencing the factors the Sixth Circuit, this Court, and countless others have recognized as relevant to market efficiency for decades. *See generally* ECF No. 111-2. Coffman's "reference to case law" does not render his opinion an improper legal one. *Willis v. Big Lots, Inc*., No. 2:12-CV-604, 2017 WL 1074048, at *3 (S.D. Ohio Mar. 17, 2017). Indeed, before analyzing whether each factor indicated market efficiency in this specific case, Coffman thoroughly explained *how* each factor was related to market efficiency. *See id.* at PageID.8632–53. Moreover, contrary to Defendants' characterization of Coffman's testimony as simply "plodding through" the *Cammer* and *Krogman* factors, ECF No. 121 at PageID.10445, Coffman expressly noted these factors are non-exhaustive, ECF No. 111-2 at PageID.8630, and considered three *additional factors* which his education and experience led him to conclude were relevant to market efficiency in this particular case. *Id.* at PageID.8653–55.

Second, Defendants' suggestion that a proposed market efficiency expert must demonstrate that the *Cammer* or *Krogman* factors are independently supported by academic literature as relevant "from a financial economist's perspective" ignores the fact that this court, the Sixth Circuit, and countless federal courts have relied on these factors for decades *precisely because* they are supported by academic literature as relevant from a financial economist's perspective. *See, e.g.*, *Krogman v. Sterritt*, 202 F.R.D. 467, 474, 477–78 (N.D. Tex. 2001) (grounding the *Krogman* factors in "economic literature" and noting the *Cammer* factors were based on sound "economic theory"). Indeed, this exact argument has been squarely rejected by other courts in this Circuit. *Willis v. Big Lots, Inc.*, No. 2:12-CV-604, 2017 WL 1074048, at *3–4. (S.D. Ohio Mar. 17, 2017) (rejecting defendant's argument that plaintiff's expert provided an improper legal opinion when relying on the *Cammer* and *Krogman* market efficiency factors); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 82 (S.D.N.Y. 2015) (rejecting defendants *Daubert* argument that plaintiff's expert improperly "plod[ded] through" the *Cammer* and *Krogman* factors as "pointless" because those factors are "widely accepted" as relevant to market efficiency).

At its core, Defendants seemingly argue that Coffman's reliance on the *Cammer* and *Krogman* market efficiency factors is unreliable simply because Defense expert Dr. Stulz reached the contrary conclusion that these factors are outdated. ECF No. 121 at PageID.10445 ("As Dr. Stulz opines, only [one factor] has any grounding in financial economics . . . [o]ther financial economists agree."). But this argument has been rejected by other courts in this Circuit. *Willis*, 2017 WL 1074048, at *3 (S.D. Ohio Mar. 17, 2017) (finding no inherent unreliability in plaintiff expert's reliance on the *Cammer* and *Krogman* factors, despite defense expert's conclusion that these factors are not relevant to modern market efficiency). Indeed, boiled down, this argument—

like *many* discussed below—presents the "classic battle of the experts" in which one party seeks to exclude the opposition's experts simply because these experts offer contrary conclusions. *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005). But "competing expert opinions" are insufficient grounds for exclusion under *Daubert*. *Id.* So long as proposed expert opinions are sufficiently reliable and relevant, any differences in opinion are issues of weight rather than admissibility. *Id.*; *In re Flint Water Cases. This Ord. Relates To: Bellwether III Cases*, 2024 WL 4120237, at *6 (E.D. Mich. Sept. 9, 2024); *see also Fox v. Mass. Bay Ins. Co.*, No. 213CV02567JTFDKV, 2015 WL 11017961, at *3 (W.D. Tenn. Mar. 12, 2015) ("The test set out in *Daubert* does not require that the Court look to one expert to determine the credibility of another[.]")

Accordingly, the Court will not exclude Coffman's market efficiency conclusions as an improper legal opinion.

### 2. Coffman's Meme Stock Considerations

Defendants next seek to exclude Coffman's market-efficiency conclusion as unreliable because he did not consider Rocket's alleged meme-stock status. ECF No. 121 at PageID.10447–50. Defendants piggyback the conclusions of their own proposed expert—Dr. Stulz—and argue that the meme-stock trading frenzy was "the elephant in the room" such that Coffman's ignorance renders his conclusions inherently unreliable. *Id.* at PageID.10449. This argument is unpersuasive, both as a matter of fact and law.

First, Defendants' repeated suggestion that Coffman "ignored" Rocket's meme stock status or "pretended" that this evidence did not exist, *see* ECF No. 121 at PageID.10457, is factually inaccurate. Although Coffman excluded March 2 and 3, 2021 as statistical outliers from his two-and-a-half-year *event study*, Coffman did not otherwise ignore the social media frenzy surrounding

Rocket Stock on these trading days. Indeed, Coffman repeatedly recognized this evidence and explained how it did not undermine the other factors he concluded weighed in favor of finding that the market for Rocket stock was efficient throughout the Class Period. *See, e.g.*, ECF No. 111-2 at PageID.8633, n. 37 ("[T]here was a period of two days around March 2–3, 2021, where there was a spike in trading volume, apparently fueled by [Reddit] investors . . . However . . . . *even taking into account the spike in those two days* . . . Rocket's average weekly trading volume was 63.1 million shares" such that the average weekly trading volume suggests market efficiency); PageID.8651, n. 82 ("Again, here, even taking into account the spike in the two days aforementioned (March 2-3, 2021) . . . Rocket's average market capitalization during the Class Period was still nearly $3 billion.").

Second, Defendants' suggestion that Coffman's market efficiency opinion was unreliable solely because he did not consider Rocket's meme-stock status lacks merit as a matter of law. There is no bright-line test for market efficiency. "It is not logical to draw bright-line tests . . . to assist the factfinder in determining whether a stock trades in an open and efficient market." *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989); *see also Dougherty v. Esperion Therapeutics, Inc*., No. 16-10089, 2020 WL 6793326, at *3 (E.D. Mich. Nov. 19, 2020) (noting "there is no bright-line test for market efficiency"); *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 133 (M.D. Tenn. 2020) (noting the *Cammer* and *Krogman* factors are an "analytical tool" to measure market efficiency, not a "checklist"). Similar to Defendants' first argument that Coffman improperly focused most of his analysis on the *Cammer* and *Krogman* factors, Defendants' instant argument that Coffman should have considered an *additional* factor goes to weight, not admissibility. *In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 530 (6th Cir. 2008).

### 3. Coffman's Price-Impact Event Study

Defendants then argue—again citing their own proposed expert's conclusion—that Coffman's price impact event study was unreliable. ECF No. 121 at PageID.10450–55. Notably, Defendants do not dispute the reliability of event studies in general. Indeed, their proposed expert agrees with Coffman that event studies "have been widely used for more than fifty years to measure the impact of new information that enters the marketplace on securities prices." ECF No. 120-2 at PageID.9188. Instead, Defendants argue that Coffman's event study was "insufficiently scientific" because he excluded March 2 and 3, 2021 as statistical outliers, ECF No. 121 at PageID.10450 (internal citations omitted), and "fundamentally flawed" because he set a two-and-a-half-year Analysis Period which included the two-month Class Period. *Id.* at PageID.10453 (emphasis omitted). Both arguments are unpersuasive.

Coffman's event study analyzed how the price of Rocket Class A common stock historically responded to Rocket's earnings releases from September 4, 2020 through May 5, 2023 (the "Analysis Period"). ECF No. 111-2 at PageID.8631, n. 33, 8640–43. Specifically, Coffman's event study employed a well-accepted regression model, which allowed him to measure how Rocket's daily returns (percentage change of stock price) would normally react to daily returns of the broader S&P 500 and the Industry Index. *Id.* at PageID.8642-43. Once this regression was modeled, Coffman was able to analyze how the price of Rocket Class A common stock responded, in comparison, to Rocket's eleven public earnings announcements throughout the Analysis Period. *Id.* at PageID.8645–46. Ultimately, Coffman found evidence of market efficiency because (1) 54.55% of earnings announcements caused a statistically significant price impact and (2) the "average magnitude of stock price movement on earnings announcement days was over three-times higher than on no news days" such that "on the days when important, company-specific

information [was] released to the market, [Rocket's] stock price move[d] much more than on days where there [was] no company-specific news." *Id.* at PageID.8646–47.

Defendants first argue that Coffman's event study was "insufficiently scientific" because he removed two days—March 2 and 3, 2021—from his larger 974-day Analysis Period without explanation or citation to academic articles. ECF No. 121 at PageID.10450. But this mischaracterizes Coffman's report. Coffman explained that March 2 and 3, 2021 were removed from his event study because the "increased trading due to attention from Reddit and Twitter" on those days were statistically significant outliers that he removed from the event study "so as to not distort the results." ECF No. 111-2 at PageID.8664; *see also* ECF No. 120-5 at PageID.9537 ("[A]ny time you have a firm-specific news item that is having an outsized effect on the company and on the regression estimates, that's no longer . . . an unbiased estimate of what the . . . relationship is between the company and the indices in the absence of news. So when there is an outlier date that's clearly caused by some form of news or activity that is causing price to move in a substantial way, it's standard to . . . remove it[.]"). Indeed, proposed Defense expert Dr. Stulz recognizes that economists properly exclude data points from event studies to ensure that "the returns . . . do not affect the measurement of the typical relationship." ECF No. 120-2 at PageID.9189.

To the extent Defendants argue—based on the testimony of their own proposed experts—that Coffman's exclusion was improper because these specific two dates, if considered, would have changed his market efficiency conclusions, ECF No. 121 at PageID.10452–23, this is an issue of weight, not admissibility. Defendants cite a non-binding 2014 Southern District of New York case—which has nothing to do with securities law—to suggest that the "arbitrary" exclusion of event study data renders the study insufficiently scientific in violation of Rule 702. ECF No. 121

at PageID.10450–51 (citing *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385 (S.D.N.Y. 2014)). But, unlike here, the expert in that case conceded that he arbitrarily selected outcome-determinative event study end dates. *Reed Const. Data. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016). Indeed, in that case, the Southern District of New York concluded that the arbitrary selection of an event study's timeframe is "not necessarily a fatal problem because . . . some judgment is called for in any statistical model and, so long as the model is robust with respect to different choices of arbitrary points, there is no pressing issue." *Id.*

On this point, a First Circuit case—which the Southern District of New York cited—is more instructive. In *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 91 (1st Cir. 2014), the First Circuit affirmed the district court's exclusion of a proposed expert's event study in a putative securities class action but did so only because (1) there was a "complete disconnect" between the complaint and the event study, which "include[d] many dates that [had] no relationship" to the plaintiff's allegations and treated "certain events as corrective when the complaint labeled them inflationary"; and (2) the expert "cherry-picked unusually volatile days and made them the focus of the study." Neither condition is present here. Coffman's event study Analysis Period included the Class Period and analyzed the same disclosures discussed in the Complaint, including Rocket's February 24, 2021 alleged corrective disclosure. *See* ECF No. 111-2 at PageID.8666. Although Coffman excluded two days *Defendants* contend are "outcome determinative," ECF No. 121 at PageID.10453, these two excluded dates are not the "focus" of his 974-day event study, which included over 670 trading days, according to Defendants' own proposed experts. *See* ECF No. 120-2 at PageID.9174.

Defendants then pivot and argue that Coffman's event study is "fundamentally flawed" not because of the two days it excludes, but because of the two-and-a-half years it considers. ECF No. 121 at PageID.10453–56. Once again, Defendants' argument parrots the opinions of its own rebuttal expert. *Id.* at PageID.10454–55 (arguing "[a]s [Dr.] Stulz explains, 'in economics, inferences based on a longer time period are only valid when the longer period data is representative to the subperiod of interest,'" and that "[u]nlike Coffman, Dr. Stulz did the analysis and found that Coffman's 2.5-year period is not representative of the two-month Class Period" (quoting ECF No. 120-2 at PageID.9228)). But the Sixth Circuit has recognized that event studies are relevant to the market efficiency argument precisely because they provide a *historical* snapshot of how the price of a given security reacts to public information. *See Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (describing the fifth *Cammer* factor as "a history of immediate movement of the stock price caused by unexpected corporate events or financial releases"). If the price of a security has historically reacted in a statistically meaningful way to the release of public information about the security, it is more likely the price of the stock during the relevant class period reflected that public information—the central premise of market efficiency and the "foundation for the fraud on the market theory." *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989). Coffman explained that he analyzed the broader "Analysis Period to *enhance* the power of [his] statistical tests." ECF No. 111-2 at PageID.8645, n. 69 (emphasis added). This makes sense, given federal courts' recognition of the limitations of small event-study analysis periods within securities litigation:

> [S]mall sample sizes may limit statistical power, meaning that only very large-impact events will be detectable. In addition, it can be extremely difficult to isolate the price impact of any one piece of information in the presence of confounding factors, such as other simultaneously released news about the company, the industry, or the geographic region.

*In re Teva Sec. Litig.*, No. 3:17-CV-558 (SRU), 2021 WL 872156, at *21 (D. Conn. Mar. 9, 2021) (quoting *In re Petrobras Sec.*, 862 F.3d 250, 279 (2d Cir. 2017)). Regardless, "issues with sample size go to the weight, not the admissibility, of expert evidence." *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 572 (E.D. Mich. 2022).

At bottom, to be admissible, Coffman's event study must be "the product of reliable principles and methods" and must reflect Coffman's reliable application of these principles to the facts of the case. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). Under the relevant *Daubert* factors, Coffman's event study unquestionably does just that. Even Defendants recognize that an event study is generally accepted within the economic community as a suitable statistical tool to assess how public information impacts the price of a security. ECF No. 120-2 at PageID.9188–89. Coffman dedicates ten pages of his proposed expert report to explaining his event study's methodology and showing how the event study is tailored to the facts alleged in the Complaint. ECF No. 111-2 at PageID.8640-50. Defendants' arguments that Coffman should have considered March 2 and 3, 2021 within this study and should have narrowed the Analysis Period are better suited to contest Plaintiffs' market-efficiency proofs at the class certification stage, instead of attempting to exclude Coffman's conclusions altogether under *Daubert*.

### 4. Coffman's Public Float Analysis

Defendants next take issue with Coffman's public float conclusion. Recall that Coffman concluded Rocket had a relatively high float during the Class Period, suggesting an efficient market. *See* ECF No. 111-2 at PageID.8653 (concluding that insiders owned only .44% of Rocket Class A common stock during the class period, such that 99% of class A shares were held by non-insiders); *see also Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (explaining that the

greater percentage of a security held by non-insiders, the more likely the price of that security will accurately reflect all public information about the security indicative of an efficient market).

Defendants do not dispute the relevancy of a security's public float to market efficiency. *See* ECF No. 120-2 at PageID.9222 (noting "financial economists . . . have documented that a low public float can lead to situations where stock prices overreact, underreact, or fail to react to new, value-relevant public information, creating impediments to market efficiency"). However—again bootstrapping the testimony of their own proposed expert—Defendants argue that Coffman should have considered *Class D shares* in his public float analysis because these shares were *fully convertible* to Class A common stock shares. ECF No. 121 at PageID.10456–57 (citing ECF No. 120-2 at PageID.9216). Had Coffman considered Rocket's convertible Class D shares, Defendants argue, Rocket's public float hovers around 6%, suggesting market inefficiency. *Id.* at PageID.10457; ECF No. 120-2 at PageID.9219. Plaintiffs respond that they need not consider Rocket's Class D convertible stock because only Rocket's Class A common stock is relevant and included in the Class definition. ECF No. 136 at PageID.14399. Defendants reply that Plaintiffs "miss the point" because, even if Class D shares are ignored, Rocket's Class A common stock shares "comprise only about 7% of Rocket stock, and such a low public float is an indicator of market inefficiency." ECF No. 142 at PageID.15451.

The Parties' dispute centers on a disagreement about how "public float" is calculated or defined. Plaintiffs narrowly define public float as the proportion of insider ownership of *the stock*—Class A common stock, here. ECF No. 111-2 at PageID.8653. Defendants broadly define public float as the proportion of insider ownership of *all stock* outstanding. ECF No. 120-2 at PageID.9216 (defining public float as the "proportion of a company's total shares outstanding that is held by the public and not by insiders"). Under their definition, Defendants explain that "Rocket

ha[d] two different classes of common stock outstanding" during the Class Period: 115.4 million shares of Class A common stock and 1.87 billion shares of Class D common stock. *Id.* at PageID.9217. Importantly, unlike Rocket's Class A common stock shares, Rocket's Class D common stock shares were nearly wholly owned by Defendant Gilbert, carried only voting rights, and were not traded on a public securities exchange. *See id.* However, based on a pre-IPO Exchange Agreement with Rocket, Gilbert "has the right to exchange" his Class D shares for Class A shares "on a one-for-one basis" at any time.[17] *Id.* at PageID.9217–18. This is why, Defendants add, relevant analyst reports throughout the Class Period—including reports relied on by Plaintiffs' proposed expert Coffman—discuss Rocket's *low* public float calculated by considering *both* Class A and D common stock:

> Some . . . investors may think Rocket only has 115.4 million shares outstanding . . . [T]hose are only the class A shares, representing a mere 6% of the true diluted share count. What is not being counted in that 115.4 million number is pre-IPO unit holdings and class D shares, which in combination can be converted into an additional 1.8 billion class A shares and sold. That's right, *the market holds a mere 6% of the total share count while insiders hold 94%.*

*Id.* at PageID.9219 (emphasis added).

Defendants' argument is well-taken but misplaced. Although Coffman's public float analysis may be *incorrect*, it is not *unreliable*. The two cases Defendants rely on to argue the contrary are inapposite. In *Rose v. Truck Centers, Inc.*, the Sixth Circuit affirmed the exclusion of expert testimony as unreliable because the expert "engaged in no testing" to support his conclusions of what caused a car crash, admitted that his conclusion assumed a certain degree of bolt tightness on a steering gear, and, critically, that conclusion was contradicted by a photograph

---

[17] Defendants' proposed expert Dr. Stulz notes that Gilbert exercised this conversion option during the Class Period, and converted 20.2 million shares of Class D common stock to Class A stock. ECF No. 120-2 at PageID.9218.

of the car's steering gear. *Rose v. Truck Centers, Inc.,* 388 F. App'x 528, 536 (6th Cir. 2010). Although Defendants prop up reports of analysts who calculated a low public float during the Class Period, these subjective reports do not have the same evidentiary weight as an objective photograph. More importantly, unlike the excluded expert in *Rose,* who offered mere assumptions, Coffman "engaged in . . . testing" and actually conducted his own empirical analysis of the ownership proportions of Rocket Class A common stock throughout the Class Period. *See* ECF No. 111-2 at PageID.8653. Defendants then cite *Farm Bureau Mut. Ins. Co. v. 1,4 Grp., Inc.,* No. 1:20-CV-12751, 2022 WL 1240404 (E.D. Mich. Apr. 27, 2022). ECF No. 121 at PageID.10457. But again, in that case, unlike here, the excluded expert testimony was based on mere assumptions which were contradicted by the factual record. *Farm Bureau,* at *8–9. Defendants do not argue that Coffman's *Class A* common stock public float conclusion was a mere "assumption" or lacked evidentiary support; they instead argue that Coffman should have additionally considered *Class D* common stock. This, as both *Rose* and *Farm Bureau* recognize, is a matter of weight, not admissibility. *Id.* at *9; *Rose*, 388 F. App'x at 535 (noting "the reliability inquiry focuses solely on the principles and methodology, not on the conclusions they generate" (internal quotations omitted)).

### 5. Coffman's Damages Proposal

Lastly, Defendants argue that this Court should exclude as unreliable Coffman's conclusion that the out-of-pocket model can calculate class-wide Section 10(b) damages. ECF No. 121 at PageID.10457–58. Specifically, Defendants take issue with Coffman theorizing that this method can be used without actually "develop[ing] any such model in this case." *Id.* (suggesting Coffman's damages conclusion is nothing but "unsupported speculation" and therefore lacks

"intellectual rigor"). But similar forms of this argument have been rejected by other courts in this Circuit, in cases involving Mr. Coffman himself:

> Defendant's criticisms are better suited for analyzing class certification as opposed to a *Daubert* challenge. In determining whether damages can be calculated on a class wide basis, Coffman utilized the out-of-pocket losses measure. This is a "model-driven-calculation, which calculates the damages as the difference between the 'inflated' price at which Plaintiffs bought their stock ... and the 'true' price, meaning the theoretical price that the ... stock would have traded for had the relevant information been disclosed." *Ludlow*, 800 F.3d at 683. Coffman's method to calculate Section 10(b) damages has been approved in a number of cases. *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105 (S.D.N.Y. 2016) (noting that that out-of-pocket damages are the traditional form of Section 10(b) damages); *Rowe v. Marietta*, 172 F.3d 49 (6th Cir. 1999) ("The out-of-pocket measures is favored method of computing damages in a securities fraud case."); *see also Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-02399, 2019 WL 6111303, at *16 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, No. 4:17-CV-2399, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) (distinguishing the district court's decision in *Ludlow* because the pre-explosion subclass did not seek out-of-pocket damages based on the artificial information of the stock price, but instead, sought consequential damages).

*Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2020 WL 3548653, at *33 (E.D. Tenn. June 29, 2020), *objections overruled*, No. 3:16-CV-121-TAV-DCP, 2021 WL 1845186 (E.D. Tenn. May 7, 2021). As discussed *infra* Section III.D., to the extent Defendants argue Plaintiffs—through their proposed expert Coffman—have not satisfied their burden to prove a damages model capable of class-wide implementation, that argument can be raised in contesting predominance at the class certification stage. This Court concludes Coffman's damages opinions are sufficiently reliable under Rule 702.

For these reasons, Defendants' motion to exclude Chad Coffman's proposed expert testimony, ECF No. 121, will be denied.

## B. Plaintiffs' Motion to Exclude Dr. René Stulz's Testimony

Turning to the next *Daubert* motion, Plaintiffs seek to exclude Dr. Stulz's proposed expert testimony, arguing (1) he is unqualified to testify about the "meme stock phenomenon;" and (2) his conclusions are unreliable. ECF No. 132. Both arguments will be addressed in turn.

### 1. Qualifications

Plaintiffs first argue that Dr. Stulz is unqualified to testify about the "meme stock phenomenon" because he "has never published an article about meme stocks, has not taught any courses on meme stocks, and has never participated in any academic study in meme stocks." ECF *Id.* at PageID.11917. This argument is without merit.

As this Court has explained:

> The court's investigation of qualifications should not be onerous or inordinately exacting, but rather must look to underlying competence, not labels. "[T]he expert need not have complete knowledge about the field in question, and need not be certain. He need only be able to aid the jury in resolving a relevant issue." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (6th Cir.1981). Similarly, lack of hands-on experience is not fatal to a qualification inquiry if the focus of the opinion is within the scope of the expert's special knowledge.

*Zuzula v. ABB Power T & D Co.*, 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003); *see also Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) (noting an aeronautical engineer would qualify as an expert to testify about how a bumblebee can fly, "even if he had never seen a bumblebee," so long as he was familiar with relevant components of flight principles); *Counts v. Gen. Motors, LLC,* 606 F. Supp. 3d 547, 568 (E.D. Mich. 2022) ("Courts do not require experts to be a specialist in every subject to which their testimony might relate—they must simply have expertise that would help a jury understand the expert's testimony.");

So, Plaintiffs are correct that Dr. Stulz has not taught a course on or published an article about "meme stocks." *See* ECF No. 132 at PageID.11918. But he need not have such "hands-on" experience to qualify as an expert and opine about how Rocket's meme-stock status impacted the

securities market throughout the relevant Class Period, and specifically whether the market for Rocket stock was efficient. What Dr. Stulz lacks in hands-on experience in "meme stocks"— which, as Defendants point out, is an incredibly recent phenomenon, ECF No. 152 at PageID.15919—he makes up for with a Ph.D. in economics and a near 45-year career teaching undergraduate and graduate courses in economics, finance, and capital markets. *See* ECF No. 120-2 at PageID.9232–47. Moreover, although Dr. Stulz has not written any articles about meme stocks, he has written over one hundred peer-reviewed publications on economics, finance, and market risk, *id.*, and has reviewed meme-stock studies in anticipation of future publications and his proposed expert testimony in this case. ECF No. 120-6 at PageID.9573; *see In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016) ("Experts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable.").

## 2. Reliability

Plaintiffs next argue that Dr. Stulz's meme-stock opinions are unreliable because he did not "provide any generally accepted definition of 'meme stock' in his report" and has not offered any "method or criteria for identifying a meme stock event." ECF No. 132 at PageID.11919. But this misrepresents Dr. Stulz's report and mischaracterizes his deposition testimony. Dr. Stulz reported that "[a]lthough there is no single formal or technical definition of a meme stock, the SEC . . . categorized meme stocks as those displaying the following characteristics: . . . (1) frequent mentions on social media, including reddit[;] [and] (2) large price moves or increased trading volume that significantly exceeded broader market movements and the amount of short interest measured as the number of shares sold short as a portion of the total shares outstanding [exceeding the market average]." ECF No. 120-2 at PageID.9193–94 (internal quotations omitted). And Dr.

Stulz noted that the SEC's definition is similar to that of "press, analysts, and other market observers." *Id.* at PageID.9194. Dr. Stulz's deposition only clarified his conclusion that, whatever the trivial differences in prevailing meme-stock definitions may be, Rocket stock classifies:

> **Counsel:** Is there a widely accepted definition of meme stock in economics literature?
> **Dr. Stulz:** There's a number of definitions that people use [but] the Rocket stock satisfies those definitions[.]
> **Counsel**: What do you mean by there are a number of different definitions?
> **Dr. Stulz**: I discuss various definitions in my report and that differ somewhat. At this point I'm not aware of financial economists having settled on one of those definitions, but I discuss in my report how Rocket satisfies those various definitions.

ECF No. 120-6 at PageID.9573.

Plaintiffs cite one—and only one—case to support their proposition that an expert's testimony is inherently unreliable if they do not offer "widely-accepted definition[s]" of terms used in their testimony. ECF No. 132 at PageID.11922 (citing *United States v. Bauer*, 82 F.4th 522, 534 (6th Cir. 2023)). But this case is wholly inapposite. In *Bauer*, a jury convicted a physician of prescribing opioids to patients in violation of the Controlled Substances Act. *Bauer*, 82 F.4th at 527. The physician appealed his conviction on four grounds, one of which argued that the district court wrongfully excluded the physician's proposed experts at trial. *Id.* at 527–28. Notably, the district court excluded the physician's proposed experts as *unqualified*, not because their proffered opinions were *unreliable*. *Id.* at 527-28, 534 (noting the district court found that "two of the [proposed experts] did not appear to have experience in treating chronic-pain patients and another had only a minimal connection to a pain medicine that was not at issue" and concluded another proposed experts "was unable to articulate the relevant standard of care and appeared unfamiliar with the standards for pain-management patients"). More importantly, the Sixth Circuit refused to consider this issue on appeal, concluding the physician had waived it. *Id.* at 534. How this case

supports Plaintiffs' argument that Dr. Stulz must proffer a "widely-accepted definition" of meme stock for his testimony to be reliable under Rule 702 is entirely unclear.

In sum, Dr. Stulz's education and career in finance and economics qualify him to offer expert testimony about market efficiency for Rocket stock throughout the Class Period and whether Rocket's meme-stock status rendered the market inefficient. *See Thomas v. Lambert*, 606 F. Supp. 3d 592, 599 (E.D. Mich. 2022). This testimony is relevant and would assist this court in considering whether Plaintiffs have satisfied the predominance requirement of class certification. *See* FED. R. EVID. 702(a); *Daubert*, 509 U.S. at 587–89. And this testimony—based on Dr. Stulz's own review of relevant economic literature—is reliable. *See First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 593–94 (1993)). Accordingly, Plaintiffs' motion to exclude Dr. Stulz's proposed expert testimony, ECF No. 132, will be denied.

### C. Plaintiffs' Motion to Exclude Dr. Laura Starks's Testimony

Plaintiffs also seek to exclude the proposed testimony of Dr. Laura Starks—Defendants' proposed price impact expert. ECF Nos. 138 (sealed); 139. Plaintiffs argue Dr. Starks's testimony should be excluded because (1) she is unqualified to offer expert testimony about price impact and sell-side analyst reporting; (2) her expert opinion is not relevant; and (3) her expert opinion is unreliable. *See generally* ECF No. 139. Each argument will be addressed in turn.

### 1. Qualifications

Similar to their argument that Dr. Stulz was unqualified to opine about market efficiency and meme stocks, Plaintiffs argue that Dr. Starks is unqualified to offer expert testimony about sell-side analyst commentary concerning Defendant Farner's alleged fraudulent misrepresentations, and whether this commentary is indicative of price impact. Not so.

As discussed, the proponent of expert testimony need only show, by a preponderance of the evidence, that the witness has met "minimal qualifications" to testify as an expert through their knowledge, skill, experience, training, or education. *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014). Defendants have met this minimal showing. Dr. Starks has a Ph.D. in finance and has spent the last thirty years teaching undergraduate and graduate courses in financial management, financial strategies, corporate finance, financial economics, and—relevant to her proposed expert testimony—"institutional investor influence." ECF No. 120-3 at PageID.9340. Dr. Starks has written over 70 peer-reviewed publications on topics including "the decision-making process of investors, including . . . institutional investors' preferences for certain stock characteristics, institutional investors' trading practices, how investors react to new information, and analyst forecasts and recommendations." *Id.* at PageID.9278, 9328–33. Dr. Stulz also has specialized experience in reviewing analyst reports to assess the price impact of corporate developments and disclosures. *See* ECF No. 139-2 at PageID.15223. Accordingly, Starks is well qualified to opine whether, based on her review of all relevant analyst reports about Rocket stock issued during the Class Period, the alleged misrepresentations in this case influenced investors. *See* ECF No. 120-3 at PageID.9290.

## 2. Relevancy

Plaintiffs next argue that Dr. Starks's conclusion is not relevant or helpful—and thus not proper subject matter for expert testimony—because her conclusion is based "solely upon her subjective reading of sell-side reports," which—Plaintiffs contend—is a "task well within the ken of the average juror." ECF No. 139 at PageID.15100–01 (internal quotations omitted). This argument can be easily disposed of.

Rule 702's relevancy—or "helpfulness"—requirement "has been interpreted to mean that the scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research . . . being offered and the disputed . . . issue[] in the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)). Moreover, proposed expert testimony is inadmissible when it "merely deals with a proposition that is not beyond the ken of common knowledge" or a lay juror. *Zuzula v. ABB Power T & D Co.,* 267 F. Supp. 2d 703, 711 (E.D. Mich. 2003).

First, reviewing sell-side analyst reports—let alone 50—is not a task "well within the ken of the average juror." *See* ECF No. 120-3 at PagewID.9362–72; *Won v. Gen. Motors, LLC*, No. 19-11044, 2022 WL 3010886, at *9 (E.D. Mich. July 28, 2022) ("The conclusions derived through . . . prodigious labor contribute tangibly to the factual record pertaining to class certification" such that the proposed expert testimony synthesizing records is "helpful to the Court" in ruling on class certification.). Second, Dr. Starks's price-impact conclusions are helpful and relevant to this Court's class certification determination. As explained *supra* Section II.A.1, Plaintiffs cannot prevail at the class certification stage if they do not satisfy Rule 23(b)(3)'s predominance requirement. And—even if they can prove market efficiency—Plaintiffs cannot satisfy predominance if Defendants rebut the *Basic* presumption of class-wide investor reliance by proving that Farner's alleged misrepresentations had no price impact. *See supra* Section II.A.1 (citing *Halliburton II*, at 280). Evidence that relevant analyst reports issued during a proposed class period did *not* reflect alleged fraudulent misrepresentations about a security is considered squarely relevant—if not dispositive—to the price impact analysis. *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 104 (2d Cir. 2023) (refusing to certify class in part because *Dr. Starks's* expert report showed that no analyst report throughout the Class Period referenced

plaintiff's alleged misrepresentation, such that any link between the alleged misrepresentation and price impact was "sever[ed]"); *see also Monroe Cnty. Employees' Ret. Sys. v. S. Co*., 332 F.R.D. 370, 396 (N.D. Ga. 2019) ("[T]he existence of . . . analyst commentary highlighting the negative news is, of course . . . evidence of price impact." (internal quotations omitted)).

Accordingly, Dr. Starks's testimony is relevant and helpful under Rule 702.

### 3. Reliability

The remainder of Plaintiffs' objections to Dr. Starks's proposed testimony relate to reliability. All are without merit.

Plaintiffs first argue that Dr. Starks's opinion is "based exclusively on her subjective analysis of analyst reports" rather than any "scientific principles." ECF No. 139 at PageID.15091. But Dr. Starks employed qualitative content analysis when she synthesized all relevant Rocket analyst reports, and drew conclusions from these reports based on her education and experience in financial economics and investor influence.[18] ECF No. 139-2 at PageID.15186–87, 15191–92; *see also* ECF No. 120-3 at PageID.9287, n. 25, PageID.9288, n. 28, PageID.9295, n. 52. Although Plaintiffs describe this methodology as nothing more than a "look to see" approach, *see* ECF No. 139 at PageID.15097, this Court recognizes that content analysis is "not junk science" and is "generally reliable" despite some subjectivity. *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 570, 574 (E.D. Mich. 2022); *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 90 (S.D.N.Y. 2015) (rejecting *Daubert* challenge that expert's review of analyst

---

[18] Although Plaintiffs challenge Dr. Starks for employing an entirely subjective "look to see" approach to her review of analyst reports, it is notable that *Plaintiffs'* proposed expert—Chad Coffman—employed the very same approach to *his* review of relevant Rocket analyst reports during the Class Period, which he concluded were "significant" and indicative of an efficient trading market. *See* ECF No. 111-2 at PageID.8635.

reports was "entirely subjective" concluding that, although such analysis is "necessarily subjective, that does not mean [the] opinion is speculative or without methodological constraints").

Second, Plaintiffs argue Dr. Starks unreliably and impermissibly "cherry-picked" relevant data by reviewing only analyst reports and excluding other, potentially contradictory, information. ECF No. 139 at PageID.15092, 15106. This argument is misplaced. True, experts cannot "cherry-pick" only favorable data to review. *United States v. Lang*, 717 F. App'x 523, 536 (6th Cir. 2017). But, at the same time, experts are not expected to review "*all* the facts and data" that may hypothetically relate to their opinions. *Id.* (emphasis in original). Dr. Starks appropriately towed this line. Dr. Starks thoroughly explained why she reviewed analyst reports instead of other sources of market information. ECF No. 120-3 at PageID.9287–88 (explaining that analysts are heavily regulated, have expertise in specific industries and access to important corporate valuation information, and that their reports are considered the "prime source of fundamental information about a company" which are heavily relied on by large-scale institutional investors). Had Dr. Starks only considered *certain* analyst reports, Plaintiffs' cherry-picking concern may have merit. But Dr. Starks did not limit her review to only those analyst reports she believed would be favorable—she instead considered *every* analyst report issued about Rocket stock throughout the Class Period. *Id.* at PageID.9291. To the extent Plaintiffs argue Dr. Starks should have considered *additional, non-analyst* information like "articles published on well-known investment websites" and "comments . . . on YouTube," ECF No. 139 at PageID.15102, that argument concerns the weight of Dr. Starks's testimony, not its admissibility.[19]

---

[19] Plaintiffs cite a string of articles which reference Jay Farner's February 26, 2021 statement Rocket's business would not "really" be impacted by rising interests rates. ECF No. 139 at PageID.15102–105. But it is entirely unclear how these articles contradict—or even undermine— Dr. Starks's conclusion that Farner's alleged misrepresentations had no *price impact.*

Third, Plaintiffs recite the *Daubert* factors and argue Dr. Starks's opinion is unreliable because her technique is not testable, has not been peer-reviewed, has no known error rate, and is not generally accepted in the economic community. ECF No. 139 at PageID.15107–09. But it is well-established that the *Daubert* factors are not a "definitive checklist or test" and should only be applied when they would reasonably measure reliability. *In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 529 (6th Cir. 2008) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993)); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (noting the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the issue, the expert's particular expertise, and the subject of his testimony"); *United States v. LaVictor*, 848 F.3d 428, 443 (6th Cir. 2017) ("[T]he district court is not bound by any explicit test when determining reliability). In this case, peer-review, error rate, testability, and scientific acceptance are inapposite to assess the reliability of Dr. Starks's review of sell-side analyst reports. Yet, this Court is satisfied that Dr. Starks's opinions are reliable. As discussed, qualitative content analysis is generally considered reliable, and this Court is satisfied that Dr. Starks reliably applied this methodology to the facts of this case. *See Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 571 (E.D. Mich. 2022) (collecting cases and holding that an expert's qualitative content analysis was reliable despite a lack of empirical analysis or grounding in the "scientific method").

Plaintiffs then assert three additional, unsupported arguments, citing "core deficiencies" in Dr. Starks's review: (1) Dr. Starks presumes that sell-side analysts "are exhaustive in their reporting" of important market information such that reporting is a reliable and comprehensive reflection of how investors interpret and understand information released by a company, ECF No. 139 at PageID.15110; (2) analyst reports cannot accurately measure impact because "contemporaneous commentary about a lie cannot measure that lie's significance," *id.* at

PageID.15113; and (3) analysts may be biased by their relationships with management, such that their reports may not be entirely accurate or inclusive. *Id.* All three arguments go to the *accuracy* of Dr. Starks's proposed expert testimony, not its *admissibility*. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (rejecting argument which "fundamentally confuse[d]" the accuracy of a proposed expert's opinion with its reliability); *United States v. Ramer*, 883 F.3d 659, 680 (6th Cir. 2018) (noting that, so long as an expert's testimony is based on sufficient facts and data and is free from speculation, "any remaining challenges merely go to . . . weight, as opposed to . . . admissibility").

For these reasons, Plaintiffs' motion to exclude the expert testimony of Dr. Laura Starks, ECF Nos. 138 (sealed); 139, will be denied.

### D. Plaintiffs' Motion to Exclude Dr. Mark Garmaise's Testimony

Plaintiffs next seek to exclude Dr. Garmaise's proposed expert testimony for two reasons. ECF No. 131. First, Plaintiffs argue Dr. Garmaise is not qualified to testify as an expert on "Section 10(b) damages methodologies." *Id.* at PageID.11567–69 (emphasis omitted). Second, Plaintiffs argue Dr. Garmaise's testimony is not "relevant" or "helpful" to the Court's class certification decision. *Id.* at PageID.1158–67. Both arguments are without merit.

### 1. Qualifications

In short, Dr. Garmaise concludes that Coffman's proposed out-of-pocket damages methodology does not sufficiently account for "the changing mix of information (*e.g.*, macroeconomic conditions and expectations, mortgage market landscape, etc.) or the potential value impact of this information, which likely differed throughout the . . .Class Period." ECF No. 120-4 at PageID.9401 (emphasis in original). Dr. Garmaise is more than qualified to render this testimony based on his knowledge, training, and education. He has a Ph.D. in finance and has taught undergraduate finance and venture capital classes for over 25 years. ECF No. 120-4 at

PageID.9437. Indeed, he specifically teaches classes on "valuation" or "the effect of information on stock prices." ECF No. 131-2 at PageID.11607. He has published twenty peer-reviewed articles on topics such as financial market theory, security design, and—relevant to his proposed expert opinion—security risk and mortgage lending. *See* 120-4 at PageID.9437–38.

Despite these qualifications, Plaintiffs argue Dr. Garmaise is unqualified to testify about damages methodologies because he has not developed a damages methodology, and instead only contests Coffman's methodology. ECF No. 131 at PageID.11568. But this distinction is without difference. *See Counts v. Gen. Motors*, LLC, 606 F. Supp. 3d 547, 588 (E.D. Mich. 2022) (noting experts may properly offer "rebuttal opinions highlighting the flaws in and limitations of" other experts' work). Plaintiffs then argue that Dr. Garmaise cannot offer expert testimony about Section 10(b) damages because he is "not a legal expert" nor an attorney. ECF No. 131 at PageID.11568. But an expert does not need a law degree to opine about relevant scientific and technical circumstances that may impact a factfinder's damages calculation. Indeed, by Plaintiffs' flawed logic, their own expert would be similarly unqualified to testify about class damages calculations as Chad Coffman is not a legal expert or an attorney, either. *See* ECF No. 111-2 at PageID.8677.

At bottom, Defendants have shown that Dr. Garmaise is qualified, based on his knowledge, experience, and education, to testify as an expert on how shifting market perceptions of Rocket stock throughout the Class Period render artificial inflation—a necessary variable in Plaintiffs' proposed class-wide damages methodology—difficult to quantify. *See* FED. R. EVID. 702.

## 2. Relevancy

The next issue is whether this testimony would help the Court determine whether the proposed Class should be certified. *See* FED. R. EVID. 702(a). As Plaintiffs put it, this dispute "boils

down to whether Plaintiffs or Defendants correctly interpret the requirements at the class certification stage, regarding damages." ECF No. 156 at PageID.16361.

Plaintiffs contend that—to satisfy Rule 23(b)(3)'s predominance requirement, they need not provide "a detailed account of how inflation will be measured" to obtain class certification, so long as they explain, "at a high level," that a specific damages theory or method *can* be implemented common to the Class as a whole. ECF No. 131 at PageID.11559, 1161. Thus, Plaintiffs maintain (1) that Coffman's "out-of-pocket" proposal—under which damages are "equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of the sale," ECF No. 111-2 at PageID.8655–56—is sufficient, so (2) Dr. Garmaise's testimony—explaining how inflation will be difficult to calculate—does not make class certification any more or less likely. ECF No. 131 at PageID.11563–67, 11559 ("Because Coffman does not purport to explain the details of how inflation should be measured, Garmaise cannot add anything to the Court's analysis by commenting on potential matters to be considered when devising a method to measure inflation."). Defendants, on the other hand, cite the 2013 Supreme Court decision *Comcast Corp. v. Behrend* and contend that—to obtain certification—Plaintiffs must show "that 'damages are capable of measurement on a classwide basis' using a methodology" consistent with their theory of liability. ECF No. 151 at PageID.15845 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) (emphasis added)). So, Defendants argue that Dr. Garmaise's proposed expert testimony is relevant and helpful because it highlights several ways in which Plaintiffs have failed to meet their necessary predominance proofs. *Id.*

Under Rule 23(b)(3), Plaintiffs must prove—at the class certification stage—that questions of law or fact common to the proposed Class members predominate over any questions affecting only individual members. FED. R. CIV. P. 23(b)(3). In *Comcast Corp. v. Behrend*, the Supreme

Court clarified two important points about how this predominance requirement intersects with damages. First*, the Court reiterated that, to satisfy predominance, plaintiffs must establish that damages are "*capable* of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Second, the Court held that courts must conduct a "rigorous analysis" to ensure that a plaintiff's proposed methodology is *consistent* with their theory of liability. *Id.* at 35 (2013). This latter point was central to the Court's holding, which reversed class certification because the plaintiff—seeking to certify a proposed class alleging antitrust violations—proposed a damages model that assumed the validity of four different theories of antitrust liability when three of these theories were expressly rejected by the district court. *Id.* at 36–37 (noting plaintiff's methodology "might have been sound, and might have produced commonality of damages, if all four of those alleged [theories] remained in the case.").

Both Parties selectively interpret *Comcast*—Plaintiffs focus on its *consistency* holding while Defendants focus on its *capability* holding. But neither holding is mutually exclusive. To Plaintiffs' point, they need not—at the class certification stage—show "exact[ly]" how damages will be calculated if the proposed Class succeeds at trial, so long as their proposed model is consistent with their theory of liability. *Id.* at 35. But, to Defendants' point, Plaintiffs must show some evidence that their proposed model is "capable of measurement." *Id.* at 34, 37; *see also Speerly v. Gen. Motors, LLC,* 343 F.R.D. 493, 523–24 (E.D. Mich. 2023), *aff'd*, No. 23-1940, 2024 WL 3964115 (6th Cir. Aug. 28, 2024) (noting, at the class certification stage, plaintiffs need only show that damages can "feasibly and efficiently be calculated once the common liability questions are adjudicated." (quoting *Leyva v. Medline Indus. Inc*., 716 F.3d 510, 514 (9th Cir. 2013))).

Accordingly, Dr. Garmaise's testimony is relevant under Federal Rule of Evidence 702. As explained, Rule 702's relevancy—or "helpfulness"—requirement "has been interpreted to

mean that the scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research . . . being offered and the disputed . . . issue[] in the case." *Pride v. BIC Corp*., 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 592 (1993)). Dr. Garmaise's reliable scientific testimony sufficiently connects to the disputed issue of class certification by rebutting Plaintiffs proposed class-wide damages model and showing that one part of the model—artificial inflation—is less likely to be "feasibly and efficiently" calculated. *See Speerly*, 343 F.R.D. at 524. Although Dr. Garmaise's opinion may not outweigh Coffman's contrary conclusion at the class certification stage, his opinion is nevertheless relevant to the class certification question. *See United States v. Anderson*, 67 F.4th 755, 768 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 552, 217 L. Ed. 2d 294 (2024) (noting disputes about accuracy of proposed expert testimony are matters of weight, not admissibility). For these reasons, Plaintiffs' Motion to Exclude, ECF No. 131, will be denied.

### E. Defendants' Motion to Exclude Chad Coffman's "Rebuttal" Testimony

The last motion considered in this Opinion and Order is not a motion to exclude expert testimony under *Daubert*, but rather a motion to *strike* a proposed rebuttal report for failure to comply with this Court's Scheduling Order and the Federal Rules of Civil Procedure. On March 8, 2024, Plaintiffs filed Chad Coffman's Expert Rebuttal Report, ECF No. 135-2, as an attachment to their reply in support of class certification, ECF No. 134. On March 21, 2024, Defendants filed a motion to strike this "rebuttal" report as improper. ECF No. 150.

Defendants argue that Coffman's rebuttal report is "unauthorized" by this Court's Scheduling Order. *Id.* at PageID.15690–91. Not so. In February 2024, this Court granted Plaintiffs leave to file an amended complaint and a renewed motion for class certification, such that Plaintiffs could add SoCal as a named Plaintiff and a proposed Subclass representative, respectively. ECF

No. 107. In so doing, this Court adjourned the operative Scheduling Order and expressly directed the Parties to file "rebuttal expert reports" by April 29, 2024. *Id.* at PageID.7494. Based on this unambiguous deadline, Coffman's rebuttal report was authorized and timely.

Defendants respond that this Court's April 29, 2024 rebuttal expert deadline "plainly referr[ed]" to *merits*-based expert testimony to be used throughout the Parties' case in chief rather than expert testimony to support *class certification*. ECF No. 159 at PageID.17708. But no such condition appears anywhere in this Court's Scheduling Order. *See* ECF No. 107 at PageID.7494. So how do Defendants read this condition into the Scheduling Order? They make two points: (1) the April 29, 2024 deadline for rebuttal expert testimony falls *after* the Parties' deadlines to brief class certification, and (2) the Parties' prior stipulations referenced two "separate tracks" for expert discovery—one relative to class certification and one relative to merits. ECF No. 159 at PageID.17708. Neither point is persuasive. True, the Parties agreed, in *May 2023*, that expert discovery would proceed on two separate tracks. ECF No. 69 at PageID.2381. Indeed, the Parties have stuck to these separate tracks since, and recently submitted a suite of additional expert reports related to the merits, simultaneous to their summary judgment briefing.[20] But the Parties' 2023 "separate tracks" agreement—just like this Court's 2024 Scheduling Order—provided *one* deadline for rebuttal expert reports, regardless of whether the rebuttal was on the "certification" track or "merits" track. *Compare* ECF No. 69 at PageID.2383 *with* ECF No. 107 at PageID.7494. Indeed, although the deadline to file rebuttal expert reports was scheduled after Plaintiffs' motion for class certification would be fully briefed, so too were the Parties' discovery and general expert

---

[20] Similar to the class certification expert reports addressed in this Opinion and Order, several *Daubert* challenges have been filed related to the Parties' "merits" expert reports. *See* ECF Nos. 169 (sealed); 170; 172 (sealed); 173; 175 (sealed); 176; 177; 180 (sealed); 181; 182 (sealed); 184 (sealed); 185; 186; 189.

disclosure deadlines. *See* ECF No. 107 at PageID.7494 (scheduling expert disclosure deadline on March 27, 2029—two weeks *after* Plaintiffs' renewed motion for class certification would be fully briefed). By Defendants' logic, *all* expert reports related to class certification would be "unauthorized."

Even if this Court's Scheduling Order was ambiguous or silent, Coffman's rebuttal report would still be authorized under the Federal Rules of Civil Procedure. Experts are entitled to file rebuttal reports under Civil Rule 26(a)(2)(D)(ii), so long as the rebuttal report "is intended solely to contradict or rebut the evidence on the same subject matter identified" by an opposing expert and is filed "within 30 days" of the opposing expert's report. FED. R. CIV. P. 26(a)(2)(D)(ii); *Hennigan v. Gen. Elec. Co*., No. 09-11912, 2014 WL 4415954, at *1 (E.D. Mich. Mar. 25, 2014), *report and recommendation adopted*, No. 09-11912, 2014 WL 4411675 (E.D. Mich. Sept. 8, 2014); *Cason-Merenda v. Detroit Med. Ctr*., No. 06-15601, 2010 WL 1286410, at *1 (E.D. Mich. Mar. 31, 2010). Defendants do not dispute that Coffman's rebuttal report—filed eleven days after the proposed Defense experts filed their reports—is timely under Rule 26. *See generally* ECF No. 150. Instead, Defendants argue that Coffman's rebuttal report is, "in effect, an entirely new expert report" rather than "a true rebuttal report." ECF No. 150 at PageID.15686, 15691.

But this grossly mischaracterizes Coffman's rebuttal report. Coffman limited his rebuttal report to explaining how his initial market efficiency and damages conclusions are not undermined by Dr. Stulz's and Dr. Garmaise's respective conclusions to the contrary. The entirety of Coffman's rebuttal report can be summarized as follows:

1. Coffman responds to Dr. Stulz's meme-stock conclusion by placing March 2 and 3, 2021 in broader context throughout the Class Period—explaining how the conceded spike in social media mentions, price, and other metrics on these two dates did not impact the remainder of the two-month Class Period and thus did not "disturb" Coffman's market efficiency conclusion. ECF No. 135-2 at

PageID.13346–49, 13356 ("In summary, the events of March 2 and 3 do not imply market inefficiency[.]")

2.  Coffman responds to Dr. Stulz's criticisms of Coffman's event study by explaining (A) "even if one were to limit the analysis" from Coffman's 2.5-year Analysis Period to the proposed 2-month Class Period, and (B) "even if one included the [March 2 and 3, 2021] outliers in the analysis," Coffman's conclusion—that the price of Rocket stock historically responded to Rocket disclosures—remains sound. *Id.* at PageID.13360–66.

3.  Coffman responded to Dr. Stulz's criticisms of Coffman's "public float" analysis by highlighting analyst reports which supported his initial conclusion that Rocket's public float was between 97% and 100%. *Id.* at PageID.13371.

4.  Coffman responded to Dr. Garmaise's conclusions that artificial inflation would be difficult to calculate by explaining how, in Coffman's view, the proposed out-of-pocket view can account for changing macroeconomic conditions, United's ultimatum, and Rocket's purported meme-stock status. *Id.* at PageID.13374–83.

Indeed, Defendants' critique of Coffman's rebuttal report is all form and no substance. Defendants conclusively claim that the rebuttal report "ambush[es]" them with "entirely new expert opinion[s]" ECF No. 150 at PageID.15685. But what "new" opinions did Coffman proffer? Defendants do not say.

At bottom, Chad Coffman's rebuttal report was timely, authorized, and proper. Defendants' motion to strike will be denied.[21]

---

[21] Defendants alternatively seek leave to file sur-rebuttal expert reports from Drs. Stulz and Garmaise which would, in effect, *disagree* with Coffman's *disagreement* with Drs. Stulz and Garmaise's *disagreement* with Coffman's initial report. ECF No. 150 at PageID.15693–94; *see also* ECF Nos. 150-2; 150-3. The decision of whether to allow a party to present a sur-rebuttal is generally committed to the trial court's discretion. *Maker's Mark Distillery, Inc. v. Spalding Grp., Inc.*, No. 319CV00014GNSLLK, 2022 WL 17824427, at *11 (W.D. Ky. Dec. 20, 2022), *clarified on denial of reconsideration sub nom. Maker's Mark Distillery, PBC v. Spalding Grp., Inc.*, No. 319CV00014GNSLLK, 2024 WL 947538 (W.D. Ky. Mar. 5, 2024). Sur-rebuttal expert reports— unlike rebuttal reports—are not contemplated by this Court's Scheduling Order, ECF No. 107 at PageID.7494, nor the Federal Civil Rules. *See* FED. R. CIV. P. 26. Defendants alternative request for leave will thus be denied. *See Melnick v. TAMKO Bldg. Prod. LLC*, No. 219CV02630JARKGG, 2023 WL 2664131, at *4 (D. Kan. Mar. 28, 2023) (denying defendant's motion for leave to file sur-rebuttal expert reports because, although "affirmative and rebuttal

## IV. Conclusion

Accordingly, it is **ORDERED** that Defendants' Motion to Exclude the Expert Testimony of Chad Coffman, ECF No. 121, is **DENIED.**

Further, it is **ORDERED** that Plaintiffs' Motion to Exclude the Expert Testimony of Dr. Mark Garmaise, ECF No. 131, is **DENIED.**

Further, it is **ORDERED** that Plaintiffs' Motion to Exclude the Expert Testimony of Dr. René Stulz, ECF No. 132, is **DENIED.**

Further, it is **ORDERED** that Plaintiffs' Motion to Exclude the Expert Testimony of Dr. Laura Starks, ECF No. 138 (sealed) and ECF No. 139, is **DENIED.**

Further, it is **ORDERED** that Defendants' Motion to Strike Chad Coffman's Rebuttal Report, ECF No. 150, is **DENIED.**

**This is not a final order and does not close the above-captioned case.**

Dated: September 30, 2024                    s/Thomas L. Ludington
                                             THOMAS L. LUDINGTON
                                             United States District Judge

---

expert disclosures are permitted under" Rule 26, this rule "does not . . . contemplate . . . sur-rebuttal expert disclosures . . . .[n]or does the Scheduling Order").